# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

---

AMERICAN FAMILY MUTUAL
INSURANCE COMPANY, ET AL.,

              Plaintiffs,

     vs.

ELECTROLUX HOME PRODUCTS, INC.,

              Defendant.

Case No. 3:11-CV-00678(SLC)

---

**BRIEF IN SUPPORT OF DEFENDANT ELECTROLUX HOME PRODUCTS, INC.'S MOTION TO PRECLUDE TESTIMONY OF W. JOSEPH FALLOWS, MICHAEL R. STODDARD, JR. AND DR. ERIC J. BOELHOUWER**

---

# Table of Contents

I.      INTRODUCTION ............................................................................................. 1

II.     LEGAL STANDARDS ...................................................................................... 3

III.    ARGUMENT ..................................................................................................... 4

      **A.**    The Court Should Exclude The Testimony Of Mr. Fallows As It
            Is Unreliable And Irrelevant. .............................................................. 4

            1.    Mr. Fallows's Admission That He Has No Knowledge Of
                 These Cases Means There Is No "Fit" Between His
                 Opinions And The Facts. ...................................................... 4

            2.    Mr. Fallows's Opinions Are Unreliable Because They Are
                 Not Based On Any Discernible Methodology. ..................... 5

            3.    Mr. Fallows Admits He Is Not Qualified To Offer His
                 Ethics Opinions, Which Are Inadmissible In Any Event. ................. 10

      **B.**    Mr. Stoddard Is Not Qualified To Offer His Proffered Opinions,
            Which Would Be Inadmissible In Any Event. ............................................. 12

            1.    Mr. Stoddard Is Not Qualified To Offer Opinions
                 Regarding Engineering, Product Design, Plastics, Or
                 Warnings As He Has No Training In These Areas........................... 13

            2.    Mr. Stoddard's Opinion That The Electrolux Design
                 Causes Excessive Lint Accumulation Is Unreliable And Is
                 Not Fit To The Facts Of These Cases................................... 14

            3.    Mr. Stoddard's Testimony Regarding The Plastics Used In
                 The Subject Dryers Is Unreliable And Does Not Meet
                 *Daubert*'s Fit Requirement. ................................................. 18

            4.    The Court Should Exclude Mr. Stoddard's Speculative,
                 Unsupported Opinions Regarding Electrolux's Warnings. .............. 19

      **C.**    Dr. Boelhouwer's Opinions Regarding Electrolux's Warnings
            Are Inadmissible. .......................................................................... 20

            1.    Dr. Boelhouwer's *Ipse Dixit* Opinion That Electrolux's
                 Warnings Are Unlikely To Be Followed Does Not Meet
                 *Daubert*'s Fit Requirement. ................................................. 20

2.    Dr. Boelhouwer's Opinions Regarding His Proposed "Feedback System" Are Inadmissible Because He Is Not Qualified To Render Them And They Are Not Based On Any Methodology. ........................................................................... 23

3.    Dr. Boelhouwer's Opinion Regarding Warnings Related To Foil Duct Would Not Aid The Trier Of Fact ............................... 25

4.    Dr. Boelhouwer's Opinion Regarding "Risk of Fire" Warnings Are Unsupported by Any Authority Or Analysis And Do Not Meet The "Fit" Requirement ........................................ 25

V.    CONCLUSION ........................................................................................ 27

# Table of Authorities

**Cases**

*Chapman v. Maytag Corp.*, 297 F.3d 682 (7th Cir. 2002)................................................ 6, 9, 17, 19

*Cummins v. Lyle Indus.*, 93 F.3d 362 (7th Cir. 1996).............................................................. 6, 19

*Donegal Mutual Insur. Co. a/s/o Vanessa Schantz v. Electrolux North America*, Case No. 1:08-
    cv-02171-YK (Dec. 22, 2010 M.D. Pa.)...................................................................... 13

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997) ...................................................... 3, 23, 25

*In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531 (S.D.N.Y. 2004) .............................. 11, 12

*Kumho Tire Co., v. Carmichael*, 526 U.S. 137 (1999) ........................................... 3, 10

*Lapsley v. Xtek, Inc.*, 689 F.3d 802 (7th Cir. 2012) .................................................. 5, 15

**Statutes**

Fed. R. Evid. 702 ................................................................................................. passim

I.      **INTRODUCTION**

Plaintiffs have designated three experts in these matters who would offer opinion testimony regarding alleged design defects in Electrolux dryers and purported warning inadequacies.  Yet these experts offer nothing more than broad, conclusory opinions unsupported by relevant facts, data, or authority.  Not one of them applies a reliable methodology in reaching his opinions—each merely leaps from his speculative hypotheses to made-for-litigation conclusions without establishing any scientific grounds in support.  None of the three challenged experts offers testimony that meets the requirements of *Daubert* and Federal Rule of Evidence 702.  Their testimony should accordingly be excluded in its entirety.

*W. Joseph Fallows.*[1]  Plaintiffs offer Mr. Fallows as an expert in the use of plastic components in the Electrolux dryers that are the subject this litigation.  Mr. Fallows opines that Electrolux should have used plastics treated with fire-retardants for two of the dryers' components rather than the non-fire-retardant plastics used.  Yet Mr. Fallows bases this opinion on nothing more than his assumption that his preferred plastics—which perform differently in laboratory tests in which the plastics are exposed to a direct flame for no more than sixty seconds—are safer in *any* fire situation.  Mr. Fallows, who did not review any of the actual fires, admits he has no evidence that the use of his preferred plastic would have made any difference whatsoever in the real-world conditions of these cases, where the plastics are exposed to direct flame for much longer periods of time due to the presence of multiple alternative fuel sources.  Mr. Fallows applied no independently-verifiable methodology, a minimum requirement under *Daubert* and its progeny, to support his unsupported conjecture that Electrolux's dryers were defective because of the plastics used.  Mr. Fallows's opinion that use of a different plastic would have made Electrolux's dryers safer in any fire is thus pure conjecture and inadmissible

---

[1] Mr. Fallows's report was coauthored by Sam Miller.  Plaintiffs designated both Mr. Fallows and Mr. Miller in their expert disclosures in these matters, but have since stated that only Mr. Fallows's testimony will be presented at trial.  *See* Ex. 1 (April 4, 2014 Email from D. Boerigter to R. Biernat).  Accordingly, Electrolux will not address in this motion Mr. Miller's qualifications to render expert opinions in these matters, but reserves its right to do so should the Court grant any subsequent request to allow Mr. Miller to testify at trial.

under *Daubert*.   And because he has not reviewed any of the actual cases, there is no "fit" between his conclusions and the facts here.   For these reasons, his testimony should be excluded.

**Michael R. Stoddard, Jr.**[2]   Mr. Stoddard would offer opinion testimony regarding his theory that the subject dryers' design allows excessive lint to accumulate behind the dryer drum near the heat source, an alleged defect arising from Electrolux's use of plastic components, and the warnings affixed to and accompanying the subject dryers.   Mr. Stoddard is not qualified, however, to render any of these opinions as he has no training in engineering, product design, plastics, or warnings.   Moreover, none of his opinions are supported by sufficient data, testing, or analysis to meet the reliability requirements of Rule 702.   And Mr. Stoddard has failed to tie his opinions to the facts of these cases in any meaningful way.   Mr. Stoddard's testimony is therefore inadmissible and should be excluded in its entirety.

**Dr. Eric J. Boelhouwer**.   Dr. Boelhouwer, Plaintiffs' designated warnings expert, offers a varying subset of four generic opinions in each of the eight cases here.   His opinions range from a bald assertion that users likely will not comply with Electrolux's warnings regarding required maintenance to an unsupported contention that Electrolux was required to implement (and could effectively have implemented) an ill-defined "feedback system" that would alert users to the danger of accumulated lint—the very same warning Dr. Boelhouwer maintains users will ignore.   Dr. Boelhouwer did not apply any discernible methodology in arriving at his opinions and did not "fit" any of his opinions to the facts of the eight cases.   His opinions are accordingly unreliable and would not assist the trier of fact to understand the evidence or to determine a fact in issue.   For these reasons, his opinions are inadmissible and should be excluded.

