# EXHIBIT 11

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

AMERICAN FAMILY MUTUAL
INSURANCE COMPANY,
      Plaintiff,     CIVIL ACTION
    vs.       FILE NO. 11CV000678
ELECTROLUX HOME PRODUCTS,
INC.,
      Defendant.

DEPOSITION OF

ERIC J. BOELHOUWER, PH.D., CSP

Thursday, April 3, 2014
9:15 a.m.

4700 Best Road
Atlanta, Georgia

Renda K. Cornick, RPR, CCR-B-909

REGENCY-BRENTANO, INC.
Certified Court Reporters
13 Corporate Square - Suite 140
Atlanta, Georgia 30329
404-321-3333

## Page 2

TABLE OF CONTENTS

| Examination | Page |
| --- | --- |
| Examination by Ms. Biernat | 7 |
| Examination by Mr. Boerigter | 186 |
| Re-Examination by Ms. Biernat | 188 |

- - -

Boelhouwer

| Exhibit | Description | Page |
| --- | --- | --- |
| 1 | Subpoena | 7 |
| 2 | CV | 7 |
| 3 | E-mails to Dr. Boelhouwer | 7 |
| 4 | Deposition Summaries | 7 |
| 5 | Blake Capital vs. Electrolux Folder | |
| | 5-A Legal Works; Product Information; Depositions, Reports, and Other Evidence | |
| | 5-B E-mails | |
| | 5-C Letter of October 30, 2013 | |
| | 5-D Invoices | |
| | 5-E Report | 7 |
| 6 | Brossard vs. Electrolux Folder | |
| | 6-A Legal Works; Product Information; Accident/Medical Information,Depositions, Reports, and Other Evidence | |
| | 6-B E-mails | |
| | 6-C Letter of November 4, 2013 | |
| | 6-D Letter of October 23, 2013 | |
| | 6-E Invoices | |
| | 6-F Report | 7 |
| 7 | Donahue vs. Electrolux | |
| | 7-A Legal Works; Accident/Medical Information, Product Information; Depositions, Reports, and Other Evidence | |
| | 7-B E-mails | |
| | 7-C Letter of December 10, 2013 | |
| | 7-D Invoices | |
| | 7-E Report | 7 |

## Page 3

Boelhouwer

| Exhibit | Description | Page |
| --- | --- | --- |
| 8 | Holt vs. Electrolux Folder | |
| | 8-A Legal Works; Accident/Medical Information; Product Information; Depositions, Reports, and Other Evidence | |
| | 8-B Invoices | |
| | 8-C Letter of October 25, 2013 | |
| | 8-D E-mails | |
| | 8-F E-mails | |
| | 8-G E-mails | |
| | 8-H E-mails | |
| | 8-I Report | 7 |
| 9 | Freeman vs. Electrolux Folder | |
| | 9-A Legal Works; Product Information; Accident/Medical Information Depositions, Reports, and Other Evidence | |
| | 9-B E-Mails | |
| | 9-C Invoices | |
| | 9-D Report | 7 |
| 10 | Kucharski vs. Electrolux | |
| | 10-A Legal Works; Product Information; Accident/Medical Information; Depositions, Reports, and Other Evidence | |
| | 10-B Letter of October 30, 2013 | |
| | 10-C E-mails | |
| | 10-D Invoices | |
| | 10-E Report | 7 |
| 11 | Larson vs. Electrolux | |
| | 11-A Legal Works; Product Information; Depositions, Reports, and Other Evidence | |
| | 11-B Letter of October 25, 2013 | |
| | 11-C E-Mail | |
| | 11-D E-Mail | |
| | 11-E Electrolux | |
| | 11-F Invoices | |
| | 11-G Report | 7 |

## Page 4

Boelhouwer

| Exhibit | Description | Page |
| --- | --- | --- |
| 12 | McCants vs. Electrolux | |
| | 12-A Legal Works; Product Information; Depositions, Reports, and Other Evidence | |
| | 12-B Letter of November 4, 2013 | |
| | 12-C E-Mail | |
| | 12-D E-Mail | |
| | 12-E E-Mail | |
| | 12-F Invoices | |
| | 12-G Report | 7 |
| 13 | References 13-A Effectiveness of Warning Labels and Signs: An Update on Compliance Research | |
| | 13-B Consumer Product Warnings: Review and Analysis of Effectiveness Research | |
| | 13-C A Most Critical Warning Variable: Two Demonstrations of the Powerful Effects of Cost on Warning Compliance | |
| | 13-D Product Information Presentation, User Behavior, and Safety | |
| | 13-E Warning Research: An Integrative Perspective | |
| | 13-F Human Factors in the Design of Effective Product Warning | 7 |
| 14 | Appendix A | |
| | 14-A Deposition Index | |
| | 14-B Letter of March 10, 2014 | 7 |
| 15 | Electrolux Service Manual 27-Inch Dryers Gas and Electric Models | 82 |
| 16 | Electrolux Venting Kit: Electrolux-Store.com | 84 |
| 17 | Warning Labels Dorris & Associates P8 | 84 |
| 18 | Electrolux Label-Warning Flex Duct Dorris & Associates P9 | 100 |

Eric Boelhouwer          American Family v. Electrolux          April 3, 2014

Page 5

Boelhouwer
Exhibit        Description        Page

19   CPSC Safety Alert Overheated Clothes
     Dryers Can Cause Fires
     Dorris & Associates D6        102
20   FEMA Topical Fire Report Series
     Clothes Dryer Fires in
     Residential Buildings (2008-2010)
     Dorris & Associates D7        104
21   NFPA Home Fires Involving
     Clothes Dryers and Washing Machines
     Dorris & Associates D8        108
22   Consumer Opinion Forum Survey #3
     Clothes Dryer Maintenance
     September 2010
     Dorris & Associates D9        108
23   U.S. Consumer Product Safety
     Commission: An Evaluation of Using
     Indicators to Inform Consumers of
     Clothes Dryer Status June 1, 2011
     Dorris & Associates D10        111
24   Whirlpool Use and Care Guide
     Dorris & Associates D11        113
25   AHAM Analysis of Industry Data on
     Clothes Dryer Fire Incidents
     August 2002
     Dorris & Associates D15        118
26   Frigidaire Laundry Center
     Owner's Guide
     Dorris & Associates P10        153

(Original exhibits enumerated above have been
attached to the original transcript.)

Page 6

APPEARANCES OF COUNSEL

On behalf of the Plaintiff:

DANIEL W. BOERIGTER, Esq.
Yost & Baill, LLP
Suite 2050
220 South Sixth Street
Minneapolis, Minnesota 55402
612-338-6000
dboerigter@yostbaill.com

On behalf of the Defendant:

REBECCA BIERNAT, Esq.
Tucker Ellis, LLP
One Market Plaza, Steuart Tower
Suite 700
San Francisco, California 94105
415-617-2223
rebecca.biernat@tuckerellis.com

- - -

Page 7

1   (Reporter disclosure made pursuant to
2   Article 10.B of the Rules and Regulations of the
3   Board of Court Reporting of the Judicial Council
4   of Georgia.)
5   (Boelhouwer Exhibits 1 through 14 were
6   marked for identification.)
7   ERIC BOELHOUWER,
8   having been first duly sworn, was examined and
9   testified as follows:
10   EXAMINATION
11   BY MS. BIERNAT:
12   Q.   Can you state your name for the record.
13   A.   Eric Boelhouwer.
14   Q.   Mr. Boelhouwer, have you had your
15   deposition taken before?
16   A.   No, ma'am.  I have not had my deposition
17   taken before.
18   Q.   Let me tell you a little bit about it.  We
19   are here taking your deposition in a case,
20   consolidated cases called American Family Mutual
21   versus Electrolux.  This is actually eight cases that
22   have been consolidated together.  You have been
23   identified and disclosed as an expert in these cases.
24   I am sure you spoke with the plaintiff's
25   attorney in this case about the deposition and how it

Page 8

1   will go.  I am here to ask you questions, you are here
2   to answer them.  I generally just get one shot at this
3   with you today, so it is important for me to get full
4   and complete answers from you.  If you do not
5   understand a question I have asked, please let me know
6   and I will rephrase it, be happy to do so.  I will
7   assume, though, you have understood the question if
8   you answer it.
9   Oftentimes this can get into a
10   conversation-type setting, but it is important to
11   remember there is a court reporter taking down
12   everything we say as we say it.  So in that respect it
13   is important to speak slowly, clearly, audibly with
14   words instead of huh-uh or uh-huh or a shake of the
15   head.  It is also important to allow me to finish my
16   question before you complete your answer and for me to
17   allow you to complete your answer before I go to my
18   next question so we have a clean transcript.  I will
19   probably strive to take a break every hour to hour and
20   a half.  I assume we will be breaking for lunch.  But
21   if you need a break before that, it is not an
22   endurance contest, please let me know and we will
23   stop.  I am the one with a large coffee here so I am
24   assuming I might have to go first.
25   I guess you have taken an oath to tell the

2 (Pages 5 to 8)

Eric Boelhouwer        American Family v. Electrolux        April 3, 2014

Page 9

1  truth under the penalty of law.  Do you understand you
2  have taken the same oath as if you were testifying in
3  a court of law?
4       A.   Yes, ma'am.
5       Q.   Is there any reason why we cannot go
6  forward with your deposition today?
7       A.   No, ma'am.
8       Q.   Boelhouwer, is that how you say your
9  name?
10      A.   Yes, ma'am.
11      Q.   You have been identified as an expert
12  witness.  What is your understanding of what area of
13  expertise you have been identified in?
14      A.   My understanding is as it relates to these
15  matters I have to address the warnings of instructions
16  related to these products.
17      Q.   And address them in what manner?
18      A.   With regard to the content of what the
19  information is that they are trying to communicate to
20  consumers who would be the target audience for these
21  products.
22      Q.   And you are here specifically for eight
23  specific cases.  But you have -- let me back up.
24  Where do you work?
25      A.   I work at Dorris & Associates

Page 10

1  International.
2       Q.   What is your job title there?
3       A.   Consultant.
4       Q.   How long have you worked there?
5       A.   Approximately four years.
6       Q.   What did you do before that?
7       A.   I was a Ph.D. student at Auburn
8  University.
9       Q.   I will look at your CV that was marked.
10  That will probably help.  Where did you go to
11  university?
12      A.   Which time?
13      Q.   The first time, college, undergrad.
14      A.   I went to Georgia Institute of Technology.
15      Q.   What degree did you obtain from there?
16      A.   Chemical engineering.
17      Q.   You graduated in 1998 with that?
18      A.   Yes, ma'am.
19      Q.   After that, where did you go?  Did you
20  work after that?
21      A.   Yes.  I went to work in industry for BASF
22  Corporation.
23      Q.   What did you do at BASF?
24      A.   I had a variety of roles over a number of
25  years at BASF Corporation.

Page 11

1       Q.   Can you describe some of those for me?
2       A.   When I was first hired into BASF they have
3  a rotational program, so I had three six-month
4  assignments.  One was in North Carolina, one in New
5  Jersey, one in Texas.
6            Following my assignment in Texas, I moved
7  to Baton Rouge, Louisiana; and I was a chemical
8  engineer in a manufacturing facility.
9       Q.   So was your employment at BASF generally
10  as a chemical engineer?
11      A.   Generally, yes.
12      Q.   Can you describe generally what you did as
13  a chemical engineer for BASF?
14      A.   Yes, ma'am.  It would relate to
15  production.  Typically, especially in the later years,
16  in Baton Rouge that my time was spent interfacing with
17  the operators, maintaining or providing direction of
18  how to operate the plants under my direction, and also
19  for some aspects of the safety associated with those
20  production facilities.
21      Q.   When you say operators, operators of their
22  plants?
23      A.   Yes, ma'am.  The operators would -- it was
24  our term for the technicians or the hourly employees.
25      Q.   BASF is a chemical company?

Page 12

1       A.   Yes, ma'am.  Global chemical company.
2       Q.   You left BASF and went to Tulane?
3       A.   No.  I attended Tulane's MBA school at
4  night while I was still at BASF.
5       Q.   And how long were you at BASF?
6       A.   Approximately seven years.
7       Q.   Why did you decide to get your BA, or MBA,
8  sorry?
9       A.   It was an opportunity through the
10  corporation that they were providing a benefit to
11  employees that you could attend school, that they
12  would pay the tuition for you.
13      Q.   So you were at BASF from 1998 to about
14  2005?
15      A.   I believe towards the end of 2006.
16      Q.   2006.  Okay.  And then what did you do
17  after you left BASF?
18      A.   We moved from Louisiana to Auburn,
19  Alabama, for me to begin graduate school.
20      Q.   Graduate school in what?
21      A.   Industrial and systems engineering with a
22  focus in human factors.
23      Q.   Why did you leave BASF?
24      A.   At the time I felt that it was something
25  else that I wanted to do with my career, that I wanted

Eric Boelhouwer        American Family v. Electrolux        April 3, 2014

Page 21

1   our recommendations to the revisions of the content in
2   the manual to the client, whether in terms of the
3   verbiage used or any pictograms or other symbols they
4   may want to consider.
5       Q.    And I would like to ask you about your
6   process in developing on-product labels for a
7   particular product.  You don't have to tell me exactly
8   what the product is.  But do you have an example that
9   you have worked on in the last year where you created
10  an on-product label?
11      A.    Generally clients come to us with
12  something they have already drafted or created for
13  products that are in the marketplace.  We would, using
14  our background and expertise, evaluate the content of
15  what they provided and provide them recommendations.
16      Q.    So then I guess in your time ever at
17  Dorris & Associates have you ever created an
18  on-product label?
19      A.    I provide recommendations to clients as to
20  the format, content, and layout of on-product labels.
21      Q.    The first one you mentioned is the child
22  restraint system.  What did you do with respect to
23  that product?
24      A.    I am not sure exactly how far I can go.
25  We have confidentiality agreements with our clients.

Page 22

1   Generally speaking --
2       Q.    We can talk about something in general.
3   That's fine.  I just want to have some point that we
4   can base our discussion on.  If you had a product like
5   a child restraint system -- well, let's discuss a
6   product that you have created or you have revised a
7   format, content, and layout of the on-product label.
8   Can you give me a broad, general example of one so you
9   don't get into confidentiality concerns?
10      A.    Generally, a client would approach us.
11  They would have drafted an instruction manual.  They
12  would have a product that they were trying to bring to
13  market, for example.  They may have already drafted
14  some language that they would like to present on the
15  product.
16      Q.    And so you have this, let's say, it is a
17  product that is smaller than a bread box, do you get
18  the product itself from your client?
19      A.    It is going to depend on the individual
20  matter.  If it is small enough for it to be shipped
21  and received and the product actually exists at the
22  time we are drafting these -- or preparing our
23  analysis of their materials, then yes, they may
24  provide us an exemplar product.
25      Q.    Have you ever yourself received an

Page 23

1   exemplar product?
2       A.    Outside of litigation?
3       Q.    Yes.
4       A.    Yes, ma'am.
5       Q.    This is all outside of litigation I am
6   talking about.
7             What is the first thing you do once you
8   get an assignment to advise on the format, content,
9   and layout of an on-product label and instruction
10  manual?
11      A.    We review the materials that have been
12  provided to us by the client in terms of what their
13  instructions -- we try to identify their concerns.  We
14  rely on them, the client, to identify the hazards
15  associated with their product.
16      Q.    So you reviewed the material they provide
17  you.  You identify their concerns by what, just
18  talking with them?
19      A.    Yes, ma'am.
20      Q.    Do you do any research yourself about the
21  product or the type of product?
22      A.    Depending on the product class, it may be
23  possible to do some research for that particular
24  product.
25      Q.    What do you mean by that?

Page 24

1       A.    Some products that clients are bringing to
2   market don't currently exist in the market so there is
3   no peer product.
4       Q.    Do you do any independent research about
5   the hazards of the product?
6       A.    Generally speaking, no, ma'am.  We rely on
7   the client to identify the hazards associated with
8   their product and perform the hazard analysis for
9   their product.
10      Q.    When you say generally speaking, have you
11  ever done independent research to identify the hazards
12  of a product?
13      A.    Outside of litigation, as I sit here, I do
14  not recall doing any independent research to identify
15  the hazards of a product.
16      Q.    Have you done any independent research
17  about any possible requirements by any governmental
18  agency or any other agency for the content or format
19  or the layout of a warning, I mean, on-product label
20  or an instruction manual?
21      A.    As I understand your question as it
22  relates to government entities which I would consider
23  the Consumer Product Safety Commission and OSHA and
24  others to fall in that category, yes, we would
25  certainly want whatever our recommendations regarding

6 (Pages 21 to 24)

Eric Boelhouwer       American Family v. Electrolux       April 3, 2014

Page 25

1  that product to be in line with the regulatory
2  requirements provided by those entities.
3      Q.   Okay.  So do you determine which entities'
4  or agencies' regulations would apply to that product?
5      A.   Generally speaking, no.  That is usually
6  identified for us by the class of the product that is
7  being considered.
8      Q.   It is identified by the client that comes
9  to you?  I don't understand.
10     A.   It is going to be very product specific.
11  So if you are selling an industrial product, you more
12  likely than not would not need to comply -- you would
13  only need to comply with OSHA regulations that may or
14  may not pertain to your product.
15     Q.   Right.  But, well, my question is who
16  makes the determination about which regulations would
17  apply to that product.  Do you identify the product as
18  a certain class and say, okay, OSHA has requirements
19  we need to make sure are followed?
20     A.   There is a lot of factors that go into
21  that.  For a given product, what the product is, what
22  its intended use is, who may or may not use the
23  product once it is in the market.  Generally I would
24  think there's a collaborative effort that the client
25  would identify what they believe is applicable to that

Page 26

1  given product.
2      Q.   So as part of your expertise, though, to
3  know which regulations apply to which products, if you
4  had somebody who was naive in that area and came to
5  you with their product, would it be your understanding
6  as the consultant at Dorris & Associates who they
7  hired that you would know which regulations needed to
8  be met?
9      A.   If they could identify for us the nature
10  of their product, who their intended audience is going
11  to be, what it is going to be used for, if we got
12  information from the client to help them to -- to help
13  our understanding of what the intended use of the
14  product is going to be and who the target audience is,
15  then it may -- it may become -- it may clarify what
16  category of product it is.  And then based on that
17  clarification, then you could say, yes, this product,
18  hypothetically, would be best addressed by Consumer
19  Product Safety regulation.  By that process you have
20  eliminated the others.
21     Q.   Okay.  Maybe I am making it more
22  complicated than what I am trying to ask.  Is it
23  within your expertise to determine which agency
24  determines what product if I come to you with a
25  product and say, look, I developed this thing in my

Page 27

1  garage and I would like to make sure I have all the
2  proper warnings on it so I don't get a lawsuit later
3  on, is that within your expertise to know which
4  agencies we need to comply with?
5      A.   If I was provided enough information
6  relative to that product and the use of that product,
7  yes, I could assist in identifying what set of
8  regulations that may be applicable.  There also may be
9  times when there is not enough information for me to
10  make that determination.
11     Q.   Okay.  And do you ever do an analysis
12  about what the product is, what its intended use is,
13  who its intended audience is when you are performing
14  your work?
15     A.   Generally that would fall outside the
16  scope of my assignment.  The client would provide that
17  information to us or clarification of those -- of that
18  information for us.  And so generally we would focus
19  on format, the content, and the layout of their safety
20  communications.
21     Q.   So now related to litigation, would you
22  say that your 60-40 break up, that's consistent over
23  the four years you have worked for Dorris &
24  Associates?
25     A.   It fluctuates on a yearly basis, depending

Page 28

1  on what assignments come in.  But generally, I would
2  think that it would be in that approximate range.
3      Q.   These eight cases here are not the first
4  time you have been engaged to review and opine on the
5  Electrolux dryer warnings; is that correct?
6      A.   I am not sure which matters have been
7  disclosed at this point.
8      Q.   Okay.  Nor am I.  There is a few that I do
9  know of.  Let me get the names of them.
10         MR. BOERIGTER:  Are you talking about
11  personally or Dorris & Associates?
12         MS. BIERNAT:  I am talking about Eric and
13  any other work he may have performed on the
14  Electrolux cases even though he was not the
15  person actually testifying.  I know there is at
16  least one case.
17     Q.   (By Ms. Biernat)  Haroutounyan, have you
18  heard of that case before?
19     A.   Yes, ma'am.
20     Q.   Did you work on that case?
21     A.   Yes, ma'am.
22     Q.   You were not the identified expert,
23  though, correct?
24     A.   No, ma'am.
25     Q.   What did your work in that case consist

7 (Pages 25 to 28)

Eric Boelhouwer      American Family v. Electrolux      April 3, 2014

Page 29

1  of?
2      A.    Reviewing the materials provided by the
3  client, discussions with the retained expert, and
4  assistance with preparation of the report.
5      Q.    What did you say, review materials
6  provided by the client, second one was what?
7      A.    Discussions with the testifying expert.
8      Q.    And assistance in preparing the report.
9      A.    Yes, ma'am.
10     Q.    Although I understand you typed the
11  report.
12     A.    Yes, ma'am.
13     Q.    Do you recall if that was your first
14  assignment to any Electrolux dryer matters?
15     A.    Again, I am not sure what has been
16  disclosed.  I don't recall if that was the first time
17  we were contacted with respect to Electrolux dryers or
18  not.
19     Q.    Do you recall about when that was, your
20  first assignment with respect to Electrolux was?
21     A.    I believe it was sometime in 2012.
22     Q.    What part of 2012?
23     A.    I don't recall.
24     Q.    So it has been two years you have been
25  working on these cases?

