**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN**

---

AMERICAN FAMILY MUTUAL INSURANCE
COMPANY, et al.,

        Plaintiffs,

vs.

ELECTROLUX HOME PRODUCTS, INC.,

        Defendant.

Case No.: 3:11-cv-00678 (SLC)

---

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO PRECLUDE
EXPERT TESTIMONY OF W. JOSEPH FALLOWS, MICHAEL R. STODDARD, JR.
AND DR. ERIC J. BOELHOUWER**

---

## INTRODUCTION

Electrolux's motion practice before the federal judiciary is akin to Hollywood's slate of summer blockbusters.  The names may be different this year, but "we've seen this movie before."[1]  After being repeatedly told by judges across the country that Plaintiffs' experts are qualified to testify in court, Electrolux stubbornly refuses to concede and once again seeks the exclusion of Plaintiffs' experts.  Electrolux even fails to narrow the scope of its challenge, challenging ***all three of Plaintiffs' testifying experts on nearly every conceivable basis.***[2]  As to those issues already decided by federal courts, the present motion serves only to waste the time and resources of Plaintiffs' experts and attorneys, in addition to this Court.  As to those very few

---

[1] Indeed, Electrolux's *Daubert* motion practice mirrors its motion practice regarding repeated requests for corporate discovery from subrogating insurers.  *See Brief In Support of Plaintiff's Motion for Transfer of Actions Pursuant to 28 U.S.C. § 1407 (Dkt. 104) at 9, n.3.* After being repeatedly told by federal judges that corporate discovery is irrelevant to the present actions, Electrolux continued filling motions seeking the same discovery from different insurers.  *Id.*

[2] To be clear, Plaintiffs have named a handful of origin and cause experts that are not subject to challenge here, but Electrolux has challenged every expert named by the Plaintiffs to testify as to the defects associated with Electrolux's ball-hitch dryer, which is at issue in every claim before this Court.

issues which are raised for the first time in the present motion, Electrolux has failed to demonstrate any basis upon which to preclude any testimony.

## <u>LEGAL STANDARD</u>

"A review of case law after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule."  Advisory Committee Notes, 2000 Amendments, Fed. R. Evid. 702; *see also Travelers Property Cas. Co. v. General Elec. Co.*, 150 F.Supp.2d 360, 264 (D. Conn. 2001).  In evaluating the admissibility of expert testimony, courts in the Seventh Circuit employ a two-step inquiry.  *See Ancho v. Pentek,* 157 F.3d 512, 515 (7th Cir.1998), citing *Wintz v. Northrop Corp.,* 110 F.3d 508, 512 (7th Cir. 1997).  First, the court must decide "whether the expert's testimony pertains to scientific knowledge" and "must rule out subjective belief or unsupported speculation." *Id.*, citing *Porter v. Whitehall Lab.,* 9 F.3d 607, 614 (7th Cir. 1993).  Second, the court must determine "whether the evidence or testimony assists the trier of fact in understanding the evidence or in determining a fact in issue." *Ancho,* 157 F.3d at 515.  Regarding this second inquiry, "the district court must consider whether the testimony will assist the trier of fact with its analysis of ***any of the issues involved in the case***." *Smith v. Ford Motor Company*, 215 F.3d 713, 717 (7th Cir. 2000) (emphasis supplied).  "***The expert need not have an opinion on the ultimate question*** to be resolved by the trier of fact to satisfy this requirement." *Id.* (emphasis supplied).  Likewise, the court's gatekeeping function should serve as a flexible and commonsense undertaking in which the trial judge is granted "broad latitude" in deciding both how to determine reliability as well as in the ultimate decision of whether the testimony is reliable. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141-42 (1999).

Importantly, the Seventh Circuit has very recently reiterated *Daubert's* admonition that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the

burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Stollings v. Ryobi Technologies, Inc.,* 725 F.3d 753, 766 (7th Cir. 2013), citing 509 U.S. at 596.  "As the Second Circuit has explained, trial judges acting as gatekeepers do not assume 'the role of St. Peter at the gates of heaven, performing a searching inquiry into the depth of an expert witness's soul' that would 'inexorably lead to evaluating witness credibility and weight of the evidence, the ageless role of the jury.'"  *Id.* at 766, quoting *McCullock v. H.B. Fuller Co.,* 61 F.3d 1038, 1045 (2d Cir. 1995).  As such, the court's focus "must be solely on principles and methodology, not on the conclusions they generate."  *Id.* at 765, quoting *Daubert*, 509 U.S. at 595 (finding the district court intruded on the role of the jury in excluding expert testimony regarding an alternative design for power saws).  "Courts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility."  *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 758 (8th Cir. 2006).

## MR. STODDARD

Before addressing Mr. Stoddard's qualifications and methodology, the Court should note that Mr. Stoddard has already withstood multiple challenges to the very opinions he offers in this case.  Electrolux has subjected Mike Stoddard and his partner at Wright Group, Inc., Ronald Parsons, to at least five *Daubert* challenges since Wright Group, Inc. began performing work as dryer experts for insurers across the country.[3]  None of Electrolux's challenges has succeeded in barring their testimony, yet Electrolux continues to beat the same dead horse.

For example, in *State Farm Fire & Casualty Company a/s/o Deitch v. Electrolux Home Products, Inc., et al.*, U.S.D.C., E.D.N.Y., Case No. 2:10-cv-03901, Mr. Stoddard was offered as an expert witness to testify to the same issues present in this case.  Electrolux presented a nearly

---

[3] Other dryer manufacturers have also sought to exclude the testimony of Mr. Stoddard and/or Mr. Parsons, without success. *Rager v. General Electric Co.*, 2010 WL 5393857 (M.D. Pa., Dec. 22, 2010) (copy attached as *Exhibit 6*).

identical challenge to the qualifications of Mr. Stoddard, as well as to the reliability and relevancy of Mr. Stoddard's opinions.  After a full evidentiary hearing, Electrolux's Motion to Preclude Mr. Stoddard was denied.  *See Exhibit 1, Transcript of Deitch Order* (Bianco, J.). Electrolux further challenged Mr. Stoddard on the issues present in this case in a California state court case, and Electrolux's challenge was defeated there as well.  *See State Farm General Ins. Co. v. Electrolux Home Products, Inc., et al.*, Superior Court, County of Los Angeles, North Central District, Case No. EC053578 at 115-133 (Milton, J.) (*Exhibit 2*).