---

[2]Mr. Stoddard's report was coauthored by Ronald E. Parsons.  Plaintiffs designated both Mr. Stoddard and Mr. Parson's in their expert disclosures in these matters, but have since stated that only Mr. Stoddard's testimony will be presented at trial.  *See* Ex. 1 (April 4, 2014 Email from D. Boerigter to R. Biernat).  Accordingly, Electrolux will not address in this motion Mr. Parsons's qualifications to render expert opinions in these matters, but reserves its right to do so should the Court grant any subsequent request to allow Mr. Parsons to testify at trial.

II.    **LEGAL STANDARDS**

Under Rule 702, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579, 589 (1993) ("*Daubert I*"); see also *Kumho Tire Co., v. Carmichael*, 526 U.S. 137, 149 (1999) (extending Daubert to all expert testimony).  Plaintiffs bear the burden of proving, by a preponderance of the evidence, the admissibility of their experts' testimony.  *See Daubert I*, 509 U.S. at 592-93.  The testimony of the expert, who must be "qualified as an expert by knowledge, skill, experience, training, or education," is only relevant if it will "assist the trier of fact to understand the evidence or to determine a fact in issue."  *Daubert I*, 509 U.S. at 588, 591. Another aspect of relevancy is the concept of "fit"—i.e., whether the proffered testimony "is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute."  *Id*. (citation omitted).

To be deemed reliable, the expert's testimony "must be supported by appropriate validation—i.e., 'good grounds,'"—not mere "subjective belief or unsupported speculation." *Daubert I*, 509 U.S. at 589-90.   "[W]here such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question, . . . the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'"  *Kumho*, 526 U.S. at 149 (citing *Daubert I*, 509 U.S. at 592).  "[O]pinion evidence that is connected to existing data only by the *ipse dixit* of the expert" is likewise inadmissible. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see also* Fed. R. Evid. 702 advisory committee notes (2000 amendments) ("The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 43 F.3d 1311, 1319 (9th Cir. 1995) ("*Daubert II*")).

III.    <u>ARGUMENT</u>

    A.    **The Court Should Exclude The Testimony Of Mr. Fallows As It Is Unreliable And Irrelevant.**

Mr. Fallows's testimony is inadmissible under *Daubert* and Rule 702 for three reasons. *First*, his failure to review the facts of any of the cases here means that he cannot say that his proposed modification would have had any impact on their outcomes.   Accordingly, his proffered testimony, which is not tied to the facts in any way, is entirely irrelevant.  *Second*, Mr. Fallows did not apply any independently-verifiable methodology, rendering his opinions, which are nothing more than unsupported, speculative conclusions, unreliable.  *Third*, Mr. Fallows is not qualified to opine that Electrolux disregarded engineering standards and consumer safety, and his improperly inflammatory opinions are wholly unsupported in any event.

    1.    **Mr. Fallows's Admission That He Has No Knowledge Of These Cases Means There Is No "Fit" Between His Opinions And The Facts.**

Mr. Fallows does not attempt to tie his conclusions about what plastics Electrolux should have used to the specific circumstances of any of the eight incidents here.  *See generally* Ex. 2 (Fallows Rep.).  Mr. Fallows does not mention a single one of the eight cases in his report, let alone apply his theory to the specific facts of any of those cases to show how the use of a different plastic would have made any difference in the outcome.  *See generally id*.  Indeed, Mr. Fallows admits that he has not reviewed the facts of any of the eight cases, *see* Ex. 3 (Transcript of Deposition of W. Joseph Fallows ("Fallows Dep.") at 34:17-34:24, and cannot say whether the use of his preferred plastics in any of the cases would have led to a different outcome, going so far as to state, "***I have no knowledge of any of the cases.***"  *Id*. at 72:7-72:11 (emphasis added).  When asked if he had any "opinion about whether any of the damage sustained could have been mitigated if a different plastic was used in [the subject] dryers," he testified, "I don't, because I don't know what the damage is."  *See id*. at 72:7-72:16.  He cannot say "within a reasonable degree of scientific certainty that the fire in the Blake case would have been contained in the cabinet of the dryer had a [plastic treated with fire retardant] been used," nor can

he make this statement for any of the other seven cases. *See id.* at 107:25-108:23. Accordingly, there is no "fit" between his proffered opinions and the facts here. Consequently, Mr. Fallows's opinions do not meet Rule 702's relevancy requirement and should therefore be excluded. *Daubert I*, 590 U.S. at 591.

> **2.  Mr. Fallows's Opinions Are Unreliable Because They Are Not Based On Any Discernible Methodology.**

All of Mr. Fallows's proffered testimony is grounded on his opinion that Electrolux should have used 5VA- or 5VB-rated plastics (i.e., plastics treated with fire retardant) rather than HB-rated plastics for the air duct and blower housing of its ball-hitch model dryers, components located in the front of the dryer cabinet. *See* Ex. 2 (Fallows Rep.) at 10. Yet he does not apply any scientifically-valid methodology to support the leap from his observation that his preferred plastics perform differently in short-duration flame tests to his conclusion that the subject dryers were defectively designed because they did not use 5V plastics. He implicitly assumes, improperly and without any basis, that the result of the use of different plastics by Electrolux would have been that none of the subject fires would have occurred, or that any fire that occurred would have been less severe.

To be admissible under Rule 702, an expert's testimony must be based on "scientific knowledge," meaning that it is "ground[ed] in the methods and procedures of science" and not based on mere "subjective belief or unsupported speculation." *Daubert I*, 509 U.S. at 589-90. In evaluating whether a particular methodology is scientifically valid, the court should consider factors such as "whether or not the theory or technique has been (1) tested, (2) subjected to peer review and publication, (3) analyzed for known or potential error rate, and/or is (4) generally accepted within the specific scientific field." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 810 (7th Cir. 2012) (citing *Daubert I*, 509 U.S. at 593-94). "A very significant Daubert factor is whether the proffered scientific theory has been subjected to the scientific method." *Chapman v. Maytag Corp.*, 297 F.3d 682, 688 (7th Cir. 2002). Accordingly, the Seventh Circuit has repeatedly recognized "the importance of testing in alternative design cases," *Cummins v. Lyle Indus.*, 93

F.3d 362, 368 (7th Cir. 1996) (analyzing cases), and excluded experts who do not support their opinions with sufficient testing. *Chapman*, 297 F.3d at 688 (excluding expert who "did not conduct any scientific tests or experiments in order to arrive at his conclusions"). In such circumstances, "the absence of any testing indicates that [the expert's] proffered opinions cannot fairly be characterized as scientific knowledge. *Id.*

As in *Chapman*, Mr. Fallows's opinions are not supported by any relevant testing or analysis and are therefore inadmissible. *Id.* As Mr. Fallows describes in his report, the HB, 5VA, and 5VB ratings are derived from the UL 94 Flame Ratings standards. Plastics are rated under the UL 94 standards based on how samples of the plastic perform in laboratory tests in which the sample is supported in a horizontal or vertical position and exposed to a flame applied at a specified angle for a total of twenty to thirty seconds. *See* Ex. 2 (Fallows Rep.) at 5-8. Mr. Fallows purports to rely on these tests and similar testing performed by the Wright Group in which the plastic components were exposed to direct flame for up to 60 seconds. *See* Ex. 3 (Fallows Dep.) at 42:19-44:7.[3] Mr. Fallows also relies on his review of a Wright Group video in which, after creating a fire in an Electrolux dryer, according to Mr. Fallows, "molten plastic seeps out of the right front corner of the Electrolux dryer and continues to burn." Ex. 2 (Fallows Rep.) at 16. Finally, Mr. Fallows purports to rely on the findings of a GE fire containment test, but could not describe the test in any detail at his deposition other than to characterize it as a "fire containment" or "drum fire test" comparing the two types of plastic. *See* Ex. 3 (Fallows Dep.) at 60:16-60:21; *see also id*. at 62:24-63:12 ("We make reference [in our report] to the GE SEE test but we've not described the testing.). Yet Mr. Fallows's admissions, along with his failure to explain logical inconsistencies in his fundamental assumptions, conclusively demonstrate that he has no scientifically-valid basis for his opinions.