Page 30

1      A.    Two years ago we were made aware of
2  litigation related to dryers, Electrolux dryers.
3      Q.    So this Haroutounyan report I have is from
4  April 27, 2012, does that sound about right?
5      A.    Yes, ma'am.
6      Q.    So we are coming up on two years.
7      A.    Yes, ma'am.
8      Q.    I may have another report here.  Have you
9  heard of the Brennan case?
10     A.    Yes, ma'am.
11     Q.    And then you drafted the report, or you
12  signed the report in that case?
13     A.    Yes, ma'am.
14     Q.    You did not testify in that case.
15     A.    My understanding of that case -- I signed
16  the report and after that, I am not aware of the
17  status of that case.
18     Q.    Let me go back to your CV.  I kind of got
19  off track a little bit.  So you worked four years at
20  Dorris & Associates full time, correct?
21     A.    I started at Dorris & Associates full time
22  at the end of 2010.
23     Q.    And how long did you do an internship for
24  them for?
25     A.    I believe my time as a part-time employee

Page 31

1  started in 2007 and continued off and on through the
2  end of 2010 when I came on full time.
3      Q.    You are a certified safety professional.
4      A.    Yes, ma'am.
5      Q.    What does that entail?
6      A.    There is an exam that you have to take.
7  It is based on your time in the industry, work
8  experience, and other factors that they use to
9  determine that you have the prerequisites to be able
10  to sit for the exam.
11     Q.    Is there a general length of time you have
12  to be in the industry in order to be able to get that
13  affiliation?
14     A.    I believe it is five years of work
15  experience.
16     Q.    It says Associate Human Factors
17  Professional.  What does that entail?
18     A.    Similar to the certified safety
19  professional.  There is prerequisites then you sit for
20  an exam.
21     Q.    When did you get that?
22     A.    I believe I obtained that certification
23  roughly the same time I obtained my master's degree in
24  industrial systems engineering.
25     Q.    How about American Institute of Chemical

Page 32

1  Engineering, Senior Member.  When did you become a
2  senior member?
3      A.    Again, my understanding, that's based on
4  time in the industry.  I believe that's five years.
5  So I believe that would have been approximately five
6  years after I graduated from undergrad at Georgia
7  Tech.
8      Q.    Got it.  Okay.
9           American Society -- are you still an
10  active member of the American Institute of Chemical
11  Engineers?
12     A.    Yes, ma'am.
13     Q.    American Society of Safety Engineers,
14  professional member, when did you become a
15  professional member?
16     A.    That category -- my understanding is that
17  category of membership is based on accomplishing the
18  certified safety professional credential.  Once you
19  become a certified safety professional, then you can
20  apply to the society and they can change your status.
21     Q.    Then Human Factors and Ergonomics Society,
22  you are a member of that?
23     A.    Yes, ma'am.
24     Q.    The National Safety Council, you are a
25  member of that, or you are affiliated with that

8 (Pages 29 to 32)

Eric Boelhouwer          American Family v. Electrolux          April 3, 2014

Page 33

1    somehow?
2        A.    National Safety Council is set up a little
3    differently.  Dorris & Associates is a member of the
4    National Safety Council.  I believe that we don't hold
5    individual -- I don't hold an individual membership
6    with the National Safety Council.
7        Q.    Society of Automotive Engineers?
8        A.    Yes.  I hold active membership.
9        Q.    Are you an automotive engineer?
10       A.    No, ma'am.
11       Q.    So can anybody join the Society of
12   Automotive Engineers?
13       A.    I don't recall what the requirements are
14   to join the Society of Automotive Engineers.
15       Q.    And then Society for Chemical Hazard
16   Communication, so you are currently on the Board of
17   Directors for that.
18       A.    Yes, ma'am.
19       Q.    Is that a national entity?
20       A.    Yes, ma'am.
21       Q.    The institute of industrial engineers, you
22   are a member of that?
23       A.    Yes, ma'am.
24       Q.    Let me ask you about some of your recent
25   publications.  The latest publication in 2013, Effects

Page 34

1    of pictograms on safety data sheets and labels.
2            What are safety data sheets?
3        A.    Industrial chemical products have material
4    safety data sheets.  The OSHA regulations as it
5    pertains to chemical products are changing and so
6    going forward those documents will be known as safety
7    data sheets.
8        Q.    The next is a presentation, is that right,
9    or is that a publication?
10       A.    I believe those are publications.
11       Q.    First one, Journal of Safety Research, was
12   this a peer-reviewed article?
13       A.    Yes, ma'am.
14       Q.    The next 2010, Effects of GHS Hazard
15   Category, Signal Words, and Pictograms on an
16   Individual's Assessment of Perceived Risk.  That was
17   published for a conference.
18       A.    Yes, ma'am.
19       Q.    What was the general subject matter of
20   that paper?
21       A.    It is similar subject matter as to the
22   previous publication and it is by experiments,
23   revolving around hazard communication as it related to
24   my dissertation research.
25       Q.    What was your dissertation research?

Page 35

1        A.    Investigating the effects of symbols,
2    pictograms, associated with this implementation of the
3    globally harmonized system.  So associated with GHS
4    which my understanding at time was it was going to be
5    coming down the pike and be in the future at that time
6    required by OSHA.  So hazard communication in the U.S.
7    would be changing over time.
8        Q.    Are you talking about with respect to
9    industrial chemicals?
10       A.    Yes, ma'am.  With respect to industrial
11   chemicals and labeling.
12       Q.    Chemicals and labeling.  Okay.  So would
13   you say that the majority or all of your publication
14   has related to industrial chemical and chemicals and
15   labeling?
16       A.    No, ma'am.
17       Q.    Let me ask you this question, though.  For
18   industrial chemical safety and labeling, you mentioned
19   that's a harmonized field, correct, or it is a
20   harmonized system?
21       A.    Yes, ma'am.
22       Q.    By that you mean what?
23       A.    The United Nations undertook an initiative
24   starting approximately 20 years ago to identify that
25   virtually every country in the world had its own

Page 36

1    regulations with regards to chemical safety
2    communications.  And it made it very difficult for
3    manufacturers to make sure they addressed all of the
4    individual country requirements.  So efforts were made
5    on a global basis to try to align those safety
6    communications over time.
7        Q.    And are they aligned now, or harmonized
8    now?
9        A.    No, ma'am.
10       Q.    They are still working towards that?
11       A.    Yes, ma'am.
12       Q.    Are they harmonized within the United
13   States?
14       A.    At this point in time we are in a
15   transition period in the United States.  So you may
16   still comply with the previous OSHA regulation up
17   until June 2016 or you may comply with the revised,
18   the amended regulation which will be in effect in
19   2016.
20       Q.    There is regulation to comply with,
21   correct, across the United States?
22       A.    Yes, ma'am.
23       Q.    Now, you said that not all your
24   publications have been related to industrial chemical
25   safety and labeling.  Can you identify which ones were

9 (Pages 33 to 36)

Eric Boelhouwer        American Family v. Electrolux        April 3, 2014

Page 37

1   not or are not?
2       A.   May I have a document to look at?
3       Q.   Yes.
4       A.   Thank you.
5            The next item down, Piper, Davis, and
6   Boelhouwer regards safety symbols, so that is not
7   related to chemical hazard communication.
8       Q.   So safety symbols with respect to what?
9       A.   That was a variety of safety symbols that
10  was an interactive process using some computer
11  simulation and some other focus group means to try to
12  get other input from a variety of individuals as to
13  what those individuals thought the pictogram should
14  look like for a given hazard.
15      Q.   Now, this is 2010.  Did you draft this
16  while you were a graduate student?
17      A.   I assisted with this paper while I was a
18  graduate student.  So yes.
19      Q.   Any others that do not relate to
20  industrial chemical safety and labeling?
21      A.   Yes.  Further down, Piper Davis and
22  Boelhouwer, 2009, again, related to the paper we just
23  discussed for 2010 which is, again, outside of
24  chemical hazard communication.
25      Q.   The one below that as well?

Page 38

1       A.   Yes, ma'am.
2       Q.   And then how about the Dorris, Valimont,
3   and you, Boelhouwer, that last publication from 2007.
4       A.   That publication related to degraded
5   on-product warnings for forestry equipment and that
6   did not include chemical hazard.
7       Q.   Forestry equipment?
8       A.   Yes, ma'am.
9       Q.   So these are all, except for the first
10  one, first publication you have here, the rest of the
11  publications are seminars, correct?
12      A.   My review of the other publications is
13  that they were at conferences.
14      Q.   In Santa Monica every year?
15      A.   No, ma'am.  That is not in Santa Monica
16  every year.  The main office for the human factors is
17  in Santa Monica, California.
18      Q.   So you didn't get to go to Santa Monica
19  every year.
20      A.   Based on my recollection, I haven't had
21  the opportunity to go to Santa Monica.
22      Q.   Let me ask you about just generally about
23  these cases, these eight cases at issue here today.
24  Can you tell me how much time you spent on all of them
25  together?

Page 39

1       A.   No, ma'am.
2       Q.   Can you tell me how much time you spent on
3   each case?
4       A.   If we look at the billing for each matter,
5   I should be able to tell you how much time was spent
6   on each matter.
7       Q.   So we have the deposition notice marked as
8   Exhibit 1, the CV Exhibit 2.  So it would be within
9   each case, correct, the individual bill?
10      A.   Yes, ma'am.
11      Q.   So before we get into this, any of the
12  individual cases, when you received this assignment
13  for these -- did you receive the assignment for the
14  eight cases at one time?
15      A.   Yes, ma'am.
16      Q.   When you proceeded to work on them, did
17  you work on the cases individually or did you work on
18  general, common matters together and then work on the
19  individual cases?
20      A.   It is difficult to say I separated them
21  out completely because they are all going on
22  concurrently.
23      Q.   Did you separate them out or you did not
24  separate them out?  I am sorry.
25      A.   For billing purposes, I would try to work

Page 40

1   on one matter for a set period of time, set it aside,
2   work on the next matter for a certain period of time.
3   But there are certainly similarities across these
4   matters.
5       Q.   And is it fair to say that your opinions,
6   you have the same opinions for all eight cases, you
7   may have additional opinions for individual cases but
8   your opinions across all eight are generally the same?
9       A.   My understanding is that my assignment was
10  to evaluate the language provided by Electrolux.  That
11  language provided was similar in all eight of these
12  matters.  So my analysis for all eight matters was
13  similar.
14      Q.   In the course of your work in these cases,
15  have you ever spoken with any of the homeowners?
16      A.   Yes, ma'am.
17      Q.   Have you spoken with any of the insurance
18  adjusters?
19      A.   As it relates to these eight matters, no,
20  ma'am.
21           MS. BIERNAT:  Let's stop for a second.
22           (Recess from 10:05 a.m. to 10:28 a.m.)
23      Q.   (By Ms. Biernat)  So let me ask you these
24  questions.  Let's talk about general questions real
25  quick.

10 (Pages 37 to 40)

Eric Boelhouwer          American Family v. Electrolux          April 3, 2014

Page 41

1      All right.  Let's talk about warnings in
2  general.  One of the things you do outside of
3  litigation work is to advise on the format, content,
4  and layout of warnings.
5      A.    Yes, ma'am.
6      Q.    And warnings on products, correct?
7      A.    Generally speaking, yes, ma'am.
8      Q.    What is the goal of a warning?
9      A.    The goal of a warning generally speaking
10  is to communicate safety information.
11      Q.    Okay.  Are there any standards applicable
12  to develop or select warnings?
13      A.    As I understand your question, there are
14  no standards that would cover all products related to
15  the development of safety communications.
16      Q.    What do you consider yourself an expert
17  in?
18      A.    I consider myself in safety
19  communications, human factors, and part of that is
20  warnings and instructions.
21      Q.    Can you give me a brief definition of what
22  human factors is?
23      A.    Yes.  Human factors relates to how humans
24  interact with systems.
25      Q.    And the safety communications, is that a

Page 42

1  field, would you say?
2      A.    Safety communications would be a subset of
3  how humans interact with the systems.
4      Q.    So you have a general broad field of human
5  factors, correct?
6      A.    Yes, ma'am.
7      Q.    A subset of that is safety communications.
8      A.    Yes, ma'am.
9      Q.    Is there across the field of human factors
10  or in the subset of safety communications, are there
11  any general standards or guidelines that need to be
12  followed with respect to warnings?
13      A.    There are voluntary consensus standards
14  related to on-product labeling.
15      Q.    And are they written anywhere?
16      A.    Yes, ma'am.  ANSI Z535.4.
17      Q.    Does that relate to a particular product?
18      A.    That would relate to labels -- on-product
19  labels.
20      Q.    On any product?
21      A.    It relates -- it may not cover any product
22  under the sun.  Generally we would consider those
23  consumer products.
24      Q.    Okay.  So if you were to say -- well, my
25  question to you is -- you gave me the answer -- that

Page 43

1  ANSI 535.4 provides a voluntary consensus standard for
2  on-product labeling for consumer products in general.
3      A.    In terms of formatting and layout.
4      Q.    Okay.  Formatting and layout only.
5      A.    Yes, ma'am.
6      Q.    Is there any standard for content of
7  warnings, either the actual content or general
8  description of the content?
9      A.    There are some products that have
10  regulated language for them and as we discussed
11  earlier industrial chemical products do have
12  regulatory -- may have some regulatory language that
13  applies to them.  Also certain classes of consumer
14  products under the Consumer Product Safety Commission
15  would also have on-product labels required language
16  that may be applicable to a given product.
17      Q.    So particular products may have
18  statutorily required language.
19      A.    Yes, ma'am.
20      Q.    How about as a general concept in the
21  field of human factors, is there or are there
22  standards for the content of warnings?
23      A.    No.  There are not standards regarding the
24  content of warnings across all products.
25      Q.    And other than -- well, you said the goal

Page 44

1  of a warning is to communicate safety.  Is there any
2  other goal of a warning more specifically than just
3  communicating safety?  Can you elaborate on that a
4  little more.
5      A.    Sure.  Generally a warning should endeavor
6  to communicate the hazard, the consequence, and the
7  avoidance for a particular hazard.
8      Q.    Would you say that that is a general
9  standard in the field of human factors for warnings,
10  what they should -- what they should have?
11      A.    Not every safety communication has to have
12  all of those elements present in order to be
13  considered reasonable or adequate.  But overall when
14  you are looking at a warning, those are elements that
15  you could typically identify or look for.
16      Q.    Can you identify any adequate warning that
17  does not need to identify each of these three factors,
18  the hazard, the consequence, and the avoidance of the
19  hazard?
20      A.    Yeah.  There may be certain hazards that
21  are considered open and obvious.  So, for example, a
22  knife would have a sharp edge where an individual
23  could injure themselves using the knife and for the
24  products like that where the hazard is considered open
25  and obvious, there is not generally an on-product

Eric Boelhouwer       American Family v. Electrolux       April 3, 2014

Page 45

1  warning that would address the hazard, consequence,
2  and avoidance.
3      Q.   One example is open and obvious.  Any
4  other examples you can think of?
5      A.   Based on the design of a product, there
6  may not necessarily need to be a warning.  So for a --
7  that would identify each of those elements.  For
8  example, a product such as a Bic lighter where there
9  is a flame that comes out of the product, you may not
10 need to identify on that product based on your
11 analysis that you would identify the hazard of fire
12 for that product.
13     Q.   Okay.
14     A.   In a warning statement.
15     Q.   So that would be an open and obvious
16 situation.  So let me just recap.  Open and obvious
17 situation is one time when you may not necessarily
18 need to communicate those three aspects of a warning
19 in order for it to be adequate.
20     A.   Generally speaking, yes.
21     Q.   Are there any negative consequences to
22 having too many warnings for a product?
23     A.   Could you please clarify your question.
24     Q.   Sure.  Let me strike that question.
25          When you develop warnings for a product,

Page 46

1  do you conduct research on where the product should
2  be -- where the label should be placed?
3      A.   Once a hazard for a given product has been
4  identified and the need for an on-product warning has
5  been identified, I certainly could assist with the
6  information on the product.
7      Q.   Who determines the need for an on-product
8  warning?
9      A.   Typically a client would identify the need
10 for an on-product warning.
11     Q.   Do you ever as an expert in safety
12 communications identify independently a need for an
13 on-product warning?
14     A.   I can't think of a specific example as I
15 sit here.  But at times I may have recommended to
16 clients to modify the content of their on-product
17 warnings to identify additional hazards, consequences,
18 and avoidance.
19     Q.   When does a product need an on-product
20 warning?
21     A.   That is dependent upon the nature of the
22 hazard, the experience the anticipated users may have,
23 and an analysis conducted by the manufacturer of a
24 product.
25     Q.   So an on-product warning requirement

Page 47

1  depends on the nature of the hazard, what was the
2  second thing you said?
3      A.   You would want to identify some
4  characteristics of the user population.  So if it is
5  an industrial product, you may not need an on-product
6  warning because there is an expectation of training.
7      Q.   And then whether an on-product warning is
8  required depends on the nature of the hazard, the
9  identity of the user population, and anything else?
10     A.   There is certainly a lot of factors you
11 want to include.  I believe I identified the main
12 ones.  For a given hazard there may be additional
13 factors you are going to want to consider as part of
14 your analysis.
15     Q.   Okay.  So have you ever made the analysis
16 that an on-product label is required for a particular
17 product?
18     A.   For a given product, there may be Consumer
19 Product Safety Commission or other statutorily
20 required language that must appear on the product.  So
21 at times you would recommend that the products comply
22 with the regulatory language.
23     Q.   So that's another factor that we have to
24 consider when we determine whether an on-product label
25 is required, correct?  So we have the nature of the

Page 48

1  hazard, the identity of the user population, any
2  governmental or regulatory requirements, and maybe
3  additional requirements depending on the nature of
4  hazard.
5          So my question to you is have you
6  specifically ever determined that whether an
7  on-product label has been -- strike that.  Have you
8  yourself ever made the determination whether an
9  on-product label is required for a particular product?
10     A.   As I understand your question, yes, I have
11 assisted.  My analysis may indicate that a client may
12 want to consider additional warning information or
13 safety communications be provided on the product.
14     Q.   And you did that by looking at these
15 factors we have discussed here.
16     A.   And, again, there may be product-specific
17 factors you need to consider in those analyses.
18     Q.   And so it is not entirely up to the
19 manufacturer or distributor to create the on-product
20 warning, that is something you as a consultant would
21 do as an -- you as a consultant in human factors would
22 do?
23     A.   As a consultant in human factors, I would
24 provide recommendations to the client regarding the
25 format, the content, and the layout of the on-product

12 (Pages 45 to 48)

Eric Boelhouwer        American Family v. Electrolux        April 3, 2014

Page 49

1   communications.
2       Q.   Have you ever done that -- well, have you
3   ever yourself made the analysis whether the on-product
4   warning is required or in every situation has your
5   client come to you saying, I need an on-product
6   warning, can you help me with the format, content, and
7   layout?
8       A.   As I understand your question, I believe I
9   have assisted them with identifying if -- as it
10  relates to a particular product there may be one
11  aspect of the interaction with that product that they
12  may want to consider as part of their on-product
13  warnings, but they would have to perform their own
14  analysis to determine if that is how they would wish
15  to proceed.
16      Q.   Okay.  So part of your engagement is not
17  to make that analysis of whether an on-product warning
18  is required or should be placed in the first place.
19      A.   I may make a recommendation and I believe
20  we have already talked about things that would be
21  required by Consumer Product Safety Commission or OSHA
22  or others that would be required to appear on a
23  product.  So there are times my recommendations would
24  include they comply with the existing regulatory
25  information and also I may make recommendations to a

Page 50

1   client that there may be additional items they would
2   want to consider for their on-product label.
3       Q.   But the decision to make an on-product
4   label has already been made by the time it comes to
5   you?  That's been your experience over the last four
6   years.
7       A.   I cannot recall a specific incidence where
8   they presented us a product that was already in the
9   market that had no warnings on the product and that we
10  made -- I made a recommendation that they needed to
11  place an on-product warning on that product.
12      Q.   Again, you have not consulted -- in your
13  nonlitigation work consulted on any household consumer
14  products.
15      A.   As I understand your question, I
16  believe what we discussed earlier was appliances and
17  we identified several products that may fall under the
18  category of appliances and I don't believe I have
19  consulted any that we have determined as appliances
20  earlier.
21      Q.   So the purpose, the goal of a warning is
22  to communicate safety.  Is the goal of a warning to
23  change behavior of a consumer?
24      A.   One aspect of safety communications would
25  certainly be that a warning should provide the user

Page 51

1   information to alert them to the hazard, the
2   consequence, and avoidance and then the user would
3   have to make a determination if they were going to
4   comply or not comply with the information that had
5   been presented.
6       Q.   All right.  And if the user does not
7   comply, does that mean that the warning is not
8   adequate?
9       A.   Generally speaking, there is lots of
10  factors that would need to be considered before I
11  could make a determination whether a warning is
12  adequate or not.
13          MS. BIERNAT:  That wasn't my question,
14  though.
15          Can you read back my question.
16          (The record was read by the reporter.)
17          THE WITNESS:  It is hard to make an
18  overall statement like that.  It is very broad.
19      Q.   (By Ms. Biernat)  So my question is the
20  mere fact that somebody does not comply with the
21  warning, does that by itself mean the warning is
22  inadequate.
23      A.   Generally, I would say I do not agree with
24  that statement.
25      Q.   Okay.  So a warning can be perfectly fine

Page 52

1   if somebody just chooses not to comply with it or heed
2   it.
3       A.   There may be a number of factors that an
4   individual presented with a certain set of
5   circumstances and safety communications where that
6   individual makes a decision whether or not to comply
7   with the warning.
8       Q.   Let's talk about -- I think you mentioned
9   this a couple of times -- number of factors that go
10  into determining whether a product is or a warning is
11  adequate or not.  What do you look for to determine
12  whether a product warning is accurate?
13      A.   Is accurate?
14      Q.   I am sorry.  Yeah.  Adequate.  Sorry.
15      A.   Factors to consider broadly are the nature
16  of the hazard, the consumer's or the user's prior
17  knowledge and experience of that hazard, the potential
18  consequences associated with that hazard, and then,
19  again, the means of avoidance for that particular
20  hazard.  So you would need to consider all of those
21  factors.
22      Q.   To consider whether a warning is adequate,
23  correct?
24      A.   Yes, ma'am.
25      Q.   And what about the nature of the hazard

13 (Pages 49 to 52)

REGENCY-BRENTANO, INC.

Eric Boelhouwer        American Family v. Electrolux        April 3, 2014

Page 53

1  that you consider?
2      A.   I believe as we discussed earlier some
3  hazards may be open and obvious to the consumer.
4  Other hazards may not be obvious to the consumer and
5  they would need to be informed of the nature of that
6  hazard.
7      Q.   How do you determine whether the hazard is
8  open and obvious?
9      A.   There is a variety of factors that you
10 would need to consider to determine that and it is
11 going to be dependent on the product itself, any
12 kind -- the physical characteristics of the product,
13 how the product is used, and in what environmental
14 circumstances the product is used as well.
15     Q.   To determine whether a hazard is open and
16 obvious or not, you need to look at a variety of
17 factors, including physical characteristics of the
18 product.  What about the physical characteristics?
19 Can you be a little more specific for me?
20     A.   Sure.  As it relates to these matters,
21 there may be the accumulations of lint inside the
22 dryer chassis so that lint accumulation may not be
23 obvious to the consumer when they open the door to the
24 dryer and look inside.
25     Q.   So let's be more general, though, and not

Page 54

1  specific to this product because we will talk about
2  that in a minute.
3          I want to know what you are looking at
4  when you approach -- you as a human factors expert
5  look at when you approach a product to determine
6  whether the hazard is open and obvious.
7      A.   I would look at the safety communications
8  that have been provided, the physical characteristics
9  of the product, and how those instructions would guide
10 the use of that product; and also your own personal
11 experience with similar products is also going to
12 influence your interaction with that product.  So
13 products that are used in an industrial setting may
14 not (indicating).
15     Q.   I understand what you are saying.  Let's
16 say there is no safety communication, you are coming
17 at this without the benefit of seeing the safety
18 communications.  You as a human factors expert, you,
19 look at the physical characteristics of a product,
20 correct?
21     A.   If it is a -- yes, ma'am.
22     Q.   Because I am trying to get at how you form
23 your opinion and so I am curious to know what research
24 or what investigation or examination do you do to
25 determine the hazard when you consider the physical

Page 55

1  characteristics.
2      A.   The hazards associated with a given
3  product may already be identified for you by the
4  manufacturer.  They may -- if you think of a chain
5  saw, you observe the product, I guess that's, again,
6  another one that may be open and obvious.  There also
7  may be other times where the hazard is not obvious to
8  the consumer.
9      Q.   How do you determine whether the hazard is
10 not obvious to the consumer?  You are the expert here.
11 How do you determine whether the hazard is obvious to
12 the consumer or not?
13     A.   Just an analysis of the safety
14 communications for that product, the communications
15 with the client regarding the product, my
16 understanding of the field of human factors and how
17 humans may interact with systems and products,
18 whatever regulatory information may also play a role
19 in that.  I think that should generally cover all of
20 the factors that would need to be considered.
21     Q.   So with respect to dryers, you yourself,
22 have you made any determination whether the hazards of
23 dryers are obvious or not?
24     A.   With respect to what hazard?
25     Q.   Any hazard.