Additionally, multiple federal courts – including this very Court – have admitted, as both reliable and relevant, nearly identical testimony on the defective condition of dryer products from other expert witnesses having the same or similar qualifications to Mr. Stoddard.  *See, e.g., State Farm Fire & Casualty a/s/o Slabach v. Electrolux Home Products, Inc.*, 2013 WL 3013531 (N.D. Ind., June 17, 2013) (*Exhibit 3*); *New Jersey Mfrs. Ins. Group v. Electrolux Home Products, Inc.*, U.S.D.C., D.N.J., Civil Action No. 10-1597 (transcript of pertinent portion of *Daubert* hearing attached as *Exhibit 4*); *The Standard Fire Ins. Co. a/s/o Newcomb v. Electrolux Home Products, Inc.*, U.S.D.C., W.D. Wis., Case No. 08-cv-540-SLC (Crocker, M.J.) (transcript of challenge to testimony of David Beauregard attached as *Exhibit 5*); *Rager v. General Electric Co.*, 2010 WL 5393857 (M.D. Pa., Dec. 22, 2010) (copy attached as *Exhibit 6*).  In *State Farm Fire & Casualty a/s/o Slabach v. Electrolux Home Products, Inc.*, 2013 WL 3013531 (N.D. Ind., June 17, 2013), Electrolux challenged Mr. Parsons, Mr. Stoddard's co-expert on every Electrolux dryer fire handled by Wright Group, Inc.  In ruling Mr. Parsons qualified under Fed. R. Evid. 702, and in deeming his testimony reliable and relevant, the *Slabach* court stated:  "Parsons's expert report was cosigned by Michael R. Stoddard, Jr., a colleague of Parsons at Wright Group,

Inc.  Stoddard has been deemed qualified to testify as to the same opinions that Parsons offers in this case . . . ."  *See State Farm,* 2013 WL 3013531, at *5.

Therefore, Electrolux's present challenge to Mr. Stoddard is nothing more than an attempt to re-litigate what has already been decided by the United States Judiciary – that Mr. Stoddard is qualified to testify on the subject matter at issue in this case, and his testimony is both reliable and relevant.  Electrolux has presented no authority to justify any deviation from the courts' determinations in any one of the numerous decisions addressing the reliability of the testimony Mr. Stoddard intends to offer.  Not only does Electrolux not offer a legal counterpoint, it does not even *cite* to the previous decisions – an indicator of Electrolux's penchant for "hiding the ball" from this Court.  *See Charter Oak Fire Ins. Co. v. Electrolux*, 10-CV-1351-JFB-WDW, 2012 WL 3217565, *1 (E.D. N.Y. July 30, 2012) (holding that the Plaintiff in the *Newcomb* case -- a case before this very Court -- was deprived of a full and fair opportunity to litigate because Electrolux failed to produce crucial information that was directly responsive to plaintiff's discovery demands).

Moreover, ***Electrolux already unsuccessfully challenged a similarly qualified expert with nearly identical opinions in front of this very Court.***  In *Standard Fire Ins. Co. a/s/o Newcomb v. Electrolux Home Products, Inc.*, U.S.D.C., W.D. Wis., Case No. 08-CV-540-SLC (Feb. 2010), David E. Beauregard testified on the same dryer design defects as Mr. Stoddard has testified in this case, utilizing the same methodology as Mr. Stoddard.  In *Newcomb*, Electrolux challenged Mr. Beauregard's testimony on a motion for directed verdict, arguing that the unreliability of Beauregard's testimony mandated striking his testimony.  *Def's Memo. of Law in Supp. of Its Motion for a Directed Verdict*, *Dkt. 98 from Newcomb (Feb. 25, 2010).*  This Court

denied the oral motion and allowed the testimony to remain in evidence, thus deeming the testimony reliable under Fed. R. Evid. 702. *(Exhibit 5.)*

In this case, Electrolux has taken the extraordinary step of seeking to preclude Mr. Stoddard without even deposing him to inquire into any additional testing and analysis that further supports his already qualified and reliable opinions.[4]  *See Cont'l Motors, Inc. v. Jewell Aircraft, Inc*., CIV.A. 12-0221-WS-C, 2013 WL 5530842 (S.D. Ala. Oct. 4, 2013) (criticizing a party for "plunging into a full-blown *Daubert* Motion" without first taking the expert's deposition and thus depriving itself of the opportunity to explore the factual basis for the opinions and the particulars of the methodology used to reach the opinions).  Indeed, Mr. Stoddard and Mr. Fallows both relied, in part, upon Dryer Fire Containment Testing, Underwriters Laboratories flame testing of plastics and Dryer Component Fire Testing performed in October of 2013.  *(Electrolux Exh. 2 at 29 and Exh. 6 at 144.)*  Mr. Stoddard has never been deposed regarding this testing, which relates directly to his opinions about the plastics utilized by Electrolux, an opinion Electrolux argues should be excluded.  *Electrolux Br. at 18-19.*

In summary, the exact opinions offered by Mr. Stoddard concerning dryer defects and failures on the part of Electrolux have been offered by *numerous* experts in various federal courts around the United States, including this Court, and each and every time the challenge by

---

[4]  Although Mr. Stoddard's report was produced on December 20, 2013, Electrolux first requested his deposition on March 20, 2014 and the parties were unable to find a mutual agreeable time in advance of the April 7, 2014 deadline for filing *Daubert* motions.  Mr. Stoddard's deposition is now scheduled, but will not take place before briefing on this motion is concluded.

Electrolux has been defeated.  Electrolux is aware of its failure rate, yet continues to file the same motion again and again, arguing the same points that have already been offered.[5]

### A.   Mr. Stoddard Is Qualified as an Expert on Dryer Design, Operation, Failure, and Safety

Electrolux offers three broad challenges to the testimony of Mr. Stoddard, challenging first his qualifications to testify as an expert on dryer design and warnings.  Federal Rule of Evidence 702 provides that a witness may testify in the form of an opinion if the witness possesses sufficient knowledge, skill, experience, training **or** education on the subject matter at issue.  The "or" language in Rule 702 demonstrates that a witness may be qualified by any one of the five listed factors.  *See Dychalo v. Cooperloy Corp.*, 78 F.R.D. 146, 149 (E.D. Pa. 1978).  Thus, a witness lacking certain education may be qualified by experience.  *Sullivan v. Rowan Co., Inc.*, 952 F.2d 141, 145 (5th Cir. 1992).  Similarly, a witness can be qualified by knowledge, education or training, though lacking certain experience.  *Id.*  Here, Mr. Stoddard's opinions are supported by multiple factors listed in Rule 702 because Mr. Stoddard:

- possesses a Bachelor of Science in Arson Investigation from the University of New Haven;

- is a Certified Fire Investigator through the International Association of Arson Investigators;
- is a Certified Fire & Explosion Investigator through the National Association of Fire Investigators;

---

[5]  Electrolux brings the Court's attention to *Donegal Mut. Ins. Co. v. Electrolux Home Products, Inc.*, U.S.D.C., M.D.Pa. Docket No. 1:08-cv-2171, arguing for its precedential value.  *(Electrolux Br. at 13.)*  However, as Electrolux well knows, the *Donegal* decision ***no longer exists*** in its present form.  Plaintiff *Donegal* moved for, and was granted, reconsideration of the Court's Order precluding Mr. Stoddard on FED. R. EVID. 702 reliability grounds, since the Court's decision in *Donegal* ran *directly contrary* to its own decision in *Rager v. G.E.* (issued on the same day by the same judge in the same district, but reaching a contrary conclusion), and since the Court did not conduct a *Daubert* hearing prior to the *Donegal* ruling.  Not only did the *Donegal* court grant reconsideration of its decision on Electrolux's motion to preclude, it conducted a full *Daubert* hearing, at which Judge Kane stated, **"the purpose of this hearing is to *take us back where we would have been* had the Court said in an order there's going to be a *Daubert* hearing."**  *See Exhibit 7,* Donegal *Transcript*, at 5.  With that pronouncement, Judge Kane ***vacated*** her earlier ruling, and "took the parties back" to a point prior to the ruling partially precluding Mr. Stoddard.  Thus, the *Donegal* decision has no precedential value, at least at the present time, and Electrolux is aware of that.