---

[3] Mr. Fallows should be precluded from offering any opinions based on testing or analysis performed by the Wright Group as Mr. Stoddard's opinions are inadmissible. *See infra* SectionIII.B. Mr. Fallows cannot independently opine on these matters because he did not replicate the Wright Group's testing or analysis, nor has he offered any basis for concluding that he would be qualified to do so. *See* Ex. 2 (Fallows Rep.) at 12, 16 (discussion of Wright Group testing); *id*. at 20-22 (Fallows CV).

It is undisputed that the plastic components at issue (the air duct and blower housing) are located in the front of the subject dryers' cabinets, while the heat source is located in the rear of the cabinet, behind the drum. Mr. Fallows makes no attempt to explain the illogical and counter-intuitive notion that plastic located in the front of the dryer could stop or reduce the intensity of a fire that, according to Plaintiffs' theory, allegedly starts in the back—particularly when there are myriad alternative fuel sources between these two points, such as accumulated lint in the dryer cabinet (a hazard Plaintiffs' experts acknowledge is present in all manufacturers' dryers) and clothing or other flammable materials in the drum.

And Mr. Fallows's admissions establish that he has no basis for his assumption that the results of the UL 94 or Wright Group tests are in any way relevant to the behavior of the differently-graded plastics in these real-world conditions. He agrees that using 5V plastic would not eliminate the fire risk inherent in all dryers (from lint accumulation resulting from improper maintenance, installation, and/or service), *see* Ex. 3 (Fallows Dep.) at 58:8-58:22, and he could not quantify the extent to which he believes it would mitigate that risk. *See id.* at 59:12-60:10. He admits that his opinion regarding the behavior of the 5V plastic would only apply in a situation "where the flame source is removed from the plastic," *id.* at 73:22-74:14, but he has not reviewed any case reports on how Electrolux, GE, or any other brand of dryer performed in an actual fire, *see id.* at 71:11-71:18, so has no opinion about whether 5V plastic would continue to burn if it came in contact with combustible material such as clothes or lint. *See id.* at 82:7-82:23. Mr. Fallows admits that he is not aware of any testing or research that has subjected 5V plastics to a direct flame for longer than 60 seconds, *see id.* at 105:17-105:20, but nonetheless asserts that the use of fire-retardant plastics would result in the fire being "starved for fuel" and "[a]t the very least, . . . would give a home's occupants more time to get out of the house if they were alerted to the dryer fire." Ex. __ (Fallows Rep. at 12). He offers no basis for this opinion, which does not account for the presence in real-world dryer fires of an abundance of primary fuels such as accumulated lint (common to all dryers) and the drum load, to the extent it is dry or otherwise contaminated by combustibles such as oil or other volatiles. With respect to the GE SEE tests,

Mr. Fallows admits that has no actual data or information regarding whether dryers that passed the GE SEE test on which he purportedly relies had a greater or lesser instance of fire than the Electrolux dryers in any period relevant to this litigation. *See id*. at 80:17-80:21. In fact, he is not aware of any fires involving GE dryers that passed the GE SEE test where the use of 5V-rated plastics actually prevented the fire from escaping the cabinet. *See id*. at 109:11-109:15.

When asked to provide a basis for his leap from the laboratory tests he cites to their applicability to real-world fires, Mr. Fallows testified that he relied on a 1998 report from the Consumer Product Safety Commission that purportedly correlates the UL 94 test result to real world applications. *See* Ex. 2 (Fallows Dep.) at 62:5-62:19. Yet Mr. Fallows was unaware that the UL 94 test itself states that it is not intended to provide correlation with performance under actual service conditions. *See id*. at 115:7-115:10.[4] Moreover, the CPSC report, which Mr.

---

[4] The standard provides, in relevant part:

**1  Scope**

1.1 These requirements cover tests for flammability of plastic materials used for parts in devices and appliances. They are intended to serve as a preliminary indication of their acceptability with respect to flammability for a particular application.

1.2 The methods described in this Standard involve standard size specimens and are intended to be used solely to measure and describe the flammability properties of materials, used in devices and appliances, in response to heat and flame under controlled laboratory conditions. The actual response to heat and flame of materials depends upon the size and form, and also on the end-use of the product using the material. Assessment of other important characteristics in the end-use application includes, but is not limited to, factors such as ease of ignition, burning rate, flame spread, fuel contribution, intensity of burning, and products of combustion.

1.3 The final acceptance of the material is dependent upon its use in complete equipment that conforms with the standards applicable to such equipment. The flammability classification required of a material is dependent upon the equipment or device involved and the particular use of the material. ***The performance level of a material determined by these methods shall not be assumed to correlate with its performance in end-use application.***
                                                    * * *
**4  Significance of Tests**

4.1 Tests conducted on a material under the conditions specified are intended to provide information when: comparing the relative burning characteristics of different materials, or assessing any change in burning characteristics prior to, or during, use. ***This method is not intended to provide correlation with performance under actual service conditions.***

Ex. 4 (UL 94 Tests for Flammability of Plastic Materials for Parts in Devices and Appliances (2003)) at 5, 7 (emphasis added).

Fallows produced at his deposition, does not provide support for the correlation Mr. Fallows makes between the UL 94 rating and performance of a plastic under sustained flame or in a real world fire.   Rather, the document describes the CPSC's study of and recommendations for the flammability requirements of plastic materials used as electrical appliance enclosures.   *See generally* Ex. 17 (CPSC Assessment of Flammability of Plastic Materials Used as Electrical Appliance Enclosures (1998)).   The study references the UL 94 ratings but did not involve any additional testing that subjected any plastics to sustained fire, nor did the authors anywhere state that a correlation can be made between UL 94  flame ratings and performance in sustained fire situations.   *Id.*   Mr. Fallows has not established how this study provides any support for his opinion that the UL 94 tests are relevant to real-world conditions.   Consequently, Mr. Fallows has not shown how the short-duration flame tests on which he relies are in any way relevant to the real question here—namely, how his preferred plastics would perform in a real-world fire.

In sum, Mr. Fallows applies no independently-verifiable methodology that would constitute the requisite "good grounds" for his opinions.   *Daubert I*, 509 U.S. at 589-90.   He simply jumps from the fact that plastics treated with fire retardant might perform better in some respects in short-duration laboratory tests to the conclusion that Electrolux should have used those plastics in its dryers, without establishing that the use of such plastics would make any difference in real-world conditions that have nothing in common with these tests, as the UL 94 standard itself explicitly states.   *See infra* n.4.   "Unsubstantiated testimony, such as this, does not ensure that the expert's opinion has a reliable basis in knowledge and experience of his discipline."   *Chapman*, 297 F.3d at 688   His conclusions are pure conjecture unsupported by "a reliable basis in the knowledge and experience" of his field and are accordingly inadmissible under *Daubert*.   *Kumho*, 526 U.S. at 149 (citing *Daubert I*, 509 U.S. at 592).[5]