Page 56

1      A.   I have not attempted to perform an
2  analysis if any hazard related to a dryer is open and
3  obvious to a consumer.
4      Q.   Have you educated yourself in any way
5  through research or reading or discussions with
6  anybody about what any of the hazards of a dryer are?
7      A.   Yes, ma'am.
8      Q.   And what have you done?
9      A.   I have reviewed materials related to these
10 individual matters, reviewed materials from the
11 Consumer Product Safety Commission, and also had
12 discussions with others.
13     Q.   Who have you had discussions with?
14     A.   Alan Dorris.
15     Q.   Anybody else?
16     A.   Not that I recall outside the context of
17 litigation.
18     Q.   So in your discussions with Alan Dorris,
19 did he indicate to you what the hazards of dryers are?
20     A.   No, ma'am.  I would not agree he educated
21 me as to the hazards of dryers.
22     Q.   So you have not done any analysis to
23 determine whether the hazards of the dryer are both
24 open and obvious to the consumer, but you have
25 educated yourself on what the hazards of the dryer are

14 (Pages 53 to 56)

Eric Boelhouwer        American Family v. Electrolux        April 3, 2014

---

Page 57

1  in the course of this litigation; is that accurate?
2      A.   I have educated myself with respect to
3  some of the hazards that may be associated with
4  dryers. But I don't feel I have firm grasp of all of
5  the potential hazards associated with the dryer.
6      Q.   What hazards have you educated yourself
7  on?
8      A.   I would say as it relates to dryers, the
9  accumulation of lint within the dryer chassis and the
10 potential for fire associated with lint accumulation.
11 And there may be others.
12     Q.   Any others?
13     A.   I don't recall a specific additional
14 hazard. But I wanted to be inclusive in my response.
15     Q.   Okay. So is your opinion in these cases
16 related specifically to the hazard of the accumulation
17 of lint in the dryer chassis and the risk of fire
18 associated with this lint accumulation?
19     A.   Can you repeat the question.
20          (The record was read by the reporter.)
21          THE WITNESS:  Generally, yes. There are
22     also case-specific or matter-specific opinions
23     that I hold in these matters.
24     Q.   (By Ms. Biernat)  So I just want to see if
25 we can limit this so that we are not going all over

---

Page 58

1  the place today.
2          Does your opinion relate to the
3  communication of the hazard of the accumulation of
4  lint in the fire chassis and the risk of fire
5  associated with lint accumulation only?
6      A.   No, ma'am. I don't believe my opinion is
7  limited to just that as it relates to all of these
8  matters.
9      Q.   What other hazards -- let me back up,
10 then.
11          Are there any other hazards that relate to
12 each of the eight cases that you have identified or
13 educated yourself on?
14     A.   Broadly across all eight cases I believe
15 the risk of fire is one area that I will opine on.
16          MS. BIERNAT:  But that's not the question
17     I asked. Sorry.
18          (The record was read by the reporter.)
19          THE WITNESS:  I believe the answer to your
20     question is no.
21     Q.   (By Ms. Biernat)  Okay. Is it fair to say
22 you may have identified other hazards with respect to
23 certain individual cases?
24     A.   Yes, ma'am.
25     Q.   That's what you are trying to say. So

---

Page 59

1  then when we talk about the individual cases, you can
2  describe for me what the hazard is that you have
3  educated yourself on.
4      A.   Yes, ma'am.
5      Q.   All right. So now the next thing I want
6  to ask you about in general is another factor you have
7  identified as whether a warning is adequate is the
8  user's prior knowledge.
9          Does that involve also the user's own
10 personal experience?
11     A.   As I understand your question, yes, ma'am.
12 The user's prior knowledge and experience.
13     Q.   How much of your analysis is influenced by
14 your own personal experience?
15     A.   Across all products?
16     Q.   Well, let's say in this case with respect
17 to dryers.
18     A.   I am sure that my own personal experience
19 does play a role in my analysis of these matters, yes,
20 ma'am.
21     Q.   How do you determine a user's prior
22 knowledge when you are evaluating the adequacy of a
23 warning in general?
24     A.   In general as it relates to other
25 products, if there are peer products in the market

---

Page 60

1  that individuals have interacted with, the product has
2  been established in the market for a long period of
3  time, those products may -- there may be an
4  expectation that users have prior experience with a
5  similar product.
6      Q.   So how do you determine that? You as the
7  expert.
8      A.   You would have to consider the hazards
9  associated with that product, the use of that product,
10 what other -- I am sorry, let me have the question
11 again.
12     Q.   Sure. We are talking about the factors
13 that you look at when you are evaluating whether a
14 product warning is adequate or not. We have discussed
15 the nature of the hazard, whether it is open and
16 obvious or not; we discussed how we determined whether
17 a hazard is open and obvious. The next factor you
18 gave me was the user's prior knowledge. How do you
19 determine the user's prior knowledge?
20     A.   For products that have been established in
21 the marketplace, individuals may have interacted with
22 similar products over a number of years and that may
23 build on their experience using those products.
24 Certainly the effect of benign experience is also
25 going to play a role for those consumers as well.

REGENCY-BRENTANO, INC.

Eric Boelhouwer        American Family v. Electrolux        April 3, 2014

Page 61

1    Q.    So you would expect a product that is new
2  to the market, the users would have limited or no
3  knowledge of as opposed to a product that has been on
4  the market for quite a while, you would expect users
5  to have greater knowledge of; is that fair to say?
6    A.    That may be a little broad, but I think I
7  agree with your statement, yes.
8    Q.    That's my question, then.  How do you
9  determine this?  How do you determine the user's prior
10  knowledge?  Do you do research?  Do you conduct
11  studies?  Do you read material?
12    A.    It can be all of those factors that you
13  just listed.  Certainly would play a role in your
14  analysis of what education has been provided to users
15  in terms of warnings and instructions and how to use
16  the product.
17    Q.    So now the question, how do you do it
18  because I am most concerned about what you do and what
19  you have done and what you can do and what you are
20  supposed to do.
21    A.    Yes, ma'am.  I certainly try to review any
22  published peer-reviewed literature that is out there
23  that may address how consumers interact with a given
24  product.  Generally there is not a lot of
25  product-specific studies in the peer-reviewed

Page 62

1  literature to review.
2    Q.    All right.  Anything other than reviewing
3  peer-reviewed literature?
4    A.    Yes.  At times, depending on the
5  circumstances, I may review warning communications
6  materials for similar products that are available in
7  the market.
8    Q.    And how do you know if those warning
9  communications for similar products are adequate or
10  not?
11    A.    For similar products, it is, again, going
12  to be dependent on the nature of the hazard, whether
13  that particular hazard is unique to the product you
14  are trying to analyze, or if it is a hazard more
15  broadly associated with that category of products.
16    Q.    So what I am trying to get at here is I
17  want to know what objective information you rely on
18  when you determine what a user's prior knowledge is
19  when you make the determination or analysis of whether
20  a warning is adequate.
21    A.    There may be -- inside of litigation there
22  may be testimony from individuals about their
23  experience with a particular product or prior
24  products.  There may be peer-reviewed literature that
25  is applicable to that category of products.  There may

Page 63

1  be surveys or other studies conducted by individuals
2  that are not peer reviewed that are available that may
3  address -- may provide additional information to
4  educate myself about the hazards for a user's prior
5  experience.
6    Q.    So outside of litigation, where you don't
7  have the benefit of deposition testimony, do you rely
8  on the other two things?
9    A.    Peer-reviewed literature, surveys
10  conducted by others, or if needed at times you could
11  also undertake some kind of study to evaluate a user's
12  or a population of users' prior experience with the
13  product.
14    Q.    With litigation usually we all have the
15  benefit of hindsight.  I am talking about the
16  situation where you do not have the benefit of
17  hindsight.  Where you are trying, you as the
18  consultant being paid to evaluate someone's warnings,
19  to try to determine if they are sufficient or
20  adequate.  You look at peer-reviewed literature, any
21  possible surveys or studies that are out there, and
22  you look into the possibility of maybe conducting your
23  own study.
24    A.    Yes, ma'am.
25    Q.    If you do not have the benefit of any

Page 64

1  general -- sorry, specific literature, or any surveys
2  or studies, what kinds of things do you look at?
3    A.    You may look at -- if a peer product
4  exists, you may look at the warnings and instructions
5  that are provided with the peer product.  There may
6  also be available accident reports or fire reports
7  from other sources as well.
8    Q.    So when you look at the peer products'
9  warnings and instructions, are you looking at them to
10  see, what?
11    A.    For across a broad category of products,
12  you would be looking to see if the hazards identified
13  are relatively the same, that the consequences of
14  those hazards are in alignment; and then again the
15  avoidance information would generally agree across the
16  peer products.
17    Q.    Then how would that inform your decision
18  with respect to the label you are looking at
19  physically?  If the hazard agrees across the product
20  class and if the avoidance information is the same
21  across a class or similar, then it is okay to use the
22  same or similar language for your own product?
23    A.    Depending on your analysis of your product
24  and if you have a similar hazard you may want to
25  consider similar avoidance information for that

16 (Pages 61 to 64)

REGENCY-BRENTANO, INC.

Eric Boelhouwer       American Family v. Electrolux       April 3, 2014

Page 65

1  hazard.
2      Q.   All right.  The next factor you gave me
3  for determining whether a product's warning is
4  adequate is the potential consequences of that hazard.
5  How is that relevant to the adequacy of the warning?
6      A.   The consequence information communicated
7  certainly can play a role in elevating a consumer's
8  awareness of a particular risk.  For example, if the
9  risk is a paper cut, the user may not evaluate that
10 risk to be that severe.  But on the other end of the
11 spectrum, if the consequence is serious injury or
12 death, that may cause the consumer to have a different
13 level of concern about the outcome.
14     Q.   But then how does the potential
15 consequence itself, how does that affect your
16 determination whether the warning is adequate or not?
17 What about the potential consequence is important in
18 determining whether an existing warning is adequate?
19 Meaning the more severe consequences, does the warning
20 need to be different than something that is less
21 severe?
22     A.   Yes, ma'am.  If the warning, if the
23 consequences are more severe, it would make a
24 difference than if they are less severe.
25     Q.   How so?

Page 66

1      A.   It depends on the nature of the hazard.
2  It depends on the circumstances of using the product.
3  There is a lot of factors that would influence how
4  that consequence information is perceived by a given
5  user.
6      Q.   And how about the means of avoidance, what
7  about the means of avoidance of the hazard is
8  important to determining whether the warning is
9  adequate?
10     A.   Again, there is a lot of things that go
11 into determining if the avoidance information for a
12 given hazard is adequate.  It is going to depend
13 generally speaking on the cost of compliance for the
14 user to comply with that hazard, whether that is in
15 terms of money that they have to spend or effort in
16 some regard that they have to exert, that may be in
17 the terms of time or some physical action they have to
18 perform.
19     Q.   Because we are going to have to go through
20 these things anyway, we may as well talk about them
21 now.  I appreciate the general overview.  I would like
22 to get more specific.
23          I identified for you one way may be the
24 potential consequences would have an impact on if the
25 determination of the warning is adequate, depending on

Page 67

1  if it is more severe the hazard -- I'm sorry, the
2  hazard is more severe and the risk is more severe then
3  that would determine -- that would factor into whether
4  the warning is adequate.
5          How about the means of avoidance?  You
6  mentioned one thing is cost of compliance.  How does
7  that affect whether the warning is adequate?
8      A.   It is possible that the avoidance
9  information provided for a given hazard may be
10 excessive in terms of what the consumer has to do in
11 order to comply with that warning in terms of either
12 monetary expense or time or effort or a combination of
13 those factors.
14     Q.   How does that relate to the adequacy of
15 the warning?
16     A.   If the means of avoiding the hazard are
17 excessive or can be evaluated to be too high, then the
18 consumer may not choose to take that action.
19     Q.   Okay.  But how does that relate to the
20 adequacy of the warning?
21     A.   If the avoidance information communicated
22 to the consumer has a very high cost of compliance,
23 then the effectiveness of the warning could
24 potentially be reduced if the consumers aren't going
25 to comply with the avoidance information they were

Page 68

1  provided due to the high cost of compliance.
2      Q.   So does that mean the warning is less
3  adequate, then?
4      A.   If the avoidance information for a
5  particular hazard has a high cost of compliance, yes,
6  then the effectiveness of that warning may be reduced
7  and then that warning may not be adequate.
8      Q.   In such a situation where you were saying
9  the cost of compliance is so high or too high that the
10 consumer chooses not to take action, is there ever a
11 possibility of an adequate warning?
12     A.   As I understand your question, no, I do
13 not think if the cost of compliance is too high there
14 could be an adequate warning for a given hazard and
15 other means of reducing the risk of that hazard need
16 to be addressed.
17     Q.   So in other words, for some products,
18 because the consumer him or herself decides it is just
19 too costly to comply, no warning would ever be
20 adequate for that product.
21     A.   For a given hazard if the cost of
22 compliance for a consumer to comply with that warning
23 is above a certain point, then no, the warning may not
24 be able to be adequate and you would have to consider
25 different means of avoidance of that risk.

REGENCY-BRENTANO, INC.

Eric Boelhouwer      American Family v. Electrolux      April 3, 2014

Page 69

1    Q.    All right.  You said if the means of
2  avoiding the hazard are too high, then the consumer
3  may not choose to take that action.  When you state
4  that, made that statement, you are taking into account
5  the consumer is educated about the hazard, correct?
6    A.    The consumer's education of that hazard
7  would certainly play a role, yes.
8    Q.    And that consumer is educated about the
9  means of compliance, correct?
10    A.    Yes, ma'am.
11    Q.    And the consumer, according to your
12  statement, has balanced the two and made a conscious
13  decision that the cost of compliance is too high,
14  correct?
15    A.    That may be a little broad but yes, ma'am.
16    Q.    So in your scenario in explaining what the
17  cost of compliance is and how that nullify a warning
18  completely, the consumer has already made -- is
19  already educated and has made his or her own decision
20  about the hazard, correct?
21    A.    The consumer may have evaluated the hazard
22  and the consequence information and then considered
23  the avoidance information to be more effort or money
24  than they were willing to expend to address that
25  particular hazard.

Page 70

1    Q.    So for the cost of compliance to have any
2  relevance whatsoever in any situation, the consumer
3  has to have already understood the warning, understood
4  the cost and made the determination that they are not
5  going to do it because it is just too much.
6    A.    That again may be a little broad.  But
7  yes, ma'am.
8    Q.    One thing I got from our discussion right
9  there is that a warning is inadequate -- or a warning
10  may be inadequate if it does not cause the consumer to
11  take an action to avoid the warning.
12    I am sorry.  Let's strike that.  A warning
13  may be inadequate if it does not cause the consumer to
14  avoid, take action to avoid the hazard.
15    A.    Generally, yes, ma'am.
16    Q.    But it is not always inadequate if the
17  consumer does not take action to avoid the hazard?
18    A.    No, ma'am.
19    Q.    Can you think of any circumstances where
20  the warning is adequate but it does not cause the
21  consumer to change his or her actions to avoid the
22  hazard?
23    A.    Are you asking for a hypothetical?
24    Q.    Sure.
25    A.    One example may be if there is a piece of

Page 71

1  rotating equipment and the hazard would be considered
2  that you can observe the hazard, you can see the blade
3  going around.  Similar to your lawnmower, for example,
4  that the individual may -- under some circumstance it
5  is possible that they may not disengage the mower to
6  stop the motor so that the blade continues to spin.
7  And then for whatever reason they choose not to use a
8  different implement or stick and put their hand in the
9  vicinity of the rotating blade in their mower.
10    There is several things that a consumer
11  would have to do to get to that point.  But it is
12  possible that they could get to that point.
13    Q.    How about with smoking, there are warnings
14  of the risks of smoking on a package, correct?
15    A.    Yes, ma'am.
16    Q.    Let's say a package of cigarettes I
17  suppose is what I am referring to to clarify these
18  days, depending on what state you are from, right.
19  And some people choose to ignore those warnings.
20    A.    Some people do still choose to smoke, yes,
21  ma'am.
22    Q.    In every situation, is that warning --
23  that warning is not inadequate?
24    A.    As it relates to the people choosing to
25  use a product that is in the marketplace and continue

Page 72

1  their behavior using that product, the warning may or
2  may not be inadequate.  There is a variety of
3  different warnings that are on a cigarette package is
4  my understanding.  I don't have reference to all of
5  them.
6    Q.    Sure.  That's probably a complicated
7  situation as well.
8    Okay.  Let me ask you about your reports.
9  We can get them out.  One thing I wanted to ask you
10  was if we can talk about any information and items
11  that you considered for every report, we can talk
12  about them all at once.  Are you able to do that?  Do
13  you need to look at all the reports or does one
14  suffice?  What would you prefer?  What would you like?
15    A.    It is going to depend on the question.
16    Q.    What I was going to ask is what material
17  did you consider when you formed your opinions and we
18  can keep it to the general opinions first and then go
19  into each of the individual cases.  So maybe what I
20  will do is -- we can start with the Blake case.
21    I will ask you if you considered all the
22  information identified here, if you tell me if you can
23  recall if you considered it for all of the cases.  I
24  understand obviously some of the depositions for each
25  individual case you did not probably rely on or

Eric Boelhouwer        American Family v. Electrolux        April 3, 2014

Page 73

1  consider for the other ones.  We can start from there
2  and see how it goes.
3      So why don't you look at the exhibit copy.
4  That's exhibit what?
5      A.   5-E.
6      Q.   5-E.  Okay.  That's for the Blake case.
7      Now, my first question to you is, is the
8  qualification section of each of your eight reports
9  the same?
10     A.   My recollection is that they are all the
11 same, yes, ma'am.
12     Q.   And please, if I ask you a question like
13 that, you need to look at them, by all means, let's
14 look at them.  It is not just -- I am just trying to
15 abbreviate things here.
16     The next section in your report is
17 materials reviewed.  Let's talk about that.  Can you
18 tell me just looking at this one report which of the
19 materials you reviewed for all of the cases?  If you
20 would like to consult the other reports, by all means.
21     A.   I will try to consult this one report to
22 respond to your question.
23     Q.   If something comes up, we can address it
24 later on, too.  It is not a problem.
25     A.   Thank you.

Page 74

1      Electrolux venting kit.  It lists the
2  website address.  Do you want me to read that?
3      Q.   Okay.  No.  I see that.
4      A.   Electrolux service manual 27-inch dryers,
5  gas and electric models, September 2002.
6      Q.   All right.
7      MR. BOERIGTER:  Are these items that you
8  did look at for every case?
9      THE WITNESS:  Yes, sir.
10     Photographs of laundry center warning
11 labels.  Label-Warning Flex Duct, B 1373339,
12 dated 3/8/2010.
13     The Consumer Products Safety Commission
14 document 5022 June 2003.
15     FEMA Topical Fire Research Series, Volume
16 7, Issue 1, January 2007.
17     NFPA March 2009 Home Fires Involving
18 Clothes Dryers and Washing Machines.
19     Consumer Product Safety Commission
20 Statement, Consumer Opinion Form, Survey No. 3,
21 September 2010.
22     Consumer Product Safety Commission June 1,
23 2011, An Evaluation of Using Indicators to Inform
24 Consumers of Clothes Dryer Status.
25     Whirlpool Use and Care Guide, Part No.

Page 75

1  3396304, 1994.
2      Deposition of Carl King in the Stout and
3  Coles also Electrolux Home Products matter.  May
4  22nd, 2013.
5      The AHAM, A-H-A-M, Analysis of Industry
6  Data On Clothes Dryer Fire Incidents, August of
7  2002.
8      And the depositions from over 100
9  Electrolux dryer owners, see Appendix A.
10     Q.   (By Ms. Biernat) How about the third
11 amended complaint, the very first one?
12     A.   I don't recall if that document is present
13 in every file for these matters.
14     Q.   Sure.  Okay.
15     So let's start with the venting kit.
16     May I pull that from my file?
17     MS. BIERNAT:  Please.
18     (Recess from 11:29 a.m. to 11:35 a.m.)
19     Q.   (By Ms. Biernat)  You got out the venting
20 kit for me.  I might have a copy of that and we can
21 mark it.  Let's see if this is the same.  If it is the
22 same, we will mark one as the exhibit.  Is it the same
23 maybe website?
24     A.   No, ma'am.  It is not the same website.
25     Q.   Okay.

Page 76

1      A.   Do you want me to identify the difference
2  in the website?
3      Q.   Yeah.
4      A.   The document from my file has a website
5  address that includes Electrolux-venting-kit1.html.
6  And the document you provided to me is in -- the
7  website address at the bottom says
8  Electrolux-venting-kit.html.  So the web addresses are
9  not the same.
10     Q.   Okay.  Can I just look at them real fast
11 just to see if I can see it.
12     So we won't mark this, this comes from
13 your file, the boxes over there.
14     A.   Yes, ma'am.
15     Q.   Let's just say it has a sticker that says
16 P6 on the top.  What does P6 stand for?
17     A.   P6 as it relates to the Blake matter is
18 the sixth document in the product folder, the yellow
19 product folder.
20     Q.   And this is a printout from a website
21 www.Electrolux-store.com/Electrolux-venting-kit1.html.
22 All right.
23     So this is material that you reviewed when
24 preparing your report and your opinion in this case,
25 correct?

19 (Pages 73 to 76)

Eric Boelhouwer        American Family v. Electrolux        April 3, 2014

Page 77

1     A.    Yes, ma'am.
2     Q.    Did you rely on this content of this
3  document at all to form your opinion or to prepare
4  your report?
5     A.    Yes, ma'am.
6     Q.    How so?
7     A.    The document has a sentence which I quoted
8  in my report on Page 7 which states, Clean the inside
9  of the dryer and around its heating element. Most
10 people do not know that lint can build up around the
11 heating element and cause a fire.
12    Q.    So is that the only part of this document
13 that you relied on in preparing your report and coming
14 to your opinions?
15    A.    No, ma'am. There are other parts of the
16 document which I reviewed, but that particular element
17 stood out to me.
18    Q.    Anything else in the document that was
19 relevant to your opinion or your report?
20    A.    There may be elements that are contained
21 in this document that are relevant to my opinions
22 regarding the education of consumers and awareness of
23 certain hazards. But as I sit here, I cannot pick out
24 another particular package that I relied on in forming
25 my opinions.

Page 78

1     Q.    Now, where did you get this document?
2     A.    From the Electrolux website.
3     Q.    You got it yourself?
4     A.    Yes, ma'am.
5     Q.    Did you search specifically for the
6  Electrolux venting kit document?
7     A.    I don't recall.
8     Q.    Let me ask you this, in your work on these
9  cases, did you ever conduct any Internet research?
10    A.    Yes, ma'am. I have used the Internet to
11 look for information related to these matters.
12    Q.    What searches did you do?
13    A.    I try to be as inclusive as I can. I
14 probably looked at Google Scholar to look for
15 peer-reviewed articles related to dryers. I looked at
16 the Electrolux website. I looked at the Consumer
17 Product Safety Commission website. And there may be
18 others. That's just what I can recall sitting here.
19    Q.    Sure. When you did a Google Scholar
20 search, do you recall what search terms you put in?
21    A.    I would assume -- no, ma'am, I don't.
22    Q.    Sitting here today, do you have any idea
23 of what you may have put in there without making an
24 assumption? You did it. Do you have a general
25 recollection of what you put in?