- has conducted more than 500 examinations of Electrolux gas and electric dryers;

- has conducted more than 1,000 hours of testing specifically related to Electrolux gas and electric dryers, and the failure modes associated with said products;

- has authored or co-authored more than eighty (80) reports specifically related to Electrolux gas and electric dryers, fires associated with those dryers, and the failure modes associated with those dryers;

- has attended more than twenty (20) training courses and seminars related to fire investigation; and

- has attended more than sixty (60) hours of training courses and seminars specifically related to appliances and dryers.

*(See Electrolux Exh. 7.)* Although Mr. Stoddard has not been deposed in this case, his prior deposition testimony even further supports his knowledge, skill, education, training and experience related to Electrolux dryer fires. *(See generally Electrolux Exh. 8.)*

In his report, Mr. Stoddard states that his investigation into the origin and cause of the fires was guided by *NFPA 921: Guide for Fire and Explosion Investigations. See Electrolux Exh. 6 at 3-4. NFPA 921* is a consensus document addressing all aspects of fire science, and has been recognized by numerous federal courts as providing a reliable methodology for fire investigation. *See Royal Ins. Co. of America v. Joseph Daniel Construction*, 208 F.Supp.2d 423 (S.D.N.Y. 2002); *Peerless Ins. Co. v. Marley Engineered Products, LLC*, 2008 WL 7440158 (E.D.N.Y. 2008); *Fireman's Fund Insurance Company v. Canon USA, Inc.,* 394 F.3d 1054, 1057-58 (8th Cir. 2005). Consistent with *NFPA 921's* requirement, Mr. Stoddard's report identifies the appliance involved in the ignition, identifies lint and other combustible material collected in the area as the material first ignited and identifies the circumstances and factors that allowed the fire to occur. *See Electrolux Exh. 6 at 4; NFPA 921 § 18.1.1.* Mr. Stoddard has also considered and eliminated all other possible sources of ignition, including misuse of the dryer, improper installation, improper cleaning, and improper materials. *See Electrolux Exh. 6 at*

*148-49; NFPA 921 § 18.1.1.*  Finally, in compliance with *NFPA 921*, Mr. Stoddard has identified a design defect and identified that design defect as a cause of the fire.  *See Electrolux Exh. 6 at 149-54; NFPA 921 § 18.1.1 & 19.5.3.*

Electrolux's primary basis to challenge Mr. Stoddard's qualification appears to be that he is not an engineer and has not designed products for Electrolux or some competitor of Electrolux.  *See Electrolux Br. at 13.*  Yet Electrolux cites to no reported case (nor can it) which requires a proffered expert to have an engineering degree or employment experience with a product manufacturer in order for that expert to offer expert opinions about a particular product.  In fact, the Advisory Committee reflecting on Rule 702 has stated that, "[n]othing in [Rule 702] is intended to suggest that experience alone – or experience in conjunction with other knowledge, skill, training, or education – may not provide a sufficient foundation for expert testimony.  To the contrary, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience.  In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony."  *Fed. R. Evid. 702 (2005) (Advisory Committee's Note, 2000 Amendment).*  This approach to an expert's qualifications may have been best explained in the case of *Berry v. City of Detroit*, 25 F.3d 1342 (6th Cir. 1994), in which the Sixth Circuit stated:

> [I]f one wanted to explain to a jury how a bumblebee is able to fly, an aeronautical engineer might be a helpful witness.  Since flight principles have some universality, the expert could apply general principles to the case of the bumblebee . . . .  On the other hand, if one wanted to prove that bumblebees always take off into the wind, a beekeeper with no scientific training at all would be an acceptable expert witness *if* a proper foundation were laid for his conclusions.  The foundation would not relate to his formal training, but to his firsthand observations.  In other words, the beekeeper does not know any more about flight principles than the jurors, but he has seen a lot more bumblebees than they have.

*Berry,* 25 F.3d at 1349-50.  Like the expert in *Berry,* Mr. Stoddard has an abundance of knowledge on dryer design, operation, and failure modes that jurors do not have, and is clearly qualified to testify in the present case based on any objective measurement.  Given his wealth of knowledge and experience specifically related to dryers, Electrolux's argument that Mr. Stoddard "does not have any training, education, or experience in the fields of engineering, product design, plastics, or product warnings and instructions" is entirely misleading.

Additionally, clarity is needed on Defendant Electrolux's challenge to Mr. Stoddard's ability to offer opinions on "plastics" and "warnings."  First, as to plastics, Mr. Stoddard does not offer opinions regarding the makeup of particular plastics, how the plastics themselves are manufactured or how a particular plastic failed, such that the opinion would require expertise in the area of "plastics engineering."  Rather, Mr. Stoddard's plastics-related opinion is limited to his opinion that the use of an alternate plastic or metal would have been more effective in containing the fire to the cabinet in most conditions, and particularly in the dryer fires at issue here.  *See Electrolux Br. at 18.*  Not surprisingly, Electrolux is critical of the testing performed by Wright Group, Inc. in reaching this opinion.  *Id. at 18-19.*  Nonetheless, Mr. Stoddard has significant knowledge and experience with the plastics used by Electrolux based upon his own observations and testing related to those plastics.  *Electrolux Exh. 6 at 125-146.*  Moreover, as discussed above, Electrolux has not yet even provided Mr. Stoddard the opportunity to testify regarding his most recent testing, which is specifically relevant to his opinions regarding the plastic chosen by Electrolux for its ball-hitch dryers.

Second, as to warnings, Mr. Stoddard has not offered, nor does he intend on offering, any opinions on warnings related to the field of "human factors," such as the propriety of the color, font, or style of a warning, or a consumer's ability or inclination to comprehend or react to a

warning label or product literature.[6]  Rather, Mr. Stoddard's opinion on "warnings" concerns the impropriety of Electrolux's use of product literature as a solution to a product design hazard. Second, this exact type of "warnings" testimony from a product design expert has been deemed acceptable by at least three separate federal courts.  In *Pineda v. Ford Motor Company,* 520 F.3d 237 (3d Cir. 2008), the Third Circuit evaluated a district court's preclusion of an expert witness intending to offer "warnings" opinions.  The expert, who offered an opinion that lift-gate glass shattered because of a defective design, also opined that the product lacked adequate instruction and warnings related to the design defect in question, and that the warnings he proposed were a solution to a safety engineering problem.  *See Pineda,* 520 F.3d at 245.  The expert also offered an analysis of subsequent warnings to the lift-gate glass.  *Id.*  Although the district court precluded the expert, the Third Circuit reversed that decision.