---

[5] Because Mr. Fallows has not established that use of a different plastic would have made any difference in any of the cases here, his allegations that Electrolux failed to fully investigate the properties of the various plastics it used and his interpretations of Electrolux's testing and documents, *see* Ex. 2 (Fallows Rep.) at 12-15, even if true, are irrelevant and therefore inadmissible.   *Daubert I*, 509 U.S. at 589 (scientific testimony must be both relevant and reliable).   Similarly, his assertions that Electrolux "failed to adopt" a "safer alternative" used in the design of General Electric dryers manufactured by Electrolux, *see id*. at 13, are entirely unsupported as Mr. Fallows has not

### 3.    Mr. Fallows Admits He Is Not Qualified To Offer His Ethics Opinions, Which Are Inadmissible In Any Event.

Mr. Fallows goes beyond merely opining that Electrolux should have used a different plastic for the components of its dryers, characterizing Electrolux's choice of material as "reckless" and asserting that Electrolux "violated basic engineering standards" and "disregarded basic safety principles" in a way that is antithetical to "engineering ethics."  Ex. 2 (Fallows Rep.) at 16-18.  Mr. Fallows admits, however, that the subject dryers met all of the applicable UL standards—even though those standards are voluntary—and could not point to any applicable engineering standard that Electrolux violated.  *See* Ex. 3 (Fallows Dep.) at 84:14-85:10.  And more importantly, because Mr. Fallows has failed to establish any defect or failure to use a safer alternative, *see supra* Section III.A.2, there is no basis for his asserting any ethical breach here.  Thus, his opinions are unreliable and should be excluded under *Daubert*.  Furthermore, his improper conjuring up of images of grave personal injuries is entirely inappropriate, where, as here, the only allegations are of property damage, not personal injury.  His opinions are therefore inadmissible under Federal Rule of Evidence 403.

Moreover, Mr. Fallows admits that he is unqualified to opine on ethical matters.  He readily admits that he is not an expert on ethics.  *Id*. at 101:12-101:14.  He has no special training in ethics and only looked at the documents regarding engineering ethics cited in his report for the purposes of this litigation and other litigation involving Electrolux.  *Id*. at 86:16-87:20; 98:1-98:8.  And he admitted that his analysis of whether Electrolux violated any ethical codes is based merely on "common sense."  *Id*. at 98:9-99:2.  These admissions establish that he is not any more qualified than a layperson to opine on these issues.  Thus, his testimony is inadmissible on the independent grounds that it will not assist the trier of fact to determine a fact in issue.  *Daubert I*, 509 U.S. at 588.  It would instead "usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying the law to the facts before it." *See, e.g.*,

---

evaluated the performance of the GE dryers under real-world conditions, let alone established that they would have performed better than the subject dryers.  These opinions should therefore be excluded.

*In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 541 (S.D.N.Y. 2004) (internal citations omitted).

Even assuming Mr. Fallows were qualified to opine on these matters, such normative and ethical opinion testimony is inadmissible under Rule 702.  Far from meeting Rule 702's requirements that his testimony be grounded on "scientific, technical, or other specialized knowledge" and the product of reliable methods reasonably applied to the facts of these cases, Mr. Fallows's normative opinions are inherently subjective, unhelpful, and unreliable.  Mr. Fallows asserts that Electrolux knew that the subject dryers did not pass the GE SEE test—a fire containment test—and that flame escaping the dryer constitutes a hazard that poses a risk of injury or death of the consumer from fire.  Ex. 2 (Fallows Rep.) at 13-14.  He then concludes that Electrolux's decision to use HB- rather than 5VA- or 5VB-rated plastics constitutes "a situation where a manufacturer identified a safety hazard that could result in consumer injury or death, determined that the plastic being used was inadequate and also determined that it was feasible to use a different material to guard against the safety hazard, but then decided to use the safer material in some, but not all, of the product models it manufactured."  Ex. 2 (Fallows Rep.) at 18.  Yet, as discussed above, Mr. Fallows provides no evidence that flames would not have escaped the subject dryers had they been modified to pass that test:

> Q.  You though have no evidence or data showing that GE dryers manufactured at that time were any better in containing fires in the real world setting; correct?
>
> A.  That is correct.
>
> * * *
>
> Q. . . . [Y]ou have no evidence that the use of HB plastic in the air duct by Electrolux caused any additional property damage in any dryer -- in any fire compared to any other dryer?
>
> A.  When you say compared to any other dryer, anybody any other manufacturer's dryer?
>
> Q.  Correct[.]
>
> A.  That is correct.

*Id*. at 93:25-94:3;94:14-94:21   Indeed, Plaintiffs' own expert Mr. Stoddard provided several examples of GE clothes dryers involved in fires that escaped the cabinet.  *See, e.g.*, Ex. 5 (Morrison Rep. in McCants) at 81 (discussing examination of an Electrolux-manufactured GE-branded dryer involved in fire that escaped the dryer cabinet and reliance materials provided by Stoddard showing additional GE dryers involved in such fires).  Consequently, Mr. Fallows has no basis to conclude that the risk to the consumer would have been reduced had the subject dryers been composed of plastics that would pass the GE test.

Mr. Fallows's testimony that Electrolux should have made his proposed modifications and breached "engineering ethics" by failing to do are the sort of normative testimony that courts routinely reject.  *See, e.g.*, *In re Rezulin*, 309 F. Supp. 2d at 538 (excluding ethical testimony by "'expert witnesses' whose intended role is more to argue the client's cause from the witness stand than to bring the fact-finder specialized knowledge or expertise that would be helpful in resolving the issues of fact presented by the lawsuit").  Mr. Fallows's normative opinion testimony does not constitute "scientific, technical, or other specialized knowledge" based on "sufficient facts or data" and the product of "reliable principles and methods" reasonably applied to the facts of these cases.  F.R.E. 702.  It would not "assist the trier of fact to understand the evidence or to determine a fact in issue,"  *id*., but would instead "usurp the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying the law to the facts before it." *In re Rezulin*, 309 F. Supp. 2d at 541 (internal citations omitted).  It is inadmissible under Rule 702 and should be excluded.

   **B.      Mr. Stoddard Is Not Qualified To Offer His Proffered Opinions, Which Would Be Inadmissible In Any Event.**

Plaintiffs' expert Mr. Stoddard, of the Wright Group, offers opinion testimony regarding his theory that the subject dryers' design results in excessive lint accumulation near the dryers' heat sources, Electrolux's use of HB-rated plastic, and Electrolux's warnings.  Mr. Stoddard opines that (1) the subject dryers' design is defective because it "inefficiently manages the lint produced during the drying process and allows for lint to accumulate in areas where it is in close

proximity or direct contact with the heat source of the dryer," (2) Electrolux's use of HB rather than 5V plastics constitutes a further defect in the dryers' design, and (3) Electrolux's warnings are inadequate.  Ex. 6 (Stoddard Rep. – Blake) at 149-52.  Mr. Stoddard's opinions should be excluded because he is not qualified to offer opinions regarding engineering, product design, plastics, or warnings; the methodology he used in formulating his opinions is unreliable; and there is no "fit" between his made-for-litigation opinions and the facts of the instant cases.