Page 79

1     A.    It would just be an assumption on my part
2  that I included the terms dryer, lint. There may have
3  been -- fire may have been another term I would have
4  considered.
5     Q.    Did you find any articles through Google
6  Scholar that you reviewed or considered at all?
7     A.    No, ma'am. I don't believe that I did.
8     Q.    Okay. Do you know, you said you looked at
9  Google Scholar for peer-reviewed articles with respect
10 to the dryers, anything in particular to dryers. You
11 mentioned lint and fire. Anything else in particular
12 with respect to dryers that you looked up?
13    A.    I may have included terms related to
14 instructions manual, warning label.
15    Q.    What about did you do any Google Scholar
16 searches or anything similar to Google Scholar
17 database for warnings, instructions, or manuals for
18 any appliances, not just dryers?
19    A.    No, ma'am. I don't believe I included
20 additional search terms for other appliance-type
21 products.
22    Q.    Did you conduct any searches into
23 peer-reviewed literature for anything other than
24 dryers with respect to this case?
25    A.    No, ma'am. I don't believe I conducted

Page 80

1  any other Google-type searches related to this matter.
2     Q.    Did you review or consider any literature
3  no matter how you got it, meaning either through
4  Google or through another source when you were
5  preparing your report and forming your opinions in
6  this case?
7     A.    Did I consider other material?
8     Q.    Other literature, other peer-reviewed
9  literature.
10    A.    Yes, ma'am.
11    Q.    And what was that?
12    A.    At the back of each of my reports it lists
13 the reference articles that -- I not only provide an
14 overview of the warnings and hazard communication
15 literature, but also I considered the Dingus,
16 Hathaway, and Hunn article as part of my opinions for
17 this report and also the Rogers, Lamson, and Rousseau
18 specifically as they relate to the cost of compliance
19 as peer-reviewed publications.
20    Q.    The other four articles you reviewed
21 generally to inform you in the area of human factors;
22 is that fair to say?
23    A.    Yes, ma'am.
24    Q.    These two, the Dingus and McCarthy
25 articles, you reviewed specifically to inform you in

20  (Pages 77 to 80)

Eric Boelhouwer        American Family v. Electrolux        April 3, 2014

---

Page 81

1    the area of costs of compliance?
2        A.    May I clarify?
3        Q.    Yes.
4        A.    The Dingus article, Hathaway, and Hunn and
5    the last item, Rogers, Lamson, and Rousseau.
6        Q.    I circled the wrong one.  Not McCarthy.
7        A.    Not specifically McCarthy, no, ma'am.
8        Q.    So you told me what you looked at for the
9    venting kit.  What is the relevance for that section
10   you identified and quoted?
11       A.    The relevance is that it informs me as the
12   reader that Electrolux had prior knowledge that in
13   their words most people do not know that lint can
14   build up around the heating element and cause a fire.
15       Q.    What relevance does that have for you as
16   an expert in human factors?
17       A.    It would speak to peoples' awareness of
18   the potential hazard related to lint accumulation in
19   their dryer.
20       Q.    How so?
21       A.    That individuals may not be aware of the
22   potential hazard associated with lint accumulating in
23   their dryer.
24       Q.    Any other of your materials -- well, let
25   me back up.

Page 82

1            Do you know who authored this document?
2        A.    No, ma'am.
3        Q.    The next item you have identified for all
4    the cases is the Electrolux service manual.  What is
5    the relevance of that one?
6        A.    It is my understanding that this document
7    would not be provided to consumers but to qualified
8    service personnel to inform them of the servicing
9    requirements for the 27-inch gas and electric model
10   dryers.
11       Q.    Let's make sure, see if this is the same
12   as you have there.  If so, we will mark that.
13       A.    The document numbers that you provided me
14   and the document you handed me and the one I pulled
15   from my file appear to be the same.
16       Q.    Can you make sure they have the same
17   number of pages so we can know they are the same.
18       A.    It appears the documents have the same
19   number of pages, 79 pages.
20            MS. BIERNAT: Let's mark my copy.
21            (Boelhouwer Exhibit 15 was marked for
22   identification.)
23       Q.    (By Ms. Biernat)  So you said your
24   understanding is this service manual, Exhibit 15, was
25   given to service providers of the product.

Page 83

1        A.    Yes, ma'am.
2        Q.    Of 27-inch dryers.
3        A.    Yes, ma'am.
4        Q.    And what is the relevance of this document
5    to your report and your opinions?
6        A.    This document generally addresses what
7    activities an authorized service professional would
8    perform as it relates to the dryer products from
9    Electrolux and several other manufacturers,
10   Frigidaire, Tappan, White-Westinghouse, Gibson,
11   Kelvinator.
12            The relevance to my opinion is not
13   contained within this document.  It does not address
14   how an authorized service provider would remove lint
15   from the interior of the dryer or to the extent that
16   the lint has the potential to accumulate behind the
17   dryer drum to remove the dryer drum from the dryer
18   chassis to clean behind there.
19       Q.    The next document is the photo of the
20   laundry center warning labels.
21            This is your only copy?
22       A.    No, ma'am.
23       Q.    Can we use this as a copy.  Is P6 your
24   only copy of that one?
25       A.    No, ma'am.

Page 84

1            MS. BIERNAT:  Can we use that as a copy,
2    too.
3            (Boelhouwer Exhibits 16 and 17 were marked
4    for identification.)
5        Q.    (By Ms. Biernat)  What is it we are
6    looking at in Exhibit 17?  What is that?
7        A.    My understanding of this document is that
8    it is a photograph of on-product labels from a laundry
9    center -- Electrolux laundry center.
10       Q.    You said it is your understanding.  How
11   did you obtain that understanding?
12       A.    This document was provided to me.
13       Q.    By?
14       A.    By attorneys.
15       Q.    And they identified for you what it was.
16       A.    Yes.
17       Q.    Did they identify -- well, they identified
18   it was from a laundry center on-product label?
19       A.    Yes, ma'am.  My understanding of this
20   document is that it is an on-product marking from an
21   Electrolux-manufactured laundry center.
22       Q.    And that's the only information you have
23   about that document.
24       A.    Yes, ma'am.
25       Q.    And is that relevant to your report or

21 (Pages 81 to 84)

REGENCY-BRENTANO, INC.

Eric Boelhouwer        American Family v. Electrolux        April 3, 2014

Page 85

1    your opinions in these cases?
2        A.    Yes, ma'am.
3        Q.    How so?
4        A.    The contents of this warnings label
5    provides a similar instruction to what is provided in
6    several of the product manuals for these products and
7    includes an instruction to the consumer to clean lint
8    screen before drying each load.  The interior of the
9    machine and exhaust system is to be cleaned
10   periodically, approximately every 18 months, by
11   qualified service personnel.
12       Q.    How is that relevant?
13       A.    It is my understanding that this was
14   provided on the laundry center appliance for a period
15   of years but not provided on all of the
16   Electrolux-manufactured dryers and -- standalone
17   dryers and laundry centers for all the products
18   related to this litigation.
19       Q.    So that is an on-product label that
20   contains warnings that to your understanding was on
21   some Electrolux laundry centers?
22       A.    Electrolux-manufactured laundry centers.
23       Q.    But not all of them.
24       A.    Not all of them.
25       Q.    Or not all Electrolux dryers.

Page 86

1        A.    Not all Electrolux dryers, yes, ma'am.
2        Q.    And do you have any criticisms of this
3    warning?  We are looking at the top one, correct?
4        A.    The first bullet --
5        Q.    The top page?
6        A.    Yes, ma'am.  The top page, first bullet of
7    this warning label in terms of the content of that
8    instruction, I would be critical of the duration, the
9    time interval for service by a qualified service
10   personnel.
11       Q.    Let me back up a second.  There is
12   multiple pages there, right?
13       A.    Yes, ma'am.  There are multiple pages
14   here.
15       Q.    How many?
16       A.    Three pages.
17       Q.    Are they all from the same product?
18       A.    I do not know.
19       Q.    Are there three different labels?
20       A.    No, ma'am.  Page 1 appears to be the
21   left-hand portion or a close-up of the label that is
22   represented in label 2, Page 2.  Page 3 appears to be
23   a different warning label.
24       Q.    Do you know where that warning label from
25   Page 3 came from?

Page 87

1        A.    No, ma'am.
2        Q.    So we are looking at -- this is an
3    on-product warning.  Can you read that?  Sorry.
4              So we talked about the three general
5    things that a warning needs to have to identify the
6    hazard -- what was it -- to identify the consequences
7    of the hazard and to identify the means of avoidance
8    of the hazard?
9        A.    Yes, ma'am.
10       Q.    So in this case, it says the warning -- it
11   says warning, do you have any problems with the term
12   warning that is written there, or the format?
13       A.    Generally, I do not have any problems with
14   the safety -- the use of the safety alert symbol and
15   the formatting for the signal word warning.
16       Q.    What is a signal word?
17       A.    The signal word on this document is
18   warning.
19       Q.    What is a signal word?
20       A.    A signal word is used on a warning label
21   to help consumers identify safety information.
22       Q.    All right.  It says to avoid hazard,
23   personal injury or fire damage, including spontaneous
24   combustion, that identifies the hazard there, doesn't
25   it?

Page 88

1        A.    Yes, ma'am.  It identifies the fire
2    hazard.
3        Q.    And down, the last line or last two lines,
4    but last full sentence has a term caution with an
5    exclamation point and a triangle.
6        A.    Safety alert symbol.
7        Q.    That's a safety alert symbol?
8        A.    Yes, ma'am.
9        Q.    Is caution a signal word?
10       A.    Caution can be used as a signal word, yes.
11       Q.    It says a closed dryer produces
12   combustible lint and should be vented outdoors.  Is
13   that also identifying the hazard, the production of
14   combustible lint?  Is that the statement, that it
15   produces combustible lint?
16       A.    That it produces combustible lint as part
17   of that sentence does help to inform the user of the
18   potential hazard, yes.
19       Q.    So then going back up towards the top of
20   the warning label, it says clean lint screen before
21   drying each load.  That is one way to avoid the
22   hazard, it is identifying it as a way to avoid the
23   hazard?
24       A.    The instruction to clean lint screen
25   before drying each load does provide a means of

Eric Boelhouwer       American Family v. Electrolux       April 3, 2014

Page 89

1  avoidance for the fire hazard but is not inclusive of
2  all the means of avoidance.
3      Q.    Another one that they identify here is do
4  not wash or dry articles that have been cleaned,
5  washed, soaked or spotted with gasoline, kerosene,
6  waxes, cooking oils, dry-cleaning solvents, or other
7  flammable or explosive substances. That also provides
8  another means to avoid the hazard.
9      A.    As it relates to the fire hazard and the
10 potential for personal injury or fire damage, yes,
11 ma'am.
12     Q.    Then the third bullet point says, Do not
13 use heat when drying articles containing foam rubber
14 or similar textured rubber-like materials or pillows
15 and clothing with feathers or down. That also
16 identifies a way to avoid the hazard that is stated up
17 here, correct?
18     A.    The instruction to not use heat does
19 provide avoidance information for consumers to avoid
20 potential fire hazard, yes, ma'am.
21     Q.    And then going back to the first bullet
22 point, the second sentence says, The interior of the
23 machine and the exhaust system is to be cleaned
24 periodically by qualified service manual, includes
25 approximately every 18 months.

Page 90

1          Well, that provides, that whole sentence
2  provides also a means to avoid the hazard, correct?
3      A.    Yes, ma'am.
4      Q.    Do you have any criticism of the sentence
5  absent the approximately 18 months' time specified?
6      A.    The beginning portion of the sentence
7  where it states "the interior of the machine" is
8  ambiguous.
9      Q.    Do you have any qualms or criticisms of
10 the term exhaust system?
11     A.    I do not have an express, explicit
12 criticism of the term exhaust system. But I don't
13 believe that term is consistent across the on-product
14 label and the information contained in the manual.
15     Q.    What do you mean, across the on-product
16 label?
17     A.    May I look at a manual for -- the term
18 exhaust system itself?
19     Q.    Right.
20     A.    May not be the same terminology used in
21 the manual provided with the machine. So these terms
22 may not be the same.
23     Q.    All right. And you have a criticism of
24 the every 18 months?
25     A.    That there is a -- it provides guidance to

Page 91

1  the consumers that an interval between when
2  cleaning -- when the next service may be needed but it
3  does not inform consumers as to when the last service
4  was performed or the next service may be needed.
5      Q.    And my question to you is so what. Why is
6  that a problem?
7      A.    If the means to avoid the hazard is that
8  the product would need to be serviced every 18 months
9  by a qualified service personnel, consumers may not
10 have a means of knowing the last time the service was
11 performed or in the time between services when the
12 next service may be required.
13     Q.    Are you talking about in a case where they
14 don't own the machine?
15     A.    An owner of this machine -- Electrolux did
16 not provide a means for an owner of this machine to --
17 a mechanism to recall when this may be required.
18     Q.    What proposed mechanisms would you --
19 well, let me back up. Would a calendar suffice?
20     A.    A customer or -- Electrolux could have
21 provided a calendar to individuals to identify the
22 time the dryer was installed, yes, ma'am.
23     Q.    How about a pencil to write down the
24 timing on a piece of paper?
25     A.    A consumer could use a pencil to write

Page 92

1  down on a piece of paper the date, yes, ma'am.
2      Q.    So your first criticism is the consumer
3  won't know when it was last serviced.
4      A.    Yes, ma'am.
5      Q.    But what if the consumer owns the product?
6      A.    The consumer -- if the consumer owns the
7  product, there is -- they would not have a means of
8  identifying the time when the service was performed.
9  For example, when you have your oil changed in your
10 vehicle, sometimes they place a small sticker on the
11 inside of your window and it says last service was or
12 next service required, so that would provide
13 information to the consumer when the last service was
14 performed.
15     Q.    Okay. But if they buy it new?
16     A.    Then at times, when the dryer is
17 installed, we would assume that the dryer is in a new
18 condition and that service according to that
19 instruction would not be required for 18 months.
20     Q.    So your criticism -- are you saying this
21 warning is inadequate because Electrolux did not
22 provide a means for the consumer to remember when 18
23 months had passed?
24     A.    That is one of my criticisms of that
25 language, yes, ma'am.

REGENCY-BRENTANO, INC.

Eric Boelhouwer          American Family v. Electrolux          April 3, 2014

---

Page 93

1    Q.   Is every manufacturer of a product
2  required to provide a consumer with means to recall
3  when a product may need to be serviced?
4    A.   That is going to depend on the particular
5  hazard and the consequences for a product.
6    Q.   Can you identify for me any other products
7  where you contend the manufacturer has a duty to
8  provide the consumer with a means to recall when the
9  service needs to be performed?
10    A.   I am aware of systems in automobile
11  applications that do inform the consumer.  For
12  example, on my own personal vehicle, it will tell you
13  what percentage of oil life is remaining and when the
14  service is performed that number is returned to 100
15  percent.  It decreases over time and so that provides
16  the information to the consumer when the next service
17  would be required.
18    Q.   So your car, when was it built?  What year
19  is it?
20    A.   My vehicle is a 2014.
21    Q.   Okay.  So what about a 2000 vehicle, the
22  year 2000, a year 1995 vehicle, if they don't have the
23  same indicator, are their warnings in there
24  inadequate?
25    A.   Older vehicles may not have incorporated

---

Page 94

1  that particular means of communicating information to
2  the consumer.  But an older vehicle in the range that
3  you have identified would have an odometer so that the
4  consumer would be able to see, observe how many miles
5  the vehicle has traveled and could consult other
6  information provided by the manufacturer in their
7  owner's manual to see what the next service interval
8  would be required for their vehicle.
9    Q.   But the owner in that case would have to
10  keep some kind of track of when service is required,
11  correct?
12    A.   The owner in that circumstance where they
13  are relying on the odometer reading to provide them
14  information, that they would be able to use that
15  information to determine when in terms of miles the
16  next service would be required in the future, yes,
17  ma'am.
18       MR. BOERIGTER:  Take a short break.
19       (Recess from 12:09 p.m. to 12:55 p.m.)
20    Q.   (By Ms. Biernat)  Let's get back on the
21  record.
22       I think we were talking about products
23  that require service, interval service, so service
24  every several months or years, whatever.
25       If a product requires regular maintenance

---

Page 95

1  over an interval of time and the manufacturer does not
2  provide a reminder mechanism, is that warning de facto
3  defective?
4    A.   For a manufacturer not to provide a
5  reminder mechanism for a service interval is going to
6  depend on a variety of factors.  So I can't just give
7  you a yes or no answer to that.
8    Q.   For this product, however, for a dryer, it
9  is your opinion that the warning is defective because
10  it does not contain a mechanism for a reminder for the
11  service.
12    A.   My opinion is that the consumers would
13  need to be informed as to when the last service was
14  performed or the next service would be required for
15  the product.  Yes.
16       MS. BIERNAT:  So can you answer my
17  question, yes or no.
18       (The record was read by the reporter.)
19       THE WITNESS:  Yes.
20    Q.   (By Ms. Biernat)  What is the basis for
21  that statement?
22    A.   That the service timeframe or interval
23  that the owner of the product wouldn't have --
24  wouldn't know when the last service was performed and
25  they wouldn't be able to determine when the next

---

Page 96

1  service is needed.
2    Q.   So what is the basis for your statement
3  that the consumer of the product would not know when
4  the last service was?
5    A.   A consumer would have -- if they were
6  provided a receipt or a document that may allow them
7  to know -- to set when the last service was performed
8  but that doesn't provide them a mechanism for knowing
9  when the next service is required.
10    Q.   What is the basis for your statement,
11  though, that the failure to provide a mechanism for a
12  reminder makes, renders the warning inadequate?
13    A.   It is just one of the factors from my
14  opinion that I considered how this particular warning
15  is not adequate.  The others are addressed in my
16  report.  With respect to this one, the basis of my
17  opinion is my experience with -- is my background,
18  training, and experience.
19    Q.   So your four years as what?  Background,
20  training, and experience as what?  As a litigation
21  expert?
22    A.   My background, training, and experience
23  covered by my doctoral research, the papers I have
24  written, and the litigation matters I have been
25  involved in and also the nonlitigation consulting

---

24 (Pages 93 to 96)

Eric Boelhouwer     American Family v. Electrolux     April 3, 2014

Page 97

1   services I have performed.
2       Q.   So that would -- there is no other basis,
3   you cannot point to anything else as a basis for your
4   opinion that the failure to provide a warning, a
5   reminder mechanism renders a warning inadequate?
6       A.   As I sit here, I am not recalling anything
7   that I can specifically point to as a basis for that,
8   no, ma'am.
9       Q.   And so your opinion is that failure to
10  provide a reminder mechanism on dryers to service them
11  every 18 months renders the warning inadequate.
12          Any other products -- you mentioned your
13  car -- any other products besides your car where the
14  failure to provide a reminder mechanism renders any
15  warning inadequate?
16      A.   As I sit here, I can't think of another
17  example off the top of my head.  I would believe that
18  there are other products that may be true for, yes,
19  ma'am.
20      Q.   Is it your understanding that furnaces
21  require regular maintenance?
22      A.   I haven't tried to analyze furnaces,
23  furnace-type products, so I don't know.
24      Q.   So can you identify any other product,
25  consumer product, be it an appliance or not, that

Page 98

1   requires regular maintenance?
2       A.   As I sit here, we have discussed
3   automobiles as one category of products.  I am not
4   able to identify another product as I sit here today.
5       Q.   And as you sit here today, have you done
6   any research to inform your opinion today that a
7   consumer would be unable or unwilling to remind him or
8   herself about regular service required for a home
9   appliance?
10      A.   It is possible for a consumer to remind
11  themselves of a service interval.  However, I am not
12  aware of that from my review of the deposition
13  testimony in these matters.
14          MS. BIERNAT:  Can you answer my question.
15          (The record was read by the reporter.)
16          THE WITNESS:  As I understand your
17  question, no, I have not done any research.
18      Q.   (By Ms. Biernat) Have you conducted any
19  surveys of consumers to determine whether they are
20  willing or able to remind themselves to conduct
21  maintenance on, interval maintenance on home
22  appliances?
23      A.   No, ma'am.
24      Q.   Have you ever written any papers or any
25  publications regarding the ability or the tendency of

Page 99

1   consumers to remind themselves of required maintenance
2   on any home appliances?
3       A.   No, ma'am.
4       Q.   Did any of your research or, sorry, did
5   any of your publications involve consumer appliances?
6       A.   Based on our -- no, ma'am, based on our
7   description or our classification of consumer
8   appliances earlier, the answer is no.
9       Q.   Have you ever taken any classes or
10  attended any seminars where the topic has been the
11  consumer's use of and maintenance of home appliances?
12      A.   As I understand your question, no, ma'am.
13      Q.   So is there any specific education that
14  you have had that you can recall that informs your
15  opinion that the failure to include a reminder
16  mechanism renders a warning inadequate in this case?
17      A.   As I -- no, ma'am, I don't recall.
18      Q.   Let's talk about the next document that
19  you have reviewed.  You said the label of the flex,
20  the warning flex duct.  Do you have that?
21      A.   Yes, ma'am.
22          I have the document now.
23      Q.   Let me see that real quick.  Is that a
24  copy we can mark?
25      A.   Yes.

Page 100

1           MS. BIERNAT:  I think I have a copy of it,
2   too.
3           (Boelhouwer Exhibit 18 was marked for
4   identification.)
5       Q.   (By Ms. Biernat)  What is the relevance of
6   this document to your opinion in your report?
7       A.   This document -- it is my understanding
8   this document is an on-product warning label that
9   Electrolux provided on the rear of some dryers that
10  they manufactured.
11      Q.   And where did you get it?
12      A.   It was provided to me by counsel.
13      Q.   And they represented to you what that was?
14      A.   Yes.  They represented to me that this was
15  an on-product marking installed on Electrolux dryers.
16      Q.   What is the relevance of that to your
17  opinion today?
18      A.   This document contains language regarding
19  the use of flexible foil venting, I believe is the
20  information that stands out to me as I review it as I
21  sit here.
22      Q.   So what relevance does that have to your
23  opinions?
24      A.   For some products, for some Electrolux
25  dryers at different points in time in the installation

Eric Boelhouwer        American Family v. Electrolux        April 3, 2014

Page 101

1    instructions it was permitted to use flexible foil as
2    part of the venting system and then my understanding
3    of this document is that at some point in time this
4    would instruct the installer to not use flexible foil
5    for the installation of a dryer.
6        Q.   So what relevance does that have to your
7    opinion about the warnings in this case?
8        A.   This document would provide information to
9    the installer about what types of materials may or may
10   not be used for the venting system for dryer
11   installation.
12       Q.   Does that inform your opinion about the
13   adequacy or inadequacy of the warnings at issue?
14       A.   It does inform me that at some point in
15   time Electrolux chose to provide this information on
16   product in addition to what they provided in the
17   installation manuals.
18       Q.   That was provided on the back of the
19   product, correct?
20       A.   My understanding is that would have been
21   provided on the rear of the product.
22       Q.   And that was about -- that's regarding the
23   venting of the product, correct?
24       A.   Generally, this document speaks to the
25   venting of the product.