The Third Circuit in *Pineda* determined that because the testimony about "warnings" was not what the precise language, font, or color should be, but rather, that a proper instruction was a possible solution to an engineering safety problem, the expert was qualified to offer such testimony based on his qualifications as a design expert.  *See id.* at 238-45.  The *Pineda* court went on to hold that an expert does not have to substantively qualify in the drafting of service manuals or instructions in order to offer an opinion about a manufacturer's use of product warnings or instructions to address a design problem; all that is required is a special knowledge of what may cause a defect in a product or machine.[7]  *See id.* at 245; *see also Exhibit 1, Transcript of Deitch Order at 6* (Bianco, J.).  This type of testimony is exactly the type to be

---

[6]  Plaintiffs have retained Dr. Boelhouwer to testify in this regard.
[7]   Similarly, in *Philadelphia Contributorship Ins. Co. a/s/o Anders Skeini & Claudia Tatanelli v. Electrolux, Inc*., U.S.D.C., E.D.Pa. Case No. 2:10-cv-02045, in an unreported decision, the court held that the same type of testimony from Mr. Ronald Parsons, Mr. Stoddard's colleague, to be admissible.  Also, in *Standard Fire Insurance Company v. Electrolux Home Products, Inc.*, U.S.D.C., W.D. Wis., Case No. 08-CV-540-SLC (Crocker, M.J.)(February 2010), plaintiff's expert David E. Beauregard, another dryer expert known to Electrolux, offered this same type of testimony regarding Electrolux's product warnings and instructions at the time of trial.

offered by Mr. Stoddard on the issue of warnings in this case, is clearly admissible based on Mr. Stoddard's special knowledge of dryer design, operation and failure modes, and safety principles applicable to dryer manufacturers.

In short, Electrolux argues Mr. Stoddard is unqualified to testify here despite the hundreds of hours of testing, examination, and analysis Mr. Stoddard has specifically performed on Electrolux and other manufacturers' dryers, and it has failed to acknowledge the scope of his knowledge and education related to the issues in this case.  Electrolux has offered the present challenge despite *multiple* courts deeming him qualified on these same issues.  Because Mr. Stoddard's qualifications grossly exceed what is required by Fed. R. Evid. 702, Electrolux's challenge to Mr. Stoddard on qualifications grounds must be denied.  Viewing the entirety of Mr. Stoddard's credentials, analysis, and opinions in this case, it is abundantly clear that he is qualified to testify as an expert witness, and that his opinions satisfy the minimal standards for admissibility as outlined by Fed. R. Evid. 702, and *Daubert* and its progeny.

### B.    Mr. Stoddard's Opinions Are Reliable.[8]

Despite the continual finding by courts that Mr. Stoddard's opinions are based on a reliable methodology, if this Court chooses to undertake its own analysis, the result will be the same.  Although it is difficult to identify all of Electrolux's criticisms of Mr. Stoddard, each of those criticisms goes to the weight of Mr. Stoddard's credibility and is more appropriate for cross examination than the present motion.

Mr. Stoddard has spent the vast majority of the last five years analyzing and testing Electrolux dryers, dryer design, dryer operation, dryer failure modes, and assessing accepted

---

[8] Electrolux argued that Mr. Stoddard's opinions are unreliable because he has never tested for lint accumulation in Electrolux dryers.  *Electrolux Br. At 15*.  This claim is patently false.  Counsel for Electrolux recently realized the same and sent a letter on May 5, 2014, directed to Plaintiffs' counsel indicating that Electrolux is withdrawing the argument contained in the paragraph that begins "Second, none of the testing…" which begins on page 15 and ends on page 16 of its Brief.

principles and standards related to the field.  It would be virtually impossible to list the "facts or data" Mr. Stoddard has collected in furtherance of his opinions, as that information is so voluminous that it can only be produced on a portable hard-drive.  Indeed, Electrolux's last complaint to this Court was that Mr. Stoddard considered such a vast amount of information that Electrolux could not possibly determine what portions of that information were pertinent to his opinions.  Now, Electrolux suggests that Mr. Stoddard lacks sufficient knowledge to testify regarding Electrolux dryers and that this vast amount of testing and other information provided to Electrolux does not amount to sufficient work by Mr. Stoddard to make his testimony reliable.

Mr. Stoddard's testimony is consistent with objective examinations of Electrolux dryers, which clearly demonstrate lint accumulations near the exemplar dryers' respective heat sources. *See Electrolux Exh. 6 at 41-48.*  Moreover, photographs of dryer lint accumulation have been taken and preserved with respect to every dryer he has examined.  *See id. at 28-40.*  Mr. Stoddard has further performed a significant amount of independent testing.  *See id. at 125-146.*  Thus, if Electrolux is critical of the testing Mr. Stoddard performed, it is free to challenge that testing in front of a jury.  However, it cannot argue that its own criticisms make his testimony unreliable.

Electrolux's claim that "Mr. Stoddard's opinions are not based on any discernible methodology" is false and misleading.[9]  His attached report details no less than a dozen separate *categories* of tests performed by Mr. Stoddard, with those categories covering more than 200 separate tests performed during the course of his analysis.  *Electrolux Exh. 6 at 125-146.*  In addition, while Electrolux criticizes some of the tests performed by Mr. Stoddard, and that Mr. Stoddard chose not to perform other tests which *it* believes he should have performed, the fact

---

[9]  Again, all opinions offered by Mr. Stoddard have been based on a careful application of the scientific method as outlined in *NFPA 921:  Guide for Fire and Explosion Investigations (2011).*  This accepted-as-reliable methodology is specifically cited by Mr. Stoddard in his report.  *Electrolux Exh. 6 at 3-4.*

remains that Mr. Stoddard's theory has been *exhaustively* tested, which clearly satisfies *Daubert*'s "testability" factor.[10]  *See Travelers, supra* ("[Machnicki's] theory is *capable* of being tested, so that GE's experts could employ testing to undercut it and, indeed, have engaged in such efforts."); *see also Rager, supra* ("Parsons' theory consisted of a *testable* hypothesis").

More importantly, Electrolux has not accurately portrayed the testing conducted by Mr. Stoddard and it is ignoring the overwhelming body of evidence that supports Mr. Stoddard's lint ignition theory.  Extensive testing and field analysis conducted by Mr. Stoddard, and many others, confirms that when lint contacts the heater coil and ignites, the natural airflow within the dryer draws the burning embers into the "baffle" where additional accumulated lint ignites, and into the drum where a load of turning clothes will also ignite.  *Electrolux Exh. 6 at 89-90.*  The component known as the "baffle" is located behind the drum of Electrolux dryers, between the drum and the heating coils.  It has holes through which heated air is drawn to the rear of the drum.  Electrolux's design of this component permits lint to collect in extraordinary quantities around the circumference of the deflector.  *Id. at 44-45.*  Mr. Stoddard has examined hundreds of Electrolux dryers and has documented this lint collection with photographs produced in this litigation.  *Id. at 44-48, 77-82, 130-141.*  Significantly, Mr. Stoddard's alternative design eliminates this component and thereby eliminates the potential for lint to accumulate and ignite behind the drum.  *Id. at 98-102.*

---

[10]  Federal Courts have also repeatedly held that an expert's failure to perform an actual physical test of his or her hypothesis under *NFPA 921* is not grounds to exclude that opinion.  *Adam v. J. Meyer Builders, Inc.,* 2009 WL 4348675 (D.N.H. 2009)(NFPA does not, in fact, require experimental testing of a fire investigator's hypothesis as to cause, and have rejected challenges to opinion testimony based on an experts failure to do so)(*citing Shuck v. CNH Am., LLC,* 498 F.3d 868, 875 n. 3 (8th Cir. 2007)(NFPA 921 provides no bright-line rule that expert opinions in fire cases always must be supported by testing to be admissible); and *Westfield Ins. Co. v. J.C. Penney Corp.*, 466 F. Supp. 2d 1086, 1094 (W.D. Wis. 2006) (electrical engineer's opinion that the lamp cord was defective and that arcing in the cord caused the fire was sufficiently reliable under *Daubert* to be admissible in a products trial, notwithstanding that the expert might have conducted other tests in addition to examining the cord and reviewing the fire investigator's report)).