> **1.** **Mr. Stoddard Is Not Qualified To Offer Opinions Regarding Engineering, Product Design, Plastics, Or Warnings As He Has No Training In These Areas.**

Mr. Stoddard has investigated fires for many years, but fire investigation does not create expertise in dryer design, plastics engineering, or product warnings—the only areas on which Mr. Stoddard's testimony is offered.  For this reason alone, he should be precluded from testifying in these areas.  *See, e.g.*, Ex. 16 (Order in *Donegal Mutual Insur. Co. a/s/o Vanessa Schantz v. Electrolux North America*, Case No. 1:08-cv-02171-YK (Dec. 22, 2010 M.D. Pa.) at 7-8 (holding Mr. Stoddard not qualified to opine on design defect and warnings, only fire cause and origin).  Mr. Stoddard earned a Bachelor of Science degree in Arson Investigation from the University of New Haven. *See* Ex. 7 (Curriculum Vitae of Michael R. Stoddard, Jr. (provided as Appendix X to Stoddard Rep.)) at 308.  Mr. Stoddard has been employed as a fire analyst, a position which involves the determination of the origin and/or cause of fires, for the majority of his professional career.  *See id*. at 308-09.  Mr. Stoddard does not have any training, education or experience in the fields of engineering, product design, plastics, or product warnings and instructions.  *See generally id*.  Mr. Stoddard has testified that he has no experience in designing products.  *See* Ex. 8 (Transcript of 5/14/2010 Deposition of Michael R. Stoddard, Jr. in *Donegal Mutual Insurance Co., A/S/O Vanessa Schantz v. Electrolux North America*, Case No. 1:08-CV-2171, United States District Court for the Eastern District of Pennsylvania ("Stoddard Dep.")) at

181:6-7, 182:24-183:25.[6]   He has never designed an appliance or worked in an appliance manufacturing facility and has never applied for a patent.  *See id.* at 183.

Plaintiffs have not established how Mr. Stoddard's experience as a fire analyst in any way qualifies him as an expert in the design and engineering of clothes dryers, or in the development and testing of those products' warnings.  Mr. Stoddard's qualifications do not meet Rule 702's requirement that he be "qualified as an expert by knowledge, skill, experience, training, or education."  His opinion testimony on these subjects is therefore inadmissible and should be excluded in its entirety.

> ### 2.   Mr. Stoddard's Opinion That The Electrolux Design Causes Excessive Lint Accumulation Is Unreliable And Is Not Fit To The Facts Of These Cases.

Even if Mr. Stoddard were qualified to offer opinion testimony regarding the allegedly defective design of the subject dryers, his testimony would nonetheless be inadmissible because it is not grounded in a scientifically-valid independently-verifiable methodology.  Mr. Stoddard's opinions regarding alleged design defects in the subject dryers do not pass muster under *Daubert* because he used no discernable methodology to conclude that Electrolux's dryer designs are defective.  His theories have not been "tested, . . . subjected to peer review and publication, . . . [or] analyzed for known or potential error rate," *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 810 (7th Cir. 2012) (citing *Daubert I*, 509 U.S. at 593-94).  Plaintiffs have not established that Mr. Stoddard's opinions are "supported by appropriate validation—i.e., 'good grounds,' based on what is known."  *Daubert I*, 509 U.S. at 590.

---

[6] Mr. Stoddard's deposition in the instant matters is currently scheduled for April 24, 2014.  Rather than request an extension of the date by which Electrolux must file *Daubert* motions and potentially delay this litigation, Electrolux will rely on Mr. Stoddard's previous deposition testimony in litigation involving Electrolux dryers.  Mr. Stoddard and his colleagues at the Wright Group have submitted numerous reports in litigation involving Electrolux dryers, and their opinions remain substantively identical from one litigation to the next.  The only basis for his opinions on which Mr. Stoddard has not previously been examined is the Wright Group's testing related to the UL 2158 Fire Containment standard, which Plaintiffs' experts concede was not effective until 2013.  *See, e.g.*, Ex. 3 (Fallows Dep.) at 70:9-71:1.  It is undisputed that none of the subject dryers were manufactured later than 2008, so this testing is not relevant to the instant action.  *See id.* That said, should his deposition reveal new information Electrolux reserves the right to supplement this motion.

*First*, the Wright Group's testing is not scientifically valid.  Mr. Stoddard concedes that factors impacting air flow, such as the type of venting used in the dryer installation, can impact the accumulation of lint in a dryer.  *See* Ex. 8 (Stoddard Dep.) at 176:9-176:12; *see also id.* at 179:3-179:5 (admitting that "bad venting causes increased drying time, which causes increased lint accumulation").  But he cannot account for that factor in the burned and unburned "exemplar dryers" he examined, which purportedly provide the data underlying his theory that the Electrolux design "inefficiently manages the lint produced during the drying process and allows for lint to accumulate in areas where it is in close proximity or direct contact with the heat source of the dryer."  *Id.* at 179:6-179:12.  Nor can he account for factors such as whether the user routinely cleaned the lint screen or whether the dryer was ever professionally serviced.  *Id.* at 179:13-179:19.  As Mr. Stoddard admits in his report, for many of the exemplar dryers, the Wright Group "ha[d] no understating of the operational history, installation or maintenance of the dryers," making it "impossible for [them] to document the information of how they were installed, how they were used and how they were maintained."  Ex. 6 (Stoddard Rep. – Blake) at 43.  When asked what information he learned about the history and usage of the exemplar dryers, he stated, "In some cases, we know nothing about the dryer other than that they were involved in fires.  The unburned dryers we purchased as used units from appliance companies that was a trade-in programs.  Therefore, we have no operational history or service history or any other history on those particular dryers."  *See* Ex. 8 (Stoddard Dep.) at 175:18-176:6.  Mr. Stoddard accordingly did not consider how these characteristics affect air flow, the potential for lint accumulation, and the likelihood of a fire involving the dryer.

*Second*, none of the testing on which Mr. Stoddard relies actually investigates his hypothesis that the subject dryers are defectively designed because they allow excessive lint to accumulate in close proximity to the heat source.  Neither Mr. Stoddard nor the Wright Group have ever tested for lint accumulation in Electrolux dryers.  *See* Ex. 8 (Stoddard Dep.) at 149:13-149:16.  The Wright Group has performed airflow testing on Electrolux dryers, but none of that testing "show[ed] any lint that had accumulated" in the Electrolux dryers at or near the heat

source.  *Id*. at 150:18-151:21.  When asked why the Wright Group, despite having performed myriad tests of Electrolux and other dryers, has never done ***lint accumulation testing*** to test their ***lint accumulation theory***, Mr. Stoddard replied that such testing would be "extremely difficult, because there is a lot of variables involved," *id*. at 161:23-162:7—"there are so many different variables involved in doing this that . . . it's a monumental task to do so in many different degrees."  *Id*. at 166:18-166:22.  Mr. Stoddard acknowledged that he is aware that Electrolux has performed lint accumulation testing, *id*. at 162:14-162:16, but faulted Electrolux for not incorporating into their protocols factors that affect the collection of lint.  *Id*. at 165:21-166:3.  Yet Mr. Stoddard admitted that the Wright Group does not request information about these factors in its investigation and testing of burned and unburned dryers that form the basis for Mr. Stoddard's own opinions.  *Id*. at 166:23-168:6.

Instead, Mr. Stoddard relies on testing such as the "failure mode testing" of Electrolux dryers the Wright Group performed in 2008 and 2009, in which they purportedly attempt to recreate the failure event and gather "physical evidence to prove or disprove" their hypotheses regarding fire growth, spread, and development.  *Id*. at 185:22-186:9.  In these tests, the Wright Group first packed cotton batting, lint, and cotton balls into the baffle on the back of the dryer drum (next to the heater), on the bottom of the heater pan, and elsewhere throughout the dryer, then attempted to catch the dryer on fire.  *Id*. at 186:10-189:10.  Out of the 43 tests performed, they were only able to achieve a dryer fire with one test—oddly enough, test number 43.  *Id*. at 190:6-190:14.  And they were only able to achieve that fire by drilling a hole in the back of the dryer and dropping pieces of lint directly inside the heater housing.  *Id*. at 186:25-189:10.  They have never been able to achieve a fire without introducing lint into the heat source:

> Q.  The only fires you've experienced in your testing are the ones where you've introduced lint to the heat source?
>
> A.  That's right or in proximity to the heat source.