Page 102

1        Q.   Do you have any criticism of that
2    document, of the warnings provided there?
3        A.   May I read it?
4        Q.   Sure.
5        A.   I have reviewed the language on the top
6    portion of this warning label and I do not have any
7    criticism of the language of the contents of this
8    label at this time.
9            MS. BIERNAT:  The next document that you
10           have identified as something you reviewed in all
11           these cases, the Consumer Product Safety
12           Commission document 5022.
13           (Boelhouwer Exhibit 19 was marked for
14           identification.)
15       Q.   (By Ms. Biernat)  So tell me what this
16   document is.
17       A.   This document is a Consumer Product Safety
18   Commission Safety Alert.
19       Q.   Did it have any relevance to your opinion
20   or your report?
21       A.   Yes, ma'am.
22       Q.   What relevance did it have?
23       A.   Generally, this document discusses the
24   potential for dryers to catch on fire.
25       Q.   So this document here is titled Overheated

Page 103

1    Clothes Dryers Can Cause Fires, is an alert intended
2    for who?
3        A.   My understanding, this would be intended
4    for consumers to review.
5        Q.   So this is an alert provided by Consumer
6    Product Safety Commission which is a governmental
7    agency, correct?
8        A.   Yes, ma'am.
9        Q.   Provided to consumers, correct?
10       A.   I am not sure how they distribute this
11   document.
12       Q.   Meant for consumption by consumers?
13       A.   It appears to me it is meant for
14   consumption of consumers, yes, ma'am.
15       Q.   Identifying that overheated clothes dryers
16   can cause fires.
17       A.   Yes, ma'am.
18       Q.   This identifies the hazard.
19       A.   Yes, ma'am.
20       Q.   It also states that fire can occur when
21   lint builds up in the dryer or in the exhaust duct,
22   correct?
23       A.   Yes, ma'am.
24       Q.   And lint can block the flow of air causing
25   excessive heat buildup and result in a fire in some

Page 104

1    dryers; is that correct?
2        A.   Yes, ma'am.
3        Q.   Do you know the date of this publication?
4        A.   I believe it is on the lower right-hand
5    corner, 022012, I would interpret that as February of
6    2012.
7        Q.   Then it says 062003, do you know if that's
8    another date that is relevant?
9        A.   I don't know.
10       Q.   So we don't know either way for sure what
11   the date of this is.
12       A.   No, ma'am.
13       Q.   How is this relevant to your opinion?
14       A.   It provides information related to the
15   hazard, the consequence, and avoidance for the fire
16   risk for clothes dryers.
17           MS. BIERNAT:  The next document that you
18           have identified is the FEMA Topical Fire Research
19           Series, Volume 7, Issue 1.
20           (Boelhouwer Exhibit 20 was marked for
21           identification.)
22       Q.   (By Ms. Biernat)  We were on the FEMA,
23   right?
24       A.   Yes.
25       Q.   What is this document?

26 (Pages 101 to 104)

Eric Boelhouwer        American Family v. Electrolux        April 3, 2014

Page 105

1     A.    This document is from FEMA and it is
2  entitled Clothes Dryer Fires in Residential Buildings,
3  2008 to 2010.
4     Q.    So the one that you have identified in
5  your report is a little outdated, correct?  The one
6  you have identified there, Topical Fire Research,
7  Series Volume 7, that one says January 2007.
8     A.    I am not aware why there is a difference
9  in the headers for these two documents.
10     Q.    Let me ask you briefly, the last exhibit,
11  the CPSC document, 5022, where did you get that?
12     A.    From the Consumer Product Safety
13  Commission website.
14     Q.    How did you decide to go to the CPSC
15  website?
16     A.    Consumer Product Safety Commission would
17  be the government agency that would address this class
18  of products.
19     Q.    Is that something that you decided on your
20  own or did somebody direct you to that website?
21     A.    I believe I went to that website on my
22  own.
23     Q.    So where did you get this Exhibit 20, the
24  FEMA report?
25     A.    I believe I get this from the FEMA

Page 106

1  website.
2     Q.    And one of my -- I am guessing that when
3  you -- well, let me ask you this, did you type this
4  report?
5     A.    Yes, ma'am.
6     Q.    Is there any portion of this report that
7  was used in a prior expert report for another case?
8     A.    Yes, ma'am.  There are portions of this
9  report that would be used not only in these matters,
10  but I believe you identified the Brennan matter as
11  well.
12     Q.    Then there is the Haroutounyan matter.
13     A.    Yes, ma'am.
14     Q.    Is it possible you had drafted this
15  portion of the report identifying the FEMA Topical
16  Research Series Volume 7, Issue 1, January 2007 in a
17  previous report, cut and pasted, and just didn't
18  change the date of the report?
19     A.    It is possible that when I was filing
20  these materials that I did not notice that
21  discrepancy.
22     Q.    Or do you know if there was actually a
23  FEMA report from 2007?
24     A.    I do not know.
25     Q.    So what is the relevance of this document

Page 107

1  to your opinion and your report?
2     A.    This document generally informs me of the
3  potential for dryer fires in residential buildings.
4     Q.    And what specific aspect of the fact that
5  it informs you of dryer fires in residential buildings
6  was relevant to your opinion?
7     A.    Without reviewing the entire document, I
8  don't believe there is anything that I can point to
9  within this document that was specific, but it was
10  more of a general for my background regarding the
11  risks of these hazards.
12     Q.    Second paragraph, there is an estimated
13  2900 dryer fires each year in the United States.  Is
14  that about right?
15     A.    That is what this document states, yes,
16  ma'am.
17     Q.    Do you have any idea how many dryers there
18  are in use across the United States?
19     A.    As I sit here, I don't recall.  I believe
20  I have seen that number in other documents.  But I
21  don't recall a number right now.
22          MS. BIERNAT:  And let's go to the next
23      document, NFPA 2009 Home Fires Involving Clothes
24      Dryers and Washing Machines.
25  ///

Page 108

1          (Boelhouwer Exhibit 21 was marked for
2      identification.)
3     Q.    (By Ms. Biernat)  Where did you get the
4  FEMA document, did you tell me?
5     A.    The one that we marked I got from the
6  FEMA.gov website identified on the bottom of the
7  document.
8     Q.    So this next document, where did you get
9  that?
10     A.    I believe the document, Home Fires
11  Involving Clothes Dryers and Washing Machines dated
12  March 2009, was provided by counsel.
13     Q.    Does this have any relevance to your
14  opinion or your report other than general education to
15  you about dryers and fires?
16     A.    As I sit here, I don't recall any
17  specific -- anything specific in this document beyond
18  just a general background.
19          MS. BIERNAT:  The next document is CPSC
20      Opinion Forum Survey No. 3.
21          (Boelhouwer Exhibit 22 was marked for
22      identification.)
23     Q.    (By Ms. Biernat)  Where did you get this
24  document?
25     A.    From the Consumer Product Safety

Eric Boelhouwer      American Family v. Electrolux      April 3, 2014

---

Page 109

1    Commission website.
2        Q.    And does this document have any relevance
3    to your opinion, opinions in this case, these cases,
4    or your report?
5        A.    Yes, ma'am.
6        Q.    What is that?
7        A.    My brief description of this document is
8    that it was a survey conducted by Consumer Product
9    Safety Commission of dryer owners.
10       Q.    And what was the purpose of the survey?
11       A.    It was to -- generally the purpose of the
12   survey was to identify how consumers used their dryer,
13   what maintenance activities they would perform related
14   to their dryers, some questions regarding how their
15   dryer was installed, and their awareness of potential
16   hazards associated with their dryer.
17       Q.    This was done in -- September 2010 it was
18   published.
19       A.    Yes, ma'am.  The study date is
20   September 2010.
21       Q.    And the survey was done on a convenience
22   sample; is that correct?
23       A.    Yes.  It was not a random sample.
24       Q.    Can you describe for us what a convenience
25   sample is?

---

Page 110

1        A.    A sample of convenience is a population --
2    and in this case these are individuals who opted to
3    participate in Consumer Product Safety Commission
4    surveys so it is not a random sample of population.
5        Q.    They, in fact, signed up to the CPSC
6    website; is that correct?
7        A.    Yes, ma'am.
8        Q.    How many respondents were there, do you
9    recall?
10       A.    Reference to this document on Page 3,
11   there were 358 respondents.
12       Q.    Out of 2,381 invitations; is that correct?
13       A.    Yes, ma'am.
14       Q.    Does this survey have any relevance to
15   your opinion at all?
16       A.    Yes, ma'am.
17       Q.    What is that?
18       A.    The entire document is relevant to my
19   opinion.  There are certain portions of it that I
20   included in my report.  It has a lot of information
21   regarding frequency of use of the dryer, number of
22   loads per week, how individuals install their dryer,
23   frequency of maintenance activities as well.
24           MS. BIERNAT:  Let's talk about that in a
25       little bit.

---

Page 111

1            (Boelhouwer Exhibit 23 was marked for
2        identification.)
3        Q.    (By Ms. Biernat)  The next one is a
4    Consumer Product Safety Commission document.
5        A.    Yes, ma'am.
6        Q.    That is the CPSC June 1st, 2011,
7    publication An Evaluation Using Indicators to Inform
8    Consumers of Clothes Dryer Status.
9            What is this document?
10       A.    It is a paper written by the Consumer
11   Product Safety Commission regarding different types of
12   features on clothes dryers.
13       Q.    And what types of features, indicator
14   features, correct?
15       A.    It states in the title indicator features,
16   yes, ma'am.
17       Q.    What is your understanding of what an
18   indicator is in this context of this paper?
19       A.    My understanding of status indicators is
20   from Page 5 and that the use of status indicators may
21   be divided into two categories, reminders and
22   warnings.  So there would either be a reminder or
23   warning to a consumer about the product.
24       Q.    Where are you reading that, on the top?
25       A.    Yes, ma'am.  The last sentence of the

---

Page 112

1    first paragraph.
2        Q.    All right.  When did you -- where did you
3    get this document from?
4        A.    I don't recall.
5        Q.    So you don't recall if you got it yourself
6    or if it was given to you?
7        A.    I do not recall if it is a reference
8    within the -- no.  I guess it would not be a reference
9    to this survey.  I do not recall if while I was on the
10   Consumer Product Safety Commission website I reviewed
11   this document or it was provided to me.
12       Q.    So do you recall when you first reviewed
13   this?
14       A.    No, ma'am.
15       Q.    Did you have the opinion -- well, one of
16   your opinions is that there should be some kind of
17   indicator on Electrolux dryers; is that correct?
18       A.    Yes, ma'am.  That is a portion of one of
19   my opinions.
20       Q.    Did you form that opinion before or after
21   reading this document?
22       A.    I don't recall.
23       Q.    Is your opinion that there should be some
24   sort of indicator on Electrolux dryers based solely on
25   this report here?

Eric Boelhouwer       American Family v. Electrolux       April 3, 2014

Page 113

1  A.  No, ma'am.
2  Q.  So you do not recall whether your opinion
3  was created after you read this statement, this
4  report?
5  A.  No, ma'am.
6  Q.  And other than your car, you cannot
7  identify for me any consumer product that has an
8  indicator on it?
9  A.  As I sit here today, I can't recall
10  another product.
11  MS. BIERNAT:  The next document is
12  Whirlpool Use and Care Guide.
13  (Boelhouwer Exhibit 24 was marked for
14  identification.)
15  Q.  (By Ms. Biernat)  What is this?  Where did
16  you get it and what significance does it have?
17  A.  This Whirlpool Use and Care Guide was
18  provided to me by counsel.
19  Q.  And do you recall when you received it?
20  A.  No, ma'am.
21  Q.  What is the significance of this document?
22  A.  A portion of the significance of this
23  document is that it includes a system that is a part
24  of a dryer to inform users when lint accumulates on
25  the lint screen.

Page 114

1  Q.  What page are you looking at?
2  A.  Please give me one moment.
3  Q.  Sure.
4  A.  Page 15.
5  Q.  Okay.  So do you know why this was given
6  to you?
7  A.  Yes, ma'am.
8  Q.  Why?
9  A.  This is a product that was available and
10  my understanding is this document dates back to 1994,
11  that other manufacturers included alternative or
12  different design features to alert consumers about the
13  presence of lint on their dryer product.
14  Q.  So let's break that statement down.  What
15  other manufacturers besides Whirlpool does this advise
16  us about?
17  A.  It just advises us about Whirlpool.
18  Q.  Your last statement was lint in the dryer.
19  That's not correct, is it?  It talks about an
20  indicator for lint in the lint screen, correct?
21  A.  And the lint screen is contained within
22  the dryer.
23  Q.  All right.  To be more specific, it is an
24  indicator for lint on the lint screen, correct?
25  A.  That is my understanding of this document,

Page 115

1  that the lint signal relates to lint on the lint
2  screen.
3  Q.  What is the percentage of dryer users who
4  remove the lint on the lint screen without any
5  indicator?  Do you know?
6  A.  I do not know the percentage of dryer
7  users who remove the lint from the lint screen without
8  the use of a dryer indicator, no.
9  Q.  How about the percentage of dryer users
10  who remove the lint from the lint screen with or
11  without an indicator?
12  A.  I would have to refer to the Consumer
13  Product Safety Commission document where they surveyed
14  consumers about their dryer usage and their
15  maintenance.
16  Q.  What does that number say?
17  A.  There is a chart on Page 10 which
18  indicates the frequency of cleaning the lint filter
19  for the survey respondents.
20  Q.  And that is what?  There is a number
21  there.  There is a number in this document, isn't
22  there?  Approximately 96 percent of all respondents
23  reported cleaning their clothes dryer lint filter at
24  some time.
25  A.  Yes, ma'am.

Page 116

1  Q.  So do you know if this warning signal in
2  the Whirlpool dryers had any effect in increasing that
3  percentage?
4  A.  I have not attempted to analyze that and I
5  am not aware of any data for that, no, ma'am.
6  Q.  Do you know what percentage of these
7  respondents -- and with the caveat that we have
8  already discussed the sample is a convenience
9  sample -- do you know what percentage of these
10  respondents use Whirlpool dryers with the lint
11  indicator?
12  A.  No, ma'am.
13  Q.  So you have no idea if none of them
14  received any indicator from their appliance or all of
15  them received any indicator from their appliance to
16  clean the lint screen?
17  A.  There is not information provided in the
18  Consumer Product Safety Commission to identify what
19  dryer features related to lint accumulation
20  indications may have been provided to consumers.
21  Q.  Do you have any information about the rate
22  of dryer fires involving Whirlpool dryers for any
23  given year in the last 15 years?
24  A.  I do not recall.
25  Q.  Do you have any indication of whether the

REGENCY-BRENTANO, INC.

Eric Boelhouwer        American Family v. Electrolux        April 3, 2014

Page 117

1    lint -- do you have any evidence or data where the
2    lint indicator of the Whirlpool dryer affected the
3    rate of compliance with that recommendation to clean
4    the lint filter?
5        A.   No, ma'am.
6        Q.   Do you have any indication or data or any
7    evidence that the lint indicator actually functioned
8    and functioned properly throughout the duration of the
9    life of the product, Whirlpool product?
10       A.   No, ma'am.
11       Q.   So the only thing that you know is that
12   there is a use and care guide that describes a whistle
13   that sounds when a lint filter in a Whirlpool dryer is
14   clogged.
15       A.   As I understand your question, yes, ma'am.
16       Q.   Have you done any other survey or review
17   of the warnings provided by other manufacturers of
18   dryers?
19       A.   No, ma'am.
20       Q.   One thing you said earlier is that one way
21   to determine what type of warning to put on a product
22   is to see what the peer products are doing; is that
23   correct?
24       A.   Yes, ma'am.
25       Q.   But you have made no attempt to compare

Page 118

1    what the peer products are doing with respect to
2    warnings for dryers.
3        A.   As it relates to the Electrolux dryers in
4    these matters, no, ma'am.
5        Q.   So you have no opinion if Electrolux
6    warnings differ in any way from other manufacturers;
7    is that correct?
8        A.   As I sit here today, no, ma'am, I do not.
9            MS. BIERNAT:   We will go to the AHAM
10   Analysis of Industry Data on Clothes Dryer Fire
11   Incidents.
12           (Boelhouwer Exhibit 25 was marked for
13   identification.)
14       Q.   (By Ms. Biernat)   What is this document?
15       A.   This document is titled AHAM Analysis of
16   Industry Data On Clothes Dryer Fire Incidents.
17       Q.   Where did you get it?
18       A.   It was provided to me with the exhibits of
19   a Carl King deposition.
20       Q.   What is the relevance of this document to
21   you?
22       A.   My recollection is this document talks
23   about the risk of fires associated with dryers; and
24   its relevance is that it is more of a historical
25   document, that it precedes all of these incidents.

Page 119

1        Q.   Is this to give you background in the
2    topic of dryer fires or was it relevant for any other
3    purpose in addition to that?
4        A.   I don't recall a specific item from this
5    document.  I believe it was just a general background.
6            Oh, yes.  This document also -- they went
7    and investigated dryer fire incidences so they were
8    trying to gather information from consumers about
9    fires that occurred.
10       Q.   And so is there any other information from
11   this document that supports your opinions or your
12   report?
13       A.   I believe there is reference in this
14   document to the high percentage of users for the
15   incidents they investigated where the installation of
16   their dryer used a foil venting product.
17       Q.   Okay.  That has relevance to your opinion
18   how?
19       A.   That the use of foil venting products was
20   prevalent as early as 2002.
21       Q.   Okay.  The next, deposition of Carl King.
22   You received and reviewed that, correct?
23       A.   Yes, ma'am.
24       Q.   We don't have to mark that.  That's fine.
25   Did you make any notations on the deposition?

Page 120

1        A.   No, ma'am.
2        Q.   Did you make any notes of the deposition?
3        A.   No, ma'am.
4        Q.   You reference the deposition in your
5    report; is that right?
6        A.   Yes, ma'am.
7        Q.   Is it just one time you referenced the
8    deposition, I think?
9        A.   Yes, ma'am.
10       Q.   So on Page 6 of your report which we have
11   I think marked as 5 something.
12       A.   E.
13       Q.   5-E.  I believe this is a paragraph
14   similar, consistent across all eight reports; is that
15   right?
16       A.   Yes, ma'am.  I believe that is correct.
17       Q.   So the report says as it relates to
18   providing safety information regarding the 18-month
19   interval, Electrolux is not consistent in providing
20   this information across all models.  When asked what
21   products have on-product warnings to clean the
22   interior of the dryer, Mr. King stated our laundry
23   center has a similar warning.  Then it says, I am not
24   aware of any evidence in this matter that an
25   on-product label related to the 18-month interval was

REGENCY-BRENTANO, INC.

Eric Boelhouwer          American Family v. Electrolux          April 3, 2014

Page 121

1  provided on the subject laundry center. Indeed, even
2  if a label to this effect was placed on the subject
3  laundry center, such as is the case for other laundry
4  center models, the reminder of an 18-month interval
5  does not specify when the last service took place or
6  when the next service is needed.
7        Now, are you referring to the subject
8  laundry center, that's the laundry center that is the
9  subject of the Blake case?
10       A.   Yes, ma'am. It is my understanding the
11  subject laundry center in the Blake case, the
12  subject --
13       Q.   That dryer?
14       A.   That dryer was classified as a laundry
15  center.
16       Q.   And so it is your contention that the
17  dryer did not have an on-product label related to the
18  18-month interval.
19       A.   It is my understanding that that dryer was
20  manufactured in September of 1992 and I believe it is
21  based on that Carl King testimony in the Stout and
22  Coles deposition that he stated the warning, the
23  on-product warning that I referred there of the
24  photographs of the laundry center warning labels was
25  placed on the laundry centers at a future point in

Page 122

1  time.
2        Q.   So it is your understanding based on the
3  Carl King deposition testimony that the dryer at issue
4  did not have an on-product label related to the
5  18-month interval.
6        A.   It is my understanding that that
7  warning -- that a warning label regarding the 18-month
8  interval was not present on the subject laundry
9  center.
10       Q.   What is the picture that you provided
11  earlier as one of the exhibits, what laundry center is
12  that from?
13       A.   I do not know.
14       Q.   So you quote Mr. King here that says our
15  laundry center had a similar warning. What is the
16  purpose of that quote?
17       A.   It is to provide some -- to provide a
18  basis that the photographs of the laundry center
19  labels that I was provided are representative of
20  labels provided by Electrolux on laundry centers.
21       Q.   So is it a criticism, is it an opinion of
22  yours that the label that was on Ms. Blake's or the --
23  not Ms. Blake. Strike that.
24        Is it your opinion that the dryer that was
25  involved in the Blake case, the on-product warning on

Page 123

1  that, label on that case was defective because it did
2  not contain information about service being every 18
3  months?
4        A.   My understanding is there was not an
5  on-product warning for the Blake subject laundry
6  center regarding the 18-month cleaning interval and
7  that information was provided to Blake Capital in the
8  owner's manuals for that product only.
9        Q.   So the information was provided to Blake
10  Capital, correct?
11       A.   The information regarding the 18-month
12  cleaning interval was communicated to Blake Capital in
13  the owner's manual.
14       Q.   Do you have any criticism about the way it
15  was communicated or do you agree that it was
16  communicated adequately?
17       A.   I do not agree that the requirement for
18  the 18-month cleaning interval was adequately conveyed
19  to Blake Capital.
20       Q.   Why not?
21       A.   For some of the reasons we discussed
22  earlier regarding the content of the communication,
23  the high cost of compliance for the individuals who
24  would have received this information, and that the
25  cleaning interval was present only in the owner's

Page 124

1  manual and that there was not an either on-product
2  label or some other mechanism to indicate to consumers
3  when service may be needed.
4        Q.   So let me back up real quick. Okay.
5  Blake Capital received the information that the
6  product should be serviced every 18 months, do you
7  agree with that?
8        A.   I believe the deposition testimony in the
9  Blake Capital matter is that they did receive the
10  owner's manuals for dryers that they purchased. I am
11  not aware of specific testimony that they received the
12  owner's manual for the subject dryer.
13       Q.   All right. But do you agree that Blake
14  Capital had received the information that the product
15  needed to be serviced or should be serviced every 18
16  months?
17       A.   I believe --
18       Q.   Yes or no. The information is in the
19  owner's manual?
20       A.   Yes, ma'am. The information is in the
21  owner's manual.
22       Q.   And they received the owner's manual, they
23  had access to the owner's manual.
24       A.   My understanding is they had access to the
25  owner's manual, yes, ma'am.

31 (Pages 121 to 124)

Eric Boelhouwer        American Family v. Electrolux        April 3, 2014

Page 125

1  Q.  Okay.  So they had access to the
2  information had they chosen to read it.
3  A.  Yes, ma'am.
4  Q.  One of your criticisms of this on-product
5  label in general is that there was no reminder
6  mechanism for the 18-month interval, correct?
7  A.  Yes, ma'am.
8  Q.  Correct me if I am wrong, is it your
9  opinion that no matter what the label would have said,
10  no matter where it was placed and no matter who read
11  it, it would still have been defective in your opinion
12  because there was no accompanying reminder mechanism?
13  A.  The label itself would serve as a reminder
14  mechanism for consumers who are interacting with the
15  dryer.  So there is information conveyed to them if
16  they choose to avail themselves of it at the time they
17  were using the dryer.
18  Q.  So I am totally confused.  Didn't we have
19  a big discussion about how the label is inadequate
20  because there is no additional reminder mechanism?
21  You just said the label itself is a sufficient
22  reminder mechanism.
23  A.  The label itself does convey the 18-month
24  interval to dryer users, but it doesn't tell them when
25  the last service was performed or the next service is

Page 126

1  needed.
2  Q.  Well, it does tell them.  It tells them it
3  needs to be done 18 months after the last one, right?
4  A.  Yes, ma'am.
5  Q.  Perhaps I need to understand your opinion
6  about this a little bit better.  The product needs to
7  contain some sort of actual date on it for when the
8  service needs to be performed, is that your opinion,
9  in order for it to be an adequate warning?
10  A.  By providing a means for -- to indicate
11  when the last service was performed would be one way
12  for -- for that information to be communicated to the
13  consumer, yes.
14  Q.  Without that, the product, the warning
15  label is defective.  Is that your opinion?
16  A.  There are other means that could be used.
17  Q.  Such as?
18  A.  Such as what I have indicated later in my
19  report that a warning light could be used to indicate
20  to consumers the need for service.
21  Q.  Anything else?
22  A.  It is also possible to convey the
23  requirement for an 18-month cleaning interval to
24  consumers at the point of sale.
25  Q.  Okay.  Is that in your report?