In 2003, scientists from the Consumer Product Safety Commission conducted tests to evaluate the accumulation of lint within a dryer, and they reached the same conclusion as Mr. Stoddard:

> [l]int begins to accumulate inside a dryer chassis upon first use.  Lint accumulates on the dryer's components, including the heater and the dryer floor.  The accumulation occurs even when the dryer's lint screen has been cleaned after each usage, and the dryer is properly exhausted.

*See Exhibit 8, CPSC Final Report on Electric Clothes Dryers and Lint Ignition Characteristics at 135*, (May 2003).  The Report also states:  "[l]int accumulating near the heater intake can ignite before the high-limit thermostat switches the heater element off."  *Id.* The Report further concludes that, "[l]int ingested by the heater and embers expelled from the heater outlet can easily ignite additional lint or fabric in the airstream, resulting in additional embers in the dryer system and exhaust vent."  *Id.* at 136.  In parallel fashion, Mr. Stoddard has opined that "the design of the dryer actually promotes the accumulation of the combustible material (dryer lint) within close proximity of a competent ignition source (electric heating element).  *Electrolux Exh. 6 at 149.*

### C.    Mr. Stoddard's Testimony "Fits" the Issues in this Case and Will Assist the Trier of Fact

Mr. Stoddard's opinions indisputably involve issues of a technical nature, (i.e. whether the cause of the fire in the dryer was due to a design defect and/or the negligence of Electrolux) and he is well-qualified, as noted above, to offer insight on those points.  Electrolux argues there is no fit between Mr. Stoddard's analysis of exemplar dryers and the facts at issue in these cases and that Mr. Stoddard relies on a biased sample that is not representative of the relevant population of Electrolux dryers.  *Electrolux Br. at 17.*  However, the *Daubert*-articulated "fit" standard is much different from Electrolux's:  "[e]xpert testimony which does not relate to *any*

*issue* in the case is not relevant and, ergo, nonhelpful." *Daubert*, 509 U.S. at 591 (emphasis added). Thus, in order for Mr. Stoddard's testimony to be deemed "not relevant," it must not relate to *any* issue in this case. This broad, biased, and sweeping statement by Electrolux cannot be supported in any fashion. Rather, Mr. Stoddard's exhaustive reports and testimony clearly demonstrate the import of his analysis of exemplar units, and the opinions derived from that analysis which relate to this case. *See generally, Electrolux Exh. 6.* In sum, Mr. Stoddard's opinions relate to the precise issues in this case, will serve to illustrate the plaintiffs' claims, and will clearly be helpful to the jury. Accordingly, Mr. Stoddard's testimony is relevant and admissible.

## MR. FALLOWS

Electrolux conveniently utilizes statements from Mr. Fallows' deposition in an effort to paint the picture that Mr. Fallows has absolutely no knowledge of anything relevant to the cases before this Court. While Mr. Fallows honestly admitted he has not reviewed the individual fact scenarios involved in each of the fires at issue in this litigation, Mr. Fallows is not an origin and cause expert. Mr. Fallows is a mechanical engineer with expertise in the design and commercial use of plastic products. He testified that he was tasked with "evaluat[ing] the utilization of polypropylene non-flame retardant plastics in components of an Electrolux dryer." *(Electrolux Exh. 3 at 6.)* His opinions are properly limited to addressing whether Electrolux met its standard of care in determining the plastic it would use in manufacturing its ball-hitch dryer. *(Electrolux Exh. 2 at 19.)* The opinions are based upon testing performed by Electrolux, Underwriters Laboratories and Wright Group, Inc., testimony from engineers at Electrolux about the decisions they made in connection with the design of the ball-hitch dryer, and his numerous years of

experience in the field as a plastics engineer.   Thus, for the reasons set forth in more detail below, Mr. Fallows' testimony meets the standards for testimony set forth in Fed. R. Evid. 702.

### A.      Mr. Fallows' Testimony is Relevant and "Fit" to the Plaintiffs' Allegations

Electrolux argues that Mr. Fallows testimony is not "fit" because Mr. Fallows does not apply his theories to the specific facts of the case.   It is well-settled under Seventh Circuit law, however, that "[t]he expert need not have an opinion on the ultimate question to be resolved by the trier of fact to satisfy [the relevance] requirement."   *Smith v. Ford Motor Company*, 215 F.3d at 717.   Rather, so long as the testimony will assist the trier of fact in assessing one of the many factual issues involved in the suit, the testimony is relevant and "fit" to the facts.   *See id.*   Here, Mr. Fallows appropriately avoids discussing issues of causation but his opinion testimony goes directly to the following factual issues that will be presented to the jury:

- That the dryers were unreasonably dangerous because they were designed with a combustible plastic (manufactured with no fire retardant capabilities) for the air duct and blower housing (Dkt. 107 at ¶ 20);

- That it was reasonably foreseeable to Electrolux that the combustible plastics in its dryer could ignite (Dkt. 107 at ¶ 20);

- That Electrolux breached its duty of care by designing and manufacturing dryers with a combustible (and non-self-extinguishing) plastic air duct and blower housing (Dkt. 107 at ¶ 27);

- That Electrolux violated basic engineering principles in choosing not to make a design change after testing established that a design change would create a safer product (Dkt. 107 at ¶¶ 36, 40).

Thus, despite Electrolux's suggestion that there is no "fit" between Mr. Fallows' opinions and the facts, there is indeed a "fit" between Mr. Fallows' opinions and the ***allegedly-defective dryer design*** at issue in each and every case.   Because Mr. Fallows does not opine on the ultimate issue, there was simply no need for him to review the facts of each case to provide his opinions.

### B.     Mr. Fallows' Opinions Are Reliable

Electrolux relies primarily on the *Chapman v. Maytag Corp.* decision in alleging that the testimony of Mr. Fallows is unreliable, but the *Chapman* case is wholly distinguishable from the fact situation present here.  *(Electrolux Br. at 5-9.)*  In *Chapman*, the plaintiff filed a wrongful death suit alleging that her husband was electrocuted when he touched a metal surface energized by a leaked current.  297 F.3d at 686.  James Petry, the only expert put forward by the plaintiff, represented to the court that he was still in the process of designing a testing procedure which would prove his theory true.  *Id.*  Thus, the expert was in fact relying on no testing whatsoever in setting forth his opinions.  Moreover, contrary to the situation here, the expert's testimony in *Chapman* was critically tied to the ultimate issue of fact.   Mr. Fallows does not reach that issue because Mr. Stoddard and others were retained to do so.