*Id*. at 193:15-19.  As in *Chapman*, Mr. Stoddard did not conduct any relevant scientific tests or experiments in order to arrive at his conclusions.  *See Chapman*, 297 F.3d at 688.  In such

circumstances, "the absence of any testing indicates that [the expert's] proffered opinions cannot fairly be characterized as scientific knowledge. *Id.*

*Third*, Mr. Stoddard's opinions cannot be reasonably applied to the facts of any of the instant cases because he is ignorant of the installation, operational, or maintenance history of the exemplar dryers—accordingly, those factors cannot be compared to the characteristics of the dryers involved in these cases.   There is no "fit" between Mr. Stoddard's "analysis" of the unburned and burned exemplars and the facts of the instant cases because Mr. Stoddard has not—and could not—compared the characteristics relevant to lint accumulation (such as installation and maintenance history) of the exemplars to those of the subject dryers.  As a result, there is too great an analytical gap between Mr. Stoddard's observations of the exemplar dryers and his opinion that Electrolux's dryer design is defective for that opinion to meet the relevance requirement of Rule 702.

*Fourth*, the Wright Group's testing on which Mr. Stoddard relies is based on a biased sample that is not representative of the relevant population of Electrolux dryers.  Mr. Stoddard's lint accumulation theory is based solely on his observation of lint accumulation in a small, unrepresentative sample of unburned and burned "exemplar dryers."   Ex. 6 (Stoddard Rep. – Blake) at 150; Ex. 8 (Stoddard Dep.) at 150:6-150:17.   The exemplar dryers include dryers the Wright Group purchased new, dryers they purchased used from appliance stores, and dryers involved in fires that they have investigated as consultants for plaintiff litigants.  Ex. 6 (Stoddard Rep. – Blake) at 42-43.   While Mr. Stoddard has referred to the exemplar dryers in previous testimony as a "random sample," they are no such thing.   A random sample is meant to be representative of a given population, an objective achieved by ensuring that every member of the population under study has an equal chance of being selected.   The haphazard inventory of dryers accumulated by the Wright Group are not a "random sample" in any statistically meaningful sense.   Mr. Stoddard therefore has no scientific basis for extrapolating his observations of the exemplar dryers and conclusions purportedly based on those observations, even if they were valid.

Mr. Stoddard's opinions are not based on any discernible methodology, let alone a scientifically valid methodology that is independently verifiable and that can be reasonably applied to the facts of any of the instant cases. His methodology cannot be repeated and thereby tested to make any meaningful assessment of its error rate or accuracy. His methodology has never been published in a peer-reviewed publication. In the end, his opinions are based on nothing more than his "subjective beliefs" and "unsupported speculation" and do not fit the facts of the instant cases. *Daubert*, 509 U.S. at 590-91. For these reasons, they are unreliable and would not assist the trier of fact to understand the evidence or determine a fact in issue and should therefore be excluded. *Id*.

### 3. Mr. Stoddard's Testimony Regarding The Plastics Used In The Subject Dryers Is Unreliable And Does Not Meet *Daubert*'s Fit Requirement.

Throughout his report, Mr. Stoddard offers conclusory opinions that the subject dryers were defectively designed because certain components were composed of HB-rated plastics in lieu of plastics treated with fire retardant or other materials. *See, e.g.*, Ex. 6 (Stoddard Rep. – Blake) at 93-94. Based on testing of the burn characteristics of HB- and 5V-rated plastics after short exposures to direct flame, *see id.* at 141-144, Mr. Stoddard concludes that "the use of alternative materials would be effective in containing the fire to the cabinet in most conditions, particularly in the Electrolux Ball-Hitch dryer fires where the fire transfers to the lint collected in and around the air duct and blower assembly located at the right front corner of the Ball-Hitch dryer." *Id*. at 144. Mr. Stoddard has not shown, however, that the tests the Wright Group performed, which exposed the plastics to flame for a maximum of 60 seconds, are in any way relevant to real-world dryer fires. Nor has he conducted any testing of the differences in the burn characteristics of these plastics under real-world conditions, let alone provided any support for his opinions that using a different type of plastic would have resulted in a different outcome in any of these cases.

As with Mr. Fallows's opinion that the subject dryers' design was defective because it did not use his preferred plastics, Mr. Stoddard's opinions are not based on any reliable

methodology and do not meet *Daubert*'s requirement that they fit the facts of the cases here. *Daubert*, 509 U.S. at 590-591.   He has not performed or relied on any testing he has demonstrated to be relevant to the real-world conditions of these cases, or otherwise subjected his speculative opinions to the scientific method.  *See, e.g.*, *Chapman*, 297 F.3d at 688 (2002) (excluding expert testimony where expert failed to support opinions with testing); *Cummins*, 93 F.3d at 368 (7th Cir. 1996) (same).   Mr. Stoddard's opinion that the Electrolux dryers are defectively designed because "[t]he use of plastic components adds a significant quantity of secondary fuels to the appliance and allows fire to more easily spread out of the cabinet" and any related testimony should therefore be excluded.

### 4.    The Court Should Exclude Mr. Stoddard's Speculative, Unsupported Opinions Regarding Electrolux's Warnings.

As discussed *supra* Section III.B.1., Mr. Stoddard's sole qualification relevant to these cases is to give fire cause and origin opinions based on his experience as a fire investigator. Accordingly, he has no experience that would qualify him to offer expert testimony regarding the warnings affixed to and accompanying the subject dryers.  Even if he were qualified to offer such testimony, however, his opinions would be inadmissible.  Mr. Stoddard opines that the Electrolux warnings are inadequate because (1) Electrolux did not include a warning to have the dryer serviced every 18 months on the on-product labels of every subject dryer model, *see* Ex. 6 (Stoddard Rep. – Blake) at 110; (2) Electrolux did not include instructions on how to remove lint in areas inaccessible to the user, *see id*. at 112 (even though this should only be done by qualified professionals); (3) it is foreseeable that users will not comply with the requirement that they service the dryer every 18 months, *see id*. at 113-14; and (4) Electrolux allegedly failed to comply with voluntary standards regarding warnings and instructions.  *See id*. at 118.   Mr. Stoddard speculates that these alleged warning inadequacies could have been addressed by incorporating into the dryer design service reminder lights, restricted airflow notifications, and a "lockout feature to shut the dryer down if the warning light was ignored by the user with

conditions of poor airflow, which could only be reset by a trained servicer." *Id*. at 6-7; *see also id*. at 104-10.

Mr. Stoddard does not support any of these opinions with any data, testing, or analysis. He offers no evidence to support his assumption that his proffered warnings would be any more informative to users than the warnings already present on the dryers and included in the accompanying documentation, or that his proposed lockout system is feasible, would be accepted by users, and would not be met with user-introduced overrides to invalidate the system. He does not address the literature evaluating the effectiveness of his proposed indicator lights. *See, e.g.*, Ex. 9 (July 2010 Consumer Reports at 1 (concluding from their testing on duct-blockage indicators that "current indicators are too inconsistent to trust"). Nor does he tie his theoretical warnings modifications to the facts of these cases in any way, let alone establish that his proposed warnings or modifications would have made any difference in the outcome of any of the instant cases. Mr. Stoddard's rank speculation that his proposed warnings and warning-related modifications are feasible and would be more effective than Electrolux's warnings does not meet Rule 702's requirements of reliability and relevance. Thus, his opinions regarding the alleged inadequacy of Electrolux's warnings should be excluded in their entirety.

### C.   Dr. Boelhouwer's Opinions Regarding Electrolux's Warnings Are Inadmissible.

#### 1.   Dr. Boelhouwer's *Ipse Dixit* Opinion That Electrolux's Warnings Are Unlikely To Be Followed Does Not Meet *Daubert*'s Fit Requirement.

Plaintiffs' warnings expert, Dr. Boelhouwer, provided reports in each of the eight instant cases. In each of those reports, he includes essentially boilerplate opinions that the warnings in the subject dryers' owner's guides regarding the need to have the dryer serviced every 18 months by qualified service personnel to remove accumulated lint from the interior of the dryer are unlikely to be followed. *See, e.g.*, Ex. 10 (Boelhouwer Rep. – Blake). This testimony does not pass muster under *Daubert* and should be excluded.