Page 127

1  A.  No, ma'am.
2  Q.  When did you arrive at that opinion?
3  A.  You asked me different -- I believe -- my
4  understanding of your question was that you could --
5  what other means could be used to inform consumers of
6  when service would be required beyond what is included
7  on the on-product label.  So I was attempting to
8  convey that there are more than one means to convey
9  that information.
10  Q.  Any other ways besides warning light,
11  point of sale?  Anything on the product itself besides
12  a warning light, anything that you can identify that
13  would be in your opinion an adequate warning with
14  respect to the need to perform maintenance on the
15  product every 18 months?
16  A.  As I sit here, I think that's an inclusive
17  list, yes, ma'am.
18  Q.  So is it fair to say it is your opinion
19  without a warning light or without point of sale
20  reminder about the 18-month-interval maintenance
21  requirement that the warning no matter what it says,
22  where it is, is inadequate?
23  A.  For that reason and the other reasons in
24  my report, yes, ma'am.
25  Q.  Well, let's just talk about 18 months.

Page 128

1  Nothing else matters, right, because if it doesn't
2  have the 18-month-interval reminder, then it is
3  inadequate, no matter what else it says, right?
4  A.  May I have the question back.
5  (The record was read by the reporter.)
6  THE WITNESS:  I believe the answer is yes,
7  ma'am.
8  Q.  (By Ms. Biernat)  Let me ask you about
9  your opinion about warning lights.  Have you ever
10  designed or do you have any experience designing
11  appliances?
12  A.  No, ma'am.  I do not have any experience
13  designing appliances.
14  Q.  Do you have any experience in the
15  manufacture of appliances?
16  A.  No, ma'am.  I do not have any experience
17  in the manufacture of appliances.
18  Q.  Do you know any other products that have
19  warning lights, any other dryers that use warning
20  lights?
21  A.  I have not attempted to conduct an
22  analysis of other dryers that use warning lights, no,
23  ma'am.
24  Q.  Where did you come up with the idea that a
25  warning light was needed?

REGENCY-BRENTANO, INC.

Eric Boelhouwer          American Family v. Electrolux          April 3, 2014

Page 129

1      A.    The use of an indicator light would be one
2   means to convey information to the user that service
3   may be needed on their dryer.
4      Q.    All right.  Can you identify for me any
5   product, any home appliance that uses an indicator
6   light for service?
7      A.    As we have defined home appliance, I don't
8   believe I can identify a home appliance that uses an
9   indicator light for when service is required.
10     Q.    Okay.  We have talked about your car.  Any
11  other consumer products that use indicator lights for
12  when service is required?
13     A.    I have not attempted to perform an
14  analysis of what other consumer products may use an
15  indicator light for when service is required.
16     Q.    So you know of no other products except
17  for an automobile where a warning light is used for
18  when service is required; is that correct?
19     A.    I have not performed that analysis.  I
20  don't recall any other products at this time that may
21  use a warning light to indicate when service is
22  required.
23     Q.    So what is the basis for your opinion that
24  a warning light is required?
25     A.    The basis for my opinion as it relates to

Page 130

1   the accumulation of lint within the dryer, the
2   Electrolux dryer, is that when the dryer is first
3   placed into service the risk of fire from the lint
4   accumulation is very low and that the dryer is used by
5   the operator over a prolonged period of time and at
6   some point the accumulation of lint within the dryer
7   goes from a safe condition to becoming an unsafe
8   condition.
9      Q.    Okay.  What is the basis for your opinion
10  other than your understanding that there is a hazard
11  from the buildup of lint that the way to address that
12  is a warning light?
13     A.    To indicate to the consumer that when you
14  transitioned from the safe condition to when the
15  unsafe condition may be presenting itself, that's when
16  a consumer needs to be informed that at this point in
17  time service needs to be performed on your dryer.
18     Q.    Other than your opinion that you just
19  stated, is there any basis for your opinion that a
20  warning light is the best way to deal with it, or the
21  only way to deal with that essentially?
22     A.    I am sure there are other means to
23  communicate to a consumer potentially when the
24  appliance has gone from a safe condition to an unsafe
25  condition.  But as it relates to lint accumulating in

Page 131

1   the dryer, a consumer cannot observe that accumulation
2   of lint when they open the door and look into their
3   dryer.  So they need some means to be informed that
4   the condition of the lint accumulation is now
5   increasing the risk of a fire.
6      Q.    Okay.  But the fact that it says on the
7   product itself lint accumulates and could cause fire,
8   that's to you not sufficient?
9      A.    No, ma'am.  It is not sufficient because
10  as it relates to that communication, it doesn't tell
11  when the last service was performed, when the next one
12  was needed, or the potential risk from the lint that
13  has accumulated in their dryer.
14     Q.    I feel like we are going around in circles
15  here.  Give to me an example of how Electrolux could
16  have complied with your standard that they needed to
17  inform the consumer of when the last service was
18  performed and the next service is needed.
19     A.    I think we have talked about a couple of
20  different options that Electrolux as a manufacturer
21  could have used to address that concern.  One, they
22  could have had a mechanism in place somewhere on the
23  dryer itself to indicate when the last service was
24  performed or the next service was needed.
25     Q.    Hold on.  So somewhere on the dryer, would

Page 132

1   that be, what, an electronic thing, a paper thing, a
2   digital thing?  What would that be?
3      A.    It could be just a place on the dryer
4   where they have indicated the date of the last
5   service, just handwritten in --
6      Q.    Who is they?
7      A.    Whomever performed the service last would
8   be the person who would record the date of either
9   installation or service.
10     Q.    Okay.  So somewhere on the machine where
11  the person who performed the service, say the owner of
12  the machine, would write that down and then somewhere
13  where they could add on 18 months to remind themselves
14  to do it again?
15     A.    Part of this warning requirement is that
16  an authorized service personnel has to conduct the
17  cleaning.  So an owner would not necessarily be the
18  person who did the cleaning, performed the cleaning
19  activity.
20     Q.    So what is the basis for your opinion that
21  this is a requirement for an adequate warning?  Do you
22  have any studies that you rely on that show you that?
23     A.    That what would be an adequate warning?
24     Q.    That adding on, say, a sticker or some
25  kind of thing on the product where somebody writes

33 (Pages 129 to 132)

REGENCY-BRENTANO, INC.

Eric Boelhouwer      American Family v. Electrolux      April 3, 2014

Page 133

1    down the last day it was serviced then adds on 18
2    months and writes that date down.
3        MR. BOERIGTER: Objection. I think that
4    misstates his testimony.
5        THE WITNESS: I don't believe I have a
6    study that I can reference that would address
7    that method of communicating when the last date
8    of service was performed or when service may be
9    required in the future.
10       Q.   (By Ms. Biernat) Do you have any study or
11   any paper or any survey or anything independent of
12   your own opinion that supports your opinion that
13   consumers need a reminder mechanism otherwise the
14   warning is inadequate?
15       A.   No, ma'am.
16       Q.   Now, back on to the warning light. Do you
17   have any idea how much it costs to install a warning
18   light on any dryer?
19       A.   No, ma'am.
20       Q.   Do you have any idea how many dryers out
21   there contain warning lights on them?
22       A.   No, ma'am. I have not attempted to
23   analyze dryers with regard to warning lights.
24       Q.   So you don't know how they operate, if
25   they operate correctly.

Page 134

1        A.   No, ma'am.
2        Q.   Do you have any evidence that a consumer
3    would heed a warning light any better than they would
4    heed a written warning?
5        A.   No, ma'am. I don't believe I have a study
6    I can point you to that would suggest a consumer would
7    heed a warning light more than a written warning.
8        Q.   Is there anything at all you can point me
9    to as the basis for your opinion that a consumer would
10   heed a warning light any more than they would heed a
11   written warning?
12       A.   I cannot point you to a specific document
13   that would suggest a consumer would heed a warning
14   light more than a written warning.
15       Q.   What is the basis of your opinion, then?
16       A.   The basis for my opinion is that the
17   warning that is provided in the instruction manual
18   which may be reviewed by the consumer at the time the
19   dryer is purchased or relatively close in time to the
20   dryer is installed is 18 months removed from the time
21   service is needed and if there is a warning light that
22   was available to the consumer and that light
23   illuminated at the time service was required, that
24   would inform the consumer much closer in time that
25   based on their usage, it is now time to service their

Page 135

1    dryer.
2        Q.   So that didn't answer my question. Do you
3    have any information or any basis that a consumer
4    would heed a warning light more often than a consumer
5    would heed a written warning?
6        A.   No, ma'am.
7        MR. BOERIGTER: Can we take a break?
8        MS. BIERNAT: Of course.
9        (Recess from 2:09 p.m. to 2:18 p.m.)
10       Q.   (By Ms. Biernat) Let me ask you this,
11   consumers don't have to necessarily heed a warning for
12   a warning to be adequate, would you agree with that
13   statement?
14       A.   Generally, yes.
15       Q.   And would you agree with the statement
16   that manufacturers have the right to assume that
17   warnings will be read and heeded?
18       A.   Can you separate that for me.
19       Q.   All right. Can manufacturers have the
20   right to assume that warnings will be read?
21       A.   Yes, ma'am. I think it is reasonable for
22   manufacturers to assume that warnings they provide
23   will be read.
24       Q.   Do you agree the fact that some consumers
25   may not follow safety information does not make the

Page 136

1    safety information inadequate?
2        A.   Generally, yes, ma'am, I would agree with
3    that statement.
4        Q.   And so just because a manufacturer decides
5    to share information one way, even though there might
6    be other ways to do it, does that mean that any one
7    particular way is wrong?
8        A.   As I understand your question, no, ma'am,
9    there is not one correct way -- well, only one way to
10   communicate safety information to consumers.
11       Q.   That's absent the caveat if there are any
12   regulatory requirements.
13       A.   Yes, ma'am.
14       Q.   Are there any regulatory requirements with
15   respect to warnings for dryers?
16       A.   I am not aware of any regulatory
17   requirements for dryer products, no, ma'am.
18       Q.   Do you think consumers bear any
19   responsibility to comply with recommendations -- let
20   me back up with that. Do you agree that consumers
21   have any responsibility to comply with warnings
22   provided by manufacturers?
23       A.   I do believe that consumers -- generally I
24   do believe consumers have a responsibility to comply
25   with safety communications, including warnings

34 (Pages 133 to 136)

Eric Boelhouwer       American Family v. Electrolux        April 3, 2014

Page 137

1   provided by manufacturers, yes.
2       Q.   To encompass that, they have a
3   responsibility to read the warnings, correct?
4       A.   Generally I would have to say that
5   consumers do have a responsibility to read the
6   warnings provided to them by the manufacturer.
7       Q.   And what about for maintaining their
8   products, do consumers have a responsibility to
9   maintain their products?
10      A.   That may be a little broad.  But yes, I
11  would agree that consumers are responsible for
12  maintaining their products.
13      Q.   Now, one of the things that you have
14  identified as relying upon in this case are
15  depositions from over 100 Electrolux dryer owners.
16      A.   Yes, ma'am.
17      Q.   Where did you receive these depositions?
18      A.   From counsel.
19      Q.   You have some documents related to that,
20  correct?
21      A.   Yes, ma'am.
22      Q.   Is this it?
23      A.   No, ma'am.  There is a folder entitled
24  Appendix A.
25      Q.   Exhibit 14 is the folder marked Appendix

Page 138

1   A.  And so this is the depositions, the deposition
2   summaries from over a hundred Electrolux dryer fires
3   that you have reviewed.
4            Have you reviewed all of these hundred
5   depositions?
6       A.   I believe at this point I have reviewed
7   all of these deposition, yes, ma'am.
8       Q.   When reviewing them, what kinds of things
9   were you looking for?
10      A.   Generally I was looking for whether the
11  user of the dryer had a custom and practice to clean
12  the lint trap and filter and also if it was their
13  custom and practice to call a qualified service
14  professional to clean the interior of the dryer at the
15  18-month interval.
16      Q.   And then anything else you were looking
17  for in these depositions?
18      A.   Not at that time, no, ma'am.
19      Q.   Did you look to have -- all of these
20  cases -- these are from actual litigation cases,
21  correct?
22      A.   It is my understanding that they are all
23  related to litigation cases, yes, ma'am.
24      Q.   All these cases are an incident where the
25  dryer caught fire allegedly and caused damage,

Page 139

1   correct?
2       A.   That is my understanding, yes, ma'am.
3       Q.   Are these all subrogation cases as far as
4   you know, if you know what that means?
5       A.   I do not know the context in which all of
6   these litigation matters are proceeding.
7       Q.   Did you look to see how the fire started?
8       A.   No, ma'am.
9       Q.   Did you look to see if anybody
10  determined -- or did you look to see what the
11  investigation of the fire showed?
12      A.   For some of these matters, I may have been
13  provided additional materials that I reviewed.  For a
14  majority of these matters, the only documentation I
15  reviewed was the depositions identified.
16      Q.   Did you review these to determine whether
17  the user read the manual?
18      A.   I did not review these for that purpose,
19  no, ma'am.
20      Q.   Did you review these to see how the
21  machine was installed?
22      A.   With regard to these dryer depositions
23  covered in the Appendix A, I did not review it for
24  that purpose.
25      Q.   You reviewed it only for those two

Page 140

1   purposes, what the user's custom and practice to clean
2   the dryer, the lint filter of the dryer, and to call a
3   service provider for 18-month service.
4       A.   Yes, ma'am.
5       Q.   What was the purpose for you to do this
6   exercise?
7       A.   I wanted to review these documents to see
8   how actual users interacted with their product in
9   terms of what activities they may perform regarding
10  the lint trap and calling for service when their
11  product was not exhibiting any performance
12  characteristic -- or performance issues.
13      Q.   All right.  Did you determine in each of
14  these cases that the deponent was not experiencing
15  user issues?  Was that part of what you were looking
16  for?
17      A.   I don't recall at this time.
18      Q.   So what is the purpose for you to look
19  through this other than -- you know, you told me that.
20  Let me back up and state it a different way.  What
21  relevance does your exercise with these depositions
22  have to your opinion or to your report?
23      A.   I wanted to look at Electrolux dryer
24  users, consumers who did use their product and
25  interacted with their product and use that to suggest

Eric Boelhouwer          American Family v. Electrolux          April 3, 2014

Page 141

 1    what their custom and practice was with regard to
 2    dryer maintenance and then to look at that in
 3    combination with the Consumer Product Safety
 4    Commission survey to get a better understanding of how
 5    consumers perform maintenance activities for their
 6    dryer.
 7        Q.    And did you use this as a basis for any of
 8    your opinions in your report?
 9        A.    Yes, ma'am. I do believe I reference this
10    in the context of my report.
11        Q.    And that's with respect to your opinion
12    that, on Page 7 of the Blake report, consumers and
13    entities such as Blake Capital have an expectation
14    that household appliances are typically serviced on an
15    as-needed basis. It is not typical to have service
16    performed on appliances that continue to function and
17    are not exhibiting any indications of a potential
18    issue. In my review of depositions for over 100
19    similar matters it was neither the custom nor the
20    practice for the dryer owners to call qualified
21    service personnel to service their dryers at an
22    18-month interval.
23        So you used your review of these
24    depositions to support that opinion, correct?
25        A.    As part of the basis for my opinion, yes,

Page 142

 1    ma'am.
 2        Q.    Does your review of those depositions
 3    support any of your other opinions?
 4        A.    As it relates to my opinion in these
 5    matters, it speaks to that the warnings regarding
 6    cleaning the interior of the dryer would be unlikely
 7    to be followed for a variety of reasons, and this is
 8    just one of the reasons that helped -- that provides a
 9    basis for that opinion.
10        Q.    You have the statement here that consumers
11    have an expectation that household appliances -- and
12    you give as examples refrigerators, ovens, cook tops,
13    dishwashers, washing machines, and other similar
14    appliances are typically serviced on an as-needed
15    basis.
16        Is there anything else to support your
17    opinion other than your review of the 100 depositions?
18        A.    The Consumer Product Safety Commission
19    reached a similar conclusion in their study. And I
20    also referenced that study as the basis, one of the
21    bases for my opinions that consumers may not call for
22    service for an appliance that is not exhibiting any
23    performance issues.
24        Q.    All right. But did the CPSC survey deal
25    only with dryers?

Page 143

 1        A.    Yes, ma'am. The CPSC survey dealt with
 2    dryers.
 3        Q.    Do you have any other basis for the
 4    statement that consumers of these household appliances
 5    typically have an expectation that they are serviced
 6    on an as-needed basis?
 7        A.    From my review of the deposition testimony
 8    and the Consumer Product Safety Commission survey,
 9    these were the bases that individuals service
10    appliances on an as-needed basis.
11        Q.    Even though those two materials dealt with
12    dryers only, you have extrapolated that to all
13    household appliances.
14        A.    Yes, ma'am.
15        Q.    Nothing else besides those two documents,
16    or those two bases, that 100 depositions and the CPSC
17    report, support your opinion there.
18        A.    Those two sources of information inform my
19    opinion and the basis for that opinion and that is
20    within the context of all the other items I have
21    included for formulating my opinion that the warnings
22    provided were not adequate.
23        Q.    I am just trying to find out what other
24    than the world according to Mr. Boelhouwer serve as a
25    basis for that. I mean, we have identified two sets

Page 144

 1    of documents, the CPSC survey and your survey of 100
 2    depositions.
 3        A.    It was a review of the 100 depositions. I
 4    would not necessarily consider that a survey. Those
 5    two documents are the ones I can recall that gave me
 6    the primary bases for my opinion for that statement.
 7        Q.    The hundred depositions, you said it was
 8    not a survey when you reviewed them. Can you give me
 9    a brief definition of a survey, how you would use it
10    in a professional context.
11        A.    Sure. When the term survey is used
12    generally, I would assume that that means something
13    more similar to what the Consumer Product Safety
14    Commission does, whether it is a questionnaire
15    developed, it is provided to a population, responses
16    are received back and some analysis is performed on
17    those responses.
18        Q.    Have you ever designed or performed a
19    survey?
20        A.    Yes, ma'am.
21        Q.    And can you tell me what -- when was that
22    and what it was.
23        A.    Yes, ma'am. I performed several
24    computer-based surveys as part of my doctoral
25    research.

36 (Pages 141 to 144)

Eric Boelhouwer        American Family v. Electrolux        April 3, 2014

Page 145

1    Q.    Can you give me the subject matter of them
2  briefly?
3    A.    Yes.  Those involved chemical hazard
4  communication, warning labels, material safety data
5  sheets, safety data sheets, and how people were able
6  to review those materials and respond to questions
7  about those materials.
8    Q.    And have you conducted any survey with
9  respect to your work on these Electrolux fire cases?
10   A.    No.  I believe as I have discussed
11 earlier, I have not conducted any survey in these
12 areas.
13   Q.    You haven't spoken to any owners of
14 Electrolux dryers, be it ones involved in litigation
15 or ones not involved in litigation.
16   A.    No, ma'am.  I have not.  I don't believe I
17 have spoken to any Electrolux dryer owners.
18   Q.    Have you ever heard of the term selection
19 bias?
20   A.    Yes, ma'am.  I have heard of the term
21 selection bias.
22   Q.    What does that mean?
23   A.    Selection bias, my understanding is that
24 the -- you may not have a population that is
25 representative of all of the potential user

Page 146

1  population.
2    Q.    Do you contend that the population
3  contained in the deponents, the 100 deponents whose
4  depositions you have reviewed, are representative of
5  the population of dryer users?
6    A.    No, ma'am.
7    Q.    So you don't make that contention,
8  correct?
9    A.    As I understand your question, no, ma'am.
10   Q.    So you agree that at least some, if not
11 all, of those deponents either did not read or did not
12 heed the warnings provided to them with respect to the
13 maintenance on their dryer.
14   A.    My review of their testimony is no, they
15 did not heed the communications to have their dryer
16 serviced at an 18-month interval.
17   Q.    And they all experienced an adverse result
18 either due to the failure to heed the warnings or some
19 other reason.
20   A.    My understanding is that all of these
21 individuals did have some relationship to a dryer fire
22 occurring, yes, ma'am.
23   Q.    That's almost the way -- the first thing I
24 thought about it was all the women in the maternity
25 ward, when you interview them and ask them why they

Page 147

1  got pregnant it is because they didn't take the pill,
2  they didn't have a sufficient reminder to take the
3  pill, because it is too hard to remember every day.
4  That would not be a proper selection of people to
5  interview about the efficacy of birth control.  Does
6  that make sense?  That's the first thing that came to
7  my mind when we looked at the 100 dryer fire
8  depositions.  Anyway.
9          Let's talk about your costs of compliance
10 opinion.  We have discussed that a little bit already.
11 I just wanted to finish discussing that.  Your opinion
12 in this Blake report, which is the same across all
13 eight reports, is that the cost of compliance is
14 simply too high for many dryer owners to comply with
15 the warning, Page 6.  It is on Page 6.
16         So you have told me before that you rely
17 on this article from Dingus, Hathaway, and Hunn as
18 well as another article from Rogers, Lamson, and
19 Rousseau for support for this opinion here.  Is that
20 correct?
21   A.    Yes, ma'am.
22   Q.    Then it looks like you rely on the CPSC
23 statement that says a service call to clean the
24 accumulated lint within the dryer can be costly and
25 inconvenient to the consumer therefore the consumer

Page 148

1  may overlook performing the maintenance task until
2  there is something wrong with the dryer.  Is that
3  something you rely on for your opinion?
4    A.    Yes, ma'am.
5    Q.    Is it your opinion that because of the
6  cost of compliance with the warning that there can
7  never be an adequate warning for the hazard of fire on
8  Electrolux dryers?
9    A.    If the avoidance mechanism for that hazard
10 is the requirement to have their dryer serviced by an
11 authorized service provider in an 18-month interval,
12 no, ma'am, I don't think it could have an adequate
13 warning to address this hazard.
14   Q.    Put a different way, because of the risk
15 of fire that we have determined through review of FEMA
16 and NFPA, CPSC, other documents is prevalent across
17 all dryers, there can never be an adequate warning for
18 addressing that risk if one of the ways to avoid the
19 risk is to have your dryer serviced.
20   A.    It may be possible to have an adequate
21 warning to address that hazard.  But as it relates to
22 these matters, the -- is it possible that the
23 characteristics of the Electrolux design are different
24 than other manufacturers so therefore the design of
25 their dryers may or may not have a higher risk of

37 (Pages 145 to 148)

Eric Boelhouwer       American Family v. Electrolux       April 3, 2014

Page 149

1    fire.
2       Q.    All right.  First off, do you have any
3    basis for the statement that the design of Electrolux
4    dryers is different than the other dryers on the
5    market?
6       A.    Yes, ma'am.  I am aware that there are
7    different designs of dryers on the market.
8       Q.    And is it your opinion that the Electrolux
9    dryer has a higher rate of fire than any other dryer
10   on the market?
11      A.    I do not know.
12      Q.    So you do not have that opinion?
13      A.    I do not know.
14      Q.    You have no basis for the statement that
15   Electrolux dryers are involved in a higher rate of
16   incidence of fire than any other dryers, correct?
17      A.    No, ma'am.
18      Q.    So you have no basis for the opinion you
19   just stated, if it was indeed your opinion, that the
20   design of the Electrolux dryers leads to fires?
21      A.    That's outside my area.  I am not a dryer
22   design expert, no.
23      Q.    So you would agree that the design of the
24   Electrolux dryer is outside your area of expertise.
25      A.    Yes, ma'am.