As such, with regard to the design defect claim addressed by Mr. Fallows, this case is more akin to the Eastern District of New York's decision in *Clarke v. LR Systems*, 219 F. Supp. 2d 323 (E.D. N.Y. 2002).  In *Clarke,* the plaintiff proffered expert testimony from Mr. Growney that a plastics grinding machine was defective because it lacked an interlocking guard.  *Id.* at 330-31.  Like Mr. Fallows, Mr. Growney held a B.S. in Mechanical Engineering and was a licensed engineer that worked for several manufacturing companies over the course of three decades.  *Id.* at 332.  Like Mr. Fallows, Mr. Growney worked as a forensic engineer providing technical support in litigation for several years at the time he provided his testimony.  *Id.*  Like Mr. Fallows, Mr. Growney had been a member of the American Society of Mechanical Engineers and had focused part of his career on designing safe consumer products in his proffered area of expertise.  *Id.*

As here, the defendant challenged Mr. Growney's testimony on the basis that it was unreliable, arguing that his opinion was not sufficiently connected to the data. *Id.* at 333. In forming his opinion, Growney had identified a well-known hazard, explained that the consequences of that hazard could be severe, and testified that the defendant knew how it could have designed the grinding machine to prevent the hazard, but failed to do so. *Id.* at 334. Mr. Growney proposed an alternative design based on his experience in the field and testified that the alternative design was technologically and economically feasible. *Id.* While the defendants argued that Growney never designed and retrofitted the interlock guard to demonstrate his testimony was reliable, the court held that Growney's knowledge of other grinders with guards was sufficient to meet the reliability requirement for expert testimony. *Id; see also Keenan v. Mine Safety Appliances Co.*, CV-03-0710 TCP ARL, 2006 WL 2546551 (E.D.N.Y. Aug. 31, 2006) (holding that an expert does not need to make, test, or review an alternative design if the design is already available on the market). Finally, although the defendant argued that Growney's conclusions were unreliable because the allegedly defective product complied with ANSI standards, the court disagreed, holding that the defendant's compliance with standards did not make Growney's conclusion unreliable. *Clarke*, 219 F.Supp.2d at 334-35.

The defendant's rejected arguments in *Clarke* are nearly identical to Electrolux's arguments in the present motion. First, Electrolux argues that Mr. Fallows' opinions are unreliable because they are not supported by any relevant testing or analysis. Of course, Electrolux then goes on to describe the very testing relied upon by Mr. Fallows and attempts to discredit the testing by arguing that the testing has no applicability to "real-world fires." *(Electrolux Br. at 6-9.)* Yet, like Mr. Growney in the *Clarke* decision, Mr. Fallows identified a well-known hazard, identified facts demonstrating that Electrolux knew of a way to design a

safer product, relied on his experience as a plastics engineer to show why the alternative product would be safer, and has relayed facts demonstrating that the alternative design was technologically and economically feasible.  *(Electrolux Exh. 2 at 13-18.)*  As was the case in *Clarke*, Mr. Fallows' testimony is reliable.

### C.   Mr. Fallows Is Qualified as an Expert on the Design and Commercial Use of Plastic Products and the Ethical Standards Associated with That Work

Mr. Fallows' experience in the field of mechanical engineering, and specifically in the field of plastics, is extensive.  As set forth in his report, Mr. Fallows holds a Bachelor of Science degree in Mechanical Engineering and has 34 years of experience with the design and commercialization of plastic products.  *(Electrolux Exh. 2 at 1, 21.)*  Most relevant to the present case, Mr. Fallows worked for GE Plastics (the largest supplier of engineering thermoplastics in the world) for 9 years as part of an engineering group tasked with determining the best plastics for specific applications.  *(Id. at 1.)*  In his 24 years devoted specifically to plastics consulting, he gained expertise in the areas of "material and process selection, property interpretation, failure analysis, and product design and safety."  *(Id. at 1.)*

Electrolux argues that Mr. Fallows cannot testify to ethical standards because he admitted in his deposition that he is not an expert in ethics.  *(Electrolux Br. at 10.)*  Yet, Mr. Fallows testified at his deposition that all of his work throughout his career was subject to engineering ethics and that he had reviewed the American Society of Mechanical Engineers' ethical standards in preparing his opinions.  *(Electrolux Exh. 3 at 87:18-19 and 30:24-31:1.)*  His analysis focused on *one* basic and clear ethics principle involving safety:

> Engineers shall hold paramount the safety, health and welfare of the public in the performance of their professional duties.

20

*(Id. at 9.)*  Indeed, Mr. Fallows' report identifies "safety" as "a key consideration in deciding which plastic to use in a product design (or whether to use plastic at all)" and discusses how those decisions were made in the real world of plastic design on a day to day basis.  *(Electrolux Exh. 2 at 8-9.)*  He further considered a learned article, titled *Engineering Codes of Ethics: Analysis and Applications*, which applied those ethical standards in real word circumstances and recognized safety as a paramount duty that takes precedence over all others.  *(Electrolux Exh. 3 at 91:4-1; Exhibit 9 at 19.)*  Although engineers in Mr. Fallows' college era were not required to take specific courses in engineering ethics, every engineer has been trained to hold public safety as the highest standard.  (*See Electrolux Exh. 3 at 98:16-99:1.*)

Thus, Electrolux's argument that "[Mr. Fallows] is not any more qualified than a layperson to opine on these issues" discounts his years of experience applying this very principle to plastic product design and the selection of plastics for commercial products.  Contrary to Electrolux's assertion, Mr. Fallows *is* an expert in understanding and applying this very simple ethical standard to matters of product design and development because of his extensive experience understanding and applying those standards in the field.  Indeed, every engineer tasked with product design and development in the field should have expertise in holding safety as the highest standard for two reasons.  First, because it is the right thing to do and, second, because avoiding liability for product failure should be a natural element of any business culture.  As case law makes clear, a witness may be qualified by experience, though lacking certain education.  *Sullivan v. Rowan Co., Inc.*, 952 F.2d 141, 145 (5th Cir. 1992).  As such, it is not necessary that Mr. Fallows be an "ethics expert" to opine on the ethical standard of care associated with decisions made by plastics engineers in the field.