The mere fact that users may not follow the safety information presented within an instruction or warning does not make that information "defective."  Dr. Boelhouwer acknowledges this fact, *see, e.g.*, Ex. 11 (Transcript of Deposition of Eric J. Boelhouwer ("Boelhouwer Dep.")) at 135:10-135:14, yet opines that the warnings provided by Electrolux are inadequate because they require "excessive or disproportionate measures for compliance."  *See, e.g.*, Ex. 10 (Boelhouwer Rep. – Blake) at 8.  He asserts that "[t]he 'cost of compliance' is simply too high for many dryer owners to comply with this warning," *id*. at 6, and concludes that, consequently, no warning based on a need to service the dryer every 18 months could ever be adequate.  *See* Ex. 11 (Boelhouwer Dep.) at 150:10-150:20; 152:7-152:21.  He apparently chooses to ignore the thousands and thousands of consumers who do in fact comply with the instruction to regularly service or have others service their dryers, citing instead a CPSC survey which states that "[a] service call to clean the accumulated lint within the dryer can be costly and inconvenient to the customer, and therefore the consumer may overlook performing this maintenance task until there is an operating problem with the dryer, which may lead to a higher risk of fire."  *See* Ex. 10 (Boelhouwer Rep. – Blake) at 6-7.  Yet Dr. Boelhouwer admits that the CPSC survey population was not a random sample; it was a "convenience sample" made up of 358 consumers who responded to a survey request.  Ex. 11 (Boelhouwer Dep.) at 108:19-110:4.  Accordingly, Dr. Boelhouwer does not—and could not—take the position that this is a statistically-valid analysis of consumer practices regarding dryer maintenance.  *See id*. at 145:22-146:22.  Moreover, he has done no research or testing himself to test this hypothesis in any manner.  And he does nothing to relate his broad assertions to the facts of any of these cases in any way, let alone apply any discernible scientifically-valid methodology that could be independently verified.

Dr. Boelhouwer also contends that the subject dryers' warnings are inadequate because Electrolux "does not inform consumers as to when the last service was performed or the next service may be needed."  *Id*. at 90:23-91:4.  In other words, the warning is inadequate "because Electrolux did not provide a means for the consumer to remember when 18 months had passed,"

*id*. at 92:20-92:25—an "inadequacy" that Dr. Boelhouwer admits could be remedied with the provision of a calendar, or a piece of paper and pencil.  *Id*. at 91:18-92:1.  He opines that one way to assess the adequacy of a product's warnings is to evaluate the warnings of peer products, *see id*. at 63:14-65:1, but admits that he made no attempt to compare the warnings of other dryers to those of the subject machines.  *Id*. at 117:20-118:4.  He provides no basis for his opinion other than his "background, training, and experience."  *Id*. at 96:10-97:8.  Yet he has no training specific to consumers' use and maintenance of home appliances, and has not done any research or conducted any surveys that would provide a basis for his opinion "that a consumer would be unable or unwilling to remind him or herself about regular service required for a home appliance."  *Id*. at 98:5-99:17.  He could not point to a single study, paper, survey, or any other independent reference to support his opinion.  *Id*. at 132:20-133:15.

Similarly, Dr. Boelhouwer opines that consumers have an "expectation" that appliances "are typically serviced on an 'as needed' basis," but provides no authority for his assumption that such an expectation somehow negates explicit on-product warnings to the contrary, *see*  Ex. 10 (Boelhouwer Rep. – Blake) at 7—an assumption that is inconsistent with his stated belief that consumers have a responsibility to read and comply with manufacturer-provided warnings and to maintain their products.  Ex. 11 (Boelhouwer Dep.) at 136:18-137:12.  Dr. Boelhouwer does not propose alternative warnings that would overcome his concerns, *see id*. at 164:12-164:21, or address the fact that a wide variety of household appliances come with recommendations about regular service schedules.  *See generally* Ex. 10 (Boelhouwer Rep. – Blake).  Apart from the CPSC survey discussed above, the only basis for his opinion that users typically do not comply with standard maintenance schedules and only service their appliances when they are not functioning properly is his review of the depositions of approximately 100 ***dryer-fire litigants***.  *See* Ex. 11 (Boelhouwer Dep.) at 137:25-138:15; 141:11-142:1.  Dr. Boelhouwer does not—and could not plausibly—contend that the use and maintenance practices of 100-odd litigants whose dryers caught fire are in any way representative of the use and maintenance practices of the millions of consumers who own clothes dryers.

Dr. Boelhouwer's unsupported *ipse dixit* opinions that the warnings at issue were inadequate because, in his view, they require excessive or disproportionate measures for compliance are inadmissible under *Daubert* and should be excluded.  *See, e.g.*, *Joiner*, 522 U.S. at 146 ("opinion evidence that is connected to existing data only by the *ipse dixit* of the expert" is inadmissible).

### 2. Dr. Boelhouwer's Opinions Regarding His Proposed "Feedback System" Are Inadmissible Because He Is Not Qualified To Render Them And They Are Not Based On Any Methodology.

Dr. Boelhouwer also opines in each of his eight reports that the subject dryers are defective because they fail "to provide reasonable or appropriate feedback to the user regarding the increased risk of a fire as lint accumulates in a location not discernible to users."  *See, e.g.*, Ex. 10 (Boelhouwer Rep. – Blake) at 7.  Dr. Boelhouwer bases this opinion on his assertion that "[w]hen through unexceptional and anticipated use, it is unlikely for a user to detect an unsafe condition and this condition makes it unreasonably dangerous to operate the product, a feedback system must be employed to alert consumers about the increased risk."  *Id*.  Dr. Boelhouwer speculates that:

> Electrolux could have incorporated feedback to users based on either time (a number of months) or usage (a number of dryer cycles) to inform users that the interior of the dryer would need to be cleaned by a qualified service person.  The feedback to the user could have been an indicator light on the control panel in combination with a word message to inform the dryer owner what actions need to be taken to reduce the risk of a fire.

*Id*.

These opinions should be excluded because Plaintiffs have not established that Dr. Boelhouwer is qualified to opine regarding design modifications.  To provide opinion testimony under Rule 702, a witness must be "qualified as an expert by knowledge, skill, experience, training, or education."  F. R. E. 702.  According to Dr. Boelhouwer, his "area of experience and expertise, pertinent to this litigation, is warnings and communications pertaining to product safety."  Ex. 10 (Boelhouwer Rep. – Blake) at 1.  He does not have any experience whatsoever in the design or manufacture of appliances.  Ex. 11 (Boelhouwer Dep.) at 128:8-128:18.  He admits

-23-

that he is "not a dryer design expert" and that "adequacy of the design, a change in design, anything like that is outside [his] area of expertise." *Id.* at 149:18-150:4. When asked if he was aware of any other dryers that use an indicator-light system to alert the user that professional servicing of the dryer is required, he stated, "I have not attempted to conduct an analysis of other dryers that use warning lights." *Id.* at 128:18-128:23. He has no idea if other manufacturers have incorporated such warning lights into their dryers, how they operate, or whether they operate correctly. *Id.* at 133:20-134:1. He could not identify a single example of a home appliance that has an indicator light that alerts the user when service is required (the only example he offered related to automobiles) and "did not attempt to perform an analysis of what other consumer products may use" such a system. *Id.* at 129:5-129:15. He has no evidence a consumer would be any more likely to heed a warning light than a written warning. *Id.* at 134:2-134:14.