Page 150

1       Q.    So any opinions about the adequacy of the
2    design, a change in design, anything like that is
3    outside your area of expertise, correct?
4       A.    Yes, ma'am.
5       Q.    Any opinion regarding how the design of
6    the Electrolux dryer relates to the design of other
7    dryers?  That is also outside your area of expertise,
8    correct?
9       A.    Yes, ma'am.
10      Q.    So let's get back to this whole idea of
11   cost of compliance.  Is it your opinion that the cost
12   of compliance -- you said the cost of compliance is
13   simply too high.  The fact that you decided it is too
14   high, does that mean there is never an adequate
15   warning for Electrolux dryers for the risk of fire?
16      A.    As it relates to Electrolux dryers and the
17   18-month-cleaning-interval requirement to have the
18   service performed by an authorized service personnel,
19   I don't believe can be an adequate requirement, no,
20   ma'am.
21      Q.    It doesn't matter what it says.  It could
22   have Mickey Mouse on all the warning labels, that
23   stuff is irrelevant.  It could have flashing red
24   lights.  It could have warning light indicators.  None
25   of that matters because the cost of compliance is too

Page 151

1    high of the warnings, no matter what they are,
2    including a warning light, are inadequate?
3       A.    No, ma'am.  My analysis incorporates all
4    of these factors, the language used to convey the
5    requirement for the warning, the cost of compliance,
6    the indicator -- the use of indicator lights, all of
7    these factors combined together speak to why the
8    warnings may not or are not adequate for the
9    Electrolux dryers.
10      Q.    But it seems to me that the cost of
11   compliance is the ultimate trump because no matter
12   what you do -- let me ask you this.  If you had a
13   warning light indicator that indicates when the
14   product needed to be serviced, wouldn't the person
15   still have to schedule service and wouldn't the cost
16   of compliance still be too high in your opinion?
17      A.    The inconvenience to the consumer is one
18   aspect of the cost of compliance, yes, ma'am.
19      Q.    What are the other aspects of the cost of
20   compliance?
21      A.    In this circumstance, actually the cost of
22   having your dryer serviced as well is another cost of
23   compliance.
24      Q.    So let's get back to my question, then,
25   which is even if there is a warning light to alert the

Page 152

1    customer to service the machine after 18 months,
2    doesn't that hurdle of the cost of compliance still
3    need to be -- still in the way?
4       A.    Yes, ma'am.  The cost in terms of the
5    monetary cost and the inconvenience to the consumer
6    still would have to be overcome.
7       Q.    So no matter what Electrolux does, even if
8    they put a state-of-the-art warning indicator, all of
9    that is inadequate because the cost of compliance in
10   your opinion is too high, correct?
11      A.    For that reason and the other reasons in
12   my report, yes, ma'am.
13      Q.    What other reasons in your report?  I am
14   asking you the cost of compliance, even if you drafted
15   the warning yourself and they came and they put a
16   warning light on there, the fact that you still have
17   to call somebody to service, to come out, pay them, be
18   there, et cetera, whatever the costs to the consumer
19   are to do that, that in your opinion is too high and
20   renders any warning inadequate.
21      A.    As I understand your question, yes, ma'am.
22      Q.    Back to your report for the Blake case.
23   Page 6, one of your opinions is the phrase "interior
24   of the dryer is ambiguous" and could reasonably be
25   interpreted to refer to portions of the dryer that are

REGENCY-BRENTANO, INC.

Eric Boelhouwer       American Family v. Electrolux       April 3, 2014

Page 153

1  visible upon opening the door.
2          What is the basis for your statement
3  there?
4      A.   May I pull one of the manuals?
5      Q.   Please do.
6      A.   Okay.
7      Q.   Go ahead.  What is the basis for your
8  statement there?
9      A.   So as it relates to the laundry center
10  owner's guide for the Blake matter which I am
11  referencing document PN 1317817009808 which is P10 of
12  my materials.
13          MS. BIERNAT:  Is that a copy that we can
14  mark?
15          (Boelhouwer Exhibit 26 was marked for
16  identification.)
17      Q.   (By Ms. Biernat) So the basis for your
18  statement is?
19      A.   Yes, ma'am.  On Page 3 of the manual, it
20  uses the term "interior of the dryer" as it relates to
21  the cleaning, the lint screening housing, and the
22  exhaust duct at the 18-month interval.
23      Q.   Okay.
24      A.   So it is my opinion that the term
25  "interior of the dryer" here is not clear as to what

Page 154

1  is intended to the consumer and whether that is when
2  they open the door to the dryer and look inside the
3  dryer and that is considered the interior, or if it
4  means something else about some other aspect of the
5  dryer.
6      Q.   Okay.  Does it say to follow up on Page 6,
7  see care and cleaning on Page 6?
8      A.   On the document I am looking at says see
9  care and cleaning, Pages 12 dash 13.
10      Q.   Okay.  What does it say on Pages 12 and
11  13?
12      A.   Page 13 addresses the care and cleaning of
13  the product.  And Page 12 talks about features and
14  also common drying problems.
15      Q.   So like troubleshooting would be Page 12,
16  bottom.
17      A.   Generally speaking, yes.
18      Q.   So on this Page 13 under the heading
19  Inside the Dryer, what does it say, the last bullet
20  point, No. 4?
21      A.   Under the heading of Inside the Dryer on
22  Page 13, it states if the dryer drum -- I apologize.
23  It states, Every 18 months an authorized servicer
24  should clean the dryer cabinet interior and exhaust
25  duct.  These areas can collect lint and dust over

Page 155

1  time.  An excessive amount of lint buildup could
2  result in inefficient drying and possible fire hazard.
3      Q.   And do you have any opinion about whether
4  an authorized servicer would not know what is meant by
5  the term "dryer cabinet interior and exhaust"?
6      A.   I have no opinion what an authorized
7  servicer may or may not know.
8      Q.   Have you done any surveys of any consumers
9  to determine whether the term "interior of the dryer"
10  is ambiguous?
11      A.   I have not surveyed any consumers to
12  determine if the phrase "interior of the dryer" is
13  ambiguous.
14      Q.   Have you viewed or read any publication at
15  all that supports your opinion that the phrase
16  "interior of the dryer" is ambiguous?
17      A.   Yes, ma'am.
18      Q.   What is that?
19      A.   On Page 13 of this same document, at the
20  top of the page, it discusses -- there is a warning,
21  safety alert symbol, a signal word, and then it
22  addresses two bullet points.  One states, Before
23  cleaning the washer or dryer interior, unplug the
24  electrical power cord to avoid electrical shock
25  hazards.  The second bullet states, Do not use any

Page 156

1  type spray cleanser when cleaning dryer interior.
2  Hazardous fumes or electrical shock could occur.
3      Q.   And how does that support your opinion
4  that the term "inside the dryer" is ambiguous?
5      A.   It is not clear from that use of the term
6  "dryer interior" which my interpretation is at the top
7  of Page 13, that warning statement is directed to a
8  consumer to perform some maintenance activity
9  regarding their dryer interior.
10      Q.   And other than the document itself, you
11  have no external document to support your opinion that
12  the average consumer would not understand that.
13      A.   Based on my review of the deposition
14  testimony of some of the insureds that we discussed
15  earlier and also some of insureds in this matter, it
16  was unclear to those individuals what was meant by
17  that -- the interior of the dryer statement in their
18  deposition testimony.
19      Q.   So you are relying on the people who had
20  the fires, who didn't follow the directions in the
21  first place; is that correct?
22      A.   I think the consumers who didn't follow
23  the directions may be a little broad.  With regard to
24  the 18-month cleaning-interval item, I tend to agree
25  they did not follow that admonition.

Eric Boelhouwer        American Family v. Electrolux        April 3, 2014

Page 157

1    Q.    Well, you don't know as you sit here today
2   how each of those fires started or what the cause of
3   those fires was in those hundred depositions; is that
4   accurate?
5    A.    I do not know what the root cause of the
6   fires was in each of those depositions.  However,
7   Electrolux does identify for us in their warning on
8   Page 3 that an excessive amount of lint buildup in
9   these areas could result in inefficient drying and
10  possible fire.
11   Q.    Which we have already discussed is the
12  hazard, correct, that needs to be addressed?
13   A.    One of the hazards.  Yes, ma'am.
14   Q.    The next bullet point you have on Page 6
15  of the Blake report, Most dryer owners would have
16  difficulty incorporating an 18-month interval into
17  their schedule.  What is the basis for that statement?
18   A.    It is my opinion that an 18-month interval
19  is an arbitrary amount of time.  I haven't seen any
20  evidence in these matters to establish why that number
21  was selected by Electrolux.  It is not a common
22  frequency of time that consumers may have -- they may
23  identify with better in terms of weekly, monthly,
24  yearly.
25   Q.    You said you haven't seen any evidence why

Page 158

1   Electrolux established that time or set that time.
2   Have you asked for any evidence for why Electrolux set
3   the 18-month interval?
4    A.    I have not asked for any evidence.  I am
5   just relying upon the deposition transcript of the
6   Electrolux employees that I have reviewed.
7    Q.    Is it important why they set the 18-month
8   interval, or relevant, I guess?
9    A.    At some level I believe it is relevant as
10  to why they selected the 18-month interval, yes,
11  ma'am.
12   Q.    What is the basis for your opinion that it
13  is arbitrary?
14   A.    That the Electrolux employee depositions I
15  have reviewed cannot provide the basis for why that
16  was selected.
17   Q.    Which deposition are you referring to?
18   A.    I don't recall.
19   Q.    Do you recall the gist of the testimony
20  that you are thinking of?
21   A.    I believe the gist of the testimony was
22  that the 18-month requirement is present in the
23  instruction manuals and did that individual when
24  asked, could they identify how that conclusion -- how
25  that 18-month interval was reached, and they could

Page 159

1   not.
2    Q.    It is relevant to you on some level.  Can
3   you tell me what level it is relevant to you on?
4    A.    From the time that the owner is provided
5   with the owner's guide at the time when they purchased
6   the dryer, that 18 months is a substantial amount of
7   time into the future to remember a maintenance
8   requirement for their product.
9    Q.    I mean, is it important why Electrolux
10  decided to recommend service every 18 months?
11   A.    Yes.  It is important to understand why
12  Electrolux would identify 18 months would be the
13  interval of time when they feel service was required
14  to address the potential lint accumulations inside a
15  dryer cabinet.
16   Q.    Why?  What relevance does it have?
17   A.    Electrolux in my opinion would have had to
18  consider that at some point in the future that the
19  amount of lint accumulation interior to the dryer
20  could be an increased risk of fire to the consumer and
21  over time the lint accumulates in the area of the
22  dryer where the consumer cannot see it.
23   Q.    In which case they advised the consumer to
24  get it serviced every 18 months, right?
25   A.    Yes, ma'am.  They do advise the consumer

Page 160

1   to have it serviced every 18 months.
2    Q.    So it is relevant to you because it shows
3   that Electrolux has knowledge that lint can build up
4   over time in the dryer and cause a fire hazard, right?
5    A.    Yes, ma'am.
6    Q.    But Electrolux addresses that hazard by
7   advising the consumer on how to avoid the hazard,
8   correct?
9    A.    Electrolux does provide a means of
10  avoidance.  However, cost of compliance with that
11  avoidance mechanism as we discussed earlier is very
12  high for the consumer.  And also if their dryer is not
13  exhibiting any performance issues, it is very
14  difficult for the consumer to say I dried my load of
15  clothes today, but tomorrow if I do not have this
16  service performed, I have a -- at some point they are
17  going to transition from a safe condition which is
18  their benign experience to an unsafe condition where
19  the next load of laundry, the next load of materials
20  dried in the dryer leads to a fire.
21   Q.    Now, let me go back to this question and
22  close it out.  The basis for your statement that most
23  dryer owners who have difficulty incorporating an
24  18-month interval into their schedule is based on
25  what?  It is based on your review of the hundred

Eric Boelhouwer       American Family v. Electrolux       April 3, 2014

Page 161

1  depositions, correct?
2      A.   (Witness nods head.)
3      Q.   Anything else that you can point to that
4  that is based on?
5      A.   A portion of that would be based on the
6  Consumer Product Safety Commission survey. As I sit
7  here, those are the documents that I would recall,
8  yes, ma'am.
9      Q.   Why is it unreasonable for a consumer to
10 want to maintain his or her appliance in a safe
11 condition rather than wait until there is a problem in
12 order to fix the appliance?
13     A.   Generally consumers when they use their
14 dryer or appliance if there is not a performance issue
15 that provides them feedback of an unsafe condition
16 would not have a -- would not develop -- would not
17 have an increased concern about having their dryer
18 serviced.
19     Q.   So as we have already discussed, we talked
20 about that already, the only basis for your statement
21 that you just made, the broad statement, is the review
22 of the hundred depositions and a part of the CPSC
23 survey, correct?
24     A.   Those are the documents I would suggest
25 that support my opinion and also that the users'

Page 162

1  experience in using the dryer plays a role in that as
2  well.
3      Q.   What user experience? How would you know
4  of the user experience? Have you done any surveys of
5  users of these products?
6      A.   I have not done any surveys of the users
7  of these products, no, ma'am.
8      Q.   So how can you possibly say other than
9  your reliance on those two other documents or sources
10 that we have discussed that the users' experience
11 would support your opinion that somebody doesn't
12 service their dryer until there is a problem? I am
13 looking for anything that supports it other than what
14 you are coming up with. We have talked about two
15 sources. Is there anything other than those two
16 sources that supports your opinion?
17     A.   Not that I recall, ma'am.
18     Q.   It is not unreasonable -- would you agree
19 with me it is not unreasonable for a consumer to want
20 to maintain the safety of his or her appliance by
21 servicing it before there is a problem, correct?
22     A.   Generally speaking, it would not be
23 unreasonable for a consumer to want to make sure,
24 ensure their product is in a safe condition, yes,
25 ma'am.

Page 163

1      Q.   Wouldn't you say that's the prudent thing
2  to do?
3      A.   Generally speaking, yes, ma'am.
4      Q.   Let's move on down -- okay. Portion 2 of
5  the Blake report, I am sorry, subsection 2, Lack of
6  User Feedback Related to Lint Accumulation. We have
7  already discussed this section. We have discussed
8  Whirlpool as well.
9           Let me ask you specifically with respect
10 to the Blake case, what is your understanding that the
11 resident of the property, of the apartment of Lisa
12 Christensen, did not have access to the manual?
13     A.   I don't recall what Ms. Christensen's
14 testimony was in the Blake matter, no, ma'am.
15     Q.   She never had the opportunity to read the
16 safety information set forth in the manual. Do you
17 have any understanding if that's accurate?
18     A.   My understanding of Ms. Christensen --
19 that she did not have opportunity review the
20 information in the owner's guide, yes, ma'am.
21     Q.   So does that have any relevance at all to
22 your opinion in this case?
23     A.   No, ma'am. I don't believe it does, in
24 the Blake matter.
25     Q.   So if she failed to have the machine

Page 164

1  serviced, the fact that she didn't have the
2  information available to her, that has no -- well, let
3  me actually back up before we go ahead.
4           We talked about the cost of compliance
5  although I still am having trouble getting over that
6  one. We talked about the warning light. Do you have
7  any opinion about what language should have been
8  provided in the on-product warning label in this case
9  that would have been adequate?
10     A.   As I understand your question, no, ma'am,
11 I do not.
12     Q.   So do you have any opinion about what
13 warnings if provided in the owner's manual would have
14 been adequate?
15     A.   I believe in the owner's manual as it
16 relates to the Blake matter, I have outlined those
17 reasons in my report and we discussed those earlier
18 today.
19     Q.   Do you have any affirmative language that
20 you believe would be adequate?
21     A.   Not at this time, no, ma'am.
22     Q.   Do you believe there is a way absent
23 putting on a warning indicator that Electrolux could
24 have provided an adequate warning to the consumers of
25 this dryer in this case?

41 (Pages 161 to 164)

Eric Boelhouwer        American Family v. Electrolux        April 3, 2014

Page 165

1    A.    As I understand your question, no, ma'am.
2    Q.    Is it your understanding -- well, is it --
3  do you believe that had a warning light been put on
4  this dryer, a feedback device, that that would have
5  provided an adequate warning for this dryer with
6  respect to the risk of fire?
7    A.    My understanding in the Blake matter is
8  that Ms. Christensen was leasing an apartment and that
9  she was using the dryer in her apartment and that if
10 there was an indicator light that appeared on her -- I
11 cannot -- I cannot state what Ms. Christensen would or
12 would not have done in this circumstance, no, ma'am.
13   Q.    Absent what she would or wouldn't have
14 done because as we already discussed the adequacy of
15 warnings is not necessarily dependent on what the
16 ultimate user does, in your opinion had a warning
17 light or indicator been put on the dryer used in the
18 Blake case, would that have constituted an adequate
19 warning of the risk of the hazard of fire?
20        MR. BOERIGTER: I object. Incomplete
21 hypothetical.
22        MS. BIERNAT: Probably an incomplete
23 sentence, too.
24   Q.    (By Ms. Biernat) One of your opinions in
25 this case is that a feedback system must be employed

Page 166

1  to alert consumers about their increased risk. You
2  have made a statement that we could have incorporated
3  feedback to users based on either time or usage. Had
4  this dryer incorporated a feedback system based on
5  either time or usage, would you then have -- would the
6  warning be adequate with respect to the risk of fire?
7    A.    In regards to the Blake matter, I
8  cannot -- with respect to the Blake matter, I am not
9  sure I can conclude that had an indicator light been
10 present the fire would have been avoided.
11   Q.    I am not asking you that question. My
12 question is was the warning adequate, would the
13 warning then be adequate in your opinion.
14        I will back up. I don't think you can say
15 within a reasonable degree of scientific certainty in
16 any of these cases that lack of warning or the
17 warning -- strike that. Go ahead. Let's go back to
18 my question.
19        (The record was read by the reporter.)
20        MR. BOERIGTER: Objection again,
21 incomplete hypothetical.
22        THE WITNESS: I am not sure I have enough
23 information to make that assessment.
24   Q.    (By Ms. Biernat) What information do you
25 need to make the assessment? You put the opinion that

Page 167

1  our warnings are not adequate. I am asking you what
2  we could have done to make them adequate. One way you
3  said was we could have incorporated feedback to users.
4  Would that have made the warning adequate?
5    A.    Feedback to users is one aspect of making
6  the warning adequate, but it still doesn't address all
7  of my concerns with regard to cleaning the dryer at
8  the 18-month interval.
9    Q.    You have no opinion on what different
10 language we could have used either on the product or
11 in the manual itself, correct?
12   A.    No, ma'am. I don't believe I have an
13 opinion with regard to that at this time.
14   Q.    So the two things that you are concerned
15 with are, No. 1, a reminder about the 18-month
16 interval; and No. 2, the cost of compliance with the
17 18-month interval.
18   A.    Those are two of my concerns, yes, ma'am.
19   Q.    Any other concerns?
20   A.    As we have discussed the interior of the
21 dryer, the ambiguous nature of the interior of the
22 dryer, and also the consumer's awareness of this
23 hazard of lint buildup in their dryer may not be well
24 known to users.
25   Q.    All right. It is your contention -- you

Page 168

1  don't have any other phrase that could be substituted
2  for interior of the dryer that would be unambiguous,
3  or do you?
4    A.    Not at this time, no.
5    Q.    You can't say whether or not a warning, a
6  feedback system on the Electrolux dryer would have
7  made Electrolux dryer's warning with respect to fire
8  adequate?
9    A.    No, ma'am.
10   Q.    You have the statement with respect to the
11 subject dryer, Electrolux could have incorporated
12 feedback to users based on either time or usage to
13 inform users that the interior of the dryer would need
14 to be cleaned by qualified service person.
15        What is your basis for your opinion that
16 Electrolux could have incorporated this feedback
17 system?
18   A.    It was my opinion that communication to
19 the user would have been technologically feasible.
20   Q.    Based on what? You have already said you
21 are not a design expert, correct?
22   A.    Correct.
23   Q.    You have not done a survey of any other
24 products, at all, whatever, except for your car that
25 incorporates a feedback system, correct?

42 (Pages 165 to 168)

Eric Boelhouwer        American Family v. Electrolux        April 3, 2014

Page 169

1    A.    Yes, ma'am.
2    Q.    So what is the basis for your statement it
3  would have been technologically feasible?
4    A.    It is my experience and my background that
5  it is possible for an electrical appliance to have an
6  electrical light that could illuminate.  That's my
7  basis.
8    Q.    That an electrical appliance can have an
9  electrical light that can illuminate.  Under what
10 circumstance?
11   A.    Again, we are getting outside my area --
12   Q.    Let's just say you have no expertise and
13 no basis for your statement that Electrolux could have
14 incorporated a feedback system; is that accurate?
15   A.    No.  I don't think that's accurate.
16   Q.    I still haven't received the statement
17 that tells me what you relied on for that statement,
18 they could technically have done it.
19   A.    Part of the basis of my opinion there is
20 what we discussed earlier today, the Whirlpool
21 appliance that did incorporate a feedback mechanism.
22   Q.    That was with respect to the lint filter,
23 correct?
24   A.    With respect to the lint filter, yes,
25 ma'am.

Page 170

1    Q.    That was something provided to you by
2  counsel, correct?
3    A.    Yes, ma'am.
4    Q.    That was something you did not investigate
5  yourself, correct?
6    A.    No, ma'am.
7    Q.    You have no understanding of how well that
8  worked, right?
9    A.    Of how well the lint signal -- I do not
10 have an understanding of how well the lint signal
11 worked on the Whirlpool appliance, no, ma'am.
12   Q.    The Whirlpool appliance lint signal did
13 not apply to any lint in the interior of the dryer
14 other than the lint filter, correct?
15   A.    It is my opinion -- that is correct.  No,
16 ma'am.
17   Q.    So that is the only basis for that
18 statement, your review of a 1994 care and use guide
19 from Whirlpool, correct?
20   A.    Yes, ma'am.
21   Q.    Let's move onto the next case.  We have
22 seven more to do in 45 minutes.  Let's do it.
23   A.    Can we take a quick break?
24        MS. BIERNAT:  Go ahead.
25        (Recess from 3:18 p.m. to 3:30 p.m.)