Moreover, Electrolux's claim that Mr. Fallows could not point to any applicable engineering standard that Electrolux violated is wholly inaccurate and misleading. Electrolux creates a false distinction by focusing only on UL standards, which Mr. Fallows admits were "voluntary." *(Electrolux Exh. 2 at 18.)* Mr. Fallows, however, goes further in distinguishing such voluntary standards from standards that govern the choice of plastic for particular products in the field of engineering. Indeed, Mr. Fallows found that Electrolux not only violated its own policies, but opined that it violated "basic safety principles when it decided to make its own dryers using HB plastic with no fire retarding properties…" *(Id.)* Moreover, in his deposition testimony, Mr. Fallows specifically testified that, unlike the voluntary UL standard, Electrolux *did not meet* the GE SEE fire containment requirement when making non-GE branded dryers. *(Electrolux Exh. 2 at 84:17-19.)*

More importantly, federal law has recognized that "[c]ompliance or lack of compliance with industry safety standards... is not dispositive of the issue of a design defect and other evidence concerning the design and safety of the machine may be considered." *Del Cid v. Beloit Corp.,* 901 F.Supp. 539, 545 (E.D.N.Y.1995) (citing *Parsons v. Honeywell, Inc.,* 929 F.2d 901, 906 (2d Cir.1991) and *DeRosa v. Remington Arms Co.,* 509 F.Supp. 762, 768 (E.D.N.Y.1981)); *see also Sawyer v. Dreis & Krump Mfg.,* 67 N.Y.2d 328, 337, 502 N.Y.S.2d 696, 701, 493 N.E.2d 920 (1986). Thus, simply because the dryer complied with voluntary UL standards does not mean that this Court should exclude Mr. Fallows from testifying. *See Clarke,* 219 F. Supp. 2d at 334-35 (E.D.N.Y. 2002). Nor should the Court allow Electrolux to define the word

"standards" as reflecting only voluntary UL standards, when Mr. Fallows has offered opinions regarding policies, requirements and principles that could indeed be labeled "standards."[11]

In addition, Electrolux misses the mark in arguing that normative ethical opinion testimony is always inadmissible.  For example, in *Kinergy Corp. v. Conveyor Dynamics Corp.*, the Court rejected the argument that opinions regarding engineering ethics were irrelevant and would confuse the trier of fact:

> Defendants additionally argue that Dr. Prater sets forth opinions regarding engineering ethics which are irrelevant to the action and will only confuse the trier of fact. Dr. Prater's testimony regarding engineering ethics is specialized knowledge based upon his specific experience and training. The Court believes it is relevant and reliable and will assist the jury in understanding the field, generally. Therefore, the Court will not strike the portions of Dr. Prater's report that discuss engineering ethics.

4:01CV00211 ERW, 2003 WL 26110512, *15 (E.D. Mo. Oct. 14, 2003).[12]  Similarly, in *The Post Office v. Portec, Inc.*, the Tenth Circuit Court of Appeals held that engineering codes of ethics are relevant to "show at least a related industry standard of conduct" and "how licensed engineers are required to behave."  913 F. 2d 802, 807.  The Court suggested that a limiting jury instruction would cure any purported prejudice associated with testimony regarding engineering ethics.  *Id.* at n. 1.  As Plaintiffs have alleged that Electrolux violated the standard of care in designing its dryers, this testimony is wholly relevant and admissible.

---

[11] The issue, in fact, may be a matter of semantics.  While Electrolux focuses on "standards," limiting its discussion of "standards" to the voluntary UL standards, Mr. Fallows' opinions focus on basic safety "principles," Electrolux's own "policies," and "requirements" of fire containment.  So while it may be true that Mr. Fallows does not criticize Electrolux for violating voluntary "standards," as that term is used by Electrolux, he is critical of Electrolux for violating a number of "principles," "policies" and "requirements."

[12] In *Kinergy Corp.*, the Court did strike certain portions of the expert's report, but only because the expert had invaded the province of the jury by making judgment calls about the credibility of certain testimony.  4:01CV00211 ERW, 2003 WL 26110512,*15. Mr. Fallows' report, on the contrary, passes no judgment on the testimony of Electrolux employees, assuming it is an accurate portrayal of their knowledge at the time of the testimony.  *(See Electrolux Exh. 3 at 10-18.)*

Indeed, similar "ethics" testimony has been admitted in several contexts.  In the context of legal malpractice cases, courts have recognized that expert testimony on the lawyer's ethical obligations is relevant.  *United States v. Kellington*, 217 F.3d 1084, 1098 (9th Cir. 2000); *United States v. Cavin*, 39 F.3d 1299, 1309 (5th Cir. 1994).  Indeed, in the Northern District of Illinois, an expert was permitted to testify regarding the professional and ethical obligations imposed on attorneys and "provide her take on the 'concrete information' of record that the fact-finder may consider in drawing its own conclusions as to whether [attorneys] breached their fiduciary duties."  *Client Funding Solutions Corp. v. Crim*, 943 F.Supp.2d 849, 963-64 (N.D. Ill. 2013).  Federal courts have also allowed testimony regarding the ethical standards governing medical research and the non-disclosure of potentially harmful pharmaceutical side effects.  *Wetherill v. University of Chicago*, 565 F. Supp. 1553 (N.D. Ill. 1983).  Similarly, the Court should permit Mr. Fallows to testify regarding the ethical obligations imposed on engineers and provide his take on the "concrete information" of record that the fact-finder should consider in drawings its conclusions on whether Electrolux breached its duty of care in designing the dryers at issue.

## **DR. BOELHOUWER**

Although this is the first case in which Dr. Boelhouwer has testified regarding Electrolux's warnings, Dr. Alan Dorris from Dr. Boelhouwer's firm testified against Electrolux in *State Farm/Haroutounyan v. Electrolux*, Case No. EC053578 (Superior Court of California, L.A., N. Central Dist.) (filed 2010).[13]  Dr. Boelhouwer's opinions here are nearly identical to the opinions provided by Dr. Dorris in *Haroutounyan* in part because Dr. Boelhouwer worked with Dr. Dorris on that case.  *Electrolux Exh. 11 at 28:17-21.*  Despite the admission of Dr. Dorris' testimony in an earlier case, Electrolux has brought a motion to exclude Dr. Boelhouwer's

---

[13] Dr. Dorris testified in that case opposite Dr. Christine Wood, a human factors expert identified by Electrolux to testify in this case.

testimony here.  As a brief review of his reports reveals, Dr. Boelhouwer is not only qualified to provide human factors testimony, but will provide testimony that will assist the jury in deciding a relevant factual issue.  Simply put, there is no basis for excluding Dr. Boelhouwer's testimony.

**A.     Dr. Boelhouwer's Opinions Regarding Electrolux's Warnings Are Not *Ipse Dixit* and Meet Daubert's "Fit" Requirement**

Once again, the crux of Electrolux's argument relates to its own subjective criticism of the work performed by Plaintiffs' expert.  Electrolux criticizes Dr. Boelhouwer's reliance on a CPSC survey and his review of over one hundred depositions of dryer owners because they are not "representative" of the millions of consumers who own clothes dryers.  Yet Electrolux points to no case in which a human factors expert has been excluded from testifying because one party to the litigation does not feel the factual review performed by the expert is sufficient.  Indeed, Electrolux fails to cite a single case that addresses human factors testimony.