Moreover, even if Dr. Boelhouwer were qualified to opine about feasible design alternatives, his opinions are inadmissible as they are not based on any discernible methodology or analysis. Dr. Boelhouwer cites no authority to support his opinion that Electrolux was required to employ a feedback system. *See* Ex. 10 (Boelhouwer Rep.) at 7-8. Dr. Boelhouwer could articulate no basis for his opinion that his proposed feedback system is needed to alert users to the possibility of a fire hazard from lint accumulation—a hazard explicitly warned about on the product and in its accompanying documentation; when repeatedly asked to explain the **basis** for his opinion, he merely repeated the opinion itself. *See* Ex. 11 (Boelhouwer Dep.) at 129:23-131:13. Even if such a system were required, he provides no evidence that Electrolux could feasibly have incorporated his proposed system. *See* Ex. 10 (Boelhouwer Rep.) at 7-8. Dr. Boelhouwer describes his proposal in the vaguest terms—a control-panel "indicator light" combined with an unspecified "word message to inform the dryer owner what actions need to be taken to reduce the risk of a fire," *see id.* at 8—information that is already included in multiple warnings provided on and with the dryer and that would be difficult if not impossible to meaningfully include on the dryer's control panel itself. Dr. Boelhouwer does not test his

hypothesis that such a system would be effective in any way.  Nor does Dr. Boelhouwer address the literature evaluating the effectiveness of such systems.  *See, e.g.*, Ex. 9 (July 2010 Consumer Reports at 1 (concluding from their testing on duct-blockage indicators that "current indicators are too inconsistent to trust").

Dr. Boelhouwer's opinion that Electrolux was required to implement a feedback system and speculation regarding what such a system might look like are pure *ipse dixit* unsupported by any facts, evidence, or authority.  They do not meet the reliability requirements of Rule 702 and should therefore be excluded.  *See, e.g.*, *Joiner*, 522 U.S. at 146.

> ### 3. Dr. Boelhouwer's Opinion Regarding Warnings Related To Foil Duct Would Not Aid The Trier Of Fact.

In the Donahue and Freeman matters, Dr. Boelhouwer opines that the subject dryers' "installation instructions do not prohibit metal (foil-type) duct to be used as part of the dryer vent system," quoting language from the installation instructions stating that "[i]n Canada and the United States if metal (foil type) duct is installed, it must be of a specific type identified by the appliance manufacturer as suitable for use with clothes dryers and in the United States must also comply with the Outline for Clothes Dryer Transition Duct, UL standard 2158A."  Ex. 12 (Boelhouwer Rep. – Donahue) at 7-8; Ex. 13 (Boelhouwer Rep. – Freeman) at 7-8.  Dr. Boelhouwer does not address the sentence immediately preceding this statement, which warns the user, "If your present system is made up of plastic duct or metal foil duct, replace it with a rigid or semi-rigid metal duct."  *Id.*  Nor does he provide any analysis to support his interpretation of these warnings.  Dr. Boelhouwer observed the warning labels just as any lay person would and is offering his mere "subjective opinion" regarding their meaning.  His opinion is therefore unreliable and should be excluded.  *Daubert I*, 509 U.S. at 588, 591.

> ### 4. Dr. Boelhouwer's Opinion Regarding "Risk of Fire" Warnings Are Unsupported by Any Authority Or Analysis And Do Not Meet The "Fit" Requirement.

Dr. Boelhouwer includes the following opinion in his reports in the Larson and McCants matters:

>
> 2. The On-Product Labels Do Not Address the "Risk of Fire" as Required by UL 2158
>
> Both Label 131785400 9810 and Label 131715000 9709 do not address the "Risk of Fire" or provide an equivalent statement as required by UL 2158-2004 Sections 7.1.2.13.a and 7.1.2.13.b. Additionally, the use of the signal word "Warning" on Label 131785400 9810 does not comply with UL 2158-2004 Section 7.1.2.13.a and is inconsistent with Label 131715000 9709.

Ex. 14 (Boelhouwer Rep. – Larson) at 7-8; *see also* Ex. 15 (Boelhouwer Rep. – McCants) at 7 (providing nearly identical opinion). This is the sum total of Dr. Boelhouwer's analysis in support of this opinion. He does not quote the on-product labels or cited authorities in his report, let alone explain in detail how the warnings fail to meet their requirements. When asked at his deposition to explain how Electrolux's warnings failed to meet this voluntary standard, Dr. Boelhouwer merely noted that (1) while the standard "allows for the use of [the word] 'caution,'" the Electrolux label uses the word "warning," and (2) the label states "avoid fire hazard" rather than "risk of fire," although he admits these phrases are equivalent. Ex. 11 (Boelhouwer Dep.) at 178:12-181:21. Dr. Boelhouwer does not explain how changing the word "caution" to "warning" and referring to a "risk of fire" rather than admonishing the user to "avoid fire hazard" would have made any difference in the Larson or McCants matters. Dr. Boelhouwer's opinion is not based on any analysis and accordingly "would not assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert I*, 509 U.S. at 588, 591. It is not tied in any way to the facts of the case, so does not meet the "fit" requirement under *Daubert*. *Id*. His opinion should therefore be excluded.

//

//

//

//

//

//

## V.    **CONCLUSION**

For the foregoing reasons, Electrolux respectfully requests that the Court grant its motion and exclude any and all testimony of Plaintiffs' experts W. Joseph Fallows, Michael R. Stoddard, Jr., and Eric J. Boelhouwer at trial.


This 7th day of April, 2014.

TUCKER ELLIS LLP

By:

_/s/ Joseph J. Morford_

| | |
|---|---|
| Joseph M. Fasi II, SBN 1006655 | Joseph J. Morford (*pro hac vice* pending) |
| Joseph_Fasi@gshllp.com | joseph.morford@tuckerellis.com |
| Gonzalez Saggio & Harlan, LLP | John Patterson (*pro hac vice*) |
| 111 E. Wisconsin Avenue, Suite 1000 | john.patterson@tuckerellis.com |
| Milwaukee, WI  53202 | 950 Main Avenue, Suite 1100 |
| Telephone: (414) 277-8500 | Cleveland, OH  44113 |
| Facsimile:  (414) 277-8521 | Telephone:   (216) 592-5000 |
| | Facsimile:    (216) 592-5009 |
| Robert H. Shulman (*pro hac vice*) | |
| rshulman@manatt.com | Rebecca M. Biernat (*pro hac vice*) |
| David B. Killalea (*pro hac vice*) | rebecca.biernat@tuckerellis.com |
| dkillalea@manatt.com | Traci L. Shafroth (*pro hac vice* pending) |
| Manatt, Phelps & Phillips, LLP | traci.shafroth@tuckerellis.com |
| 700 12th Street N.W., Suite 1100 | Tucker Ellis LLP |
| Washington, D.C.  20005 | One Market Plaza |
| Telephone: (202) 585-6500 | Steuart Tower, Suite 700 |
| Facsimile:  (202) 585-6600 | San Francisco, CA  94105 |
| | Telephone:   (415) 617-2400 |
| | Facsimile:    (415) 617-2409 |
| | |
| | *Attorneys for Electrolux Home Products, Inc.* |

-27-

**CERTIFICATE OF SERVICE**

I hereby certify that on April 7, 2014, a copy of the foregoing BRIEF IN SUPPORT OF

DEFENDANT ELECTROLUX HOME PRODUCTS, INC.'S MOTION TO PRECLUDE

TESTIMONY OF W. JOSEPH FALLOWS, MICHAEL R. STODDARD, JR. AND DR. ERIC J.

BOELHOUWER and exhibits referenced therein were filed electronically.  Notice of this filing

will be sent to all parties by operation of the Court's electronic filing system.  Parties may access

this filing through the Court's system.


*/s/ Rebecca M. Biernat*

Rebecca M. Biernat
Tucker Ellis LLP
One Market Plaza
Steuart Tower, Suite 700
San Francisco, CA  94105
Telephone:  (415) 617-2400
Facsimile:   (415) 617-2409
E-mail:  rebecca.biernat@tuckerellis.com

*Attorneys for Electrolux Home Products, Inc.*