Page 171

1    Q.    (By Ms. Biernat)  Have you read any of the
2  reports of Christine Wood in these cases?
3    A.    Yes, ma'am.
4    Q.    Do you have any criticisms of her report?
5    A.    To the extent that Christine reaches
6  different conclusions than I do with regard to some of
7  the safety communications provided by Electrolux, yes,
8  ma'am.
9    Q.    Any other criticisms besides the opinion
10 itself?
11   A.    If you could point me to something
12 specific.  As I sit here, I don't recall.
13   Q.    That's fine.  I just didn't know if you
14 had -- well, I thought I would ask.  All right.
15        Let's talk about the Brossard case.
16   A.    Okay.
17   Q.    So the first section of your report is the
18 same, correct, meaning qualifications?
19   A.    I believe so, yes, ma'am.
20   Q.    We have gone through what the
21 additional -- we have gone through the material
22 reviewed that is common to every case, correct?
23   A.    Yes, ma'am.
24   Q.    What is your understanding of the
25 circumstances of the Brossard case?  What are the

Page 172

1  relevant facts to you in your opinions?
2    A.    My opinions in the Brossard matter again
3  relate to the guidance provided in the Frigidaire
4  owner's guide relating to cleaning the interior of the
5  lint screen and the recommended service interval.
6    Q.    When you say cleaning the interior of the
7  lint screen, you mean that first paragraph there,
8  under Facts and Opinions, Paragraph 1?
9    A.    That is the first of my opinions in the
10 Brossard matter, yes, ma'am.
11   Q.    And you are referring to Page 2 of the
12 owner's guide.
13   A.    Yes, ma'am.
14   Q.    Is there anything in particular about this
15 Page 2 that you have criticism about?
16   A.    My criticisms of Page 2 in the Brossard
17 matter are very similar to what we have previously
18 discussed for the Blake matter.
19   Q.    Is there anything different in this than
20 we discussed in the Blake matter?
21   A.    As I sit here, I do not recall any
22 differences in my opinions in the Brossard matter from
23 the Blake matter.
24   Q.    Any facts of the case -- well, let's back
25 up.  You reviewed the depositions of Ms. Brossard,

43 (Pages 169 to 172)

Eric Boelhouwer        American Family v. Electrolux        April 3, 2014

Page 173

1    Mr. Brossard, you have reviewed photographs taken by
2    the cause and origin investigator.  You have reviewed
3    the consumer instruction check list.  That's something
4    new, right, that we didn't discuss before?
5        A.    I believe that is a document that is
6    specific to each case, yes, ma'am.
7        Q.    And you reviewed discovery responses by
8    plaintiff and by defendant, correct?
9        A.    Yes, ma'am.
10       Q.    Photographs of the washer and dryer,
11   correct?
12       A.    Right.  I reviewed the materials listed in
13   my report, yes, ma'am.
14       Q.    Those also relate to individual facts of
15   the case.  Is there any relevant facts that you
16   learned through review of the depositions and the
17   facts related specifically to this fire in this case
18   that were relevant to your opinion in the Brossard
19   case that the warnings were inadequate?
20       A.    As I sit here, I don't recall any specific
21   facts unique to the Brossard case.
22       Q.    Let me ask you about the Donahue case.
23       A.    Okay.  Donahue.
24       Q.    And in this case, your general opinions
25   about the adequacy of the warnings, do they differ at

Page 174

1    all from the Brossard or Blake case?
2        A.    Generally my recollection is no, with
3    respect to the warning regarding cleaning the interior
4    of the dryer is unlikely to be followed.  And also
5    with regard to my third opinion in the Donahue matter,
6    the lack of user feedback related to lint accumulation
7    are generally the same between the Blake and Brossard
8    matters.  However opinion 2 in the Donahue matter is
9    different than either of those.
10       Q.    And how so?  I see that there.  Yes.  I
11   did know that.
12           Your opinion is that installation
13   instructions for the subject dryer are permissive of
14   the use of metal foil-type duct to be used as part of
15   the dryer vent system provided the metal foil-type
16   duct complies with UL Standard 2158.
17           What is your criticism of that?
18       A.    On Page 3 of the Kenmore installation
19   instructions, in column 2, I provided a representation
20   of that page in my report and called out a portion of
21   text in column 2 that says in Canada and United States
22   if the metal foil-type duct is installed it must be of
23   a specific type identified by the appliance
24   manufacturer as suitable for use with clothes dryers,
25   and in the United States must also comply with the

Page 175

1    outline for closed dryer transition duct, UL Standard
2    2158 A--
3        Q.    How is that a criticism?
4        A.    It is my understanding and my recollection
5    that metal foil duct was found to be used in the
6    Donahue matter as a portion of their venting system.
7        Q.    You are saying that that is improper to
8    use the metal foil duct, is that what you are saying,
9    but the instructions allow for it?  I am unclear on
10   what your criticism is.
11       A.    Criticism is probably not the right word.
12   But the installation instructions permit the use of
13   metal foil duct, and it is my understanding that metal
14   foil duct was used in the Donahue matter.
15       Q.    Okay.  Anything about the facts of the
16   Donahue matter that are relevant to your opinion in
17   that case?
18       A.    I don't recall any specific, case-specific
19   facts relevant to my opinions of the Donahue matter.
20       Q.    Let's talk about the Freeman case.
21       A.    Yes, ma'am.
22       Q.    Is there anything relevant in the facts,
23   your review of the facts of the case, the deposition
24   testimony or any of the inspection documents or photos
25   that were relevant to your opinions in the Freeman

Page 176

1    matter?
2        A.    I believe all the documents I reviewed in
3    the Freeman matter are listed under my report and I
4    don't recall any case-specific facts as it relates to
5    my opinions in the Freeman matter.
6        Q.    Does the fact that Mrs. Freeman testified
7    she never looked at the product literature after
8    buying the product have any relevance to your opinion
9    about adequacy of the warnings?
10       A.    My recollection of Mrs. Freeman's
11   testimony is that she did not review -- as you have
12   stated -- did not review the installation instructions
13   as it relates to the subject dryer.
14       Q.    So does that have any relevance to --
15   well, strike that.  Let's move onto the next case,
16   Holt.
17       A.    Holt.
18       Q.    Is there anything that differs in this
19   opinion from your general opinions here from the
20   previous opinions, previous cases?
21       A.    Yes, ma'am.
22       Q.    What is that?
23       A.    Opinion 1 on Page 4 of my report for the
24   Holt matter.
25       Q.    Okay.

44  (Pages 173 to 176)

Eric Boelhouwer        American Family v. Electrolux        April 3, 2014

Page 177

1      A.   Is that the subject dryer had been
2  installed in the Holts' home for approximately 18
3  months at the time of the fire.
4      Q.   And the relevance of that is what?
5      A.   Is the guidance to have your dryer
6  serviced every 18 months was not sufficient to have
7  the Holts avoid this accident.
8      Q.   Do you know where the Holts purchased
9  their dryer?
10     A.   I do not recall exactly where the Holts
11 purchased their dryer, no, ma'am.
12     Q.   Do you know if the dryer was new when the
13 Holts purchased it?
14     A.   I do not recall if the dryer was new when
15 the Holts purchased it.
16     Q.   Do you know if it had been serviced prior
17 to the Holts obtaining it?
18     A.   I don't recall at this time if the dryer
19 had been serviced prior to the Holts obtaining the
20 subject dryer.
21     Q.   Do you know what the cause of the fire in
22 the dryer was?
23     A.   As it relates to the Holt matter, I do not
24 recall.
25     Q.   Do you know if the dryer was installed

Page 178

1  correctly?
2      A.   As it relates to the Holt matter, I don't
3  recall.
4      Q.   The next case is Larson.
5      A.   Larson.
6      Q.   How about this case, is there anything,
7  any opinions in this case that differ from the other
8  cases?
9      A.   With respect to the Larson matter, opinion
10 2, is that the on-product labels do not address the
11 fire risk as required by UL 2158.
12     Q.   What does 2158 require?
13     A.   As I stated in my report of UL 2158 has a
14 requirement in Section 7.1.2.13.a and 7.1.2.13.b
15 regarding on-product labeling.
16     Q.   All right.  And how does it fail to comply
17 with these?
18     A.   May I pull some materials from my file?
19     Q.   Sure.
20     A.   Okay.
21     Q.   Go ahead.
22     A.   It is my understanding from the materials
23 I was provided in the Larson matter there was two
24 on-product labels which are covered by UL 2158 and I
25 believe the relevant standard is in my report.  It is

Page 179

1  the 2004 edition of the standard.  And in that
2  standard on Page 23 it provides explicit language
3  requirements with regards to the on-product markings.
4      Q.   And how does the language differ?  Does it
5  differ materially?  I will ask you that question.
6      A.   Yes, ma'am.
7      Q.   And how does it differ materially?
8      A.   With respect to 7.1.2.13.a, within that
9  statement in the standard, it states that the warning
10 label, that the appliance should be marked with a
11 statement that says risk of fire, a clothes dryer
12 produces combustible lint.  The dryer must be
13 connected to an exhaust to the outdoors in the
14 installation instructions.
15     Q.   Doesn't it say you can say risk of fire or
16 its equivalent?
17     A.   Yes, ma'am.  It does state you can say
18 risk of fire or its equivalent.
19     Q.   Don't we say that to avoid fire hazard, is
20 that equivalent in your opinion?
21     A.   The information to avoid fire hazard is on
22 the label 1317150009709, yes, ma'am.
23     Q.   But is it your opinion that that is a
24 material difference and that they are not equivalent?
25     A.   The statements to avoid fire hazard and

Page 180

1  risk of fire are equivalent my opinion.
2      Q.   So it is not really a material difference
3  from 2158.
4      A.   My opinion is that in the portion of the
5  label that addresses the other statements referenced
6  in 7.1.2.13.a that the risk of fire should have been
7  included as part of that caution statement for the
8  consumer.
9      Q.   Okay.  All right.  Isn't there another
10 part to this, too?  Does it not use the signal word
11 warning does not comply with 2158?
12     A.   That was in reference to a different
13 label.
14     Q.   On a different label, label 1317854009810?
15     A.   Correct.
16     Q.   Does the UL allow for the word caution,
17 correct?
18     A.   UL in 7.1.2.13.b allows for the use of
19 "caution."
20     Q.   But we used the word warning, right?
21     A.   Yes, ma'am.
22     Q.   Are you saying that that is -- our use of
23 the word "warning" renders the label inadequate as
24 opposed to the word "caution"?
25     A.   I wasn't trying to address the adequacy of

45 (Pages 177 to 180)

Eric Boelhouwer        American Family v. Electrolux        April 3, 2014

Page 181

1   the warning with my statement in my report.  I was
2   just trying to call attention to the fact that the
3   standard requires the use of the word caution and on
4   this label 131785400 that that is not the correct
5   signal word.
6        Q.   Okay.  And then your statement above the
7   title of that paragraph says, The on-product labels do
8   not address the risk of fire as required by UL 2158.
9   That's not accurate, right?  It just does not state
10   risk of fire.
11        A.   With respect to which label?
12        Q.   The one above it, label 1317854009810.
13   Sorry.  Yeah.  131715009709.
14        A.   Okay.  It is my opinion to be in
15   compliance with UL 2158 7.1.2.13.b that a label
16   131785400 needed to include the risk of fire as part
17   of the language used.
18        Q.   Anything else about that report or about
19   that case that is different than the other cases?
20        A.   I don't recall any other differences at
21   this time.
22        Q.   Do you recall Mrs. Larson complaining of
23   marks on her clothing obtained during the drying
24   process that she believed were the result of the dryer
25   being too hot?

Page 182

1        A.   I do recall some of Mrs. Larson's
2   testimony to that effect, yes.
3        Q.   So your statement that there were no prior
4   problems with the dryer that would have alerted her,
5   did that include this issue that she experienced the
6   waffle marks on the clothes?
7        A.   We have gone over a lot of matters today.
8        Q.   Sure.
9        A.   One of my recollections and I can't
10   remember if it is -- I do not recall at this time.
11        Q.   I understand.  Let's talk about the
12   McCants -- no.  Did we do Kucharskis?
13        A.   Kucharskis.
14        Q.   Have you found it?
15        A.   Yes, ma'am.
16        Q.   Is there anything different in this report
17   than in the other reports that is specific to the
18   Kucharski case?
19        A.   On Page 6 of the Kucharski matter, when
20   discussing the servicing, maintenance activities
21   performed by the Kucharskis, I identified some of
22   their deposition testimony regarding vacuuming the
23   exhaust vent piping from the exterior of the home on a
24   yearly basis and vacuuming the interior of the lint
25   screen housing.

Page 183

1        Q.   And the relevance of that is what?
2        A.   That the Kucharskis in this matter did
3   perform some dryer maintenance activities beyond
4   simply just cleaning the lint screen for their
5   Electrolux dryer.
6        Q.   Anything else that is different in this
7   case from the other cases?
8        A.   I don't recall at this time.
9        Q.   Then let's talk about the McCants report.
10   With respect to the McCants case, is there anything in
11   particular in this, in your report in this case?
12        A.   Generally the opinions are the same in
13   McCants as many of the other reports.  Specifically,
14   again, in McCants as we have already talked about,
15   that the on-product label does not address the risk of
16   fire as required by UL 2158 is part of my analysis for
17   the McCants matter.
18        Q.   Other than the UL 2158 discussion we have
19   had about those two reports, do you agree that
20   Electrolux complied with all applicable standards,
21   including UL and ANSI?
22        A.   Can you please be more specific in the
23   documents you are identifying.
24        Q.   No.  I am just asking you.  Do you have an
25   opinion that they did not comply with UL standards or

Page 184

1   the ANSI standards with respect to warnings on their
2   products?
3        A.   I believe I have identified the issues I
4   wished to raise with regard to the UL 2158 standard.
5   With regards to an ANSI standard which we haven't
6   identified, I have no opinion.
7        Q.   And for your testimony today and through
8   your written reports that we have looked at here, have
9   we encompassed -- did that encompass all of the
10   opinions that you intend to give in these cases?
11        A.   I believe that we have covered my opinions
12   in this case, these matters, yes, ma'am.
13        Q.   And here is the Haroutounyan case.  Let me
14   ask you if you want to look at this.  I don't care if
15   we mark it or not.  But that's signed by Mr. Dorris.
16   Did you help draft that?  Correct?
17        A.   I assisted Dr. Dorris in the preparation
18   of this report, yes, ma'am.
19        Q.   Is there anything in there that -- well,
20   let me back up.  That's similar to your report in this
21   case, correct?
22        A.   Similar to my reports in all eight of
23   these matters, yes, ma'am.
24        Q.   And from the time that you helped
25   Dr. Dorris draft that report, did you have any -- if

Eric Boelhouwer        American Family v. Electrolux        April 3, 2014

Page 185

1   you can recall -- any additional or different opinions
2   about any of the matters stated in there?
3        A.   Yes, ma'am.
4        Q.   What are they?
5        A.   I believe --
6        Q.   Let me back up.  Do you have any different
7   opinions that are contrary to what Dr. Dorris stated
8   in that report?
9        A.   I don't believe my analysis in the reports
10  reviewed today -- I believe my eight reports we
11  reviewed today reach similar conclusions as
12  Dr. Dorris, but I also hold case-specific opinions in
13  these eight matters.
14       Q.   Let me ask you with respect to the cost of
15  compliance, we talked about -- can you tell me what
16  the actual costs are involved in these cases?
17       A.   The actual cost with regard to what?
18       Q.   The cost of compliance that you address in
19  your report.
20       A.   I think we have discussed at several
21  different times today there is a monetary cost and
22  also a cost in terms of time, effort, and energy that
23  an individual must exert to comply with these
24  warnings.
25       Q.   Do you know what the monetary costs would

Page 186

1   be?
2        A.   I believe in one of the Larson depositions
3   I was recently provided, it suggests that if they were
4   called that the cost would be around a hundred
5   dollars.
6        Q.   Let me ask you briefly, have we marked
7   this as an exhibit?
8        A.   Yes.
9        Q.   Do you contend that Electrolux dryers are
10  unreasonably dangerous?
11       A.   That seems too broad.  It would also seem
12  to be outside of my area.
13       Q.   I think with that, that's all the
14  questions I have for you today.  Thank you very much.
15            Let me go back on the record.  Do you plan
16  on doing any additional work in these cases?
17       A.   Not at this time.
18       Q.   If you do have an additional or different
19  or whatever opinion that you will let us know and then
20  we can reschedule.
21       A.   Yes, ma'am.
22            EXAMINATION
23  BY MR. BOERIGTER:
24       Q.   I just have a couple of questions.
25            Now, since the date of this report, you

Page 187

1   have reviewed additional documentation; is that right?
2        A.   Yes, sir.  We have received a substantial
3   amount of documentation within the last few days.
4        Q.   Some of that is deposition transcripts
5   from Electrolux employees.
6        A.   Yes, sir.  Those are not covered in the
7   materials reviewed for my report.
8        Q.   They are in the files in the documentation
9   that were provided to counsel today.
10       A.   Yes, sir.
11       Q.   Anything in those documents that would
12  cause you to have different opinions than what you set
13  forth in your reports?
14       A.   From the documents I have reviewed so far,
15  I do not believe they would cause me to have different
16  opinions.  But some of the testimony may provide
17  additional bases for my opinions in the future.
18       Q.   And you have been provided the reports
19  from Dr. Christine Wood; is that right?
20       A.   Yes, sir.
21       Q.   Have you had a chance to review those in
22  detail?
23       A.   I have read them.  I haven't had the
24  opportunity to do a thorough analysis of those reports
25  at this time.

Page 188

1        Q.   And if you are called to testify at trial,
2   you might be asked questions about Dr. Wood's report.
3        A.   Yes, sir.
4        Q.   We have not covered that today; is that
5   right?
6        A.   Yes, sir.  We have not covered those
7   reports today.
8        Q.   I know there was a lot of questions today
9   and a lot of hypotheticals and other things that you
10  went over today.  As we sit here at the end of your
11  deposition today, any reason to believe that you have
12  different opinions than what you set forth in your
13  reports?
14       A.   No, sir, not at this time.
15       Q.   Have you changed any of your opinions
16  based on the questioning today from what was set forth
17  in your reports?
18       A.   No, sir.
19            MR. BOERIGTER:  That's all I have.
20            RE-EXAMINATION
21  BY MS. BIERNAT:
22       Q.   I need to know which depositions you
23  received that are not contained in your reports.
24       A.   These items are identified in the exhibits
25  that have been marked.

47 (Pages 185 to 188)

Eric Boelhouwer        American Family v. Electrolux        April 3, 2014

Page 189

1    Q.    That's the same for each case?
2         MR. BOERIGTER:  The new ones might be the
3    same.
4         THE WITNESS:  The materials reviewed for
5    each matter are listed on the file listing which
6    has been marked, for example, in the Blake matter
7    5-A and then most recent depositions received
8    which I believe are all -- most, the majority of
9    them Electrolux employees -- are Chris Adams, Jay
10   Bjerke, Shelley Clausen, Steve Joerger, and Scott
11   Harder.
12   Q.    (By Ms. Biernat)  When did you receive
13   them?
14   A.    I believe they were provided by counsel on
15   Monday.  Monday, I believe, of this week.
16   Q.    Have you reviewed all of those?
17   A.    Yes, ma'am.  I have read all of those
18   depositions.
19   Q.    Did you take any notes when you reviewed
20   them?
21   A.    Yes, ma'am.  I believe I provided those to
22   you.
23   Q.    Your annotations from these?
24   A.    Yes, ma'am.
25   Q.    And off the top of your head right now,

Page 190

1    can you advise me how any of those depositions have
2    informed your opinions in this case?
3    A.    Not citing to specific pages and pieces of
4    testimony, Shelley Clausen identified that she
5    considered the instruction to clean the dryers at an
6    18-month interval to be an instruction and not a
7    warning.
8         I believe it was Steve Joerger who
9    testified that he informed the customer service
10   representatives when individuals called the 1-800
11   number that individuals experiencing issues needed to
12   clean the lint filter and their exhaust system but did
13   not include an instruction to clean the interior of
14   their dryer.  There may be others, I just can't recall
15   at this time.
16   Q.    And those, you did not review those at the
17   time you came to your conclusions in this case or
18   drafted your reports?
19   A.    No, ma'am.  Those were provided after that
20   time.
21   Q.    Is there any other information that is not
22   identified in your reports that you have considered,
23   reviewed, or relied upon in this case?
24   A.    As I have stated we received a lot of
25   documents very recently and I have not had the time,

Page 191

1    opportunity to provide thorough analysis of all those
2    materials.
3    Q.    So none of those other documents have any
4    bearing on your opinions at this moment because you
5    haven't looked at them.
6    A.    I don't believe they have influenced what
7    we have talked about today, no, ma'am.
8    Q.    So with that caveat I am going to ask you
9    if they do influence what you talked about, you will
10   let me know.
11   A.    Yes, ma'am.
12   Q.    We can go from there.
13   A.    Yes, ma'am.
14        MS. BIERNAT:  That's it.
15        MR. BOERIGTER:  I don't have anything
16   else.
17        (Deposition concluded at 4:08 p.m.)
18        (Pursuant to Rule 30(e) of the Federal
19   Rules of Civil Procedure and/or O.C.G.A.
20   9-11-30(e), signature of the witness has been
21   reserved.)
22
23
24
25

Page 192

1
2         C E R T I F I C A T E
3
4    STATE OF GEORGIA:
5    COUNTY OF FULTON:
6
7         I hereby certify that the foregoing
8    transcript was taken down, as stated in the
9    caption, and the questions and answers thereto
10   were reduced to typewriting under my direction;
11   that the foregoing pages 1 through 191 represent
12   a true, complete, and correct transcript of the
13   evidence given upon said hearing, and I further
14   certify that I am not of kin or counsel to the
15   parties in the case; am not in the regular employ
16   of counsel for any of said parties; nor am I in
17   anywise interested in the result of said case.
18        This, the 7th day of April, 2014.
19
20
21        RENDA K. CORNICK, CCR-B-909
22
23
24
25

48 (Pages 189 to 192)

REGENCY-BRENTANO, INC.

Eric Boelhouwer      American Family v. Electrolux      April 3, 2014

Page 193

COURT REPORTER DISCLOSURE

Pursuant to Article 10.B of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia, I make the following disclosures:

I am a Georgia Certified Court Reporter. I am here as a representative of Regency-Brentano, Inc.
I am not disqualified for a relationship of interest under the provisions of O.C.G.A. Section 9-11-28(c).
Regency-Brentano, Inc., was contacted by Rebecca Biernat, Esq., to provide court reporting services for this deposition.
Regency-Brentano, Inc., will not be taking this deposition under any contract that was prohibited by O.C.G.A. 15-14-37 (a) and (b).
Regency-Brentano, Inc., has no exclusive contract to provide reporting services with any party to the case, any counsel in the case, or any reporter or reporting agency from whom a referral might have been made to cover this deposition.
Regency-Brentano, Inc., will charge its usual and customary rate to all parties in the case, and a financial discount will not be given to any party to this litigation.

Renda K. Cornick, CCR-B-909
April 3, 2014

Page 194

DEPOSITION OF: ERIC J. BOELHOUWER, PH.D., CSP/RKC
I do hereby certify that I have read all questions propounded to me and all answers given by me on April 3, 2014, taken before Renda K. Cornick, and that:

1) There are no changes noted.
2) The following changes are noted:
Pursuant to Rule 30(e) of the Federal Rules of Civil Procedure and/or the Official Code of Georgia Annotated 9-11-30(e), both of which read in part: Any changes in form or substance which you desire to make shall be entered upon the deposition...with a statement of the reasons given...for making them. Accordingly, to assist you in effecting corrections, please use the form below:

Page No. ____ Line No. ____ should read:

Page No. ____ Line No. ____ should read:

Page No. ____ Line No. ____ should read:

Page No. ____ Line No. ____ should read:

Page No. ____ Line No. ____ should read:

Page No. ____ Line No. ____ should read:

Page No. ____ Line No. ____ should read:

Page No. ____ Line No. ____ should read:

Page 195

DEPOSITION OF: ERIC J. BOELHOUWER, PH.D., CSP/RKC
Page No. ____ Line No. ____ should read:

Page No. ____ Line No. ____ should read:

Page No. ____ Line No. ____ should read:

Page No. ____ Line No. ____ should read:

Page No. ____ Line No. ____ should read:

Page No. ____ Line No. ____ should read:

Page No. ____ Line No. ____ should read:

Page No. ____ Line No. ____ should read:

If supplemental or additional pages are necessary, please furnish same in typewriting annexed to this deposition.

ERIC J. BOELHOUWER, PH.D., CSP

Sworn to and subscribed before me,
This the ____ day of ____, 20 __.

Notary Public
My commission expires:

Please forward corrections to:

Regency-Brentano, Inc.
13 Corporate Square, Suite 140
Atlanta, Georgia 30329
(404) 321-3333

49 (Pages 193 to 195)

REGENCY-BRENTANO, INC.