Courts have generally permitted human factors experts to testimony based upon an expert's education, experience, familiarity with the facts of the case, and study of the warnings provided.  In *Burks v. Abbott Laboratories*, for example, plaintiff produced a human factors expert to testify that the warnings on a drug were inadequate because consumers would not know about risks associated with the drug and would assume the risks only apply in certain situations.  917 F.Supp.2d 902, 920 (D. Minn. 2013).  His opinions were attacked by the defendant on the same basis Electrolux attacks Dr. Boelhouwer's opinions here:

> Abbott attacks Dr. Goldhaber's report on numerous grounds. Abbott contends that he is unqualified and that his opinions are not based on sufficient facts and data because he is not an expert on infant feeding practices or the science of C. sak and PIF. Abbott also argues that his opinions are unreliable and speculative because he did not conduct testing or surveys regarding the current warnings or of his proposed alternative warning.

*Id.* at 921.  The court denied the defendant's *Daubert* motion, holding that the expert's education and experience allowed him to provide reliable and useful opinions regarding the effectiveness of the provided warnings and alternative warnings, despite the lack of testing or surveys.  *Id.,* citing *Wolfe v. McNeil-PPC, Inc.*, Civ. No. 07-348, 2011 WL 1673805, at *10 (E.D. Pa. May 4, 2011) ("[A]fter reviewing substantial literature on the association between SJS and ibuprofen ... [the witness] concluded that the warning in this case was inadequate to communicate the nature of the risk. Based on her years of studying human interaction with packaging, she is qualified to make that determination.").

Indeed, this very Court has recognized that human factors opinion testimony may be admissible even in the absence of testing or surveys:

> Human factors analysis is not novel. "It is a recognized analytical approach that is applied in a variety of contexts and may yield legitimate insights as to the hazards that particular products and situations ... may pose in light of predictable human behavioral patterns." *Mihailovich v. Laatsch,* 359 F.3d 892, 919 (7th Cir. 2004). A human factors analysis focuses on the interaction between human behavior and the design of a machine or product. *Id.* at 915. An expert engaging in such an analysis will consider whether, in light of predictable human behavior, the design or condition of the subject item poses a potential hazard. *Id.*
>
> It is undisputed that Kvalseth is an expert is human factors engineering. ***Although he performed no studies or tests in conjunction with this case, the theories and methods upon which he relies are recognized by the engineering community.*** Kvalseth's credentials are impressive, and his knowledge of warnings and their proper design may be helpful to the jury. Therefore, his testimony is admissible.

*Michaels v. Mr. Heater, Inc.*, 411 F. Supp. 2d 992, 999-1000 (W.D. Wis. 2006).  In keeping with the previous decision of this Court, Dr. Boelhouwer's testimony as to all the warnings provided by Electrolux (including warnings related to foil duct, and "risk of fire") should be subjected to cross examination rather than excluded from trial.

Moreover, while Electrolux criticizes Dr. Boelhouwer for not conducting any testing or surveys that would provide a basis for his opinions, its own expert, Dr. Christine Wood, acknowledged in a previous deposition that she did not conduct any testing or surveys related to Electrolux dryers and that a survey was unnecessary to derive her opinion that Electrolux's warnings are adequate.  (*Exhibit 10*; 6/8/2012 Deposition of Dr. Christine Wood at 112.)  Indeed, when Dr. Wood was asked for the basis of her opinion that Electrolux's warnings are adequate, she testified that:

> It's based on a lot of studies and information gathered over years that address different aspects of warnings and how information is presented on products and the tradeoffs with manuals, and all of those kinds of things have been looked at, so they – it's based on a whole history of warnings.

(*Id.* at 113:9-14.)  Thus, while Electrolux accuses Dr. Boelhouwer of relying on his "background, training and expertise" and not pointing to any specific study, paper, or survey to support his opinions, Electrolux's own expert has admitted that she is relying on historical information gathered through her training and not on any specific study, paper, or survey related to the facts at issue.

## B.   Dr. Boelhouwer Is Qualified as an Expert on Human Factors and Appropriate "Feedback Systems"

Dr. Boelhouwer's qualifications are set forth in his report.  (*Electrolux Exh. 12 at 15-17.*)  In short, he holds a Ph.D. and a Master of Industrial and Systems Engineering from Auburn University and is a member of a number of organizations related to human factors and product safety.  (*Id.*)  He has published a number of papers and given multiple presentations in his field.  (*Id.*)  Moreover, he has worked for over seven years in manufacturing environments, with work that involves the evaluation of warnings, product instructions, and similar precautionary information for consumer products.  (*Id.*)

Electrolux challenges Dr. Boelhouwer's qualifications to testify regarding a "feedback system," arguing that such testimony requires expertise in the area of appliance design or manufacture. To the extent his opinion relates to product design, however, it relates to the utilization of a warning mechanism on a particular product, which is directly within his area of expertise. Courts do not require human factors experts to go any further.

In fact, courts have admitted testimony from human factors experts with regard to safety measures and a proposed design change even where the expert had no firsthand knowledge of the particular product at issue. In *Smith v. Ingersoll-Rand Co.*, for example, plaintiff produced an expert in "human factors engineering" to testify regarding "devices he would recommend adding to the machine to increase safety." 214 F.3d 1235, 1243 (10th Cir. 2000). A second expert with expertise as a safety consultant testified that the defendant's failure to properly consider product hazards led to the adoption of improper safety measures. *Id.* at 1243-44. The district court admitted the testimony of both experts, despite the experts' admissions that they had no firsthand knowledge of the particular machine at issue. *Id.* at 1244. On appeal, the Tenth Circuit cited *Daubert*'s admonition that "an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Id.* In upholding the district court's decision, the Tenth Circuit noted that the testimony was properly admitted because the experts' testimony was limited to matters within their fields of expertise. *Id.* There is no law to suggest the Seventh Circuit would reach a different conclusion.

## CONCLUSION

The testimony offered by the Plaintiffs' experts is based upon the scientific method, supported by proper analysis in their respective fields, and will assist the trier of fact in understanding at least one of the many facts at issue in this litigation. As such, it meets the

requirements for admission of expert testimony pronounced by *Daubert* and the Seventh Circuit and Electrolux should be left to raise its criticisms at the proper time – during trial.  *See Ancho*, 157 F. 3d at 515.  "We've seen this movie before."  So we know how it ends.  Electrolux's motion should be denied.

Dated: <u>May 7, 2014</u>

**YOST & BAILL, LLP**
*Counsel for Plaintiffs*

By: <u>s/Teirney S. Christenson</u>
    Teirney S. Christenson, SBN 1056438
    YOST & BAILL, LLP
    745 Mayfair Bank Tower
    2300 North Mayfair Road
    Milwaukee, WI  53226
    T: (414) 259-0600
    F: (414) 259-0610
    tchristenson@yostbaill.com

    -and-

    Daniel W. Boerigter
    YOST & BAILL, LLP
    2050 US Bank Plaza South
    220 South Sixth Street
    Minneapolis, MN 55402
    T: (612) 338-6000
    F: (612) 344-1689
    dboerigter@yostbaill.com
    *Admitted Pro Hac Vice*

    -and-

    Jeffrey C. Arnold
    FISHER KANARIS, P.C.
    200 S. Wacker Drive, 22nd Floor
    Chicago, IL 60606
    T: (312) 879-1521
    F: (312) 474-1410
    jarnold@fisherkanaris.com
    *Admitted Pro Hac Vice*