SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF LOS ANGELES, NORTH CENTRAL DISTRICT

STATE FARM GENERAL INSURANCE
COMPANY,

    Plaintiff,

vs.    No. EC053578

ELECTROLUX HOME PRODUCTS, INC., a
Delaware corporation; SEARS ROEBUCK
AND CO., a New York corporation; and
DOES One (1) through Twenty-Five (25),
inclusive,

    Defendants.

**ORIGINAL**

DEPOSITION OF CHRISTINE TALBOT WOOD
Long Beach, California
Friday, June 8, 2012
Volume I

Reported by:
RAMONA LUX
CSR NO. 12846
Job No. 147588
PAGES 1 - 140

Page 1

Sarnoff, A VERITEXT COMPANY
877-955-3855

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073722

---

SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF LOS ANGELES, NORTH CENTRAL DISTRICT

STATE FARM GENERAL INSURANCE
COMPANY,

    Plaintiff,

vs.    No. EC053578

ELECTROLUX HOME PRODUCTS, INC., a
Delaware corporation; SEARS ROEBUCK
AND CO., a New York corporation; and
DOES One (1) through Twenty-Five (25),
inclusive,

    Defendants.

Deposition of CHRISTINE TALBOT WOOD, Volume I,
taken on behalf of Plaintiff, at 310 Golden Shore,
Fourth Floor, Long Beach, California, beginning at
2:14 p.m. and ending at 6:39 p.m. on Friday, June 8,
2012, before RAMONA LUX, Certified Shorthand Reporter
No. 12846.

Page 2

Sarnoff, A VERITEXT COMPANY
877-955-3855

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073723

---

APPEARANCES:

For Plaintiff:

    GROTEFELD HOFFMANN SCHLEITER GORDON & OCHOA
    BY: BONNIE A. MILUSO
    Attorney at Law
    655 Montgomery Street, Suite 1220
    San Francisco, California 94111
    (415) 344-9670
    bmiluso@ghlaw-llp.com

For Defendants Electrolux Home Products, Inc., and Sears
Roebuck and Co.:

    PRINDLE, AMARO, GOETZ, HILLYARD, BARNES & REINHOLTZ
    BY: CATHY DIEL
    Attorney at Law
    310 Golden Shore, Fourth Floor
    Long Beach, California 90802
    (562) 496-0564
    cdiel@prindlelaw.com

Page 3

Sarnoff, A VERITEXT COMPANY
877-955-3855

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073724

---

INDEX

| WITNESS | | EXAMINATION |
|---|---|---|
| CHRISTINE TALBOT WOOD | | |
| Volume I | | |
| | BY MS. MILUSO | |

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit A | Retention letter | 11 |
| Exhibit B | Letter dated May 8th, 2012 | 11 |
| Exhibit C | Report dated June 4, 2012 | 13 |
| Exhibit D | List of materials | 14 |
| Exhibit E | Slaybach report | 17 |
| Exhibit F-1 | Checklist | 21 |
| Exhibit F-2 | Dryer Warning No. B1318241 | 21 |
| Exhibit F-3 | Label Clearance B1317832 | 21 |

Page 4

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER

LARSON 073725



EXHIBIT
10

INDEX (Continued):

| NUMBER | DESCRIPTION | PAGE |
|--------|-------------|------|
| Exhibit F-4 | Label-Prefabricated Home/Closet B1314637 | 21 |
| Exhibit G | Operating Instructions | 38 |
| Exhibit H | Kenmore Dryer Use and Care Guide | 39 |
| Exhibit I | Master Protection Agreement | 76 |
| Exhibit J | ANSI Standard | 97 |
| Exhibit K | Article by John R. Hall | 113 |
| Exhibit L | CPSC documents | 118 |
| Exhibit M | Furnace Installation Instructions | 120 |
| Exhibit N | Gas Water Heater Instructions | 121 |
| Exhibit O | Car Maintenance Manual | 122 |

Page 5

Sarnoff, A VERITEXT COMPANY
877-955-3855

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073726

---

INDEX (Continued):

| NUMBER | DESCRIPTION | PAGE |
|--------|-------------|------|
| Exhibit P | Indices | 132 |
| Exhibit Q | Sears Protection Agreement | 132 |

Page 6

Sarnoff, A VERITEXT COMPANY
877-955-3855

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073727

---

Long Beach, California, Friday, June 8, 2012

2:14 p.m.

CHRISTINE TALBOT WOOD,

having been administered an oath, was examined and
testified as follows:

EXAMINATION

BY MS. MILUSO:

Q     Hi. I'm Bonnie Miluso, attorney for plaintiff,
State Farm General Insurance Company, in this case. Have
you been deposed before?

A     I have.

Q     And so I'm not going to waste a lot of time
giving you what happens during a deposition, but I will
just remind you that we should not talk over each other,
and so you should make sure that I ask my entire question
before you start answering. I also talk fast, so if --
if because I've spoken quickly or for any other reason
you don't understand my question, please feel free to ask
me to either slow down or to repeat the question or we
can have it read back if you don't understand. Does that
make sense?

A     It does.

Q     Okay. And again, just as a reminder, we need

Page 7

Sarnoff, A VERITEXT COMPANY
877-955-3855

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073728

---

to make sure we have all verbal replies, no head shaking
or "uh-huh," those are hard to put down in the
transcript.

A     All right.

Q     So please state your name and spell it for the
record.

A     My name is Christine Talbot Wood, and the first
name is C-h-r-i-s-t-i-n-e, Talbot is T-a-l-b-o-t, and the
last name is W-o-o-d.

Q     And can you please state your qualifications,
your degrees that you have.

A     I attended Stanford University and received a
bachelor's degree in psychology with distinctions and
honors, and that was in 1971 and then continued at
Stanford to obtain a Ph.D in psychology in the area of
experimental psychology.

Q     Do you have a degree in statistics?

A     I do not have a degree in statistics.

Q     Do you have any other certifications in
statistics that -- outside of a formal degree?

A     I do not.

Q     Okay. I'm going to ask you a little bit about
your history with this case. When were you first
contacted by the attorney -- the attorneys for this case
regarding your retention?

Page 8

Sarnoff, A VERITEXT COMPANY
877-955-3855

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073729

```
 1       A    That would have been in late April, early May
 2   2012.
 3       Q    Do you have a record of exactly when you were
 4   contacted?
 5       A    What I have is the date which we sent out a
 6   retention letter.
 7       Q    Would that -- I'm sorry, what's the date of the
 8   letter?
 9       A    It's dated May 3rd, 2012.
10       Q    Okay.  And do you know -- can you tell from
11   your retention letter what day you were first contacted
12   by counsel?
13       A    I can't.
14       Q    It would have been, obviously, before May
15   3rd?
16       A    Yes, shortly before that.
17       Q    Okay.  So could it have been, you know, May
18   2nd?
19           MS. DIEL:  Objection.  Asked and answered.
20           THE WITNESS:  Unless that's -- unless that's a
21   weekend, but it would have been shortly before May 3rd.
22   BY MS. MILUSO:
23       Q    Okay.  Can you please describe what counsel
24   talked to you about during the first contact with you.
25       A    I don't have a specific recollection.  As I
                                                    Page 9
```

Sarnoff, A VERITEXT COMPANY
877-955-3855

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                                    EHP LARSON 073730

```
 1   recall, we talked about the fact that there had been a
 2   dryer fire, that there were issues related to warnings
 3   that she would like to have addressed, and I believe also
 4   the schedule of activities was also mentioned.
 5       Q    What do you mean, the schedule of activities,
 6   what do you mean by that?
 7       A    The trial date.
 8       Q    Okay.
 9       A    For example.
10       Q    And at that time, did you have an understanding
11   of whether or not plaintiff had retained an expert?
12       A    I don't recall if -- at what point, whether in
13   that conversation, but I knew something about the experts
14   that had been retained by the plaintiffs.  The letter is
15   dated May 8th, 2012, so that was shortly after this
16   discussion, included reports of some of the experts.
17       Q    Okay.  I've asked you to bring your materials
18   that you've relied upon and also any communications that
19   you had with your attorneys.  Have you brought those
20   materials?
21       A    I brought the transmittal letter.  There may be
22   some e-mails that I don't have here with me, that would
23   have been transmissions of Dr. Doris's deposition and
24   things like that, but I don't -- because I've been on the
25   road, I haven't been able to print those out.
                                                    Page 10
```

Sarnoff, A VERITEXT COMPANY
877-955-3855

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                                    EHP LARSON 073731

```
 1       Q    Okay.  Well, I'm going to mark some of the
 2   things you brought here as exhibits and obviously we can
 3   give you back your originals at the end as long as
 4   opposing counsel agrees to make copies so that they can
 5   become the official record.  So, first, the retention
 6   letter, can we mark that as Exhibit A.  And this is the
 7   letter that you described as the retention letter sent on
 8   March 3rd, 2012.  And would this be your agreement to be
 9   retained in this case; is that how you would describe
10   this?
11       A    Yes.
12       Q    So I'll put this on as Exhibit A.
13           (Exhibit A was marked for identification
14   by the court reporter and is attached hereto.)
15           MS. MILUSO:  And you also described a letter
16   of, I believe, May 8th, I'm going to mark that as Exhibit
17   B.
18           (Exhibit B was marked for identification
19   by the court reporter and is attached hereto.)
20   BY MS. MILUSO:
21       Q    Can you please describe what is in this letter.
22       A    This, I would describe as a letter that was
23   sent from Ms. Diel to myself that listed various
24   materials that -- documents that would have accompanied
25   this letter.  I would call this a transmittal letter.
                                                    Page 11
```

Sarnoff, A VERITEXT COMPANY
877-955-3855

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                                    EHP LARSON 073732

```
 1       Q    Okay.  And so as of May 8th there were the
 2   documents that you had received from Ms. Diel regarding
 3   this case?
 4       A    Yes.
 5       Q    Had you received any other e-mails prior to May
 6   8th from Counsel?
 7       A    I don't believe so.
 8       Q    Okay.  Do you recall if you've received any
 9   other communications, any other e-mail or written
10   communications from Counsel, since May 8th, since this
11   and the accompanied documents that follow in Exhibit B?
12       A    Oh, there might be some related to changes in
13   time frames of this deposition.
14       Q    Regarding scheduling of when your deposition
15   would occur?
16       A    Yes, scheduling.
17       Q    Okay.  You brought with you what I believe is a
18   list of materials that you reviewed regarding this case,
19   and one was originally attached to your report;
20   correct?
21       A    Yes.
22       Q    Okay.  I'm going to -- do you have a copy of
23   your report with you?
24       A    I do.
25       Q    Okay.  I'm going to mark that as Exhibit C.
                                                    Page 12
```

Sarnoff, A VERITEXT COMPANY
877-955-3855

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                                    EHP LARSON 073733

1      (Exhibit C was marked for identification
2    by the court reporter and is attached hereto.)
3  BY MS. MILUSO:
4      Q    Okay.  So I believe there was -- and I just
5  want you to verify that this is the original report that
6  you submitted, and it's dated June 4th; is that
7  correct?
8      A    Yes.
9      Q    Okay.  There is -- on page 9 of your report,
10  can you please describe what this page is.
11     A    Yes, this is a -- list of materials, is the
12  heading.  It includes a list of those materials that were
13  sent to me by client -- by my client, and then also
14  additional materials that I reference in the body of my
15  report.
16     Q    Okay.  And you described prior to the beginning
17  of this deposition today that you have an additional list
18  of materials, and can you please tell me what's on that
19  list and how it may differ from the list that was in your
20  original report, Exhibit C.
21     A    Okay.  This list, again, includes the list of
22  materials that were provided to me by my client, and then
23  in addition -- at the time of my report, and then in
24  addition, there is a listing of four additional items
25  that were sent to me after having prepared the report.

Page 13

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                                EHP LARSON 073734

---

1  This list does not contain the items that were cited in
2  my report that were not sent to me by the client.
3      Q    Okay.  So the list that we're going to mark as
4  Exhibit D is essentially a supplemental list to your
5  report.
6      (Exhibit D was marked for identification
7    by the court reporter and is attached hereto.)
8  BY MS. MILUSO:
9      Q    Can you tell me when you received the
10  additional documents that weren't -- and that are at the
11  end, those four notations, I believe -- I'll read them
12  in, the Sears protection -- we'll just do it one by one,
13  I apologize -- when you received the Sears protection
14  agreements brochure, dated May 2011?
15     A    I can't give you a specific date.  They're
16  going to be -- the report is dated June 4th, obviously
17  they're going to be this past -- during this week.
18     Q    So it would have been after June 4th?
19     A    It would have been after.  I believe it's after
20  the 4th or perhaps even contemporaneous with the 4th.
21     Q    Okay.  There's also an extended warranty
22  agreement screen shot for Alencosh Adamian, and do you
23  recall if this was provided on the 4th or after the 4th;
24  is that correct?
25     A    That's my memory.

Page 14

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                                EHP LARSON 073735

---

1      Q    Also a photograph of a Sears, quote unquote,
2  800 number by Michael Stoddard and that, again, you
3  received that after the 4th.
4      A    On or after the 4th.
5      Q    Okay.  And the deposition of Alan Doris dated
6  6/5/12, a rough and final version, I know that
7  Mr. Doris's deposition was on the 5th.  If I recall
8  correctly so -- oh, yes, because it says the 5th, so you
9  received it on or after the 5th?
10     A    Yes.  That, we can nail down.
11     Q    Okay.  You testified that you don't recall a
12  specific conversation that you had with opposing
13  counsel -- I mean, with counsel when you first were
14  retained, but did they tell you what, you know, the scope
15  of what they would like you to be testifying about in
16  this case?
17     A    Well, I don't recall the specifics of the
18  conversation but there was a specific conversation, and
19  as I recall, what I was asked to address was related to
20  warnings issues with respect to this incident.
21     Q    Okay.  Have you testified or have you been
22  retained in other cases regarding Electrolux dryers?
23     A    I have.
24     Q    In how many other cases?
25     A    I have testified in two previous Electrolux

Page 15

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                                EHP LARSON 073736

---

1  dryer fire cases.
2      Q    And when you say "testified," does that mean
3  you were deposed?
4      A    Yes.
5      Q    Have you ever testified in trial?
6      A    No.
7      Q    Okay.
8      A    Well, not in any dryer fire cases.
9      Q    Okay.  Can you tell me what -- the two cases
10  that you've -- where you've testified at least as a
11  deponent or an expert witness prior to trial, can you
12  please tell me the name of those two cases.
13     A    Yes.  One is -- well, it's -- the name of the
14  family that -- whose dryer was involved is Slabach and
15  the other is Powers.
16     Q    Do you know who the plaintiff is in the Slabach
17  case, if it's an insurance company?
18     A    Yes.  These were both -- they both involve
19  insurance companies.
20     Q    Do you think they both involve the State Farm
21  General Insurance company?
22     A    I don't know.
23     Q    Okay.  And can you tell me who your client is
24  in those cases, in the Slabach case?  Would it be fair to
25  assume that your client is Electrolux Home Products, at

Page 16

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                                EHP LARSON 073737

```
 1   least one of your clients in that case?
 2       A    That would be the entity that likely is being
 3   represented by my client.
 4       Q    And who is your client in the Slabach case?
 5       A    I can't remember the name of the law firm.
 6       Q    Do you know what state they're in?
 7       A    I don't.
 8       Q    Okay.  Riley Bennett & Egloff, does that ring a
 9   bell in Indiana.  Mary Reeder (phonetic), does her name
10   ring a bell?  What about Sarah MacGill, does she ring a
11   bell?
12       A    Those names do ring a bell.
13       Q    So it's possible that these are your clients in
14   that case, the Riley Bennett & Egloff firm?
15       A    It's possible.  I just don't have a very clear
16   recollection, obviously.
17       Q    Okay.  And did you write a report in that case,
18   in the -- what you call the Slabach case?
19       A    I believe I did.
20       Q    I'm going to hand you what I'm going to mark as
21   Exhibit E.  I apologize, it's not stapled and it is
22   two-sided.
23            (Exhibit E was marked for identification
24            by the court reporter and is attached hereto.)
25   BY MS. MYLUSS:
```

Page 17

```
 1       Q    Does this look like your report from the
 2   Slabach case?
 3       A    It does.
 4       Q    Okay.  So were you retained in the Slabach case
 5   to also talk about warnings issues?
 6       A    Yes.
 7       Q    On behalf of Electrolux?
 8       A    I was.
 9       Q    Okay.  Do you recall if you were -- if your
10   client represents any other entities in the Slabach case?
11   For instance, let's say Sears Roebuck & Company or
12   another company?
13       A    I don't recall.
14       Q    Okay.  You also mentioned a Powers case, and
15   can you tell me if you recall who the plaintiff is in the
16   Powers case?
17       A    It's an insurance firm.
18       Q    Okay.  So you know who your client is in the
19   Powers case?  Let's make it easier, based on what you've
20   said earlier, this would be another case where your
21   client is the -- are the attorneys for Electrolux Home
22   Products?
23       A    I think -- they are going to be representing
24   Electrolux in the matter.
25       Q    Do you recall if there's another entity like a
```

Page 18

Sarnoff, A VERITEXT COMPANY
877-955-3855

CONFIDENTIAL - SUBJECT                    EHP LARSON 073738
TO PROTECTIVE ORDER

Sarnoff, A VERITEXT COMPANY
877-955-3855

CONFIDENTIAL - SUBJECT                    EHP LARSON 073739
TO PROTECTIVE ORDER

```
 1   Sears Roebuck & Company that your client also represents
 2   in the Powers case?
 3       A    I don't recall.
 4       Q    Okay.  Have you issued reports in the Powers
 5   case?
 6       A    I believe I did.
 7       Q    Or a report?
 8       A    I believe I did.
 9       Q    Okay.  Have you formed any opinions in this
10   case based on your review of the materials?
11       A    Yes.
12       Q    Okay.  And are those opinions set forth in your
13   report?
14       A    They are.
15       Q    Okay.  Can you please tell me what your
16   opinions are in this case.
17       A    The overarching primary opinion is that warning
18   and safety information about factors associated with
19   dryer fires and cleaning provided by Electrolux were
20   reasonable and adequate in terms of location and
21   content.
22       Q    Do you have any other opinions?
23       A    That's the broad overriding opinion, and there
24   may be -- within the body of the report, there may be
25   subopinions and there may be things that come up in the
```

Page 19

```
 1   deposition today, but those certainly are the ultimate
 2   opinions I reached.
 3       Q    Okay.  Why don't you describe to me how you
 4   came to those opinions.  What is the basis for those
 5   opinions that the warnings are adequate?
 6       A    The -- what I examined was the -- first, the
 7   labeling that accompanies the dryer and labeling that is
 8   on the dryer.
 9       Q    Okay.  And do you have copies of those labels
10   that you have reviewed with you?
11       A    Yes.
12       Q    Okay.  Can you please get them out of your
13   materials.
14       A    They are in the tabs -- they are related to the
15   first four tabs of this binder.
16       Q    Okay.  Well, let's just start going through
17   them so we can mark them.  Maybe we'll do the first tab.
18   Can you describe the name of that tab.
19       A    This tab is labeled "Dryer Warning Labels and
20   Checklist."
21       Q    Okay.  So I'm going to -- let's look at that
22   first one, I believe it's the checklist.  Can we take
23   that out of the your binder; is that okay?
24       A    Sure.
25       Q    I'll try not to mess it up.
```

Page 20

Sarnoff, A VERITEXT COMPANY
877-955-3855

CONFIDENTIAL - SUBJECT                    EHP LARSON 073740
TO PROTECTIVE ORDER

Sarnoff, A VERITEXT COMPANY
877-955-3855

CONFIDENTIAL - SUBJECT                    EHP LARSON 073741
TO PROTECTIVE ORDER

**Page 21**

```
 1    A    Okay.
 2    Q    Thank you.
 3    A    That's the set that's from there.
 4    Q    Okay.  Well, I'm going to mark these all
 5  together as Exhibit F, and we'll just call the first page
 6  here F-1, so we can kind of keep them together for you,
 7  it might be easier for later.
 8         (Exhibit F was marked for identification
 9         by the court reporter and is attached hereto.)
10  BY MS. MILUSO:
11    Q    Why don't you tell me what -- at least what you
12  believe this document represents.
13    A    And by document, are you thinking that this is
14  going to be F-1 and that's F-2?
15    Q    Yes.  So just F-1, can you describe what your
16  understanding of what it represents?
17    A    Yes.  My understanding is that this is -- it is
18  entitled "Follow this checklist for best drying
19  performance," and my understanding is that this is a
20  document that is placed on the dryer and is available
21  for -- it's on the exterior of the dryer and can be a
22  temporary label.
23         Okay.  So do you know in -- where -- when you
24  say "a temporary label," is that one that can be removed;
25  is that correct.
```

**Page 22**

```
 1    A    It is.  It is one that is removable.
 2    Q    So do you know whether this checklist that
 3  you're seeing in F-1, whether this was on the dryer that
 4  the insureds in this case, we'll call them the
 5  Haroutounyans, H-a-r-o-u-t-o-u-n-y-a-n-s, Haroutounyans.
 6  Do you know if this checklist was on the Haroutounyans
 7  dryer?
 8    A    I haven't seen a photograph with it being
 9  present in the pictures that I've looked at
10  postincident.
11    Q    Okay.
12    A    And I haven't seen testimony with respect to
13  it.  My understanding is that it's the custom and
14  practice for Electrolux dryers to arrive with this
15  checklist on them.
16    Q    Okay.  But we -- but based on materials you've
17  reviewed, you don't know if this checklist was on the
18  dryer that the Haroutounyans purchased when they
19  purchased it?
20    A    I don't have any independent, specific
21  knowledge beyond that this is the practice that
22  Electrolux typically follows.
23    Q    Okay.  And in this case, it's your
24  understanding that the dryer was actually sold by Sears;
25  is that correct?
```

**Page 23**

```
 1    A    Yes.
 2    Q    Okay.  Do you know whether Electrolux would
 3  have put that temporary label or checklist on the product
 4  or whether Sears would have done that?
 5    A    I don't know.
 6    Q    Okay.  And do you know how it was affixed to
 7  the dryer?
 8    A    My understanding is that it is typically
 9  taped.
10    Q    Do you know what kind of tape is used?  I'm
11  sorry that that sounds petty, but I want to know how this
12  was affixed, if you know.
13    A    I don't know what type of tape is used.
14    Q    Do you know whether that's taped on the outside
15  or the inside?
16    A    My understanding is it appears taped on the
17  outside of the dryer.
18    Q    What's the basis for that --
19    A    This is testimony, I believe, I've read from
20  Carl King.
21    Q    Okay.  And that was in a different case?
22    A    I believe it is, yes.
23    Q    Okay.  And Carl King, if I am correct, is an
24  employee of Electrolux?
25    A    Yes.
```

**Page 24**

```
 1    Q    And he works as a safety engineer; is that
 2  correct, based on your understanding?
 3    A    I don't know exactly what his title is.
 4    Q    Have you ever talked to Mr. King directly?
 5    A    I have.
 6    Q    In what circumstances have you spoken to him?
 7    A    It was related to a different incident that was
 8  about to have some kind of a hearing.
 9    Q    Do you remember if it was either the Slabach or
10  the Powers case?
11    A    I don't believe it was either one.
12    Q    Well, let me ask you a question.  Has
13  Electrolux itself ever retained you either as a
14  consultant or an expert outside of what you described to
15  me today, this case, the Slabach case and the Powers
16  case, has Electrolux ever retained you?
17    A    In -- directly, as opposed to going through an
18  attorney; is that the question?
19    Q    Yes.
20    A    Not that I recall.
21    Q    But you've spoken to Mr. King directly?
22    A    Yes.
23    Q    And can you tell me about the content of the
24  conversation -- have you spoken to him more than once or
25  was it just one occasion?
```

Sarnoff, A VERITEXT COMPANY
877-955-3855

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER          EHP LARSON 073742

Sarnoff, A VERITEXT COMPANY
877-955-3855

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER          EHP LARSON 073743

Sarnoff, A VERITEXT COMPANY
877-955-3855

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER          EHP LARSON 073744

Sarnoff, A VERITEXT COMPANY
877-955-3855

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER          EHP LARSON 073745

```
 1      A    One occasion.  It was just before a hearing was
 2   about to go forward that next day.
 3      Q    Okay.
 4      A    Or perhaps it was the day after, and in the
 5   end, the -- someone got ill and wasn't able to make the
 6   hearing.  The hearing then got postponed and in the end,
 7   it didn't take place.
 8      Q    So what was your -- can you describe the
 9   content of your conversation with Mr. King in that
10   instance?
11      A    Well, this has now been a while ago.
12      Q    When was it?
13      A    Not 2012.
14      Q    Was it 2011?
15      A    That's what I'm trying to see if I can -- I'm
16   working my way back.
17      Q    Okay.
18      A    I'm having trouble finding anything to hang it
19   on.
20      Q    Well, let me ask you a specific question, maybe
21   that will refresh your recollection.  Did he talk to you
22   about the warnings on an Electrolux product?
23      A    It was a general topic but not specific to any
24   particular dryer, that I recall.
25      Q    Was it related to a specific -- I want to make
```

Page 25

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                    EHP LARSON 073746

```
 1   it clear, it wasn't just an independent consulting
 2   related to a specific case?
 3      A    Yes.  I was there related to a specific case.
 4      Q    And it was a case in litigation?
 5      A    Yes.
 6      Q    Okay.  And do you remember if it was regarding
 7   a dryer?
 8      A    It was.  It was a dryer-related case, yes.
 9      Q    Okay.  And during that conversation, did you
10   get an understanding of the nature of the case?  Was it a
11   dryer fire case, do you recall?
12      A    It was a dryer fire case.
13      Q    Okay.  And you never testified in that case
14   though?
15      A    Yes, as far as I know, no arbitration went
16   forward.
17      Q    And you weren't deposed in that case either?
18      A    And my understanding was there wasn't going to
19   be -- there was never a plan for a deposition.
20      Q    Did you write a report in that case?
21      A    I don't recall having written a report.
22      Q    Okay.  So you described the basis of your
23   opinions partly on what you've reviewed, on what you
24   believe were the labels or the warnings on the product at
25   the time and the use and care guide that came with it and
```

Page 26

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                    EHP LARSON 073747

```
 1   all the materials that came with it?
 2      A    Yes.
 3      Q    So what is on this checklist that in P-1 that
 4   you describe as an adequate warning of the risks
 5   associated with this dryer?
 6      A    Well, this piece of information covers the need
 7   to clean the lint filter.  It also describes the process
 8   of what a dryer does and factors that can impact its
 9   performance, such as the length of duct runs and things
10   like that; then in addition, there is a reference to the
11   type of vent system that attaches the dryer to the wall
12   in terms of that venting portion and the appropriate kind
13   of component to have there.
14      Q    Okay.
15      A    And it specifically mentions the fact that lint
16   can restrict air flow and become a fire hazard.
17      Q    Okay.  Does it -- on that checklist that you're
18   reading, does it mention anything about the need to
19   clean -- have an authorized servicer clean your dryer or
20   service it every 18 months; is that mentioned on this
21   checklist?
22      A    This one does not have that information on this
23   label.  It does say to read and follow all installation
24   instructions and to read the owner's guide and operating
25   instructions.
```

Page 27

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                    EHP LARSON 073748

```
 1      Q    Okay.  But it doesn't say specifically on the
 2   checklist itself to --
 3      A    That's correct.
 4      Q    Okay.  Let's go to what I've marked as P-2 from
 5   your first tab and I think it says -- it's labeled "Dryer
 6   Warning No. 81318241" and I think it has a date on it,
 7   January 12th, 1999.  And why don't you tell me how this
 8   is the basis of your opinion that there were adequate
 9   warnings?
10      A    The -- and I've talked about these all in terms
11   of location and content -- this label is one that is on
12   the dryer itself and tends to be permanently there.  The
13   warning specifically mentions and identifies fire as a
14   hazard and potential for personal injury.  It covers a
15   number of different aspects of what consumers can do to
16   reduce the chance of fire occurring.  It includes
17   cleaning the lint screen before or after each load, but
18   it has a number of other important pieces of information
19   about don't dry things that are made of foam, rubber or
20   rubber-like products and concerns about flammable and
21   combustible liquids and then identifies as a separate
22   caution that a clothes dryer produces combustible lint,
23   must be exhausted outdoors, care should be taken to
24   prevent the accumulation of lint around the exhaust
25   opening and the surrounding area, and then there's
```

Page 28

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                    EHP LARSON 073749

**Page 29**

1  information about specifically a telephone number that
2  can be called 24 hours a day, seven days a week to
3  schedule a Sears repair service, so this would be a label
4  that's directly permanently on the dryer.
5      Q.   Okay.  Based on what you just read and what we
6  can see here on Exhibit F-2 there's nothing specifically
7  on this that instructs the purchaser or the consumer to
8  have an authorized servicer come out every 18 months to
9  clean the inside of their dryer; is that correct?
10     A.   That's correct, that specific information is
11  not there.
12     Q.   Okay.  And I'm going to give you F-3, which is
13  called "Label Clearance B1317832" and it has a little
14  "Rev" is for F, which I think is revision F or revised F but
15  there is an F there, and it is dated August 13th, 1998.
16  I'm going to show that to you.  Can you tell me what
17  warning that includes?
18     A.   This warning specifically states "To reduce the
19  risk of fire, this appliance must be exhausted outdoors,
20  see installation manuals" -- "installation instruction
21  manuals," and then it has a table that identifies the
22  minimum installation clearances in inches depending on
23  where the dryer is installed within a home or some other
24  location, and that is a label, again, that is on the
25  dryer itself.

**Page 30**

1  Q.   Okay.  And again, that label doesn't say that
2  you need to have it cleaned every 18 months?
3      A.   That's correct.
4      Q.   Okay.
5      A.   And I'm not -- I am not going to -- what I'm
6  reading into the record is not everything that's on the
7  label.  This information is presented again in Spanish.
8      Q.   Sure, I respect that, we'll consider it based
9  on everything that's on the label, not just what you
10  read, and I'm going to give you what I'm marking as F-4
11  and that's "Label-Prefabricated Home/Closet B" --
12  "Home" -- I'm sorry, "Home/Closet, B1314637, Rev,"
13  whatever that means, "D."  April 12th, 1995 is the date
14  and I'll hand that to you, and I think this is a small
15  label, and again, these are all things that would have
16  been affixed to a dryer I'm assuming?
17     A.   Yes, my understanding is that this is another
18  label that's affixed to the dryer.
19     Q.   Okay.
20     A.   This label says, "This dryer is suitable for
21  pre-manufactured home installation" and again refers
22  people to "see installation instructions for installation
23  standard and closet and exhaust kit part numbers" and
24  then it's also covered in the other languages.
25     Q.   And again, from what I've reviewed it doesn't

**Page 31**

1  have anything, at least that we can tell, that says it
2  should be cleaned every 18 months; is that correct?
3      A.   It does not specifically say that on that
4  label.
5      Q.   Okay.  So is it your understanding that these
6  labels were -- or would have been -- and should have been
7  affixed to the dryer at issue in this case, the
8  Haroutounyans' dryer?
9      A.   Yes.
10     Q.   And has your client told you this is the
11  totality of what would have been affixed and all of the
12  stickers that were on the dryer in this case?
13     A.   My understanding is that those are all the
14  warning-related stickers.
15     Q.   Okay.  And in this case obviously there was a
16  fire so certain labels that may have been affixed may
17  have burned off, so I just went to make sure that it has
18  been represented to you that this was everything that
19  should have been on the dryer at some point regarding
20  warnings?
21     A.   Regarding warnings, yes.
22     Q.   Okay.  I just wanted to make sure that's clear.
23  So none of these, though, say that you need to clean your
24  dryer every 18 months, that's not on any of the labels
25  that would be affixed to the dryer; is that correct?

**Page 32**

1      A.   That's correct.
2      Q.   Okay.  And your opinion is that the warnings
3  were adequate.  So do you think that a consumer should be
4  warned about a need to clean something every 18 months in
5  order to avoid fire?  Do you think that would be a fair
6  statement that consumers should be warned of any cleaning
7  they need to do to avoid fire?
8      A.   If that is something that a manufacturer
9  believes to be important, then that is something that
10  consumers should then be warned about.
11     Q.   Do you think something as important as the risk
12  of fire should be warned on the machine and -- in a
13  permanent label that they can see?
14     A.   The -- most of the information that we've been
15  talking about related to the labels that -- F-1 through
16  F -- well, maybe not F-4, but F-1 through F-3 relate to
17  consumers about fire, and so that is very much the
18  emphasis of these labels in terms of content.
19     Q.   Okay.  If we were to assume in this case that
20  the lint accumulation that either caused or contributed
21  to the fire was in an area that the consumer could not
22  see, does that change your opinion at all regarding
23  whether the on-product labels were adequate?
24     MS. DIEL:  Objection.  Incomplete
25  hypothetical.

BY MS. MILUSO:

Q    You can answer, if you can.

A    In -- assuming that these are the labels on the product and that it's not the only information that is provided with the product, with the dryer, there's other information that these labels refer to, that all of this information together represents information that's adequate and reasonable with respect to issues related to this case and issues related to your question.

Q    Okay.  Is it your belief that not everything needs to be put on an on-product label?

MS. DIEL:  Objection.  Vague and ambiguous.

BY MS. MILUSO:

Q    Do all -- I'll rephrase.  Do all warnings need to be on on-product labels?

MS. DIEL:  Objection.  Vague and ambiguous, overbroad.

BY MS. MILUSO:

Q    You can answer, if you can.

A    If -- the question really relates to manuals that go with equipment versus -- that may contain safety information and warnings that are placed on the equipment itself, typically for most products, all of the information that's contained in a manual is not placed on the product, so a subset of that information is -- as a

Page 33

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073754

---

typical practice is placed on the -- on a product, on the equipment, on an appliance, and more information then -- more extensive information is provided in the manual.

Q    Okay.  And based on your experience as an expert and your research, how -- what things -- based on your experience, what warnings need to be on a product, what types of warnings need to be on a product as opposed to a user guide?

MS. DIEL:  Objection.  Vague and ambiguous, overbroad.

MS. MILUSO:  If you can answer based on your experience.

THE WITNESS:  Well, there are all kinds of debates about that.

BY MS. MILUSO:

Q    I just want to know your opinions on it.

MS. DIEL:  Same objections.

THE WITNESS:  One of the things to consider is what the guidance might be in a standard or even in some cases regulations that suggest locations for information, so that's something that I would look toward and consider in making that decision.  Other instances relate to what kinds of information might be -- might be most directly related to maybe the greatest number of potential incidents or the severity of these incidents or the

Page 34

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073755

---

likelihood of those incidents, so sometimes you make decisions based on that.  Other times you might make a decision based on whether a general population of users might already know about that hazard, and in that case, you might not warn about it at all.

Q    Okay.

A    So there are lots of different factors that relate to making a decision.

Q    Okay.  So the -- but it's your belief based on what you know about this case and the circumstances and the mechanism of the fire in this case that as far as on-product labels these were sufficient and adequate?

A    Yes.

Q    So -- and I'll just refer to your report, which I think we have as Exhibit A, but I'm looking -- no, I'm sorry, it's Exhibit C, okay.  So that in this case there was -- I'm sorry, I just want to make sure that I have the basis for your opinions on what happened in the fire so I'm going to find that here.  Hold on.  Why don't you just describe for me, what is your understanding of what caused this fire.  I know that you're not an expert in the area of cause, but based on your review of the materials, what do you believe caused the fire?

MS. DIEL:  I'll object on the grounds that it calls for an expertise that we are not providing this

Page 35

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073756

---

witness for.

MS. MILUSO:  And I'm not asking her on that basis.

So you can answer just on your review of the materials what you understand to be the cause of the fire.  I'm not going to hold you to it as what was the actual cause, I know your not an expert on that.

THE WITNESS:  My understanding -- so yes, I'm absolutely not an expert in fire cause and origin and these aspects or how to design a clothes dryer, but my understanding of the allegations here is that lint built up in some part of either the dryer itself or the exhaust system of the dryer and that that was ignited.

BY MS. MILUSO:

Q    Okay.  And so based on -- and obviously there was a fire in this case; right?  I mean, we can assume -- let's assume there was a fire that started in the dryer.

A    Yes.

Q    Okay.  And I believe for purposes of the rest of the deposition, let's assume that the fire started in the dryer because that's what the engineering expert for your client has said, so let's start with that understanding so we can have a meaningful pursuit in the rest of this deposition.  So either the lint in the inside of the dryer or in the exhaust vent caused the

Page 36

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073757

**Page 37**

```
 1   fire; is that your understanding of the cause in this
 2   case?
 3        MS. DIEL:  Objection.  Beyond the scope of her
 4   expertise.
 5        But you can answer.
 6        THE WITNESS:  My understanding is that it was
 7   the lint that was ignited.
 8   BY MS. MILUSO:
 9        Q   Okay.  And do you know where the lint ignited,
10   which portion of the lint, whether in the exhaust vent or
11   in the --
12        A   I don't have any independent knowledge of
13   that.
14        Q   Okay.  Do you know if the lint was in an area
15   that you could -- that a regular consumer could see?
16        A   My understanding of the allegation is that it's
17   not in a place that a consumer could see.
18        Q   Okay.  Let's get to the operating instructions
19   or the owner's manual that came with this product.  Do
20   you have those, were those provided to you?
21        A   I do.
22        Q   Okay.  Let's mark as Exhibit G what you have
23   behind your tab.
24        A   Operating instructions.
25        Q   There you go, okay.
```

Sarnoff, A VERITEXT COMPANY
877-955-3855

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                          EHP LARSON 073758

**Page 38**

```
 1        (Exhibit G was marked for identification
 2        by the court reporter and is attached hereto.)
 3   BY MS. MILUSO:
 4        Q   Did your client tell you that there are the
 5   operating instructions that accompanied the dryer in this
 6   case?
 7        A   Yes.
 8        Q   Can you tell me what warnings are contained in
 9   these operating instructions, if any?
10        A   There are --
11        Q   Regarding fire, risk of fire, let's do that.
12        A   There is, first, the reminder to read your
13   dryer use and care guide, then it says specifically, "To
14   reduce the risk of fire, electric shock, or injury to
15   persons, read the important safety instructions in your
16   dryer use and care guide before operating this
17   appliance."  There are -- in addition to information
18   about the controls and use of the controls, there's
19   information warning people not to use heat to dry certain
20   kinds of items.
21        Q   Is there anything on those -- what we call
22   them, operating instructions, Exhibit G, that warns the
23   insured about having to clean a dryer every 18 months to
24   avoid the risk of fire?
25        A   There is not that specific information.  There
```

Sarnoff, A VERITEXT COMPANY
877-955-3855

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                          EHP LARSON 073759

**Page 39**

```
 1   is specific information about the need to keep the lint
 2   screen clean and exhaust the dryer correctly.
 3        Q   Okay.  You read and took notes, I believe, on
 4   the testimony of our -- the insureds in this case,
 5   Mr. Harouteunyan and Ms. Adamian; is that correct?
 6        A   Yes.
 7        Q   And didn't they testify that they cleaned the
 8   lint filter every -- you know, most of the time, if not
 9   all the time?
10        A   I think she estimates that she did it 90
11   percent of the time.
12        Q   All right.  Let's go to the user manual.
13   Again, we haven't come across any warning yet having to
14   do with having to clean your dryer every 18 months, so
15   let's see if it's in that -- the guide there that we're
16   going to mark as Exhibit H, and this is Kenmore Dryer Use
17   and Care Guide, and has your client represented to you
18   that this was the use and care guide that accompanied the
19   model at issue?
20        A   That is what I've been given to understand.
21        (Exhibit H was marked for identification
22        by the court reporter and is attached hereto.)
23   BY MS. MILUSO:
24        Q   Okay.  Why don't you -- we'll go to -- I think
25   it's page 3.  And on page 3 here is important safety
```

Sarnoff, A VERITEXT COMPANY
877-955-3855

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                          EHP LARSON 073760

**Page 40**

```
 1   instructions, and here, why don't you tell me the warning
 2   that has the warning regarding every 18 months, I believe
 3   this is the location, having to clean your dryer every 18
 4   months.
 5        A   It's one of the locations.  It is indeed on
 6   page 3 and it's under a section called "Important Safety
 7   Instructions" and "Read all instructions before using
 8   this dryer," and specifically under that it's warning,
 9   "To reduce the risk of fire, electrical shock, or injury
10   to persons when using this dryer comply with the basic
11   warnings listed below.  Failure to comply with these
12   warnings could result in serious personal injuries."  And
13   then it's under a heading that says "Prevent Fire," and
14   within that is a warning that says "Clean the lint screen
15   before or after each load.  The interior of the dryer,
16   lint screen housing and exhaust duct should be cleaned
17   approximately every 18 months by qualified service
18   personnel.  An excessive amount of lint build-up in these
19   areas could result in inefficient drying and possible
20   fire," and then it says to "See care and cleaning, page
21   7."
22        Q   Is there any -- how many other warnings are
23   listed on that page with the warning that you described
24   regarding the 18 months?  How many warnings are on that
25   page?
```

Sarnoff, A VERITEXT COMPANY
877-955-3855

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                          EHP LARSON 073761

1     A     With respect to prevent fire?

2     Q     Sure, or just in general, and then you can tell

3  me about fire.

4     A     Well, there are -- under "Prevent Fire" there

5  are eight separate pieces of safety information that are

6  preceded by the word "Warning" or the signal word

7  "Warning."

8     Q     Okay.  And would you agree with the statement

9  that the effectiveness of a warning about a given hazard

10  is likely to decline when it must competes with many

11  other warnings and other stimuli for product user's

12  attention?

13     MS. DIEL:  Objection.  Vague and ambiguous,

14  overbroad, incomplete hypothetical.

15     THE WITNESS:  There is research both in

16  psychology in general and in warnings research that the

17  more information there is, then the more difficult it is

18  to remember it all.

19  BY MS. MILUSO:

20     Q     Okay.

21     A     And then with respect to warnings, the more

22  warnings that there are, there is differences in the

23  amount of information that people can retain as the

24  amount of information increases.

25     Q     Okay.  I'm just going to repeat this because I

Page 41

---

1  don't think you exactly answered my question.  I want to

2  know if you agree with this statement and then it's a

3  "yes" or a "no."  I don't mean to box you in but that's

4  the question I'm asking.

5     A     Okay.

6     Q     So you agree with the statement the

7  effectiveness of a warning about a given hazard is likely

8  to decline when it must compete with many other warnings

9  and stimuli for a product user's attention; do you agree

10  with that statement?

11     MS. DIEL:  Objection.  Vague and ambiguous,

12  overbroad, incomplete hypothetical.

13     THE WITNESS:  I think it will be specific to

14  the product and kind of information that's being

15  presented.

16  BY MS. MILUSO:

17     Q     Okay.  In this case there is a defense that,

18  you know, these insureds did not follow the instructions

19  because they testified that they never had their dryer

20  serviced by an authorized servicer and definitely not

21  every 18 months, so the defense is that they didn't

22  follow the warnings, and I want to know whether you think

23  that -- because it's an allegation in this case whether

24  there were -- you testified there were eight other

25  warnings on the sheet, do you think that it is -- that

Page 42

---

1  there was a -- that a consumer could have been

2  potentially overwhelmed by the number of warnings and may

3  not have heeded all of them because there so many on

4  one sheet?

5     MS. DIEL:  Objection.  Vague and ambiguous,

6  overbroad, incomplete hypothetical.

7     THE WITNESS:  Well, my understanding in this

8  instance is that Ms. Adamian never read any of the

9  information in this manual, so it would be irrelevant to

10  her in terms of the number or specific things that were

11  cited, and Mr. Haroutounyan, he -- he talks about

12  glancing through it but couldn't recall any of the

13  information that was contained in here, and he was not

14  the -- he was -- very seldom used the dryer.  So for

15  these particular people, I believe that that whole issue

16  was largely irrelevant.

17  BY MS. MILUSO:

18     Q     Would it have been irrelevant if that warning

19  label was on the product itself, clean it every 18

20  months, do you think that they most likely would have

21  read that had it been on the product?

22     MS. DIEL:  Objection.  Vague and ambiguous,

23  overbroad, calls for speculation.

24     MS. MILUSO:  She's an expert and she can

25  testify to what she believes as a human factors expert.

Page 43

---

1     Q     What you believe in the case based on what

2  you've read about what they've done, whether or not --

3  whether you think an on-product label would have

4  increased their likelihood to have read it.

5     MS. DIEL:  Let me just interpose the same

6  objections and incomplete hypothetical.

7     THE WITNESS:  The -- I haven't seen any

8  testimony that says whether they read any of the labels

9  on the dryer at all, and having information on the dryer

10  itself does not automatically increase the likelihood

11  that somebody is going to read it.  We have people in

12  this case who have had previous experience with a dryer,

13  they've used a dryer before and they used a dryer without

14  incident before and the -- so users who are familiar with

15  a product, even though it might not have been necessarily

16  an Electrolux dryer, it's difficult then for a

17  manufacturer who can provide instructions and labels on

18  their product and information in manuals to have people

19  read that information.  And that is, you know, an early

20  study that Dr. Doris did where he had people using

21  hammers and each hammer had a warning on it that -- of

22  the hundred people tested no one even noticed that there

23  was a warning on the hammer.  So that has been a finding

24  that has been replicated by others as well.

25  BY MS. MILUSO:

Page 44

Sarnoff, A VERITEXT COMPANY
877-955-3855

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073762

EHP LARSON 073763

EHP LARSON 073764

EHP LARSON 073765

**Page 45**

```
 1        Q    So what, in your opinion, should a manufacturer
 2   of a product that poses a risk of fire do, if anything,
 3   to adequately warn or prevent injury?  Isn't that the
 4   point of warning, to prevent injury or accidents?
 5        MS. DIEL:  Let me just interpose an objection.
 6   It's vague, ambiguous, overbroad, it's argumentative and
 7   an incomplete hypothetical.
 8   BY MS. MILUSO:
 9        Q    Can you just state what you believe the purpose
10   of warnings is to be, let's start there.  What is the
11   purpose of a warning?
12        A    The purpose of a warning in general is to
13   provide information, a message, to reduce injury, or in
14   this case, reduce the risk of fire and provide
15   information in such a way that hazards are potentially
16   identified and what steps can be taken to avoid them.
17        Q    Okay.  And would you agree with the statement
18   that hazards that a consumer knows, they're more likely
19   to avoid; would you agree with that statement?
20        MS. DIEL:  I'll object on the grounds that it's
21   vague, ambiguous, overbroad and an incomplete
22   hypothetical.
23        You can answer.
24        THE WITNESS:  I don't understand the
25   question.
```

Sarnoff, A VERITEXT COMPANY
877-955-3855

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073766

**Page 46**

```
 1   BY MS. MILUSO:
 2        Q    Okay.  So my question is -- I'll give you a
 3   hypothetical.  If you walk out to your car in the morning
 4   and you see that your back tire, back left tire, is, you
 5   know, low, almost touching the ground and you can see
 6   that it's low, would it be reasonable to assume that a
 7   consumer who can see that would be less likely to drive
 8   in that car because they know it could pop and be unsafe,
 9   is that a reasonable assumption based on your
10   experience?
11        MS. DIEL:  Objection.  Incomplete
12   hypothetical.
13        THE WITNESS:  I can't speak sufficiently to
14   that kind of specific example.  What I do know is that
15   often times people are aware -- totally aware of hazards,
16   the hazard is well understood and people will still take
17   risks and will still take chances for a whole variety of
18   reasons.  So having the knowledge doesn't necessarily
19   make people act on that knowledge.
20   BY MS. MILUSO:
21        Q    Okay.  And, you know, providing a warning
22   doesn't necessarily mean that the warning is going to be
23   followed; is that an accurate --
24        A    That is right.  The warning can't in and of
25   itself make people act.
```

Sarnoff, A VERITEXT COMPANY
877-955-3855

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073767

**Page 47**

```
 1        Q    Okay.  Do you agree with the statement that the
 2   time and effort that a person is likely to devote to any
 3   given warning message is likely to suffer as a number of
 4   competing messages on the same product and on other
 5   products in the users' environment increases?
 6        MS. DIEL:  I'll object on the ground that it's
 7   vague, ambiguous, overbroad and an incomplete
 8   hypothetical.
 9        THE WITNESS:  Well, generally, the more
10   information that there is that has to be processed, that
11   represents a certain cost in effort, in information
12   processing effort, and as that increases, either people
13   will make a decision to invest or not.
14   BY MS. MILUSO:
15        Q    Okay.  And in this case you've provided the
16   opinion that the warnings on this product were -- and I
17   believe we've gone through all the -- unless you disagree
18   with me, we've gone through all the warnings on this
19   product, is that correct, that accompany the product; is
20   that correct?
21        MS. DIEL:  Objection.  Did you go through
22   everything?
23        MS. MILUSO:  I don't know.  Did we miss
24   anything regarding warnings that accompanied this
25   product?
```

Sarnoff, A VERITEXT COMPANY
877-955-3855

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073768

**Page 48**

```
 1        THE WITNESS:  Well, there's a document that's
 2   called the installation instructions.
 3   BY MS. MILUSO:
 4        Q    Do you know if the installation instructions
 5   accompanied the product and were distributed to the
 6   consumer?
 7        A    Well, it's Electrolux's practice to include
 8   those with the other material that's to be left with the
 9   consumer.
10        Q    Do you know if in this case the consumer
11   actually read the installation instructions?
12        A    Oh, my understanding is that certainly --
13        Q    I know it's hard, you can say the husband or
14   wife if it's easier?
15        A    My understanding is that the wife didn't read
16   any of it and I don't recall any testimony that the
17   husband did.
18        Q    Okay.  And do you know whether or not the
19   consumers themselves installed the product or whether
20   someone else installed the product?
21        A    Oh, in this case?
22        Q    Yes.
23        A    Oh, my understanding is that they absolutely
24   did not install it themselves.  They had somebody install
25   it and I believe it was related to Sears.
```

Sarnoff, A VERITEXT COMPANY
877-955-3855

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073769

**Page 49**

```
 1      Q    Okay.  And so if the Barootounyans -- or the
 2  husband and wife didn't install it and they had a company
 3  install it, would it be -- is it unforeseeable that
 4  they're not going to read the installation instructions,
 5  based on your experience as an expert?
 6      A    Well, they may or they may not.  This has
 7  Sears's name on it and it says "Save these instructions."
 8  It will depend on what they're interested in.  These are
 9  labeled "Installation instructions" and these -- these
10  people are not doing the installation but if there was
11  something that came up related to the performance, for
12  example, this might be a document that they would refer
13  to.
14      Q    Okay.  Well, if no issue came up in relation to
15  performance, meaning everything was functioning properly,
16  is it your belief as an expert that the consumer would go
17  back to their product manual for any reason if it was
18  working properly?
19           MS. DIEL:  Objection.  Vague, ambiguous,
20  overbroad, calls for speculation and an incomplete
21  hypothetical.
22           THE WITNESS:  I think it will depend on the
23  consumer and their wish to seek information and whether
24  they are -- decide to look for information, so it's very
25  much consumer driven.
```

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER        EHP LARSON 073770

**Page 50**

```
 1  BY MS. MILUSO:
 2      Q    Okay.  You're a consumer; right?
 3      A    I am a consumer, yes.
 4      Q    Do you own a dryer?
 5      A    I do.
 6      Q    Do you own more than one dryer?
 7      A    No.
 8      Q    And is this dryer in your residential home,
 9  your personal permanent residence?
10      A    It is.
11      Q    And is it located within your own unit?  I
12  don't want to make assumptions about where you live, but
13  is it located within your own unit as opposed to like a
14  laundry room in your building?
15      A    It is.
16      Q    Do you know who made that dryer or what the
17  brand name is on your dryer?
18      A    I believe it's Amana.
19      Q    Do you -- did you purchase it?
20      A    Yes.
21      Q    And do you know when you purchased it?
22      A    I don't.
23      Q    What -- can you give me a range?  Did you
24  purchase it a year ago or more than a year ago?
25      A    No, it's more than a year ago and I'd say it's
```

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER        EHP LARSON 073771

**Page 51**

```
 1  more than five years ago.
 2      Q    Is it more than ten years ago?
 3      A    I don't think so.
 4      Q    Is it more than seven years ago?
 5      A    I don't know.
 6      Q    But sometime -- it's over five years old?
 7      A    It is.
 8      Q    Okay.  Have you ever had it serviced?
 9      A    I don't recall having it serviced.
10      Q    Okay.  And have you ever had any problems with
11  its performance?
12      A    No.
13      Q    Have you ever had it cleaned?  And when I say
14  "cleaned" I mean have you ever had an authorized servicer
15  come in and clean your dryer?
16      A    I have not.
17      Q    Have you ever had someone clean your vent
18  ducts?
19      A    I have.
20      Q    Do you remember when you had someone clean your
21  ducts?
22      A    I believe it was at the time when I had the
23  roof redone.
24      Q    And was it part of your -- just the maintenance
25  performance or was there a problem that led you to have
```

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER        EHP LARSON 073772

**Page 52**

```
 1  those ducts cleaned?
 2      A    I think it was prompted by the fact that -- as
 3  I recall, it was related to I was replacing the roof and
 4  that's where the outlet -- the exhaust outlet is.
 5      Q    Do you know if you -- do you know how -- the
 6  configuration of the ducts in your home, do you know how
 7  they're configured?
 8      A    In terms of the part between the walls?
 9      Q    Yeah.  Between the walls, yeah.
10      A    I don't specifically know.  I know it's vented
11  to the exterior.
12      Q    Do you know how far it is from the back of your
13  dryer to the exterior of your home?  I mean, I'm just
14  asking about what you know about your own dryer.
15           MS. DIEL:  Objection.  Irrelevant.
16  BY MS. MILUSO:
17      Q    Well, to be fair, Mr. Doris went through the
18  same line of questioning, so I'm going to go through this
19  with you as well.
20      A    The dryer is on the second floor of the house
21  and the vent outlet is fairly directly above that, I
22  believe.
23      Q    Okay.  So it travels upward you believe.  Does
24  it go up to your roof?
25      A    Yes.
```

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER        EHP LARSON 073773

**Page 53**

```
 1        Q    So it vents onto your roof?
 2        A    It does.
 3        Q    Do you know how far it is from the back of your
 4   dryer to the roof, just an estimate, or -- is it less
 5   than 30 feet?
 6             MS. DIEL:  Objection.  Irrelevant.
 7             THE WITNESS:  I don't know.
 8   BY MS. MILUSO:
 9        Q    Okay.  Have you ever looked inside your exhaust
10   vent on the back behind -- that goes behind your dryer on
11   the wall?
12             MS. DIEL:  Objection.  Irrelevant.
13             THE WITNESS:  Looked into it?
14   BY MS. MILUSO:
15        Q    Yes, looked into it.
16        A    I have not.
17        Q    Did you -- did you purchase this dryer yourself
18   or maybe a spouse?
19        A    It's -- I probably purchased it.
20        Q    Do you remember purchasing it?
21        A    I don't.
22        Q    Do you remember reading any instructions that
23   came with it?
24        A    I have read them.
25        Q    You've read them.  When did you read them?
```

Sarnoff, A VERITEXT COMPANY
877-955-3855

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                            EHP LARSON 073774

**Page 54**

```
 1        A    It's going to be back around the time that I
 2   purchased it.
 3        Q    Have you read them since then or have you
 4   pulled it out for any reason since you purchased it?
 5        A    I don't believe so.
 6        Q    Okay.  And was there any -- to your
 7   recollection, were there any instructions regarding
 8   maintenance that you recall reading in your
 9   instructions?
10        A    No.
11        Q    Do you recall reading that you should clean the
12   lint filter?
13        A    Oh, yes, that's -- that's certainly there,
14   yes.
15        Q    And is it your --
16        A    I thought you were asking about -- when you
17   were talking about maintenance, I thought you were
18   talking about with respect to some periodic
19   maintenance.
20        Q    Well, you don't remember -- I just want to make
21   sure I understand your testimony.  In terms of periodic
22   maintenance, you don't remember seeing any -- when you
23   read it, you don't remember what you read if there was
24   anything regarding periodic maintenance?
25             MS. DIEL:  Objection.  Irrelevant.
```

Sarnoff, A VERITEXT COMPANY
877-955-3855

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                            EHP LARSON 073775

**Page 55**

```
 1             THE WITNESS:  I don't recall whether there was
 2   information like that in there.
 3   BY MS. MILUSO:
 4        Q    Okay.  Would -- if -- and I'm giving you a
 5   hypothetical, if it said in your dryer instructions that
 6   every 18 months you have to have a professional come out
 7   and clean the inside of the dryer in places where you
 8   can't see, would you have had that performed,
 9   personally?
10             MS. DIEL:  Objection.  Irrelevant and
11   incomplete hypothetical.
12   BY MS. MILUSO:
13        Q    You can answer.  If everything had been working
14   properly on your dryer, which I believe it has for you.
15        A    It has, and I have not had such maintenance
16   done.
17        Q    Would you have -- so you personally don't --
18   you haven't done any normal, regular maintenance every 18
19   months or you don't do any regular maintenance on your
20   dryer; is that correct?
21             MS. DIEL:  Objection.  Irrelevant.
22             THE WITNESS:  In terms of having a qualified
23   service technician come out, I don't recall having done
24   that with this dryer.
25   BY MS. MILUSO:
```

Sarnoff, A VERITEXT COMPANY
877-955-3855

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                            EHP LARSON 073776

**Page 56**

```
 1        Q    Do you perform any maintenance on your dryer
 2   at all?
 3             MS. DIEL:  Objection.  Irrelevant.
 4   BY MS. MILUSO:
 5        Q    And if you do, when do you do?
 6        A    Well, I certainly clean the lint from the lint
 7   basket that's within the dryer, periodically vacuum in
 8   back and around the dryer.
 9        Q    And when you vacuum in back and around, do you
10   pull it away from the wall or disconnect it from any
11   exhaust venting?
12        A    I do not disconnect and I do not unplug.
13        Q    Okay.  And I'm assuming also that you don't
14   take off, like, the outside of the dryer and clean
15   inside, you don't take the metal off and clean inside?
16             MS. DIEL:  Objection.  Irrelevant.
17             THE WITNESS:  I do not try and dismantle the
18   dryer.
19   BY MS. MILUSO:
20        Q    Okay.  If cleaning of a consumer dryer required
21   a dismantling, would that be a reasonable expectation on
22   consumers to clean it that way, based on your experience
23   as an expert?
24             MS. DIEL:  Objection.  Vague and ambiguous,
25   overbroad, incomplete hypothetical, calls for
```

Sarnoff, A VERITEXT COMPANY
877-955-3855

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                            EHP LARSON 073777

**Page 57**

```
 1  speculation.
 2          THE WITNESS:  I think it will depend on how
 3  comfortable someone is at doing that, but what this
 4  information says is that that kind of operation should be
 5  done by a qualified service person.
 6  BY MS. MILUSO:
 7      Q   And would it -- but it doesn't say that that's
 8  provided with this dryer, that they will send somebody
 9  out for you, does it?
10          MS. DIEL:  Objection.  Misstates the
11  evidence.
12          THE WITNESS:  If we're talking about the dryer
13  in this case, my understanding is that the homeowners had
14  purchased a three-year agreement with Sears that allowed
15  them to have, at that point, once they paid that money,
16  an annual review and inspection and maintenance of the
17  dryer and someone would come out and perform that, they
18  purchased that.
19  BY MS. MILUSO:
20      Q   Do you know what -- and what's the basis for
21  your information that they purchased that product?
22      A   My understanding -- actually, I'm not sure this
23  is it -- oh, yes -- is the -- there's an agreement
24  reference specifically that has -- this has
25  Mrs. Adamian's name on it for $68.99 and I believe they
```

**Page 58**

```
 1  included a -- this specific kind of agreement that's also
 2  described in the -- as a master protection agreement
 3      Q   And this would have been purchased at the time
 4  she purchased the dryer; is that correct?
 5      A   It is.
 6      Q   It's maybe what we would know as an extended
 7  warranty; would that be fair or a protection plan?
 8      A   I don't know what it's been called within the
 9  litigation.  Here, it's referenced as a master protection
10  agreement that among the other things that's included is
11  an annual preventative maintenance check at your request
12  and no extra charge.
13      Q   Okay.  Do you know if the Haroutounyans ever
14  used their protection plan or master protection
15  agreement?
16      A   From their testimony, my understanding is that
17  they did not.
18      Q   And didn't they also testify that they never --
19  that they didn't have any problems with the dryer?
20      A   Yes, that's my understanding.
21      Q   Okay.
22      A   Prior to the fire.
23      Q   So as an expert, wouldn't it be reasonable to
24  assume that a consumer who has no problems with their
25  dryer would not necessarily call out someone to service
```

**Page 59**

```
 1  their dryer?
 2          MS. DIEL:  Objection.  Vague, ambiguous,
 3  overbroad, incomplete hypothetical.
 4  BY MS. MILUSO:
 5      Q   I'm asking you as an expert if it's -- if a
 6  consumer -- I'm sorry, you can actually repeat the
 7  question.
 8          (Record read.)
 9          THE WITNESS:  I think in -- particularly in
10  this instance where we have people who have already paid
11  for that kind of service, that it's unusual for them not
12  to take advantage of it.
13  BY MS. MILUSO:
14      Q   Have you ever purchased, personally, an
15  extended warranty?
16      A   I have.
17      Q   And have you -- have any of your extended
18  warranties included regular maintenance?
19      A   Yes.
20      Q   Can you describe which products you bought
21  these extended warranties on.
22      A   They were actually for a washer and dryer
23  through Sears.
24      Q   Was it similar to the protection agreement that
25  you purchased, similar to the one that you're reading
```

**Page 60**

```
 1  here in the master protection agreement in this case?
 2  This is a Kenmore Sears dryer.
 3          MS. DIEL:  Objection.  Irrelevant.
 4          THE WITNESS:  I don't recall all the different
 5  aspects of it, but it certainly included a -- annual
 6  inspection, that someone would come out and -- and I just
 7  don't recall how many years it covered.
 8  BY MS. MILUSO:
 9      Q   Do you remember ever having someone -- calling
10  someone out, in your own experience, to come out and do
11  that annual service?
12      A   I did.
13      Q   Did you initiate that on your own or did Sears
14  call you?
15      A   I don't recall.
16      Q   Let me -- well, other than the installation
17  instructions, the user guide, the on-product labels and
18  the operating instructions that we've reviewed, do you
19  have any knowledge of any other warnings that came
20  associated with this product?
21      A   I think in terms of what we've discussed
22  already, including the installation instructions that we
23  didn't mark, but that's my understanding of the
24  information that would either be on or accompanying the
25  dryer that would have contained information with respect
```

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                EHP LARSON 073778

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                EHP LARSON 073779

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                EHP LARSON 073780

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                EHP LARSON 073781

## Page 65

```
 1   authorized service person, would you do that -- would you
 2   call someone out every 18 months?
 3        MS. DIEL:  Objection.  Vague, ambiguous,
 4   incomplete hypothetical.  She already indicated someone
 5   came out.
 6        THE WITNESS:  It's not that a fire will happen,
 7   it's a fire -- there's a chance of a fire.  By failing to
 8   do this action, you are increasing the likelihood of a
 9   fire occurring compared to having it serviced but it's
10   not something that's going to happen 100 percent of the
11   time.
12   BY MS. MILUSO:
13        Q    Well, I mean, most things aren't going to
14   happen 100 percent of the time; right?
15        A    Right, so the likelihood is low.
16        Q    Okay.  And -- but when the likelihood --
17   doesn't it matter what the risk is, if it's death or
18   injury, isn't it more important than if the risk is
19   failure -- you know, a failure in the product and its
20   service and how it performs?
21        MS. DIEL:  Objection.  Vague, ambiguous,
22   overbroad, incomplete hypothetical.
23        THE WITNESS:  In terms of what?  What are you
24   relating it to?
25   BY MS. MILUSO:
```

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                     EMP LARSON 073786

## Page 66

```
 1        Q    Sorry, I'm sure it was vague.  It is more --
 2   would you agree with the statement that it's more
 3   important to have a warning on something that is -- has a
 4   risk to injury or death like a fire versus a warning, you
 5   know, to make sure it's maintained properly so it
 6   performs properly; correct?
 7        MS. DIEL:  Objection.  Vague, ambiguous,
 8   overbroad.
 9        THE WITNESS:  The information about maintenance
10   in the set of information that we've been talking about
11   is in terms of risk, is in terms of fire and to reduce
12   your chance of fire, have a service technician come out
13   and perform what's -- an annual inspection on this
14   suggested time frame, so that's there.
15   BY MS. MILUSO:
16        Q    But it -- and I think this warning says, "Clean
17   the lint screen before or after each load, the interior
18   of the dryer, lint screen, housing and exhaust duct
19   should be cleaned approximately every 18 months by
20   qualified service personal.  An excessive amount of lint
21   buildup in these areas could result in inefficient drying
22   and possible fire."  So would it be reasonable for a
23   consumer whose dryer is performing efficiently to assume
24   that they don't have a risk of fire because it's
25   performing efficiently?
```

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                     EMP LARSON 073787

## Page 67

```
 1        MS. DIEL:  Objection.  Vague, ambiguous,
 2   overbroad, incomplete hypothetical.
 3        THE WITNESS:  Reading this information under
 4   important safety information, under a warning that says
 5   "To reduce the risk of fire, electrical shock, injury to
 6   persons when using this dryer comply with basic warnings
 7   listed below.  Failure to comply with these warnings
 8   could result in serious personal injuries," and then the
 9   heading "Prevent Fire," now that's the context of the
10   information that you just read into the record in
11   addition to it being fronted by the signal word
12   "warning."  So it is being placed in the context of
13   safety and this is a safety related behavior, so the
14   presentation of this information is characterizing it as
15   definitely related to reducing the risk of fire.
16   BY MS. MILUSO:
17        Q    But you're not concerned at all, you don't
18   think there's any distraction, in your opinion, in the
19   fact that the same warning includes the result of not
20   performing those functions as an inefficient drying?
21   That doesn't bother you at all that it also says
22   "inefficient drying"?
23        MS. DIEL:  Objection.  Vague, ambiguous,
24   overbroad, incomplete hypothetical.
25        THE WITNESS:  Well, it includes both,
```

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                     EMP LARSON 073788

## Page 68

```
 1   inefficient drying and possible fire.
 2   BY MS. MILUSO:
 3        Q    And so based on this user care guide and the
 4   warnings that are included in here, you believe that's
 5   adequate warning for the risk associated with this
 6   dryer?
 7        MS. DIEL:  I'll object on the grounds that it's
 8   vague and ambiguous as to whether you've also included
 9   all the other warnings.
10   BY MS. MILUSO:
11        Q    I'll include all the other warnings.
12        A    I believe, as I stated in my opinion, that the
13   information that's provided here is reasonable and
14   adequate and specifically includes information about the
15   need to do the 18 months service by a qualified service
16   personnel.
17        Q    Do you think that most consumers who receive,
18   based on your experience as an expert in the area of
19   warnings and human factors and human behavior, do you
20   think that most individuals, most consumers who purchase
21   this dryer had an authorized service person come every 18
22   months?
23        A    I don't know.
24        Q    You think it's a reasonable expectation on
25   consumers, I'm not talking about the Harootunyans, do
```

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                     EMP LARSON 073789

**Page 69**

1  you think it's a reasonable expectation on consumers to
2  have someone come and clean parts of the dryer that you
3  cannot see every 18 months?  Do you think that's a
4  reasonable expectation?
5      A   I think it's reasonable for someone who reads
6  this information to understand that if they don't do
7  that, it increases their risk of fire, that that
8  information is conveyed and it's conveyed in a clear
9  manner, in words that people can understand and then it's
10  up to the consumer to decide whether they're going to act
11  upon that or not.
12      Q   You've mentioned cost and the cost to the
13  consumer, do you think that's a reasonable cost for a
14  consumer to undergo, not only the cost of buying the $90
15  protection plan, but after the three years there is no
16  protection plan.  Do you think it's a reasonable
17  expectation -- a reasonable cost on consumers to have to
18  pay that money to have it be serviced?
19      A   Well, you do have to pay a service provider to
20  come out and inspect your dryer and that's true if I want
21  to have my furnace done or my -- or if I had an
22  air-conditioner, to have an air-conditioner checked, to
23  take my car in to be serviced, those things do have some
24  monetary costs to them, but that is -- the person who is
25  performing that service is a professional and that's

**Page 70**

1  their job to do that kind of work.
2      Q   But isn't it true that people are -- normal
3  basic -- normal behavior is that, you know, if something
4  is -- you know, if it's not broken then why fix it?
5  Would you agree with -- that most consumers function
6  that, you know, the products in their home, if it's
7  working efficiently then I'm not going to fix it?
8          MS. DIEL:  Objection.  Incomplete
9  hypothetical.
10         THE WITNESS:  I think it would be influenced by
11  a lot of different factors.
12  BY MS. MILOSO:
13      Q   Okay.  Well, let's talk about that.  Are there
14  other -- what products do you think consumers are more
15  likely to get serviced when they're working totally fine,
16  which products in your mind and in your experience as a
17  human factors expert, are people likely to get regular
18  service on when it's working properly?
19      A   I don't know.  I haven't done that kind of
20  analysis.
21      Q   Is it -- so you can't testify whether you think
22  it's reasonable that -- for a consumer who buys a dryer
23  to have to perform annual service even if it's working
24  fine?
25      A   No, I haven't said that.

**Page 71**

1      Q   Okay.  Well, let's talk about a dryer then.  Is
2  a dryer in someone's home, is it reasonable that a
3  consumer would get something -- get a dryer serviced that
4  was working fine?
5      A   I think that it's reasonable for a consumer who
6  reads the information that's provided here by Electrolux
7  to understand that if they don't have this regular kind
8  of service done, that that increases their risk of a
9  fire.  And then it's up to them to make a decision about
10  whether -- given all the other risks that people face in
11  day-to-day activities whether they're going to act upon
12  that information.
13      Q   Isn't that something that the consumer should
14  know before they buy it, what they're expected to do?
15      A   Well, I saw some of that kind of testimony in
16  Dr. Doris's deposition.  The -- I would think that at
17  least to the extent that this family decided to purchase
18  a master protection agreement that potentially there was
19  some understanding of the issue about scheduling
20  maintenance and the possibility of a potential issue with
21  the dryer, so that there wasn't some -- there was some
22  reason that they decided to make this additional $90
23  purchase in addition to what they had already paid for
24  the dryer.  The -- apart from that, you have an appliance
25  whose basic role is to produce heat and the transfer of

**Page 72**

1  heat and maybe they don't understand about the -- that
2  the water turns to vapor and all those kinds of things.
3  If they read some of this information, they will
4  understand, but they'll know that this is a
5  heat-producing appliance that transfers heat from
6  whatever it is that the appliance is doing itself to the
7  clothing or whatever items are in the dryer.  And just
8  that kind of a process is a potential fire risk and not
9  specific to any particular manufacturer.
10      Q   Well, there are a lot of fire risks in our
11  homes; right?
12      A   There is and people will understand in general
13  that a range in the kitchen poses a potential fire
14  risk.
15      Q   And people would -- and a toaster, for
16  instance, would also pose a fire hazard?
17      A   A toaster, yes.
18      Q   If a consumer had to take apart their toaster
19  to clean it, take it off, use a screwdriver to take it
20  off, would that be a reasonable expectation on a
21  consumer?
22          MS. DIEL:  Vague, ambiguous, overbroad,
23  incomplete hypothetical.
24          THE WITNESS:  I have not looked at toasters and
25  what's expected of consumers for toasters.

Sarnoff, A VERITEXT COMPANY
877-955-3855

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073790
EHP LARSON 073791
EHP LARSON 073792
EHP LARSON 073793

## Page 73

```
1   BY MS. MILUSO:
2        Q    Have you looked at any other household
3   appliance in your experience as a human factors expert
4   regarding maintenance?  Have you looked at any other
5   household appliances?
6        A    In what respect?
7        Q    In terms of the risk of fire associated, how
8   consumers act and in terms of maintenance, any of those
9   things.
10            MS. DIEL:  Objection.  Vague and ambiguous.
11            THE WITNESS:  That's a very broad question.
12            MS. DIEL:  Overbroad.
13   BY MS. MILUSO:
14       Q    Well, you're an expert; right?
15       A    I have expertise in the area of warnings and
16   risk communication.
17       Q    And I guess in your history of your years that
18   you've been in this business and -- what experience do
19   you have with household products in all these years?
20   Other than what you use personally, I'm talking about as
21   an expert.
22       A    I have done a lot of work related to household
23   products of various kinds.
24       Q    Can you just tell me about some of the work
25   that you've done that would be relevant to household
```

Page 73

Sarnoff, A VERITEXT COMPANY
877-955-3855

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                          EHP LARSON 073794

## Page 74

```
1   products that pose a fire risk?
2        A    Well, I've got examples in here of manuals
3   that -- one is -- accompanies a furnace, the other
4   accompanies a -- I believe it's -- all of a sudden I
5   can't remember.  Let me look.
6        Q    Okay.
7        A    Oh, water heater, and there's also an example
8   of a car manual in here.
9        Q    Why do you think the car manual is relevant?
10       A    Well, I think the -- I think what it does is
11   assist with consumers' expectations, that lots of
12   products come with manuals, that manuals tend to have
13   more information than what is on a product itself and
14   that -- so that people will know that often when they
15   get -- you can talk about appliances but motor vehicles,
16   all kinds of consumer products, that there will be
17   potentially labeling on the product, and if not, or in
18   addition to, there will often be a manual.
19       Q    And when it -- can you tell me other examples
20   of when -- some product that a consumer buys that is
21   expected to do regular maintenance say every -- like on
22   an 18-month basis or any other basis -- one-year,
23   two-year basis, can you tell me any other examples of
24   those?  I just want no know about your research.
25       A    Well, I didn't attempt to try and look at every
```

Page 74

Sarnoff, A VERITEXT COMPANY
877-955-3855

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                          EHP LARSON 073795

## Page 75

```
1   single product.  I provided these as examples of other
2   kinds of products that people do have in their homes
3   where these manufacturers have suggested periodic
4   maintenance be done.
5        Q    Okay.  So let's talk about what you brought
6   with you regarding that.  You said you brought gas
7   furnaces.  So what are the expectations of consumers as
8   it relates to the maintenance in the gas furnace material
9   that you've reviewed?
10       A    Well, there's two issues.  One is with respect
11   to the fact that gas furnaces come with manuals, but the
12   other one is that at least within -- this is an example,
13   within the manual there's information about the need to
14   do some regular service of it.
15       Q    And can you tell me what you -- let's mark
16   that --
17       A    Okay.
18       Q    -- as -- where are we?  Let's go --
19            MS. DIEL:  Let's go off the record.
20            (Recess.)
21   BY MS. MILUSO:
22       Q    We realized that we hadn't actually marked the
23   document that you talked about that was a receipt of
24   their -- the Harootomyune purchase of the master
25   protection agreement, so we're going to have that marked
```

Page 75

Sarnoff, A VERITEXT COMPANY
877-955-3855

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                          EHP LARSON 073796

## Page 76

```
1   as Exhibit I and we have had that copied but we hadn't
2   marked it yet so that's going to be I.  And we don't have
3   a J; correct?
4        A    And that wasn't the "I" that was rotated and it
5   looked like an H?
6        Q    I wrote it but we hadn't marked it yet.
7        A    Okay.
8        Q    So there's a few things out, so we'll get back
9   to the other things that you relied on when we get them
10   back.
11       A    Okay.
12            (Exhibit I was marked for identification
13       by the court reporter and is attached hereto.)
14   BY MS. MILUSO:
15       Q    So let's just get back to your report for a
16   second.  Do you have any opinions about whether consumers
17   are more or less likely to refer to something else when
18   they're told to go somewhere else?  For instance, in this
19   case, the on-product labels say "Please read the user
20   guide," do you have any opinion as to whether that
21   consumer is more likely or less likely to go read
22   something somewhere else when they're told to go to
23   another label or warning?
24       A    It will very much depend on the consumer's --
25   it's consumer driven and if they are seeking information,
```

Page 76

Sarnoff, A VERITEXT COMPANY
877-955-3855

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                          EHP LARSON 073797

## Page 77

```
 1    then they know that that source exists and that it's
 2    something that they can refer to and then also it is a
 3    way of indicating that -- for example, that an on-product
 4    label that then refers to a manual, separate manual, that
 5    this is not all the information.  This is a subset --
 6    typically a subset of the information.
 7         Q    Does -- so your answer is that it would depend
 8    on the diligence of the consumer is that correct?
 9         A    It is, it's whether the consumer is seeking
10    information, if they're looking for information.
11         Q    When -- in the case of dryer maintenance and
12    service, when would a consumer, you know, be seeking that
13    information?
14         MS. DIEL:  Objection.  Vague and ambiguous.
15         THE WITNESS:  Well, I think we've talked about
16    some of the factors that influence that.  If a product is
17    not familiar to a consumer, if they -- then they're more
18    apt to seek the information and if the product is seen as
19    potentially hazardous.  Let's think of things like
20    chemicals as an example that might be -- give off fumes
21    and be volatile, that might be seen as more hazardous
22    than some other kind of less-familiar product that exists
23    in a home.  So that -- those can be some examples of
24    factors that influence whether someone will go and seek
25    information.
```

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                          EHP LARSON 073798

## Page 78

```
 1    BY MS. MILUSO:
 2         Q    And what about when -- you know, I'd like to
 3    get your opinions on, what is a reasonable cost.  Because
 4    we know that there is cost of compliance, right, we
 5    talked about that a little bit.  At what point does the
 6    cost of compliance become unreasonable?  So at what
 7    point -- or maybe it doesn't.  Do you think that the cost
 8    of compliance ever becomes unreasonable?
 9         A    It -- there might be somewhere out there that
10    kind of a situation and I haven't tried to define it at
11    that -- wherever that tipping point is, but in this case,
12    I really don't think that the cost of compliance is a big
13    issue related to this incident.  It's certainly a factor
14    in trying to keep all kinds of things maintained in our
15    house, in our home.  All different kinds of products
16    there's some effort, and it can be even having your
17    carpets cleaned, just it -- unfortunately, it does
18    require, typically, making a call or sending an e-mail
19    and having -- if it's something that requires someone to
20    come out to the house, typically you have to be there and
21    be present when that person does their work at least to
22    get them started, so -- but this is just going to be part
23    of keeping the house operational.
24         Q    What about -- but like when someone's carpet is
25    cleaned it's generally because it's dirty; right?
```

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                          EHP LARSON 073799

## Page 79

```
 1         A    That can be one reason.
 2         Q    And, you know, when -- let's go back a little
 3    bit to automotive because I think that's an interesting
 4    issue.  Is it your opinion that the regular maintenance
 5    that we know to perform on our car, even if it's working
 6    normally, is analogous to the regular maintenance that
 7    Electrolux expects from its consumers to maintain its
 8    dryers?
 9         MS. DIEL:  Objection.  Vague, ambiguous,
10    incomplete hypothetical.
11    BY MS. MILUSO:
12         Q    I just want to understand why you've brought in
13    that -- why automotive service, regular maintenance, is
14    relevant to this case.
15         A    Well, the reason that I brought it in was that
16    there seemed to be some question about the
17    appropriateness of having maintenance, the regular
18    maintenance information contained in a manual and not be
19    on a product, and it's just not an unusual condition.  It
20    is a frequent kind of a decision to have that kind of
21    information contained in a manual that accompanies a
22    product and a car was one example, but what's being
23    copied right now are other examples for other
24    appliances.
25         Q    So let me just make sure I understand you, so
```

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                          EHP LARSON 073800

## Page 80

```
 1    putting certain things in a manual versus -- is normal
 2    and not everything has to be on a product; is that what
 3    you're saying?
 4         A    Often times -- well, it is a very typical kind
 5    of a convention to have service information contained in
 6    a manual, and it often times is not possible nor would
 7    consumers want to have their appliances covered with all
 8    of the information that's in the manual, and so there is
 9    this trade-off between certain selecting certain items to be on
10    the product itself and then having additional information
11    in a manual.
12         Q    Well, do you agree with the statement that the
13    best approach is to prioritize hazards in relation to how
14    commonly they are understood, with respect to the first
15    criteria and only largely unknown hazards are the first
16    candidates for possible warnings?
17         MS. DIEL:  Objection.  Vague, ambiguous,
18    incomplete hypothetical.
19         THE WITNESS:  I think that there are various
20    approaches to making those kinds of decisions and
21    certainly that would be one possible thing to consider.
22    BY MS. MILUSO:
23         Q    Based on your experience as an expert, do you
24    think that the average dryer consumer, the average
25    homeowner, knows that outside of just their vent itself
```

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                          EHP LARSON 073801

**Page 81**

```
 1    that there are other risks inside that they can't see?
 2    Do you think the average consumer knows that?
 3         MS. DIEL:  Objection.  Vague, ambiguous, calls
 4    for speculation, incomplete hypothetical.
 5         THE WITNESS:  If they read the information
 6    that's provided by Electrolux, as an example, they will
 7    have some understanding of that.
 8    BY MS. MILUSO:
 9         Q    Does it say in any of the labels that we talked
10    about or any of the user guide or installation
11    instructions that the consumer may not be able to see all
12    of the places where lint can accumulate?  Does it say
13    that?
14         A    It references, for example, the exhaust system
15    or the exhaust ducts, those are places consumers can't
16    see, so it certainly talks about that.
17         Q    Does it explicitly say that, you know, lint can
18    build up in the -- you know, behind your dryer drum where
19    you can't see it, it doesn't say that, does it?
20         A    I don't recall those specific words.
21         Q    Is it your opinion that the expectation on the
22    consumer of this product, to have it serviced every 18
23    months by a professional servicer, is it your opinion
24    that that's a reasonable expectation, based on your
25    experience as an expert?
```

Page 81
Sarnoff, A VERITEXT COMPANY
877-955-3855
CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER
EHP LARSON 073802

**Page 82**

```
 1         A    In terms of --
 2         MS. DIEL:  I'll just impose an objection on the
 3    grounds that it's vague, ambiguous and an incomplete
 4    hypothetical.
 5         THE WITNESS:  And I'm not sure I understand the
 6    question.
 7    BY MS. MILUSO:
 8         Q    Okay.  I want to know if it's your opinion
 9    based on your experience and your research that an
10    average consumer can be expected to have an authorized
11    servicer come every 18 months without any reminder or
12    warning, is that a reasonable expectation on a
13    consumer?
14         MS. DIEL:  Same objections.
15         THE WITNESS:  Well, there are any number of
16    ways that a consumer who is interested in keeping that
17    kind of a schedule can track it.  So I don't -- I don't
18    think that that kind of information about here's, you
19    know, three ways to think about doing needs to be
20    included in the manual.
21    BY MS. MILUSO:
22         Q    Okay.  Well, when we -- do you know whether
23    Sears, who sold the dryer and provided the service or
24    lack thereof under the master service agreement, whether
25    they ever called or reminded the Adamians to have their
```

Page 82
Sarnoff, A VERITEXT COMPANY
877-955-3855
CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER
EHP LARSON 073803

**Page 83**

```
 1    dryer service performed?
 2         A    I don't know.
 3         Q    Do you know whether it was Sears's standard
 4    practice to do so?
 5         A    I don't know.
 6         Q    Would you agree that not all hazards -- I'm
 7    sorry, not -- the right terminology is escaping me --
 8    just because a product contains a warning, that it may
 9    not be followed; is that correct?
10         A    Yes, that's true.
11         Q    And the purpose -- I'm reading from your report
12    on page 7, "The purpose of a warning is to inform a user
13    of possible negative consequences as a result of taking
14    or failing to take some action," would you agree with
15    that?
16         A    Yes.
17         Q    And then you say, "However, research into the
18    effect that warnings and safety information have on human
19    behavior has shown warnings cannot motivate or force
20    compliance"?
21         A    Yes.
22         Q    And are there -- so what happens -- I mean,
23    what should a manufacturer do if they can't rely on
24    consumers to follow the warnings?  Well, what should a
25    manufacturer do?
```

Page 83
Sarnoff, A VERITEXT COMPANY
877-955-3855
CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER
EHP LARSON 073804

**Page 84**

```
 1         A    The -- what a manufacturer can do is in terms of
 2    warnings is to provide information in a way that can
 3    communicate, can be understood by consumers and that is
 4    in locations that are reasonable for being able to
 5    communicate with consumers and that really is the extent
 6    of what a manufacturer can do in terms of providing
 7    warnings.  It then -- you know, whether someone will seek
 8    that information and read it and act upon it is related
 9    to a lot of other factors, some of which we've already
10    spoken about, and that is beyond the control of the
11    manufacturer.  So the adequacy of the information and the
12    presentation of it can't get coupled with effectiveness
13    because those really are two different aspects.
14         Q    Well, there's a third option; right?  I mean,
15    the manufacturer can design a product or incorporate
16    designs that are -- that are safer, that prevent some of
17    those failures; correct?
18         A    And I'm addressing it from warnings, what can
19    somebody -- a manufacturer do with respect to warnings.
20         Q    When would you find -- in what circumstance
21    have you ever found that a warning was inaccurate?  Let
22    me strike that and rephrase.
23         Have you ever found that a warning that you
24    have reviewed has been inadequate?
25         MS. DIEL:  Objection.  Vague, ambiguous,
```

Page 84
Sarnoff, A VERITEXT COMPANY
877-955-3855
CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER
EHP LARSON 073805

**Page 85**

```
 1   overbroad.
 2          THE WITNESS:  I have testified in a case with
 3   respect to a fireworks warning.
 4   BY MS. MILUSO:
 5       Q    And why did you find that the warning was
 6   inadequate in that case?
 7       A    Well, there were warnings on the fireworks.
 8   This particular type of firework had a -- a consistent
 9   pattern of performance related to injury that was not
10   included among the warnings.
11       Q    So you do -- can you quantify how much work you
12   do for defense versus how much work you do for
13   plaintiffs?
14       A    The -- I would estimate about 65 percent of the
15   work that I do is litigation-related, and of that work,
16   over 90 percent is on behalf of the defense.
17       Q    And when you do that litigation work for the
18   defense, have you ever determined in your process of
19   reviewing the materials provided to you that warnings
20   were inadequate?
21          MS. DIEL:  Objection.  Vague, ambiguous,
22   overbroad.
23          THE WITNESS:  Well, if -- certainly if I'm
24   asked to do that and that is what I determine then I
25   don't proceed with that work very far, that's sort of the
```

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                    EHP LARSON 073806

**Page 86**

```
 1   end of the review.
 2   BY MS. MILUSO:
 3       Q    That makes sense.
 4       A    Uh-huh.
 5       Q    Well, you talked about the Slabach and the
 6   Powers case that you had been retained by counsel and
 7   also another case that never made it to fruition that
 8   maybe Electrolux had pulled you in on, what were your
 9   findings in those other cases?  Did you determine that
10   the warnings were adequate?
11       A    Yes, I did.
12       Q    And you didn't -- I don't have it here anymore
13   but your report in the Slabach decision, if you recall
14   it, maybe we can look at it when it comes back, but was
15   it relatively similar to your opinion in this case?
16       A    It is.
17       Q    Why is that?  Why are they similar?
18       A    Well, it's the -- it's very much a similar set
19   of safety information and warnings that were present on
20   the two dryers.
21       Q    Okay.  I don't want to get too far ahead of
22   ourselves because I want to see the ANSI, A-N-S-I, all
23   caps, standard that you brought in and I want to talk
24   about that before we go home, but let's talk about this
25   other document you brought in, the Sears protection
```

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                    EHP LARSON 073807

**Page 87**

```
 1   agreements.  I think on your index you had it listed as a
 2   2011 agreement; would that be accurate?
 3       A    Yes.
 4       Q    Why is this relevant to your findings in this
 5   case?
 6       A    Well, this is a document that was sent to me by
 7   Counsel.
 8       Q    Do you know why it was sent to you?
 9       A    I -- I think it was to illustrate the kinds of
10   things that can be covered in a Sears protection
11   agreement, but I -- but it is for my -- my understanding
12   is that this is for 2011 and I thought that the
13   description in the manual that came with the appliance in
14   this case, with the dryer in this case, was probably a
15   better description of what some of that would cover --
16   what specifically things would be covered.
17       Q    Did your client provide you with like the
18   actual protection agreement or any other material that
19   came with their $90 purchase or $89.99 purchase of the
20   Agreement?
21       A    No.
22       Q    So you don't know what -- other than what's in
23   the user and care guide, you don't know what else the
24   consumer received; is that correct?
25       A    In this case?
```

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                    EHP LARSON 073808

**Page 88**

```
 1       Q    Yes, in this case.
 2       A    What this particular family received?
 3       Q    Yes.
 4       A    I don't.
 5       Q    Okay.  So it's possible that they didn't
 6   receive any document outside of just their use and care
 7   guide; is that correct?
 8          MS. DIEL:  Objection.  Calls for speculation.
 9          THE WITNESS:  I don't know one way or the
10   other.
11   BY MS. MILUSO:
12       Q    Okay.  Other than the cases that we've talked
13   about today, have you ever done any other work for
14   Electrolux or any other counsel that represented
15   Electrolux for any other product?
16       A    Can you chunk that into a smaller question?
17       Q    Yes.  Electrolux manufactures several different
18   products; they manufacture refrigerators, other home
19   appliances, have you ever been an expert or consultant
20   for Electrolux in any other product?
21       A    I have.
22       Q    Okay.  What other products?
23       A    A range.
24       Q    Like a stove range, that type of thing?
25       A    Yes, kitchen range.
```

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                    EHP LARSON 073809

**Page 89**

1   Q   Okay.  And was it, again, that you were

2   retained as an warnings expert?

3   A   Yes.

4   Q   And what were your findings in that case, if

5   you can recall, generally?

6   A   As I recall, it related to tip-over risk and I

7   don't recall all the specific findings but there were

8   warnings on the product and warnings accompanying the

9   product with respect to that risk.

10   Q   You've read Dr. Doris's report; is that

11   correct?

12   A   Yes.

13   Q   And what was your -- do you have any problems

14   with his report?  Do you agree -- or do you disagree with

15   anything in his report?

16   A   I believe I pointed out some of the areas that

17   he and I disagree about.

18   Q   And what were those areas?

19   A   The bottom of page 6 and going on to page 7.

20   Q   So on the bottom of page 6 it says "Dr." --

21   "Well, Dr. Doris acknowledges that noncompliance with

22   warnings does not necessarily make a warning inadequate.

23   He opines that the warnings provided by Electrolux are

24   inadequate because they require excessive or

25   disproportionate measures for compliance.  He does not

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                    EHP LARSON 073810

---

**Page 90**

1   propose alternative warnings that would overcome his

2   concerns and would have prevented or reduced likelihood

3   of this event."  So is it your opinion that the warnings

4   provided by Electrolux are adequate and they do not

5   require excessive or disproportionate measures for

6   compliance?

7   A   Well, I think -- well, first, I do believe, as

8   I say in my overall opinion, that the warnings provided

9   by Electrolux are adequate, but I also -- I disagree with

10   Dr. Doris in -- in the concept that even if actions are

11   required that -- that require some cost associated with

12   compliance, that just may be the cost in order to reduce

13   the risk, and so there are -- people have to wear OSHA

14   supplied or OSHA-rated respirators to work in confined

15   spaces and it may be uncomfortable, it may be hot and

16   that may impose some cost on the person, but nonetheless

17   in those kinds of circumstances that would be the steps

18   that somebody would need to take to reduce their risk.

19   So it's true that some -- some actions that are asked of

20   consumers for them to take to reduce the risk will pose

21   some cost of compliance, some effort and sometimes some

22   money to achieve that compliance.

23   Q   Hypothetically, if Electrolux required that you

24   had to have an authorized service person out to your home

25   every six months and it was going to cost you $50 every

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                    EHP LARSON 073811

---

**Page 91**

1   time, every six months throughout the duration of your

2   dryer, do you think that would be an -- that would be a

3   cost of compliance that was too high?

4   MS. DIEL:  Objection.  Vague, ambiguous,

5   incomplete hypothetical.

6   THE WITNESS:  Yeah, I have not looked at the --

7   again, measuring where things become excessive or a

8   disproportionate measure for compliance.  In this case

9   what we have is a recommendation of 18 months that comes

10   from Electrolux.  The family in this case paid for an

11   agreement that covered, in that agreement, they could

12   have as many as three visits to look at the appliance, so

13   that -- that particular cost, the actual monetary cost,

14   has already been sunk basically.

15   BY MS. MILUSO:

16   Q   But it's only been sunk for the first three

17   years; right?

18   A   Right.

19   Q   And then there's additional costs after those

20   three years?

21   A   There would be.

22   Q   Do you disagree with Dr. Doris's statement that

23   appliances are typically serviced on an as-needed

24   basis?

25   A   Yeah, I didn't -- I didn't see that he had a

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                    EHP LARSON 073812

---

**Page 92**

1   basis for that statement and I provided the other

2   examples of -- that were in my binder that I brought here

3   of other appliances that suggest to consumers -- that

4   recommend to consumers that they have those appliances

5   serviced on a regular basis.

6   Q   Do you know whether it was Sears's practice to

7   provide any warnings verbally at the time of purchase

8   regarding the maintenance requirements of this dryer?

9   A   I don't know what Sears's practices were.

10   Q   I think we touched this a little bit but I want

11   to go back to it.  You read Dr. Doris's transcript from

12   his deposition?

13   A   I did.

14   Q   And during that deposition transcript he

15   mentioned that it would have been -- that those warnings

16   were inadequate was obviously his findings, but that

17   because certain consumers are more diligent and other

18   consumers are not, that the choice to buy this dryer --

19   in order to make that choice the consumer should have

20   known about the maintenance requirements, particularly

21   something as -- particularly the 18-month cleaning

22   requirement to avoid fires.  Do you disagree with that

23   opinion?

24   A   Well, it seems to me that under that there's an

25   assumption that other brands and other manufacturers

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                    EHP LARSON 073813

**Page 93**

1  won't have --

2  THE REPORTER:  I'm sorry, my computer just shut

3  off.

4  (Recess.)

5  MS. MILUSO:  So when we failed -- let's just

6  have her repeat that one more time.

7  THE WITNESS:  She closed the file.

8  BY MS. MILUSO:

9  Q  Okay.  That's okay.  We were talking about

10  prepurchasing labeling, I believe, if that makes sense.

11  Do you remember?

12  A  I do remember.

13  Q  Okay.  Go ahead.

14  MS. DIEL:  And I'll just object that the

15  question was compound and vague, ambiguous.

16  MS. MILUSO:  Okay.  You can answer, if you

17  remember.

18  THE WITNESS:  Well, I remember what I was going

19  to say.

20  MS. MILUSO:  Okay, perfect, why don't you say

21  that.

22  THE WITNESS:  It seems to me that there was an

23  assumption in that belief that if consumers understood

24  the maintenance issues with Electrolux dryers, that then

25  they would make some other decision about purchase, and

**Page 94**

1  there will be -- for dryer manufacturers who follow the

2  ANSI standards for gas dryers, there is guidance that in

3  their manuals they should provide recommendations for

4  periodic maintenance.  Electrolux is doing that.  For

5  other manufacturers that -- and I don't know what their

6  recommendations for periodic maintenance might be, but if

7  they are following the ANSI standard for their product,

8  they would have guidance also.  So it's not -- I don't

9  believe it's going to really be a matter of by purchasing

10  some other manufacturer's appliance or dryer that you're

11  going to somehow be able to avoid having to do any

12  maintenance on the appliance.

13  BY MS. MILUSO:

14  Q  And -- okay, but if -- would you agree with the

15  statement that some hazards cannot be avoided or

16  mitigated through any action except by avoiding the

17  product or situation?

18  MS. DIEL:  Objection.  Vague, ambiguous,

19  overbroad, incomplete hypothetical.

20  THE WITNESS:  Can you read that again.

21  BY MS. MILUSO:

22  Q  Yes.  Some hazards cannot be avoided or

23  mitigated through any action except by avoiding the

24  product or situation?

25  MS. DIEL:  Same objections.

**Page 95**

1  THE WITNESS:  In some broad way, that's

2  probably true.

3  BY MS. MILUSO:

4  Q  And also that -- would you agree with the

5  statement that some information made to consumers, if

6  presented at the point of purchase -- example -- a

7  warning about the potential choking hazard of small parts

8  could potentially steer parents away from buying a toy

9  that might prove dangerous for small children?

10  MS. DIEL:  Objection.  Vague, ambiguous,

11  overbroad, incomplete hypothetical.

12  THE WITNESS:  If -- for parents that might read

13  that warning and have a child that might be at risk some

14  of them might make other decisions.

15  BY MS. MILUSO:

16  Q  And in the same way, a consumer who buys a

17  product, let's say, a household product like a toaster

18  oven, they buy a toaster oven, and on -- at the point of

19  sale they see that, you know, this toaster oven requires

20  you to clean something every two days, whereas another

21  one says to clean it after every use, I mean, wouldn't a

22  consumer be able to use that information to decide

23  whether it wants to purchase one toaster over another

24  toaster?

25  MS. DIEL:  Objection.  Compound, incomplete

**Page 96**

1  hypothetical.

2  THE WITNESS:  Well, potentially there's all

3  kinds of information that could be available to consumers

4  on which to make a decision, and I think we have a --

5  cost can be a consideration, and I believe that the

6  people in this case mentioned something about cost as one

7  of the things -- the amount of money that they would have

8  to pay for the dryer, so there can be a whole variety of

9  factors that influence a purchase decision.  I would

10  expect that maintenance -- getting back to dryers -- that

11  the maintenance of dryers and the period -- recommended

12  period for maintenance is not going to be some major

13  influence on whether a particular consumer chooses that

14  dryer over another manufacturer's.

15  BY MS. MILUSO:

16  Q  Okay.  Now that everything is back here, let's

17  talk about ANSI, and that's A-N-S-I.  What is ANSI?

18  A  ANSI is an umbrella standards organization that

19  has many different subgroups within it, and the subgroups

20  typically form a task force that develops standards that

21  can be applicable to whole varieties, there's hundreds

22  and hundreds of ANSI standards.  In this case what we

23  have is an ANSI standard that's specific to gas clothes

24  dryers, that's the ANSI Z21.5.1.  And in order to be

25  published as an ANSI standard, there has to be a certain

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073814

EHP LARSON 073815

EHP LARSON 073816

EHP LARSON 073817

**Page 97**

```
 1  process that's been gone through in developing the
 2  standard.  They are a consensus standard and if that
 3  process is gone through, then it ultimately can be
 4  published as an ANSI standard.
 5      Q   Okay.  You brought this ANSI Z21.5.1, dash,
 6  2002, and this is what you believe to be the applicable
 7  ANSI standard at the time of the distribution of the
 8  dryer at issue?
 9      A   Yes.
10      Q   Okay.  And --
11      A   Or at the time of the manufacturer.
12      Q   At the time of manufacturer.  So you refer
13  to -- in your report you say the applicable standard for
14  the incident dryer, ANSI Z21.5.1, 2002, recommends that
15  dryer instruction manuals include instructions about the
16  need for periodic examination of exhaust systems.
17          MS. DIEL:  What page are you on?
18          MS. MILUSO:  I'm sorry.  I'm on page 7 of her
19  report, middle of the way down, the end of the first full
20  paragraph.
21      Q   So why don't we go to the ANSI standard that
22  you brought with you, we're going to mark that as Exhibit
23  J, and let's go to the portions that you cite here.
24      A   Okay.
25      Q   I believe you cite to footnote 32, section
```

**Page 98**

```
 1  1.22.8C.
 2      A   Yes.
 3          (Exhibit J was marked for identification
 4      by the court reporter and is attached hereto.)
 5  BY MS. MILUSO:
 6      Q   Okay.  So can you read to me what 1.22.8C says.
 7      A   Yes, it is within -- there's A, B, C, D, E, F,
 8  so I think it's better to start up higher.
 9      Q   Okay, go ahead, start at the top.
10      A   Okay.  1.22.8, "Maintenance instructions shall
11  include instructions for all maintenance intended to be
12  performed by the user, including recommended frequency
13  guidelines.  Maintenance instructions shall include but
14  are not limited to" and then it lists cleaning of lint
15  screen, that was A; B, lubrication of moving parts; C,
16  and this is the one that we're talking about, periodic
17  examination of exhaust systems.
18      Q   Okay.  Now, as an expert, do you think that the
19  periodic examination of exhaust systems would include
20  looking in places where the consumer can't access?
21      A   Yes, it can.  It can include that.
22      Q   Okay.  So in order to meet this standard the
23  exhaust system -- sorry, strike that.
24          It says "Maintenance instructions shall include
25  instructions for all maintenance intended to be performed
```

**Page 99**

```
 1  by the user" and then you refer to part C, periodic
 2  examination of exhaust systems, this is specific to the
 3  user.  But in this case, isn't the warning at issue
 4  something that they have to be -- have service performed
 5  by an authored servicer?
 6      A   Yes, and the information goes to the user to
 7  have that done, to act upon that to have the service
 8  personnel come out.
 9      Q   Is there anything in this standard that says
10  that you have to tell users to have a person come out to
11  service your dryer?
12      A   I'm -- I am not aware that that level of detail
13  is in this standard.  It allows the manufacturer to
14  determine that.
15      Q   Well, if we assume, hypothetically, that the
16  user cannot see or access themselves portions of the
17  dryer that accumulate lint and can lead to lint
18  accumulation and potential fire risk, would then the
19  instructions on -- that we've reviewed today that came
20  with this dryer and were on this dryer, would those meet
21  this standard?
22          MS. DIEL:  Objection.  Vague, ambiguous,
23  compound and incomplete hypothetical.
24          THE WITNESS:  In my view, they do meet the
25  standard in that we've talked about the specific segments
```

**Page 100**

```
 1  within the manual that direct consumers to -- every 18
 2  months to have the exhaust system and the dryer checked
 3  out by a qualified service technician, and that surely
 4  would meet the periodic examination of exhaust systems
 5  guidance within the standard.
 6  BY MS. MILUSO:
 7      Q   Now, this standard, does it make any
 8  recommendations?  These are general recommendations,
 9  correct?  I'm sorry, are these general recommendations?
10      A   They -- well, for --
11          MS. DIEL:  Objection.
12          THE WITNESS:  -- gas --
13          MS. DIEL:  Vague and ambiguous.
14          THE WITNESS:  They are for gas clothes dryers,
15  so they're specific to gas clothes dryers.
16  BY MS. MILUSO:
17      Q   But not every gas clothes dryer is the same;
18  right?
19          MS. DIEL:  Objection.  Vague and ambiguous.
20  BY MS. MILUSO:
21      Q   Well, I mean, it's a question.  I mean, this is
22  a standard that should apply to all; but not every dryer
23  is the same; correct?
24          MS. DIEL:  Objection.  Vague and ambiguous.
25          THE WITNESS:  Well, with respect to the scope
```

Sarnoff, A VERITEXT COMPANY
877-955-3855

CONFIDENTIAL - SUBJECT        EHP LARSON 073818
TO PROTECTIVE ORDER

CONFIDENTIAL - SUBJECT        EHP LARSON 073819
TO PROTECTIVE ORDER

CONFIDENTIAL - SUBJECT        EHP LARSON 073820
TO PROTECTIVE ORDER

CONFIDENTIAL - SUBJECT        EHP LARSON 073821
TO PROTECTIVE ORDER

**Page 101**

```
 1    of this standard, I mean, you have to -- and this is
 2    type-one clothes dryers, all of the dryers that fall
 3    within that particular scope, this standard would be
 4    applicable to.
 5    BY MS. MILUSO:
 6        Q    Okay.  But just because you've met the language
 7    in the standard does not automatically mean that the
 8    warnings are adequate; correct?
 9        A    Oh, I agree that that's not necessarily a
10    determiner, that's not the sole determiner of the
11    adequacy.
12        Q    Okay.  What other factors would an expert like
13    you look at to determine the adequacy other than you
14    relied on the ANSI standard, but what else would
15    determine adequacy?
16        A    Well, I've discussed a lot of them in the
17    report, so -- is the information in a manner that people
18    can understand it, is it in a -- located in a place where
19    people could reasonably find it.  Those were certainly
20    some of the aspects of adequacy that I considered.
21        Q    Isn't it true that there are certain products
22    that no warning would be adequate to prevent a danger and
23    require a change in the -- in the product itself?
24              MS. DIEL:  Objection.
25    BY MS. MILUSO:
```

Page 101

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                    EHP LARSON 073822

**Page 102**

```
 1        Q    Would that be true?
 2              MS. DIEL:  Vague and ambiguous, incomplete
 3    hypothetical.
 4              THE WITNESS:  I don't understand the
 5    question.
 6    BY MS. MILUSO:
 7        Q    Well, we see consumer products all the time,
 8    right, that have safeguards built it; is that correct?
 9    Would you agree?
10              MS. DIEL:  Objection.  Vague and ambiguous.
11              THE WITNESS:  I'm -- I still --
12    BY MS. MILUSO:
13        Q    For instance, a vacuum cleaner has a fan that
14    processes the air out and pushes the air out and we have screens over
15    those fans to make sure little kids don't stick their
16    fingers in the fan and get their fingers caught, we put
17    safeguards onto products.  Would you agree with that
18    statement that safeguards are built into products?
19              MS. DIEL:  Objection.  Vague, ambiguous,
20    incomplete hypothetical.
21    BY MS. MILUSO:
22        Q    As a layperson, have you come across products
23    that incorporate safeguards, in general?
24        A    I still don't know -- I still --
25        Q    Okay, fair enough.  Have you ever used a table
```

Page 102

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                    EHP LARSON 073823

**Page 103**

```
 1    saw?
 2        A    No.
 3        Q    Have you ever used a weed whacker?
 4        A    I don't recall doing that.
 5        Q    Have you ever seen one?
 6        A    Yes.
 7        Q    And on the base of a weed whacker there's a
 8    guard, little strings rip around, and around those
 9    strings is a guard.  Have you ever seen that before?
10        A    No.
11        Q    Okay.  Let's find another product.  Well, just
12    a normal box fan that you would have sitting on your hot
13    patio or whatever, or in your house, the fan, it's just
14    not blades ripping around, right, normally you would see
15    some type of protective housing around the fan?
16        A    There often times is a cover over the fan that
17    has some holes in it.
18        Q    And so there are -- and that would be a
19    safeguard that's integrated into the design itself,
20    right, the fan cover?
21        A    It can be a guard that's present there to
22    reduce the likelihood of contact between the moving blade
23    and fingers, for example.
24        Q    Okay.  Have you ever in your experience come
25    across a different product, a different consumer product,
```

Page 103

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                    EHP LARSON 073824

**Page 104**

```
 1    that had other safeguards built into the product itself
 2    because sometimes the warning was not -- could not be
 3    adequate?
 4        A    Well, the -- I think you're -- your question
 5    assumes that there is -- when there's a situation where a
 6    guard is insufficient, that then there might be warnings
 7    and the warnings are present only when the guard can't
 8    protect sufficiently, but the -- but the problem with
 9    that assumption is that many times there are both guards
10    and safety information, guards and warnings, and in other
11    cases, you have products that have injuries associated
12    with their use and there are no warnings.  The -- tables
13    and chairs have injuries associated with their use and we
14    often didn't have warnings all over our tables or on the
15    surfaces of our chairs, so that kind of mix of what is
16    done differs from product to product.
17        Q    Well, what's the -- if you can, provide me the
18    general, you know, at what point does a product need to
19    have a label on it to warn someone of a risk?  Obviously
20    you just described a chair as one that does not, we know
21    there are risks, you can fall back, you can hit your
22    head, things can happen.  What would be an example of a
23    product where the warning has to be on the product to
24    prevent a risk?
25              MS. DIEL:  Objection.  Vague and ambiguous.
```

Page 104

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                    EHP LARSON 073825

**Page 105**

```
 1        MS. MILUSO:  Let's do household products, for
 2   instance.
 3        MS. DIEL:  Objection, vague, ambiguous,
 4   overbroad, incomplete hypothetical.
 5        THE WITNESS:  To the extent that there were
 6   requirements by law, those would be things that should be
 7   present in terms of warnings.  The -- from a human
 8   factors perspective, we've talked about all the decisions
 9   and things that you might consider about whether to warn
10   or not and we talked about those earlier in the
11   deposition and what things -- what are the -- some of the
12   rules of thumb that you might use to make a decision
13   about warning, and, you know, in this case with clothes
14   dryers, so much of the information that's present here,
15   both on the product and in the manual, is related to fire
16   risk and so there is a significant portion of safety
17   information that's related to different actions that can
18   be taken to reduce the risk of fire.
19   BY MS. MILUSO:
20        Q    Based on your experience as an expert, can you
21   tell me which of those warnings may have been unnecessary
22   because people, like you said before, know things,
23   consumers just -- they know things based on their
24   experience and time and we don't have to warn away.  Are
25   any of the warnings that you saw in the guide anything
```

Page 105

Sarnoff, A VERITEXT COMPANY
877-955-3855

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                    EHP LARSON 073826

**Page 106**

```
 1   that was unnecessary to warn about?
 2        MS. DIEL:  Objection.  Compound, vague and
 3   ambiguous.
 4   BY MS. MILUSO:
 5        Q    Let's look at it, I think that would be fair.
 6   This is the user guide and we'll look at page 3 again.
 7   Are any of these warnings for things that, in your
 8   experience, are unnecessary?
 9        A    Well, I haven't -- I haven't taken and
10   attempted to do an analysis like that.  Some of these are
11   laid out in the guide that's provided under the ANSI
12   standard.  Some of these, as a indicated in my report,
13   are related to patterns that -- on page 5 of my report,
14   patterns of fire-related events involving dryers and --
15   so that information that relates to drying something that
16   might have something -- might have some kind of gasoline
17   or solvent, that's included.  Drying a product that has
18   plastic or foam rubber, that's included.  The lint screen
19   after each load, we talked about that before.  The 18
20   months is contained in here, we've already talked about
21   that.  Using it -- using the equipment without the lint
22   screen if it's block, damaged or missing, that's
23   mentioned as a fire hazard.  So I -- and it goes --
24   there's others in addition.
25        MS. MILUSO:  Let's just take a brief second.
```

Page 106

Sarnoff, A VERITEXT COMPANY
877-955-3855

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                    EHP LARSON 073827

**Page 107**

```
 1        (Discussion off the record.)
 2        MS. MILUSO:  I don't mean to interject, I just
 3   have to have it on the record, I did not receive anything
 4   this morning.  We were -- I just received defendants'
 5   proposed jury instructions from opposing counsel, and for
 6   the record, I did not receive anything this morning.  To
 7   the extent that this is a duplicate of what my office
 8   received on the 8th, I believe your office filed your
 9   proposed jury instructions on the 4th and I did receive
10   that filing of your trial, pretrial materials, the jury
11   list -- I'm sorry, the proposed jury instructions,
12   exhibit list, witness list and short statement of the
13   case, I received them on the -- I believe on the 5th via
14   overnight mail -- no, I'm sorry, I was hand-served them,
15   I think, in the office on Tuesday the 5th.  My contention
16   this morning was not that I had not received them, it's
17   that they were due on the 1st is what my understanding of
18   the rules was.  So if this differs, I can't compare right
19   now what I did receive and was served by mail, but I
20   can't contend whether this differs from what was already
21   provided to me.  If it does, then this would be my first
22   time I received it because the only thing I had was what
23   I received earlier in the week that had a proof of
24   service of June 6th.  This has a proof of service of June
25   8th, so I will assume this is new and I haven't seen it
```

Page 107

Sarnoff, A VERITEXT COMPANY
877-955-3855

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                    EHP LARSON 073828

**Page 108**

```
 1   before.
 2        MS. DIEL:  Okay.
 3        MS. MILUSO:  Okay.  Thank you.  I said it was
 4   defendants' proposed jury instructions, okay.  Thanks.
 5        Q    We were on page 5 and you were talking about
 6   your -- that your belief that these -- the instructions
 7   provided met the ANSI standards and a lot of the other
 8   instructions in the use and care guide are probably
 9   derived from the requirements at least laid out in the
10   ANSI standard; would you agree with that?
11        A    They certainly are aspects of the ANSI standard
12   that relate to the content of this information of the use
13   and care guide.
14        Q    Do you think that the -- we talked about cost
15   of compliance and I don't know what is the appropriate
16   word but maybe you do, we talked earlier about if there's
17   a lot of things and there's a lot of warnings you're less
18   likely to -- consumers may be less likely to follow them.
19   Do you think that, in your opinion, that this -- okay,
20   redefine what I said earlier -- or what you said earlier
21   about the amount of things -- amount of warnings and how
22   that affects a consumer.
23        A    Well, the amount of information impacts the
24   amount of effort that will have to be spent to process
25   all the information, that's -- that's -- and then it puts
```

Page 108

Sarnoff, A VERITEXT COMPANY
877-955-3855

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                    EHP LARSON 073829

**Page 109**

```
 1   more demands on trying to remember it and retrieve it and
 2   all those kinds of things.  The issue is that there's a
 3   lot of information here and most of it is here for
 4   reasons that relate to safety and you're talking about --
 5   you're suggesting -- or what's been raised here is that
 6   some of this information should be moved over to the
 7   dryer itself, but then that increases the amount of
 8   information that's on the dryer, and the idea is to
 9   strike a balance between information that's on the
10   product itself and then all the information that can be
11   put into a manual.
12       Q.   Okay.  So it's your opinion that it was --
13   these are adequate warnings to be provided in a manual as
14   opposed to on the product?
15       A.   In my opinion the decisions that have been made
16   by Electrolux and the location of the information and the
17   content of the information as it relates to fire hazards,
18   these are reasonable decisions and the warnings that are
19   provided are adequate.
20       Q.   Okay.  Is the ANSI standard a law?
21       A.   No.
22       Q.   Is a manufacturer required to follow the ANSI
23   standard?
24       A.   No.
25       Q.   And may the -- may a manufacturer provide more
```

**Page 110**

```
 1   warnings than are listed in the ANSI standard?
 2       A.   Yes.
 3       Q.   And when would it be appropriate for -- I'm
 4   sorry, strike that.
 5            When would a manufacturer be -- having met all
 6   the ANSI standards, when would the warnings be inadequate
 7   on a gas clothes dryer?
 8       MS. DIEL:  Objection.  Vague, ambiguous,
 9   overbroad, incomplete hypothetical.
10       THE WITNESS:  The -- if you think of a
11   situation where maybe a product posed some emerging,
12   unique risk that might rise to the level of needing
13   warning that -- that's something that could occur.  These
14   standards are updated periodically and in some
15   situations -- I'm not saying it's true with dryers but in
16   general, sometimes new information becomes available and
17   then changes are made to warnings.  It's an evolving
18   process.
19   BY MS. MILUSO:
20       Q.   And what are the types of things that would
21   lead to a change in the standards, you know, this was a
22   2002 -- I know there was a 1999 -- what types of things
23   would lead to a change in the ANSI standard between, say,
24   2002 and the one that came after that, I don't know what
25   year that was?
```

**Page 111**

```
 1       MS. DIEL:  Objection.  Vague, ambiguous,
 2   overbroad.
 3       THE WITNESS:  Yeah, I don't know specifically
 4   for gas dryers.  I don't know.
 5   BY MS. MILUSO:
 6       Q.   Okay.
 7       A.   I haven't attempted to study that.
 8       Q.   Okay.  Have you looked at the ANSI standard
 9   after this ANSI standard, this 2002 version?
10       A.   I may have.  I don't recall specifically.  I
11   haven't attempted to identify changes.
12       Q.   Okay.  Did you look at any other dryers or any
13   other user guides by any other manufacturer in your
14   research to provide your opinion?
15       A.   Apart from the ones that we've talked about
16   with the furnace and the --
17       Q.   Right, but any other -- have you looked at any
18   other dryer use and care guide for another
19   manufacturer?
20       A.   No, I have not.
21       Q.   Did you look at the one in your home?  The
22   Amana that you have in your home, did you look at that
23   guide?
24       A.   I haven't recently looked at it.
25       Q.   Did you conduct any studies or surveys
```

**Page 112**

```
 1   regarding this case or your work on any of the dryer
 2   cases in general to base your opinion upon?
 3       MS. DIEL:  Objection.  Vague, ambiguous,
 4   overbroad.
 5       THE WITNESS:  I haven't -- I have not conducted
 6   some new data collection in terms of surveying consumers,
 7   if that's what your question is.
 8   BY MS. MILUSO:
 9       Q.   Yes.  If you were to -- did you feel like a
10   survey was unnecessary to derive your opinions?
11       A.   I did.
12       Q.   Okay.  And why wouldn't a survey on consumer
13   behavior with regard to clothes dryers, why wouldn't that
14   be a good basis for your opinion?
15       A.   I --
16       MS. DIEL:  Objection.  Misstates her testimony,
17   vague, ambiguous, overbroad.
18   BY MS. MILUSO:
19       Q.   Let me rephrase.  Could a survey of consumer
20   behavior, could that help you in your -- form your basis
21   on a decision of whether or not the warnings here were
22   adequate?
23       MS. DIEL:  Objection.  Vague, ambiguous,
24   compound.
25       THE WITNESS:  You'd have to give me more
```

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073830
EHP LARSON 073831
EHP LARSON 073832
EHP LARSON 073833

1  information.

2      MS. DIEL:  Incomplete hypothetical.

3      THE WITNESS:  On the face of it, I don't see

4  how it could.

5  BY MS. MILUSO:

6      Q    Well, your opinion that the warnings are

7  adequate, is it not based on any type of consumer

8  behavior?

9      A    It's based on a lot of studies and information

10  gathered over years that address different aspects of

11  warnings and how information is presented on products and

12  the tradeoffs with manuals, and all of those kinds of

13  things have been looked at, so they -- it's based on a

14  whole history of warnings.

15      Q    Let's -- you brought with you the article by

16  John R. Hall, I'm going to mark that as Exhibit K, and

17  it's dated March 2009 and it's from the Natural Fire

18  Protection Association, Fire Analysis and Research

19  Division.  This is also -- this is also called NFPA, I

20  believe is the initials.  This is called Home Fires

21  Involving Clothes Dryers and Washing Machines.

22      (Exhibit K was marked for identification

23      by the court reporter and is attached hereto.)

24  BY MS. MILUSO:

25      Q    Can you tell me why this is in your collection

Page 113

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                    EHP LARSON 073834

---

1  of materials?

2      A    Yes, it relates to, on page 5 of my report, a

3  paragraph -- the second full paragraph, there are a whole

4  series of documents here, the Hall report being one, the

5  CPSC document being another as examples of descriptions

6  of actions that can be taken or that are related to

7  clothing dryer fires.  And in looking at the -- those

8  documents and the information that's contained in them,

9  my conclusion was that the Electrolux warnings and safety

10  information specifically addressed a variety of factors

11  associated with clothes dryer fires, including cleaning

12  of the dryer, and that's what some of this information is

13  related to.

14      Q    Do you know whether these studies included

15  Electrolux dryers?

16      A    The Hall article, whether some of the accounts

17  of information that's in there, whether some of those

18  would involve Electrolux dryers --

19      Q    Yes.

20      A    -- is that your question?

21      Q    Yes.

22      A    I would assume so given that Electrolux dryers

23  are among the population of clothes dryers that are out

24  there.

25      Q    Is there -- you talked about the failure to

Page 114

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                    EHP LARSON 073835

---

1  clean and -- as a cause of fires but you're not an expert

2  in the area of fire cause, are you?

3      A    I think we established early on that I am not a

4  cause and origin person.

5      Q    Okay.  You mentioned in your report that the

6  NFPA includes several safety tips in its report,

7  including the -- cleaning the lint filter before or after

8  each load; right?

9      A    Yes.

10      Q    And if I were to tell you that cleaning the

11  lint filter would not have prevented this fire, how would

12  that affect your opinions?

13      MS. DIEL:  Objection.  Incomplete

14  hypothetical.

15      THE WITNESS:  Well, if that's true, that is

16  still something important to include in safety

17  information to the extent that it might be related to

18  other fires.  What you can't do is design a warning -- or

19  what you shouldn't do is design a warning all around one

20  particular event.

21  BY MS. MILUSO:

22      Q    There are certain things that the manufacturer

23  can do to increase the likelihood that a warning is going

24  to be followed.

25      MS. DIEL:  Objection.  Vague and ambiguous.

Page 115

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                    EHP LARSON 073836

---

1      THE WITNESS:  Well, what a manufacturer can do

2  is have information be available in a location where

3  consumers might interact with it and provide it in a

4  manner that it can be understood.

5  BY MS. MILUSO:

6      Q    And do you think that the use and care guide

7  warning lets a consumer know that lint can accumulate in

8  a place that they cannot see behind the drum, do you

9  think that that adequately warns a consumer of that risk,

10  of that danger?

11      MS. DIEL:  Objection.  Vague, ambiguous,

12  overbroad, incomplete hypothetical.

13      THE WITNESS:  Are you asking in the section

14  about the interior of the dryer, lint screen housing and

15  exhaust duct should be cleaned approximately every 18

16  months by qualified service personnel, is that --

17  BY MS. MILUSO:

18      Q    Yes.

19      A    -- the specific -- an excessive amount of lint

20  build-up in these areas could result in inefficient drying

21  and possible fire?  It included the lint screen warning

22  as well here.  I mean, there are -- within this

23  description, there are indications that parts of the

24  system, the dryer and the exhaust system, aren't --

25  consumers know that these aren't all visible to them and

Page 116

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                    EHP LARSON 073837

**Page 117**

1   it's saying they should be cleaned approximately every 18
2   months, not by the consumer his or herself but rather by
3   a qualified service personnel.
4      Q  Well, there is a cost associated with that,
5   right, with having that service personnel come?
6      A  I think we covered some of that already.
7      Q  Okay.  So in this case, they purchased that
8   agreement, but do you know what the cost would have been
9   if they hadn't purchased the agreement?
10      A  I don't.
11      Q  Do you know what the cost would have been to
12   the Haroutounyans --
13      A  And by "cost" there you're meaning the dollar
14   amount?
15      Q  Dollar amount cost.
16      A  I don't.
17      Q  And what other costs would have been associated
18   with having an authorized service person come, if you
19   think there are any other costs?
20      A  Well, the cost of compliance that -- that term
21   that's used in warnings-related research often does not
22   relate solely to money but rather amount of effort, and
23   some of that's already been talked about in these
24   depositions about having to stay home and wait for
25   somebody to arrive.  Those kinds of things are costs in

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER      EHP LARSON 073838

**Page 118**

1   terms of people's time and effort, calling -- making a
2   call to make the appointment, that requires a certain
3   amount of effort.
4      Q  Okay.  Let's look at the CPSC documents that
5   you referred to, and I believe we'll mark that as L.
6      (Exhibit L was marked for identification
7      by the court reporter and is attached hereto.)
8   BY MS. MILOSO:
9      Q  It's called document 5022, June 2003.  Can you
10   describe what this is.
11      A  This is a document that was issued by the
12   Consumer Product Safety Commission.  It is entitled
13   "Overheated Clothes Dryers Can Cause Fires" and it
14   describes some of the steps to take to help prevent
15   fires.
16      Q  Okay.  And why do you have this here?  What
17   makes this relevant to your opinion?
18      A  This and the document that we just talked about
19   from the NFPA are discussed in the second full paragraph
20   on page 5, and these kinds of actions that CPSC is
21   suggesting are ones that are also in the Electrolux
22   information.
23      Q  Okay.  So the Consumer Product Safety
24   Commission warning, there are these -- I guess it's a
25   warning, right, or it's a document, I don't know, a

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER      EHP LARSON 073839

**Page 119**

1   document?
2      A  It's a document.  It can be -- it's certainly
3   information intended for consumers about dryer fires.
4      Q  Okay.  I'd like to read in the first sentence
5   at the top there and I'm assuming it's the reason why
6   this was issued.  It says, "The U.S. Consumer Product
7   Safety Commission estimates that in 1998 clothes dryers
8   were associated with 15,600 fires, which resulted in 20
9   deaths and 370 injuries.  Fire can occur when lint builds
10   up in the dryer or in the exhaust duct.  Lint can block
11   the flow of air, cause excessive heat buildup and result
12   in a fire in some dryers."  Do you -- it's not clear,
13   though, from here any specific dryers; right?
14      A  That's right.
15      Q  And I'm sorry, it was your testimony that all
16   of these warnings exist in the documents that were
17   provided to the consumer in this case?
18      A  The -- these topics are covered in the
19   materials that Electrolux provides.  I'm not saying that
20   it's the same words, exact same words, but similar
21   messages.
22      Q  Okay.  Let's go to what we talked about earlier
23   a little bit, the documents you brought with you as a
24   comparison of maintenance and/or warnings.  We started
25   talking about the gas furnace and so I want to understand

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER      EHP LARSON 073840

**Page 120**

1   why this is relevant to our case about a dryer?
2      A  Well, one of the -- one of the points that
3   Dr. Doris made was that he seemed to think that other
4   appliances generally didn't have suggestions about
5   maintenance, periodic maintenance, and that that would be
6   unusual.  And what I'm indicating here or providing some
7   examples of is appliances that are common -- commonly
8   found in people's homes, a gas furnace is one example and
9   the water heater as another example and suggests that
10   periodic maintenance be done on these appliances.  And
11   then I also included excerpts of pages of a motor vehicle
12   manual.
13      Q  So this installation instructions that come
14   with the furnace, let's mark those as Exhibit M.
15      (Exhibit M was marked for identification
16      by the court reporter and is attached hereto.)
17   BY MS. MILOSO:
18      Q  What's types of periodic maintenance is
19   required in this specific gas furnace that you brought
20   along with you?
21      A  There is a section in the table of contents
22   that says "Regular dealer maintenance," and if you turn
23   to page 7 it talks about the blowers, and the annual
24   cleaning of the blower wheel and housing is recommended.
25   For maximum air output, this must be performed only by

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER      EHP LARSON 073841

**Page 121**

1  qualified servicer or service agency.

2      Q    Does it mention the risk of fire?

3      A    I'm not sure that it is specific to fire, but

4  it's in a -- there's a section of hazardous gases,

5  there's a section about not altering the unit, there's

6  carbon monoxide poison hazard warnings in here.  I'm not

7  saying that these -- that maintenance of all of these

8  different appliances that I've provided examples of are

9  specific to fire but rather that there are

10  recommendations for periodic maintenance of appliances

11  that are common appliances for the home that are found in

12  users guides and information that is -- accompanies a

13  product.

14      Q    Okay.  You brought with you also the

15  instructions for a gas water heater.  Can you point me to

16  where the service maintenance -- sorry.  I'll mark that as

17  Exhibit N.

18          (Exhibit N was marked for identification

19          by the court reporter and is attached hereto.)

20          THE WITNESS:  On page 20 under the section on

21  maintenance there are suggestions that at least every

22  three months a visual inspection should be made of the

23  venting and air supply system, piping systems, main

24  burner and pilot burner, check the water heater for the

25  following and then it has four different items under

**Page 122**

1  that, including obstructions, damage or deterioration in

2  the venting system and the build up of soot and carbon on

3  the main burner and pilot burner, so there are a number

4  of different aspects that are suggested there.

5  BY MS. MILUSO:

6      Q    And you talked about a car and we should get

7  into that a little bit.  I'll mark this car maintenance

8  manual here as Exhibit O.

9          (Exhibit O was marked for identification

10          by the court reporter and is attached hereto.)

11  BY MS. MILUSO:

12      Q    Why is this car maintenance document

13  relevant?

14      A    Again, it's -- a car is a product that many

15  consumers will have.  They will be familiar with the fact

16  that not every warning related to a car that might be --

17  that might come from the vehicle's manufacturer will be

18  on the vehicle or in the occupant compartment itself and

19  that there will be other information in a manual that

20  will be related to maintenance and servicing, and these

21  are just some of the pages from a Camry 2006 about

22  maintenance and servicing.

23      Q    Do you think the average car consumer knows

24  without reading this that they are required to do regular

25  maintenance on their vehicle?

**Page 123**

1      A    I don't know that they know that they're

2  required to.  I would think that people who have owned

3  cars and have looked at their motor vehicle manual would

4  be aware that that was something that was recommended by

5  the vehicle manufacturer.

6      Q    Okay.  And do you think that they know that

7  it's recommended that they do this service even if they

8  don't read this?

9      A    I think they might know that there would be

10  information in the manual that would contain those

11  recommendations even if they don't read it.

12      Q    Do you have a car?

13      A    I do I have a car.

14      Q    Do you do regular service on your car?  Do you

15  bring it in for regular service?

16      A    I do.

17      Q    And when do you do that?

18      A    I try and do it in accordance with the

19  manufacturer's recommendations.

20      Q    How often do you refer to your instructions

21  that came with your car?

22      A    Oh, I don't know.  I don't know how often I

23  look at those.

24      Q    Do you have -- is there like a sticker in your

25  car maybe that says get your oil changed every -- you

**Page 124**

1  know, so at this point when you hit these miles, get your

2  oil changed; do you have that?

3      A    I do have a sticker that the place where I have

4  the car serviced puts that on.

5      Q    And is that one of the -- is that one of the

6  indicators for you that, oh, gosh, I should go bring my

7  car in, is that something that reminds you?

8      A    It is something that I use, yes.

9      Q    What else do you use to remind yourself to

10  bring your car in for regular service?

11      A    I have a sense of how many miles I drive in a

12  month and that is useful.  I also have an odometer that

13  tells me how many miles I've driven.

14      Q    And when was the last time you had your car

15  serviced?

16          MS. DIEL:  Objection.  Relevance.

17  BY MS. MILUSO:

18      Q    The same question was asked of my expert, I'm

19  entitled to ask the question.

20      A    I believe it was last year.

21      Q    And do you remember why you brought it in?

22      A    I think it was a major service, like 65,000

23  miles or something.

24      Q    Okay.  And other than those major services and

25  getting your normal oil change, when else have you

**Page 125**

```
 1   brought your car in for service for, like what other
 2   instances led you to bring your car in for service?
 3       A    If there was something unusual in its
 4   performance.  I'm trying to think of an example.  I'm
 5   sure that that has occurred in my lifetime of driving
 6   cars.
 7       Q    Can you think of the last time you had someone
 8   in your home to service one of your appliances?
 9            MS. DIEL:  Objection.  Irrelevant.
10            THE WITNESS:  Yes, I can think of that.
11   BY MS. MILUSO:
12       Q    Okay.  When was the last time someone came into
13   your home to service an appliance?
14       A    Within the last two years I've had somebody
15   come out and service the furnace.
16       Q    Okay.  And did you -- why -- what led to that
17   service visit, did you call them?
18       A    I did, I called them.
19       Q    Do you have a normal service agreement with
20   this company?
21       A    I don't.
22       Q    And why did you call them?
23       A    The furnace itself has a filter in it and the
24   recommendation was to have somebody who knows something
25   about furnaces do the monitoring of it and check it and
```

**Page 126**

```
 1   check the furnace out.
 2       Q    What -- do you have any other products in your
 3   home that you had serviced in the last five years that
 4   you can think of?
 5       A    I've had the chimney checked, I've had a lot of
 6   products replaced.
 7       Q    Why did you have a product replaced?
 8       A    The toilet just wasn't working anymore.
 9       Q    And when -- I mean, do you have a dishwasher in
10   your home?
11       A    I do.
12       Q    And do you have that regularly serviced?
13       A    It's -- I have not had to have that serviced.
14       Q    Do you have a stove in your home?
15       A    I do.
16       Q    Have you had that regularly serviced?
17       A    I have not.
18       Q    And I think at some point earlier you told me
19   that you had a service agreement for a dryer.  Do you
20   have one on the Amana that you currently now in your
21   home?
22       A    No.
23       Q    Have you had anyone to regularly service your
24   Amana dryer?
25       A    I don't recall having done that.
```

**Page 127**

```
 1       Q    Do you recall your instructions telling you to
 2   have someone regularly service your dryer?
 3       A    I don't; they could be there.
 4       Q    Okay.  I'm almost done.  Other than what you've
 5   put in your report regarding your issues with Mr. Doris's
 6   report, do you have any other concerns or issues with any
 7   of plaintiffs' positions in their expert reports?
 8       A    Beyond what's in my report?
 9       Q    You talked a little bit about Mr. Parsons and
10   Mr. Stoddard's warnings and you cite on page 6, for
11   example, in their report they call for the addition of
12   three lights on the front of the dryer, one each next to
13   the messages, clean exhaust system or check exhaust
14   system, service dryer soon and service dryer now.  Do you
15   have any opinions about these -- the monitoring system
16   they recommended?
17       A    I have -- in the next paragraph I talk about
18   some issues that can be related to attempts to deal with
19   those types of warning system and having -- what kind of
20   consumers responses you can get so that when the -- they
21   ultimately get to them, possibly having the dryer shut
22   down, disengage the heating element.  Although it wasn't
23   all laid out clearly enough for me to understand, but
24   there have been certainly other circumstances where these
25   kinds of interlocks have been proposed for other products
```

**Page 128**

```
 1   that have met with a great deal of consumer resistance
 2   when they were confronted with -- and I use the example
 3   of the interlock on seat belts where a car wouldn't start
 4   unless you had your seat belt already fastened.  There
 5   are other kinds of interlocks that I know are sometimes
 6   intentionally overridden by some consumers and then
 7   there's the example in the consumer reports review that
 8   looked at the indicators on some dryers that were
 9   available in 2010 that determine that the current
10   indicators on those particular appliances were too
11   inconsistent to be able to trust.
12       Q    Have you brought a copy of this consumer --
13       A    I don't think I have that with me.
14       Q    Okay.  I would like a copy of it.
15            Cathy, on the record, I'd like a copy of the
16   consumer reports, July 2010.
17            THE WITNESS:  I apologize for that, that should
18   be here but I did not bring it.
19   BY MS. MILUSO:
20       Q    And did you bring a copy of the laws -- Public
21   Law 93492?
22       A    I didn't.  Those are all very public laws.
23       Q    Okay.  I'll be able to find them, I'm assuming.
24   Are these in California or are they federal?
25       A    They're federal.
```

Sarnoff, A VERITEXT COMPANY
877-955-3855

CONFIDENTIAL - SUBJECT     EHP LARSON 073846
TO PROTECTIVE ORDER

CONFIDENTIAL - SUBJECT     EHP LARSON 073847
TO PROTECTIVE ORDER

CONFIDENTIAL - SUBJECT     EHP LARSON 073848
TO PROTECTIVE ORDER

CONFIDENTIAL - SUBJECT     EHP LARSON 073849
TO PROTECTIVE ORDER

**Page 129**

```
 1      Q   Okay.  Do you have any issue, generally, with
 2  active monitoring systems on products?  Do you think that
 3  they are helpful?
 4      A   The -- I think it will -- I think it will
 5  depend.  It's very specific to the equipment and what
 6  kind of response you might get, so I indicated here that
 7  just proposing this doesn't necessarily result in the
 8  consumer response that you want and we have examples of,
 9  in the past, where that has occurred and we have examples
10  where -- in other situations on dryers where they may not
11  be reliable enough for consumers to count on.  So
12  certainly in some kinds of circumstances they have been
13  known -- for example, smoke detectors, they have
14  dramatically cut the risk of fires, numbers of fires,
15  actually, and injuries and fatalities associated with
16  fires, and they -- there's a -- kind of an active alarm
17  that has been very effective.
18      Q   Do you have any reason to believe that an
19  active monitoring system would not be effective in this
20  case, based on what you know as an expert in your
21  research?
22      A   The consumer reports article is specific to
23  dryers and their determination was that they didn't
24  behave in a reliable manner, and if you have indicators
25  that are not reliable, are not -- are coming on when they
```

**Page 130**

```
 1  shouldn't come on or are not coming on when they should
 2  come on that -- then that information gets discounted and
 3  ignored.
 4      Q   Does it get -- do you have any opinion whether
 5  it gets ignored more than the user guide or manual?
 6      A   I don't have -- I don't have any opinion about
 7  that, no.
 8      Q   Okay.  It's not uncommon, is it, that a
 9  consumer doesn't read the manual, is it?
10          MS. DIEL:  Objection.  Overbroad, vague and
11  ambiguous, incomplete hypothetical.
12          THE WITNESS:  I think we've talked about when
13  it is that consumers will read manuals, some of the
14  factors that prompt a consumer to read a manual, you
15  know, they're seeking information, the product might be
16  unfamiliar, it might be perceived as unusually hazardous
17  but those kinds of things are more likely to result in
18  consumers looking at information, but some of it is going
19  to be specific to the consumer, some of it's going to be
20  related to aspects of the product, some of it's going to
21  be in the environment that it exists in, so there's not
22  some percentage that you can say, this is what it is for
23  all product manuals, all products.
24  BY MS. MILUSO:
25      Q   Okay.  Let me just collect everything and make
```

**Page 131**

```
 1  sure I mark it.  I believe you brought some deposition
 2  indices with you?
 3      A   Yes.
 4      Q   Are these documents that you made?
 5      A   My staff did.
 6      Q   Your staff did, and did your staff -- is what
 7  you've brought here today other than the consumer report
 8  article that we talked about and the contents of the CD,
 9  which for the most part are here --
10      A   Yes.
11      Q   -- did -- is this the totality of the
12  information other than what you know from your own
13  experience that you relied upon to make your opinion?
14      A   Yes, it represents the case specific
15  information that I've got, plus the information that I
16  looked at specific to writing my report.
17      Q   Okay.  Did you read the depositions of the
18  insureds in this case?
19      A   I have.
20      Q   You have, and have you reviewed these indices
21  that your staff prepared for accuracy?
22      A   I have -- well, not for accuracy.
23      Q   Just reviewed them?
24      A   I have reviewed them, yes.
25      Q   Okay.  I'm going to mark your indices here as
```

**Page 132**

```
 1  Exhibit P.  I don't know if we marked this Sears
 2  protection agreement.
 3          (Exhibit P was marked for identification
 4      by the court reporter and is attached hereto.)
 5          MS. DIEL:  I don't think so.
 6          MS. MILUSO:  All right.  Let's just mark that
 7  as Q, I just want to make sure we all know what happened
 8  here.  I think everyone has a copy of that.
 9          (Exhibit Q was marked for identification
10      by the court reporter and is attached hereto.)
11          MS. MILUSO:  Just give me one moment and I'll
12  finish up.
13      Q   Can you tell me -- you said you do litigation
14  work at least 65 percent of the time, can you tell me
15  what you do the other 35 percent of the time?
16      A   Yes.  I develop safety information, I do perform
17  risk analysis, I look at -- I get involved in the design
18  of products from a human factors perspective, I assist
19  clients that encounter issues that are being raised by
20  regulatory agencies.
21      Q   What types of issues are raised by regulatory
22  agencies that you get brought in on in a case like
23  that?
24      A   They can be a concern about a particular aspect
25  of a product, tipovers and catch points and entrapments
```

**Page 133**

```
 1  and it can be a whole variety of different aspects.
 2       Q    And often times is one of the agencies the
 3  Consumer Products Safety Commission?
 4       A    Yes.
 5       Q    And do you -- do you get brought in on cases
 6  when reports have been made to the Consumer Products
 7  Safety Commission about problems with products?
 8       A    It sometimes relates to information that has
 9  come into the Consumer Products Safety Commission that
10  that agency has concerns about.
11       Q    Have you ever been retained by the Consumer
12  Products Safety Commission to study inadequacy of a
13  warning?
14       A    No, I don't think so.
15       Q    Have you consulted specifically for the
16  Consumer Product Safety Division?
17       A    Within Exponent, I have.
18       Q    In what circumstances did you do that?
19       A    It related to a softball, some particular
20  aspect of it.  I can't remember now whether it was size
21  or hardness of it and people's ability to use that kind
22  of a ball.
23       Q    The company you work for is Exponent, would
24  that be accurate?
25       A    Yes.
```

Page 133

Sarnoff, A VERITEXT COMPANY
877-955-3855

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073854

**Page 134**

```
 1       Q    And we talked about the cases that you've
 2  worked on for Electrolux regarding dryers, have you -- do
 3  you know if anyone else at Exponent has been retained by
 4  Electrolux or has worked on Electrolux cases?
 5       A    Well, a man by the name of Dwayne Stephie
 6  (phonetic) has done so.
 7       Q    Do you know those cases and what the
 8  circumstances of those were?
 9       A    Well, I don't -- I don't know all of them but
10  he has done some statistical analysis that -- jointly
11  with me, and I believe Tray Morrison.
12       Q    Does Tray Morrison work for Exponent?
13       A    Yes.
14       Q    And in what context, what's his specialty?
15       A    Thermal scientist.
16       Q    Has he worked with you on any of the cases you
17  talked about today, Slabach or Powers or this case?
18       A    We -- I have not worked with him.  I believe
19  that he's been involved in doing some cases.
20       Q    Have you ever talked with him about any of the
21  cases that you've worked on?
22       A    I don't -- I don't recall having done so.
23       Q    Okay.  Do you have any opinions outside of what
24  we discussed today or what's in your report regarding
25  this case?
```

Page 134

Sarnoff, A VERITEXT COMPANY
877-955-3855

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073855

**Page 135**

```
 1       A    I don't think so.  Whatever you might ask me at
 2  trial, but I think we've covered, between the deposition
 3  and the report, what I would expect to testify to.
 4       Q    Okay.  We requested your billing and
 5  information, I believe, in our deposition notice.  Did
 6  you bring any of your billing information related to this
 7  case with you?
 8       A    We have not submitted an invoice yet.
 9       Q    Can you tell me how many hours, if you know,
10  that you've worked on this case or an estimate?
11       A    I hesitate to give you an estimate --
12       Q    More than ten?
13       A    -- it's too much of a guess.
14       Q    Less than ten?
15       A    It's going to be more than ten.
16       Q    More than fifteen hours?
17       A    I don't know.
18       Q    Well, I'd like your billing information.
19            Cathy, I'll just put on the record, I'd like
20  any invoice that you have received or some estimate on
21  her time, if possible, if she can provide that.  Even if
22  it's a partial invoice, I think we should be able to
23  obtain that.
24            MS. DIEL:  Okay.
25            MS. MILUSO:  Okay.
```

Page 135

Sarnoff, A VERITEXT COMPANY
877-955-3855

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073856

**Page 136**

```
 1       Q    And do you know how many hours you've spent
 2  since June 4th on this case?
 3       A    Basically preparing for the deposition.
 4       Q    And what did you do to --
 5       A    And traveling and --
 6       Q    What did you do to prepare for the
 7  deposition?
 8       A    I went back over the report, I went back over
 9  the deposition testimony, I looked at Dr. Doris's
10  testimony, basically I reviewed the various materials,
11  particularly those that I brought to the deposition.
12       Q    Did any of your opinions change since you've
13  written your report based on any new information that
14  you've reviewed?
15       A    No.
16            MS. MILUSO:  Okay.  I'll just state one more
17  time for the record, we'd like a copy of the Consumer
18  Reports article, we'd like a copy of any billing or
19  interim billing or some estimate of time, even if it's
20  notes, and I think we've been provided --
21            I'm sorry, how much do you charge per hour for
22  testimony?
23            THE WITNESS:  The company bills my time at $440
24  an hour and that's regardless of what I'm doing.
25  BY MS. MILUSO:
```

Page 136

Sarnoff, A VERITEXT COMPANY
877-955-3855

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073857

**Page 137**

```
 1      Q    So your research time versus your deposition

 2  transcript -- I mean, deposition time is the same?

 3      A    Yes.

 4      Q    And is your testimony at trial the same as

 5  well?

 6      A    It is.

 7           MS. MILUSO:  Okay.  Let's go off the record for

 8  a second.

 9           (Discussion off the record.)

10           MS. MILUSO:  The parties have agreed to receive

11  a copy of the transcript via e-mail on Monday, June 11,

12  the day of the start of trial.  Ms. Wood will make best

13  efforts to review that as quickly as possible and get her

14  signature page done and her errata done as quickly as

15  possible.  If there's a date -- maybe if we don't

16  receive -- I know it's a little ambiguous, but if we

17  don't receive an errata or a signature prior to the

18  testimony of Mr. Doris, then we'll accept that -- her

19  testimony and -- as basically a waiver of signature and

20  accept that as a final version.

21           MS. DIEL:  The only thing is that Whalen

22  (phonetic) would not stipulate to that with me when I

23  took depositions.  He would only stipulate that the

24  witness used best efforts and that I use best efforts and

25  he used best efforts to have the witness review the
```

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                          EHP LARSON 073858

**Page 138**

```
 1  testimony as soon as possible and communicate the

 2  information between the attorneys as quickly as

 3  possible.

 4           MS. MILUSO:  Okay.  Well, we'll use that same

 5  stipulation and if there's -- for some reason Mr. Doris

 6  testifies prior to Ms. Wood then maybe the parties can

 7  have a brief conversation as to whether or not they think

 8  Ms. Wood is going to have any changes.

 9           MS. DIEL:  Agreed.

10           MS. MILUSO:  So stipulated.

11

12           (TIME NOTED:  6:39 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                          EHP LARSON 073859

**Page 139**

```
 1

 2

 3

 4

 5

 6

 7

 8           I, CHRISTINE TALBOT WOOD, do hereby declare under

 9  penalty of perjury that I have read the foregoing

10  transcript; that I have made any corrections that appear

11  noted, in ink, initialed by me, or attached hereto; that

12  my testimony as contained herein, as corrected, is true

13  and correct.

14           EXECUTED this _____ day of _____,

15  2012, at _____, _____.

16

17

18

19           _____

20                 CHRISTINE TALBOT WOOD
                      VOLUME I
21

22

23

24

25
```

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                          EHP LARSON 073860

**Page 140**

```
 1

 2

 3

 4           I, the undersigned, a Certified Shorthand

 5  Reporter of the State of California, do hereby certify:

 6           That the foregoing proceedings were taken before me

 7  at the time and place herein set forth; that any

 8  witnesses in the foregoing proceedings, prior to

 9  testifying, were placed under oath; that a verbatim

10  record of the proceedings was made by me using machine

11  shorthand which was thereafter transcribed under my

12  direction; further, that the foregoing is an accurate

13  transcription thereof.

14           I further certify that I am neither financially

15  interested in the action nor a relative or employee of

16  any attorney or any of the parties.

17           IN WITNESS WHEREOF, I have this date subscribed my

18  name.

19

20  Dated:  6/11/12

21

22

23           _____

24                 RAMONA LUX
                     CSR No. 12846
25
```

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                          EHP LARSON 073861

INSTRUCTIONS FOR READING/CORRECTING YOUR DEPOSITION

To assist you in making corrections to your deposition testimony, please follow the directions below. If additional pages are necessary, please furnish them and attach the pages to the back of the errata sheet.

This is the final version of your deposition transcript.

Please read it carefully. If you find any errors or changes you wish to make, insert the corrections on the errata sheet beside the page and line numbers.

If you are in possession of the original transcript, do NOT make any changes directly on the transcript.

Do NOT change any of the questions.

After completing your review, please sign the last page of the errata sheet, above the designated "Signature" line.

**ERRATA SHEET**

| Page | Line | |
|------|------|---|
| ____ | ____ | Change: _____ |
| | | Reason: _____ |
| ____ | ____ | Change: _____ |
| | | Reason: _____ |
| ____ | ____ | Change: _____ |
| | | Reason: _____ |
| ____ | ____ | Change: _____ |
| | | Reason: _____ |

| Page | Line | Change: _____ |
|------|------|---|
| ____ | ____ | Reason: _____ |
| | | Change: _____ |
| ____ | ____ | Reason: _____ |
| | | Change: _____ |
| ____ | ____ | Reason: _____ |
| | | Change: _____ |
| ____ | ____ | Reason: _____ |
| | | Change: _____ |
| ____ | ____ | Reason: _____ |
| | | Change: _____ |
| ____ | ____ | Reason: _____ |
| | | Change: _____ |
| ____ | ____ | Reason: _____ |
| | | Change: _____ |

_____ Subject to the above changes, I certify that the transcript is true and correct.

_____ No changes have been made. I certify that the transcript is true and correct.

_____     _____
Signature                    Date

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER
EHP LARSON 073862

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER
EHP LARSON 073863

---

**Exponent**
Failure Analysis Associates

May 3, 2012

Cathy Mailer Diehl, Esq.
Frindle, Anram, Goetz, Hillyard, Barnes & Reiboltz LLP
510 Golden Shore, 4th Floor
Long Beach, CA 90802

Subject: State Farm (Herrontrojan) v Electrolux
Project No. 1204640.002

Dear Mr. Diehl:

Thank you for retaining Exponent Failure Analysis Associates (Exponent) for technical services related to the above-referenced matter. This letter presents our current understanding of the scope of services sought and terms of the engagement.

All work will be completed on a time and expense basis. Exponent charges my time at a rate of $640 an hour, including deposition and trial.

Exponent's services will be provided on a time-and-expense basis. Charges will include professional fees (commensurate with the level of expertise of the personnel assigned to the project), equipment usage fees, and other out-of-pocket expenses according to our Schedule of Rates & Charges, a copy of which is enclosed and made a part hereof by reference.

Exponent's services are provided only in accordance with our Terms and Conditions of Agreement, a copy of which is enclosed and made a part hereof by reference. It is our understanding that Exponent's retention on this project is solely with your organization and all charges (i.e., fees and expenses) incurred by Exponent on this project will be the responsibility of Frindle, Anram, Goetz, Hillyard, Barnes & Reiboltz LLP, independent of other participants involved. If our understanding is not correct and your organization is not responsible for these charges, please have the responsible party sign this letter to signify that the terms are acceptable and Exponent is authorized to commence work as described herein. If invoices should be mailed to an address other than the one above, please provide that information with the signed letter.

Based on the information you have provided, we have performed a conflict-of-interest check for the following parties:

- Herrontrojan

Ⓐ

Ex

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER
EHP LARSON 073864

---

Cathy Mailer Diehl, Esq.
May 3, 2012
Page 2

- State Farm
- Electrolux
- Sears

Using this information, Exponent has determined that it does not currently have a conflict that would preclude us from assisting you in this matter. Please inform me as soon as possible if this list of parties is incomplete or incomplete, or if other parties become involved as this matter proceeds.

Pursuant to our Terms and Conditions of Agreement, it is the policy of Exponent to request a retainer of $3,000. The retainer will be held on account until the final invoice has been issued. At that time, you will have the option of paying the invoice in full and requesting a refund of your retainer or applying the retainer against the final invoice. Exponent will begin work after the retainer is received. Exponent's Federal tax ID number is 77-0218004 and is included on all invoices.

Please indicate your understanding and acceptance of the terms of retention by signing and returning a copy of this letter along with your retainer. This proposal is valid for 30 calendar days. If you have any questions or require additional information, please do not hesitate to contact me at (650) 688-7134. We look forward to working with you.

Sincerely,                        Accepted by:

Christine Wood                    _____
                                  Authorized Signature

Christine T. Wood, Ph.D.          Cathy Diehl
Principal Scientist               Name and Title
Director, Human Factors
(650) 688-7134 Direct             Frindle Anram
(650) 328-2981 Fax                Organization
cwood@exponent.com
                                  5-7-12
Enclosures (3)                    Date

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER
EHP LARSON 073865

Ex

LAW OFFICES OF
**PRINDLE, AMARO, GOETZ,**
**HILLYARD, BARNES & REINHOLTZ LLP**

310 Golden Shore, Fourth Floor
Long Beach, California 90802
TELEPHONE: 562.435.3006
FAX 562.436.0384
PRINDLELAW.COM

May 8, 2012

**VIA OVERNIGHT**

Christine T. Wood, Ph.D.
Exponent
149 Commonwealth Drive
Menlo Park, CA 94025

Re: *State Farm General Insurance Company (Haroutounyan) v. Electrolux Home Products, Inc., et al.*
Our File No.: WHH0254

Dear Dr. Wood:

Please find enclosed the following documents:

(1) Complaint;

(2) Deposition transcripts and exhibits of the insureds, Mel Haroutounyan and Almoush Adanian;

(3) Deposition transcript of Larry Brown (Plaintiff's C&O), and the photograph he took at the scene;

(4) Report of Larry Brown;

(5) Report of Alan Durris;

(6) Report of Michael Stoddard and Ron Parsons and appendix;

(7) Warnings provided for the dryer;

(8) Use & Care Guide; and

(9) Installation Instructions.

---

LAW OFFICES OF
PRINDLE, AMARO, GOETZ,
HILLYARD, BARNES & REINHOLTZ LLP

Christine T. Wood, Ph.D.
Re: State Farm General Insurance Company (Haroutounyan) v. Electrolux Home Products, Inc. et al.
**May 3, 2012**
Page 2

Would you please contact us after you have had a chance to review the documents?

Very truly yours,

PRINDLE, AMARO, GOETZ,
HILLYARD, BARNES & REINHOLTZ LLP

BY: CATHY MULLER DIEHL

CMD:mlc

---

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER                    EHP LARSON 073866

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER                    EHP LARSON 073867

---

**E^xponent**
*Failure Analysis Associates*

June 4, 2012

Cathy Muller Diehl, Esq.
Prindle, Amaro, Goetz, Hillyard, Barnes & Reinholtz LLP
310 Golden Shore, 4th Floor
Long Beach, CA 90802

Subject: State Farm (Haroutounyan) v Electrolux
Project No. 1204640.002

Dear Ms. Diehl:

I am writing to summarize the work undertaken by Exponent® Failure Analysis Associates in connection with human factors issues in the above-referenced case and the conclusions reached on the basis of work to date.

I received a Bachelor's Degree in psychology with Distinction and Honors from Stanford University and hold a Ph.D. in experimental psychology also from Stanford University. I am a Principal Scientist and Director of the Human Factors Practice at Exponent. I am involved in the analysis and evaluation of human behavior in response to information intended to change behavior and reduce injury rates. I have studied the area of human information processing, including the specific context of processing safety information associated with products under various circumstances. I have written extensively on the subject of human information processing, safety information, and warning label development. I have applied experimental design and statistics for the purpose of measuring the effectiveness of warnings. I am a member of the Human Factors and Ergonomics Society, the American Educational Research Association, and the Society for Risk Analysis.

A list of my publications can be found in the copy of my resume, which is attached. Exponent currently charges my time at a rate of $440 an hour.

Over the past 30 years, a sizable amount of literature has developed on behavioral responses to risk communications. Significant reviews of and annotated guides to the literature for different periods and content areas can be found in McCarthy et al. (1984), Ayres et al. (1994, 1998), Miller & Lehto (2001), and Deloy et al. (2006). Key factors considered in the scientific literature include the likely effectiveness of providing a warning about a particular hazard (e.g., Deloy et al., 2006; Sonmersal et al., 1985; Ayres et al., 1994; Arndt et al., 1998; Durris & Purswell, 1977), labeling directives presented by regulatory agencies and in relevant standards and guidelines (e.g., Sala et al., 2010; Wood et al., 2006; Diedrich et al., 2001), relationships

---

Cathy Muller Diehl, Esq.
June 4, 2012
Page 2

between the number of warnings presented and attention and memory (e.g., Chen et al., 1997; Durris, 1991; Frantz et al., 1999), the likely effect of formatting and the inclusion of specific warning elements on compliance (e.g., Young et al., 2002; Guo et al., 2003; Weatherby et al., 2001), individuals' acceptance of communication and motivation to alter behavior (e.g., Wogalter et al., 1989; Ranuati et al., 1996; Sonmersal et al., 1995), the effect of media and publicity (e.g., Sonmersal, et al., 1992; Kerpelman, 1978), and the selection of hazards to warn about based on the highest potential impact, in terms of injury context, risk analysis, or accident mode analysis (e.g., McCarthy et al., 1995; Ayres & Wood, 1995). The significant body of literature to which these studies belong allows for scientific investigation as to what, when, where, and how warnings could be provided and the likely impact they are to have on human behaviors. The results and evolving knowledge base have in some instances been incorporated by regulatory agencies with respect to safety information and has shaped specific guidance statements (Sala et al., 2010). Based on a synthesis of findings from published scientific studies, frameworks have been developed to identify factors that must be present for a warning to result in reductions in harmful behaviors (Ayres et al., 1994).

Based on the review of the supplied materials, I have the following understanding of the incident:

On the evening of November 23, 2008, a fire occurred, which allegedly originated in the dryer, on a residential property belonging to Mel Haroutounyan and Almoush Adanian in Glendale, California.[1] On the day of the incident, Ms. Adanian testifies that she dried half a load of laundry for 15 to 30 minutes and turned the dryer off before leaving the house.[2] Ms. Adanian testifies after they got home she turned the dryer back on to fully dry the clothes, which were damp.[3] The testimony suggests that after the dryer was operating for approximately three to ten minutes, Ms. Adanian smelled a burning smell, notified her husband, and they and their son left the house.[4] The fire department responded to the fire.[5] No one was injured in the fire.

The incident dryer is a Kenmore gas dryer, model 417.91142200, manufactured by Electrolux.[6] The dryer was purchased by Mr. Haroutounyan and Ms. Almoush Adanian on April 13, 2005 from Sears.[7]

---

[1] Glendale Fire Department Incident Report; Complaint for Property Damage
[2] Adanian, pp. 44, 46-47
[3] Adanian, p. 46-47
[4] Adanian, pp. 47-50, Haroutounyan, pp. 56-58, 58-59
[5] Glendale Fire Department Incident Report
[6] Purchase information from Sedgwick CMS; Deposition of Mel Haroutounyan ("Haroutounyan"), pp. 21-23; Deposition of Almoush Adanian ("Adanian"), pp. 18-19
[7] Purchase information from Sedgwick CMS; Haroutounyan, pp. 21-23; Adanian, pp. 18-19

---

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER                    EHP LARSON 073868

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER                    EHP LARSON 073869

Cathy Muller Diehl, Esq.
June 4, 2012
Page 3

It is alleged that the dryer failed to contain adequate warnings or instructions with regard to fire hazards and a potential for lint to accumulate within the dryer cabinet and gas burner and ignite a fire.[5]

Based on my review of case materials and other information identified on the attached list of materials, and my education and experience, I have determined the following:

**Warnings and Safety Information Provided with Electrolux Gas Dryers**

Electrolux provided numerous warnings directed at fire hazards associated with lint accumulation and information on how these hazards could be mitigated through proper installation, maintenance, and use of the Kenmore dryer. These warnings were presented in a variety of locations both attached to the dryer and in literature accompanying the dryer. Some of the safety information is directed at users of the dryers and other safety information is directed at installers and those who service the appliance.

Safety information intended primarily for consumers is included in the Use & Care Guide, the Operating Instructions, and a label on the dryer drum. The Use & Care Guide instructs the user to read all instructions before using the dryer and to save the instructions contained in it.[6] In the front of the Use & Care Guide is a section "Important Safety Instructions," several warnings that are distinguished from other portions of the manual by the inclusion of a safety alert symbol (a triangle surrounding an exclamation point) and the signal word "WARNING."[7] In this section consumers are given specific instructions on how to reduce the risk of fire including:

- Clean the lint screen before or after each load. The interior of the dryer, lint screen housing and exhaust duct should be cleaned approximately every 18 months by qualified service personnel. An excessive amount of lint build-up in these areas could result in inefficient drying and possible fire. See Care and Cleaning, page 7.

- Do not operate the dryer if the lint screen is blocked, damaged or missing. Fire hazard, overheating and damage to fabrics can occur. If your dryer has a drying rack, always replace the lint screen when finished using the dryer.

- Keep area around the exhaust opening and surrounding areas free from the accumulation of lint, dust and dirt.[8]

Consumers are given further instructions on how to prevent fires, including not using heat to dry items containing foam rubber or similarly textured rubber-like materials, not drying items that

---
[5] Complaint for Property Damage
[6] Use & Care Guide, pp. 3-4
[7] Use & Care Guide, pp. 3-4
[8] Use & Care Guide, p. 5

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073870

---

Cathy Muller Diehl, Esq.
June 4, 2012
Page 4

have been in contact with flammable materials or cooking oils, and not spraying any type of aerosol near the dryer.[9] Users are further instructed not to store or use flammable vapors and liquids in the vicinity of the dryer.[10] The Use & Care Guide also contains warning information in sections that address protecting children and preventing injury.[11] Further, consumers are warned, "To prevent injury and damage to the dryer: All repairs and servicing must be performed by an authorized servicer unless specifically recommended in this Owner's Guide."[12]

The Use & Care Guide provides consumers with guidelines in the "Drying Procedures" section, including the instruction to "Check that lint screen is clean and in place" prior to loading the dryer.[13] In the "Care and Cleaning" section consumers are instructed to "Clean the lint screen after every load," and are provided with instructions and an illustration of how to clean the lint screen.[14] Consistent with information provided in the "Important Safety Instructions" section of the guide, consumers are instructed not to operate the dryer without the lint screen in place, and to have an authorized servicer clean the dryer cabinet interior and exhaust duct every 18 months as "[a]n excessive amount of lint build-up could result in inefficient drying and possible fire hazard."[15]

Additional safety information is contained in the Operating Instructions, which instruct the user to read the Use & Care Guide before operating the dryer.[16] Following the safety alert symbol and the word "WARNING" it warns users to reduce the risk of fire, to "read the IMPORTANT SAFETY INSTRUCTIONS in your dryer Use and Care Guide before operating this appliance. The section "Operating Steps" contains steps to take to use the dryer, including checking that the lint screen is clean and in place prior to loading the dryer and cleaning the lint screen after every load. Users are directed to the "Drying Procedures" section of the user's manual for more detailed information. Additional information about Temperature Selection, Cycle Selection, and Energy Saving Tips is included in the Operating Instructions, as is a warning to not use heat to dry items containing foam rubber, plastic, or similarly textured, rubber-like materials.

Electrolux also provided specific warnings on the dryer.[17] This label has the safety alert symbol and the word "WARNING." Followed by the information "To avoid fire hazard, personal injury, or fire damage – including spontaneous combustion" and instructions to "Clean lint screen before or after each load" and not to dry foam rubber or similar materials, or articles that have been exposed to flammable/combustible liquids or solids. The label warns, "CAUTION – A clothes dryer produces combustible lint and can be exhausted outdoors. Care should be taken

---
[11] Use & Care Guide, p. 3
[12] Use & Care Guide, p. 4
[13] Use & Care Guide, p. 5
[14] Use & Care Guide, p. 7
[15] Use & Care Guide, p. 7
[16] Use & Care Guide, p. 7
[17] Operating Instructions
[18] Label B 1314241, Rev B

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073871

---

Cathy Muller Diehl, Esq.
June 4, 2012
Page 5

to prevent the accumulation of lint around the exhaust opening and in the surrounding area." A telephone number was also included on the labels which users could call if they had any questions about the appliance.

In addition, a Customer Instruction Check List is provided with the dryer, notifying the user to "Follow This Check List For Best Drying Performance," to "Read the Dryer Owner's Guide and Operating Instructions" and to "ALWAYS clean your lint filter BEFORE every drying cycle" with an accompanying illustration.[19]

It is recognized by the National Fire Protection Association (NFPA) and the Consumer Product Safety Commission (CPSC) that lint accumulation within clothes dryers may cause excessive heat build-up, possibly resulting in fires. For example, the NFPA reported that for home fires from 2003-2006, the most common factor contributing to the ignition of clothes dryers was the "failure to clean."[20] The NFPA includes several safety tips in its report, including cleaning the lint filter before or after each load. The CPSC has also recognized this problem and recommends that users of clothes dryers clean the lint screen/filter before or after drying each load of clothes, to clean behind the dryer where lint can build up, and to have a service person clean the interior of the dryer channels periodically to minimize the amount of lint accumulation.[21] Appropriately, Electrolux warnings and safety information specifically address a variety of factors associated with clothes dryer fires, including cleaning of the dryer.

**Analysis of Adequacy of Warnings and Safety Information**

ANSI Z21.5.1-2002, the American National Standard for Gas Clothes Dryers, is a voluntary standard that provides guidance for the safety information provided on and with gas dryers. The safety information provided on and with the dryer is consistent with the recommendations in ANSI Z21.5.1-2002. Although Plaintiff's experts Ronald Parsons and Michael Stoddard are critical that the safety information provided by Electrolux did not comply with UL 2158,[22] this standard is not applicable to this incident dryer. UL 2158 is a voluntary standard for electric clothes dryers and the dryer at the Heretonopas/Adamko residence was a gas dryer.

The safety information contained within the Electrolux Installation Instructions and on the product clearly communicate the need for proper installation and exhaust, the need to consistently clean and keep the dryer free of lint, and to have authorized personnel clean the dryer approximately every 18 months. Where applicable, these sources also provide the appropriate actions to take and possible consequences of failing to take these actions.

---
[19] Label B 1314362, Rev A
[20] Hall, 2009
[21] CPSC Document # 5022, June 2003
[22] Report of Parsons and Stoddard, p. 101

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073872

---

Cathy Muller Diehl, Esq.
June 4, 2012
Page 6

The safety information provided with the Kenmore dryer identifying fire-related hazards and appropriate installation and cleaning procedures provided by Electrolux was reasonable and adequate in terms of its location, content, and format and was consistent with applicable industry standards, guidelines, and practices.

Mr. Parsons and Mr. Stoddard recommend additional warnings as part of their redesign to address the same potential hazards. For example, in their report they call for the addition of three lights to the front of the dryer – one each next to the messages "CLEAN EXHAUST DRYER" or "CHECK EXHAUST SYSTEM," "SERVICE DRYER SOON," and "SERVICE DRYER NOW."[23] They propose that an active monitoring system of the dryer would determine which, if any, of these lights should be illuminated, and could simultaneously disengage the heating element, preventing the dryer from producing any heat.

The pairing of an "interlock" that disengages the heating element as part of the proposed monitoring system of either the air-flow or "maintenance" schedule as put forward by Mr. Parsons and Mr. Stoddard raise a number of potential concerns from a human factors perspective. From the description offered in their report, it appears that the proposed interlock would disengage the heating element, but otherwise allow for the operation of the dryer. Though Mr. Parsons and Mr. Stoddard claim that users would then respond a certain way to this interlock and warning system (i.e. contacting an authorized service person to disassemble and inspect the dryer), they offer nothing to support that users would act in that manner. Users may not initially notice or understand that the dryer is not producing heat or what is preventing it from doing so. Indeed, users may continue to use the dryer. In practice, such interlock designs have actually been met with considerable user opposition as well as various overrides to invalidate these interlocks. For example, in response to attempts to prevent the operation of automobiles by drivers who did not have their safety belts buckled, vehicle manufacturers implemented an interlock system. However, ultimately, Congress passed legislation prohibiting such a system and the National Highway Traffic Safety Administration explicitly removed such an interlock as an option to manufacturers, specifically citing users' negative response to this design.[24] Users have intentionally defeated interlocks for other types of products, providing additional examples of consumer resistance to these types of design features. Furthermore, in 2010, Consumer Reports concluded from their testing on dust-blockage indicators that "current indicators are too inconsistent to trust."[25]

While Dr. Doeris acknowledges that noncompliance with warnings does not necessarily make a warning inadequate, he opines that the warnings provided by Electrolux are inadequate because they require "excessive or disproportionate measures for compliance".[26] He does not propose alternative warnings that would overcome his concerns and would have prevented or reduced

---
[23] Report of Parsons and Stoddard, pp.83-84
[24] PL. 93-492; 39 CFR 26130; 39 FR 16223
[25] Consumer Reports (July 2010)
[26] Report of Alan Doeris, p. 6

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073873

Cathy Muller Diehl, Esq
June 4, 2012
Page 7

the likelihood of this event. The purpose of a warning is to inform a user of possible negative consequences as a result of taking or failing to take some action. However, research into the effect that warnings and safety information have on human behavior has shown warnings cannot motivate or force compliance.[25] The fact that some consumers may not follow presented safety information does not make that information inadequate.

In contrast to Dr. Dorris' statement that appliances are typically serviced on an as needed basis, manuals for other appliances as well as motor vehicles provide recommendations about regular service schedules.[26] Dr. Dorris indicates that among other factors, it is not realistic for Electrolux to expect consumers to remember the recommended service intervals.[27] The time frame provided by Electrolux does not require consumers to track numbers of loads or other indicators of the amount of use of the dryer. Information provided in the Use & Care Guide continuously specifies that the unit be serviced at 18-month intervals and consumers can track the time interval using any number of methods. The applicable standard for the incident dryer, ANSI Z21.5.1-2002, recommends that dryer instruction manuals include instructions about the need for "periodic examination of exhaust systems".[28]

Dr. Dorris opines that information Electrolux provided to its authorized servicers was not sufficient to inform them of how to clean the dryer.[29] However, this opinion is not relevant to this case as the Haroutounyan/Adamian family provides no testimony that suggests that they attempted to contact a service technician to clean their dryer and/or ductwork and that it was performed improperly.

### Knowledge and Behavior of Dryer Owners, Mr. Haroutounyan and Ms. Adamian

Mr. Haroutounyan and Ms. Adamian purchased the Kenmore dryer at Sears on April 13, 2003 and had it installed in their townhouse in Glendale, California, where they had lived since 1995.[30] Ms. Adamian testifies that she did all the laundry in the home and that she dried three to four loads per week.[31] She testifies that she cleaned the lint screen after more than 90 percent of the loads she dried.[32] Mr. Haroutounyan testifies that although his wife was the primary user of the dryer, he used the dryer and cleaned the lint screen about two to four times per year.[33] Ms.

---

[25] e.g., Ayres et al, 1994
[26] Report of Alan Dorris, p. 5, e.g. American Standard User's Information Guide for Gas Furnaces (2002), Installation, Operation, and Service Manual, Residential Storage Type Gas Water Heater (2006); Toyota Camry Owner's Guide (2006)
[27] Report of Alan Dorris, p. 5
[28] ANSI Z21.5.1-2002, Section 1.22.8.
[29] Report of Alan Dorris, pp. 5-6
[30] Haroutounyan, pp. 16-18, 21-22, 29; Adamian, pp. 11, 18-19, 36
[31] Adamian, pp. 38-39; Haroutounyan, pp. 21-22; 43
[32] Adamian, p. 24
[33] Haroutounyan, p. 49

$E^x$

---

Cathy Muller Diehl, Esq
June 4, 2012
Page 8

Adamian testifies that she does not recall the incident dryer ever being serviced prior to the fire.[34]

According to the testimony of Mr. Haroutounyan, he and his wife received a manual when they purchased the dryer.[35] Ms. Adamian testifies that she did not read the manual or documents that came with the dryer prior to the fire.[36] Mr. Haroutounyan states that he read the manual and instructions but that he does not recall what they said about cleaning any part of the dryer, including the lint screen and the exhaust system, or having the dryer serviced.[37] In this instance, there is no testimony about whether Mr. Haroutounyan and Ms. Adamian noticed or read the labels on the dryer.

### Summary of Opinions and Conclusions

In summary, based on the information cited above and my education, training, and experience, I offer the following opinions with a reasonable degree of scientific certainty:

- Warnings and safety information about factors associated with dryer fires and cleaning provided by Electrolux were reasonable and adequate in terms of location and content.

Sincerely,

Christine Wood

Christine T. Wood, Ph.D.
Principal Scientist, Director, Human Factors
(650) 688-7134 direct
(650) 326-2981 fax
cwood@jieropsmart.com

Enclosures (1)

---

[34] Adamian, pp. 30, 39-42
[35] Haroutounyan, pp. 24-25
[36] Adamian, p. 23, 25
[37] Haroutounyan, pp. 24-25

$E^x$

---

Cathy Muller Diehl, Esq
June 4, 2012
Page 9

### List of Materials

- Depositions
  - o  Mel Haroutounyan 10/21/11
  - o  Alexandr Adamian 10/21/11
  - o  Larry Brown 05/16/11
- Complaint for Property Damage
- Glendale Fire Department Incident Report (Incident GLN0814580)
- Kenmore Dryer Use & Care Guide - P/N 134161000 (0309)
- Kenmore Gas & Electric Dryer Installation Instructions -P/N 134199600 (0311)
- Operating Instructions - P/N 134187500 (0210)
- Warning labels (B 1318241, Rev B; B 1317832, Rev F; B 1314637, Rev D)
- Check List (B 1317862, Rev A)
- Wiring Diagrams (134081500 B)
- Sears HomeCentral Repair Parts List - P/N 134195560 (11/02)
- Report of Alan Dorris 04/27/12
- Report of Ronald Parsons & Michael Stoddard, Jr. 04/27/12, with Appendices I-V
- Report of Larry Brown 02/13/09
- Color photos taken by Larry Brown
- Purchase Information from Sedgwick CMS

- ANSI Z21.5.1-2002/CSA 7.1-2002, American National Standard/CSA Standard for Gas Clothes Dryers Volume I, Type 1 Clothes Dryers. Cleveland, OH: CSA America, Inc.
- Ayres, T. J., Gross, M. M., Wood, C.T., Horst, D. P., Beyer, R. R., & Robinson, J. N. (1994). What is a warning and when will it work? In K. R. Laughery Sr., M. S. Wogalter, & S. L. Young (eds.), Human factors perspective on warnings: Selection from Human Factors and Ergonomics Society annual meetings 1980-1993 (pp. 1-5). Santa Monica, CA: Human Factors and Ergonomics Society.
- CPSC Document # 5022, June 2003. Overheated clothes dryers can cause fires. Retrieved on 03/07/2010 from http://www.cpsc.gov/cpscpub/pubs/5022.html
- Hall Jr., J. R. (2009). Home fires involving clothes dryers and washing machines. Quincy, MA: National Fire Protection Association.
- Consumer Reports (July 2010). Dryers. A feature disappoints, but good deals abound. Retrieved from http://www.consumerreports.org/cro/magazine-archive/2010/july/appliances/dryers/overview/index.htm?view=Print on 04/03/12.
- Product manuals for exemplar products

$E^x$

---

Cathy Muller Diehl, Esq
June 4, 2012
Page 10

- o  American Standard User's Information Guide for Gas Furnaces (2002)
- o  Installation, Operation, and Service Manual, Residential Storage Type Gas Water Heater, (2006)
- o  Toyota Camry Owner's Guide (2006)
- 39 FR 38780 (1974). Federal motor vehicle safety standards: Seat belt interlock option
- 39 FR 10272 (1974). Federal motor vehicle safety standards: Occupant crash protection.
- United States Public Law 93-492 (S 355). October 1974. Motor vehicle safety. U.S. Department of Justice: 93rd Congress, Second Session.
- UL 2158 (2004). Standard for Electric Clothes Dryers. Underwriters Laboratories Inc.

$E^x$

Exponent
Failure Analysis Associates

Exponent
[address block, illegible]

## Christine T. Wood, Ph.D.
### Principal

**Professional Profile**

Dr. Christine Wood is a Principal Scientist and Director of Exponent's Human Factors practice. She has spent over 20 years researching the impact of safety- and health-related information on human behavior and injury reduction. She has applied the area of human information processing, involving aspects of attention, learning, memory, decision-making, and behavioral response, to risk communications. She has investigated and identified factors that influence compliance with warnings and developed a scientific framework for predicting effectiveness. She has evaluated a wide variety of strategies for dissemination of warnings. Her work includes the analysis, evaluation, and development of safety information for many different products, such as consumer products, medical devices and medications, workplace equipment, and motor vehicles. She has also studied and published papers on the historical use of warnings on products in the United States throughout the twentieth century.

Much of Dr. Wood's work focuses on issues related to child safety. She has applied her knowledge of child development to the analysis of accident patterns that are unique to children. As part of her research, she has conducted numerous studies involving the testing of hundreds of children to better understand their capabilities and methods of interacting with products. The results of her studies have been used in the design of products, development of product design standards, and the evaluation of the child resistance of products. She has also studied and analyzed the knowledge of parents regarding child hazards and the strategies they use to reduce child injury.

Dr. Wood has analyzed injury/illness, adverse event, and accident data available from a wide range of sources such as those gathered by government agencies. She has used quantitative analyses to develop and assess the effectiveness of safety information and dissemination methods. She has presented quantitative analyses of accident patterns for individual products to regulatory agencies for consideration in potential product recalls. She has designed and collected data using written questionnaires, interviews, and group discussions.

Prior to joining Exponent, Dr. Wood held research positions with competitor RMC Research Corporation, SRA Technologies, Inc., and the Institute for Mathematical Studies in the Social Sciences where she conducted studies in the areas of measuring the effectiveness of education and training programs and developing a federally-mandated evaluation systems for education programs used nationwide.

**Academic Credentials and Professional Honors**

Ph.D., Experimental Psychology, Stanford University, 1981
B.A., Psychology, Stanford University (with Distinction and Honors), 1971

12/11

**Publications**

Sala JB, Nichols EA, Muhammad R, Lakhiani SQ, Rauschenberger R, Wood CT. Government, warnings, safety information: A comparison of inter-agency regulations and guidance. In: Advances in Human Factors, Ergonomics, and Safety in Manufacturing and Service Industries. Karwowski W, Salvendy G (eds), pp. 1047-1056, CRC Press, 2010.

Huntley-Fenner G, Wood CT, Sala JB. Study of the impact of California's Proposition 65 warnings on safety related awareness and behaviors. Society for Risk Analysis Proceedings Abstracts, San Antonio TX, December 9-12, 2007.

Wood CT, Sala JB, Sanders K, Cassidy P. Trends in consumer product warnings found in voluntary standards. Proceedings, 50th Annual Meeting of the Human Factors and Ergonomics Society, Santa Monica, CA, 2006.

Sanders KJ, Wood CT, Sala JB. Human factors and the design of medical devices. In: Bringing Your Medical Device to Market. Food and Drug Law Institute, Second Edition. Reiss JD (ed), pp. 197-204, Washington DC, 2006.

Arndt SR, Wood CT, Delahunt PB, Wall CT. Who's in the back seat? A study of driver inattention. Proceedings, 50th Annual Meeting of the Human Factors and Ergonomics Society, Santa Monica, CA, 2006.

Diedrich TJ, Wood CT, Ayres TJ. Analysis of trends in federally mandated warning labels. Proceedings, Human Factors and Ergonomics Society Annual Meeting, pp. 838-842, 2001.

Arndt S, Ayres TJ, Li L, Wood CT, Young D. Human factors in product recall planning. Proceedings, 6th Annual International Conference on Industrial Engineering, November 2001.

Murray J, Wood CT, Ayres TJ, Humphrey D. Mobile communications, driver distraction, and vehicle accidents. International Journal of Vehicle Design 2001; 26(1):70-84.

Wood CT, Ayres TJ, Schmidt R, Young D, Murray J. Affordance perception and safety intervention. Proceedings, Human Factors and Ergonomics Society Annual Meeting, Vol. 6, pp. 51-54, 2000.

Ayres TJ, Wood CT. Memory problems for survey-based estimates of population activity. International Journal of Cognitive Technology 1999; 4(1):4-10.

Wood CT, Arndt S, Kellar R. Children's use of various internal automobile trunk release mechanisms intended to reduce child entrapment risk. Proceedings, Human Factors and Ergonomics Society Annual Meeting, pp. 912-915, 1999.

Ayres TJ, Wood CT, McCarthy RL, Arndt SR. Relative rollover risk estimates for pickup trucks. Proceedings, 7th International Conference on Product Safety Research, Washington, DC, 1999.

Christine T. Wood, Ph.D.
Page 1
12/11

Arndt T, Ayres T, McCarthy R, Schmidt R, Wood CT, Young D. Warning labels and accident data. Proceedings, Human Factors and Ergonomics Society Annual Meeting, pp. 550-552, Chicago, IL, October 1998.

Humphrey DG, Murray JM, Wood CT, Ayres TJ. Human factors issues in the design of medical devices. Proceedings, Medical Design & Manufacturing Conference, pp. 116-1–116-6, January 1999.

Ayres TJ, Wood CT, Schmidt RA, McCarthy RL. Risk perception and behavioral choice. International Journal of Cognitive Ergonomics 1998; 2(1-2):35-52.

Ayres TJ, Wood CT, Schmidt R, Young D, Murray J. Effectiveness of warning labels and signs: An update on compliance research. Proceedings, Silicon Valley Ergonomics Conference & Exposition, pp. 199-205, May 1998.

Murray J, Ayres TJ, Kelsh M, Wood CT. Mobile telephones and road accidents: A review of some issues. Proceedings, Silicon Valley Ergonomics Conference and Exposition, pp. 194-198, 1998.

Wood CT, Arndt SR, McCarthy RL. Using risk analysis to reduce the hazards on playgrounds. Proceedings, National Manufacturing Week Conference, Chicago, IL, March 1998.

Wood CT. Design challenges to the use of child restraints as a safety strategy. Proceedings, Human Factors and Ergonomics Society Annual Meeting, pp 442-446, October 1997.

Ayres TJ, Wood CT, Schmidt RA, Bjärkije VM. Warning labels and the state of the art. Proceedings, Silicon Valley Ergonomics Conference and Exposition, Palo Alto, CA, May 1996

McCarthy RL, Ayres, TJ, Wood CT. Risk and effectiveness criteria for using on-product warnings. Ergonomics 1995;38, 11, 2164-2175.

Ayres TJ, Beyer R, Wood CT. Ergonomics and the treatment plant. Operations Forum 1995; 12.

Ayres TJ, Wood CT. The warning label development process. Proceedings, Silicon Valley Ergonomics Conference and Exposition, San Jose, CA, May 1995.

Beyer RR, McCarthy RL, Wood CT. Ergonomic analysis of extension ladders. Proceedings, Human Factors and Ergonomics Society Annual Meeting, 1994.

Wood CT, McCarthy RL, Padmanaban J, Beyer RR. Analysis of accident data and fatal risk for occupational use of extension ladders. Proceedings, Human Factors and Ergonomics Society Annual Meeting, 1994.

Christine T. Wood, Ph.D.
Page 3
12/11

Wood CT, McCarthy RL, Fowler G, Robinson JN. A comparative analysis of the annual injury risk for motorized vehicular recreation. Proceedings, American Society of Mechanical Engineers Winter Annual Meeting, New Orleans, LA, November 1992.

Ayres TJ, Wood CT, et al. Applications of risk analysis to off-road vehicles. Proceedings, Society of Automotive Engineers Off-Highway and Powerplant Congress, September 1992.

Ayres TJ, Gross, MM, Horst DP, Wood CT, Beyer, RR, Acon& DB, Bjärkije, VM. Do subjective ratings predict warning effectiveness? Proceedings, Human Factors Society Annual Meeting, 1990.

McCarthy RL, Taylor RK, Kost G, Robinson JN, Wood CT. A comparative analysis of industrial lift truck (forklift) accidents. Proceedings, American Society of Mechanical Engineers, Winter Annual Meeting, Dallas, TX, November, 1990.

Ayres TJ, Gross MM, Wood CT, Horst DP, Beyer RR, Robinson JN. What is a warning and when will it work? Proceedings, Human Factors Society Annual Meeting, 1989.

Wood CT. Policy analysis of California's program for gifted and talented students. Educational Evaluation and Policy Analysis 1995; 7(3):281-287.

Ball FM, Wood CT, Smith KE. When are semantic targets detected faster than visual and acoustic ones? Perception & Psychophysics 1975; 17(1):1-8.

Wood CT. Processing units in reading. Ph.D. Dissertation, Stanford University, 1974.

Juola JF, Fischler I, Wood CT, Atkinson RC. Recognition time for information stored in long-term memory. Perception & Psychophysics 1971; 10:8-14, 1971.

**Reports**

Wood CT, Gamel NN, Roberts SJ. Evaluation of the Pacific World Telecourse Prototype. RMC Research Corporation, June 1988.

Millsap M, Jastrzab J, Wood CT. State and local response to the Perkins Act: A conceptual framework. Abt Associates, December 1987.

Wood CT, Gabriel R. A study of targeting practices used in the Chapter 1 Program. SRA Technologies, Inc., 1986.

Tallmadge GK, Wood CT, Roberts SJ. Availability and utility of existing databases for addressing issues related to the impact of ECIA Chapter 1 Legislation and Regulations. SRA Technologies, Inc., 1984.

Wood CT. Final report of the evaluation of the Gifted and Talented Education Program. RMC Research Corporation, February 1983.

Christine T. Wood, Ph.D.
Page 4
12/11

Talmadge RL, Wood CT. Comparability of gains from the Three Models in the Title I Evaluation System. RMC Research Corporation, April 1980.

Talmadge GK, Horst DP, Wood CT. The adequacy of the Equipercentile assumption in the Norm-Referenced Evaluation Model. RMC Research Corporation, April 1980.

Talmadge GK, Wood CT. A comparison of lock-step and self-paced instruction strategies for training tracked vehicle mechanics. MOS-63C, RMC Research Corporation, 1978.

Wood CT, Fagan BM, Talmadge GK. Hawaii State Title I Evaluation Report 1977–1978. RMC Research Corporation, August 1978.

Talmadge GK, Wood CT. User's Guide, ESEA Title I Evaluation and Reporting System. RMC Research Corporation, January 1978.

Wood CT. Test norming practices and the Norm-Referenced Evaluation Model. Further Documentation of State ESEA Title I Reporting Models and Their Technical Assistance Requirements—Phase II, Vol. 2. Boruch BL (ed), RMC Research Corporation, 1978.

Talmadge GK, Wood CT. Local norms. RMC Research Corporation, January 1978

Horst DP, Wood CT. Collecting achievement test data. RMC Research Corporation, January 1978.

Wood CT, Cannara AB, Talmadge GK, Fagan BM. Further documentation of State ESEA Title I Reporting Models and their technical assistance requirements: Phase I, Part 2. RMC Research Corporation, August 1976.

Wood CT, Ozenil NN, Talmadge GK, Binkley JL. State ESEA Title I Reports: Review and analysis of past reports, and development of a model reporting system and format. RMC Research Corporation, October 1975.

Horst DP, Talmadge GK, Wood CT. Measuring achievement gains in educational projects. RMC Research Corporation, October 1974; also published as "A Practical Guide for Measuring Project Impact on Student Achievement," Stock No. 1780-01460, U.S. Government Printing Office, Washington, DC.

### Presentations

Beyer RE, Ayres TJ, Wood CT. Applying basic principles of human factors and ergonomics. 67th Annual Conference and Exposition of the Water Environment Federation, No. 947801, Chicago, IL, October 1994.

Ayres TJ, Wood CT. Memory problems for survey-based estimates of population activity. 3rd Practical Aspects of Memory Conference, College Park, MD, August 1994

Christian T. Wood, Ph.D.
Page 3
3/2/11

McCarthy RL, Ayres TJ, Wood CT, Robinson JN. Risk-based warning design. American Bar Association National Institute; Product Warnings, Instructions and User Information. Washington, DC, January 1994.

Wood CT, McCarthy RL, Ayres TJ. Human subject testing in the development of warning labels. American Bar Association National Institute, Product Warnings, Instructions and User Information, Washington, DC, January 1994.

### Editorial Boards

- Member of editorial board for *Journal of Children's Health*, 2003–2005

### Professional Affiliations

- Human Factors and Ergonomics Society (member)
- Society for Risk Analysis (member)
- American Educational Research Association (member)

Christian T. Wood, Ph.D.
Page 4
3/2/11

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073882

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073883

---

## List of Materials

- Depositions
  - o Mel Harootunyan 10/21/11
  - o Alenoosh Adamian 10/21/11
  - o Larry Brown 05/16/11
- Complaint for Property Damage
- Glendale Fire Department Incident Report (Incident GLN0814580)
- Kenmore Dryer Use & Care Guide - P/N 134195000 (0509)
- Kenmore Gas & Electric Dryer Installation Instructions - P/N 134195600 (0211)
- Operating Instructions - P/N 134187400 (0210)
- Warning labels (B 1318341, Rev B; B 1317832, Rev F; B 1314637, Rev D)
- Check List (B 1317862, Rev A)
- Wiring Diagrams (134061500 B)
- Sears HomeCentral Repair Parts List - P/N 134195500 (1102)
- Report of Alan Dorris 04/27/12
- Report of Ronald Parsons & Michael Stoddard, Jr. 04/27/12, with Appendices I-V
- Report of Larry Brown 02/13/06
- Color photos taken by Larry Brown
- Purchase information from Softquick CMS

- Sears Protection Agreement brochure, dated May 2011

- Extended Warranty Agreement Screenshots for Alenoosh Adamian
- Photograph of Sears "860" number by Michael Stoddard
- Deposition of Alan Dorris 05/03/12, rough and final versions

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073884

---

## Exponent®
*Failure Analysis Associates®*

April 27, 2011

Sarah T. MacGill, Esq.
Riley Bennett & Egloff, LLP
141 E. Washington Street, Fourth Floor
Indianapolis, IN 46204

Subject:  State Farm a/s/o Rixbach v Electrolux
          Project No. 1103525

Dear Ms. MacGill,

I am writing to summarize the work undertaken by Exponent® Failure Analysis Associates in connection with human factors issues in the above-referenced case and the conclusions reached on the basis of work to date.

I received a Bachelor's Degree in psychology with Distinction and Honors from Stanford University and hold a Ph.D. in experimental psychology also from Stanford University. I am a Principal Scientist and Director of the Human Factors Practice at Exponent. I am involved in the analysis and evaluation of human behavior in response to information intended to change behavior and reduce injury rates. I have studied the area of human information processing, including the specific context of processing safety information associated with products under various circumstances. I have written extensively on the topic of human information processing, safety information, and warning label development. I have applied experimental design and statistics for the purpose of measuring the effectiveness of warnings. I am a member of the Human Factors and Ergonomics Society, the American Educational Research Association, and the Society for Risk Analysis. A copy of my resume and my list of testimony for the past four years is attached.

### Background of Scientific Studies of Risk Communication

Over the past 30 years, there has developed a sizable literature on behavioral responses to risk communications. Significant reviews of and annotated guides to the literature for different periods and context areas can be found in McCarthy et al. (1984), Ayres et al. (1994, 1998), Miller & Lehto (2001), and DeJoy et al. (2006). Key factors considered in the scientific literature include the likely effectiveness of providing a warning about a particular hazard (e.g., DeJoy et al., 2006; Sorensen et al., 1989; Ayres et al., 1994; Arndt et al., 1998; Dorris &

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073885




Sarah T. MacGill, Esq.
April 27, 2011
Page 2

Purswell, 1977), labeling directives presented by regulatory agencies and in relevant standards and guidelines (e.g., Sala et al., 2010; Wood et al., 2006; Diedrich et al., 2001), relationships between the number of warnings presented and attention and memory (e.g., Chan et al., 1997; Dorris, 1991; Frantz et al., 1999), the likely effect of formatting and the inclusion of specific warning elements on compliance (e.g., Young et al., 2002; Otis et al., 2003; Wemberly et al., 2001), individuals' acceptance of communication and motivation to alter behavior (e.g., Wogalter et al., 1989; Racoati et al., 1996; Soumerai et al., 1994), the effect of media and publicity (e.g., Soumerai, et al., 1992; Korpelman, 1978), the selection of hazards to warn about based on the highest potential impact, in terms of injury counts, risk analysis, or accident mode analysis (e.g., McCarley et al., 1995; Ayres & Wood, 1995). The significant body of literature to which these studies belong allows for scientific investigation as to what, when, where, and how warnings could be provided and the likely impact they are to have on human behaviors. The results and evolving base of knowledge have in some instances been incorporated by regulatory agencies with respect to safety information and has shaped specific guidance statements (Sala et al., 2010). Based on a synthesis of findings from published scientific studies, frameworks have been developed identifying factors that must be present for a warning to result in reductions in harmful behaviors (Ayres et al., 1994).

Based on the review of the supplied materials listed in the report, I have the following understanding of the incident:

On the morning of August 16, 2006, a fire occurred in a dryer on a residential property belonging to Kelly Shairath in Elkhart, Indiana.[1] None of the family members was injured.[2]

The incident dryer is a Frigidaire gas dryer, model FGR21HAS, manufactured by Electrolux and sold in 2005.[3] It is alleged that the dryer failed to contain adequate warnings or instructions with regard to a potential lint accumulation and ignite a fire.[4]

Based on my review of case materials and other information identified on the attached list of materials, and my education and experience, I have determined the following:

**Warnings and Safety Information Provided for the Electrolux Gas Dryer**

Electrolux provided safety information about proper use and maintenance of the model FGR21HAS dryer both on the dryer and in literature accompanying the dryer. The safety information identifying fire-related hazards provided by Electrolux was reasonable and adequate

[1] Complaint, p. 1; Osolo Fire Department report
[2] Complaint, p. 3
[3] Complaint, p. 2; Invoice from Higby TV
[4] Complaint, p. 3

---

Sarah T. MacGill, Esq.
April 27, 2011
Page 3

in terms of its content, format, and location. Many guidance documents for the content of warnings (e.g., ANSI Z 535.4) suggest that warnings include identification of the hazard(s), actions to take to avoid the hazard, and the consequences of failing to take these actions. The safety information provided by Electrolux clearly identifies fire as a potential hazard and that the consequences can include injury or death.[5] The safety information identifies numerous steps to be taken to reduce the risk of fire. The importance of removing lint from the dryer and methods of doing so are referenced in numerous places.

The safety information is presented using commonly used formatting techniques that assist the reader in processing the information. Techniques include the use of headings to organize the information into "chunks" and the use of "signal words", i.e., WARNING, to indicate the information is related to safety. For example, in the front of the Owner's Guide is a section with the heading "Important Safety Instructions" and several warnings that are distinguished from other portions of the manual by the inclusion of a safety alert symbol (a triangle surrounding an exclamation point).[6]

Safety information is included in both the Owner's Guide and the Operating Instructions that accompany the dryer. Both sources of information instruct the user to read the Owner's Guide before using the dryer, and the Owner's Guide further instructs users to save the instructions.[7]

The Owner's Guide gives specific instructions on how to prevent fires including the following examples:

• Clean the lint screen before or after each load. The interior of the dryer, lint screen housing and exhaust duct should be cleaned approximately every 18 months by qualified service personnel. An excessive amount of lint build-up in these areas could result in inefficient drying and possible fire. See Care and Cleaning, page 6.
• Do not operate the dryer if the lint screen is blocked, damaged or missing. Fire hazard, overheating and damage to fabrics can occur. If your dryer has a drying rack, always replace the lint screen when finished using the drying rack.
• Keep area around the exhaust opening and surrounding areas free from the accumulation of lint, dust and dirt.[8]

Manufacturers of many types of appliances (e.g., furnaces, water heaters, refrigerators) as well as motor vehicles recommend that regular inspections of their products be conducted by trained professionals. Such a recommendation by Electrolux is consistent with this practice.

[5] E.g., Owner's Guide, p. 2
[6] Owner's Guide, pp. 2-3
[7] Owner's Guide, pp. 1, 2; Operating Instructions
[8] Owner's Guide, p. 2

---

Sarah T. MacGill, Esq.
April 27, 2011
Page 4

Consumers are given further instructions on how to prevent fires, including not drying items that have been in contact with flammable materials, not using heat to dry items containing various materials (e.g., plastic, foam rubber, feathers), and not spraying any type of aerosol near the dryer.[9] Users are instructed not to store or use flammable vapors and liquids in the vicinity of the dryer.[10] The Owner's Guide also notes that, "The instructions appearing in this Owner's Guide are not meant to cover every possible condition and situation that may occur. Common sense and caution must be practiced when installing, operating and maintaining any appliance."[11]

The Owner's Guide provides users with guidelines for "Drying Procedures", including the instruction to "Check that lint screen is clean and in place."[12] In the "Care and Cleaning" section, users are instructed to "Clean the lint screen after every load," and are provided with instructions and a pictorial on how to clean the lint screen.[13] As in the "Important Safety Instructions" section of the guide, users are instructed not to operate the dryer without the lint screen in place, and to have an authorized service clean the dryer every 18 months as "an excessive amount of lint build-up could result in inefficient drying and possible fire hazard."[14]

Electrolux also provided specific warnings on the inside door wall of the dryer that would be visible to all users once they opened door to the dryer.[15] Following the safety alert symbol and the word "WARNING" was the information "To avoid fire hazard, personal injury, or fire damage - Including approximate combustion" and instructions not to dry foam rubber or similar materials or articles that have been exposed to flammable/combustible liquids or solids. The label states: "Caution - A clothes dryer produces combustible lint and should be exhausted outdoors. Care should be taken to prevent the accumulation of lint around the exhaust opening and in the surrounding area." A telephone number was also included on the label which users could call if they had any questions about the appliance.[16] In addition, a customer instruction check list is provided with the dryer, notifying the user to "Follow This Check List For Best Drying Performance", to "Read the Dryer's Owner's Guide and Operating Instructions" and to "ALWAYS clean your lint filter BEFORE every drying cycle" with an accompanying pictorial.[17]

[9] Owner's Guide, p. 2
[10] Owner's Guide, p. 2
[11] Owner's Guide, p. 2
[12] Owner's Guide, p. 4
[13] Owner's Guide, p. 6
[14] Owner's Guide, p. 6
[15] Label B 1317159
[16] Label B 1317159
[17] Label B 1317882

---

Sarah T. MacGill, Esq.
April 27, 2011
Page 5

It is recognized that lint accumulation within clothes dryers may result in fires. For example, the National Fire Protection Association (NFPA) reported that for home fires from 2003-2006, the most common factor contributing to the ignition of clothes dryers was the "failure to clean."[18] The NFPA includes several safety tips in its report, including cleaning the lint filter before or after each load. The Consumer Product Safety Commission (CPSC) has also recognized this problem and recommends that users of clothes dryers clean the lint screen/filter before or after drying each load of clothes, to clean behind the dryer where lint can build up, and to have a service person clean the interior of the dryer chassis periodically to minimize the amount of lint accumulation.[19] Appropriately, the warnings and safety information provided by Electrolux include and emphasize the concerns identified in the analysis of dryer-related incidents conducted by the NFPA and CPSC and Electrolux disseminates this information to purchasers of their clothes dryers.

**Plaintiff's Claims of Need for Additional and Alternative Warnings**

Ron Parsons and Michael Stoddard are critical of the warning system employed by Electrolux. In their report dated February 25, 2011 they state that the warnings are defective because "it is foreseeable that the user may not read the manual."[20] In making these statements, the authors are either unaware of or ignore a substantial literature related to warnings. The purpose of a warning is to inform a user of possible negative consequences as a result of the user taking or failing to take some action. However, as research into the effect that warnings and safety information have on human behavior has shown, warnings cannot motivate or force compliance.[21] The fact that some users may not follow the safety information presented within an instruction or warning does not make that information "defective." The safety information contained within the Electrolux Owner's Guide, Operating Instructions, and on the product clearly communicates the need for proper installation and exhaust, the need to consistently clean and keep the dryer free of lint, and to have authorized personnel clean the dryer approximately every 18 months.

[18] Hall, 2009
[19] CPSC Document # 5022, June 2005
[20] Report of Ron Parsons and Michael Stoddard, p. 47
[21] E.g., Ayres et al., 1994

case 3:08-cv-00436-WCL-CAN   document 97-1   filed 03/30/12   page 6 of 7

Sarah T. MacGill, Esq.
April 27, 2011
Page 6

**Summary of Opinions and Conclusions**

In summary, based on the information cited above and my education, training, and experience, I offer the following opinions with a reasonable degree of scientific certainty:

- Warnings and safety information about factors associated with dryer fires provided by Electrolux were reasonable and adequate in content, location, and format and were not defective.

Sincerely,

*Christine Wood*

Christine T. Wood, Ph.D.
Principal Scientist
Director, Human Factors
(650) 688-7134 direct
(650) 326-2983 fax
cwood@exponent.com

Enclosures (2)

case 3:08-cv-00436-WCL-CAN   document 97-1   filed 03/30/12   page 7 of 7

Sarah T. MacGill, Esq.
April 27, 2011
Page 7

**List of Materials**

- Complaint
- Cavailable Fire Department report
- Owner's Guide, Dryer
- Installation Instructions, Gas & Electric Dryer (P/N 134196100 (0213))
- Warning labels:
  - B 1317150
  - B 1317832
  - B 1314637
  - B 1317862
- Operating Instructions
- Invoice from Hagley TV
- State Farm's Expert Reports:
  - Report by Skipper Shand, dated 02/12/07, CV
  - Report by Jack Sanderson, dated 02/17/11, CV
  - Report by Scott Jones, dated 02/28/11, CV
  - Report by Ronald Parsons and Michael Stoddard, dated 02/25/11 and CVs

- *American National Standard for Product Safety Signs and Labels* (ANSI Z535.4-2002). 2002. Cleveland, Ohio: CSA International.
- CPSC Document # 5022, June 2003. *Overheated clothes dryers can cause fires.* Retrieved on 05/07/2010 from http://www.cpsc.gov/cpscpub/pubs/5022.html
- Ayres, T. J., Gross, M. M., Wood, C.T., Horst, D. P., Beyer, R. R., & Robinson, J. N. (1994). What is a warning and when will it work? In K. E. Laughery Sr., M. S. Wogalter, & S. L. Young (eds.), *Human factors perspective on warnings: Selections from Human Factors and Ergonomics Society annual meetings 1980-1993* (pp. 1-5). Santa Monica, CA: Human Factors and Ergonomics Society.
- Hall Jr., J. R. (2005). *Home fires involving clothes dryers and washing machines.* Quincy, MA: National Fire Protection Association.

$E^{x}$

$E^{x}$

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073890

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073891



F-1



CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073892

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073893



F-2

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073894



CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073895



F-3

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073896



CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073897



F-4

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073898

## OPERATING INSTRUCTIONS    83142/83142



### Before Operating Your Dryer

### Operating Steps

### Temperature Selection

### Cycle Selection

G

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073899



### Cycle Selection (continued)
Automatic Dry Cycle

### Air Fluff Cycle

### Timed Dry Cycle

### Energy Saving Tips

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073900

# Kenmore®

## DRYER
Use & Care Guide

## SECADORA
Manual de Uso & Mantenimiento

ENGLISH

ESPAÑOL



Sears, Roebuck and Co., Hoffman Estates, IL  60179 U.S.A.
www.sears.com

P/N 134191000 (0206)

H

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073901

## Table of Contents

Product Record ........ 2
Dryer Warranty ........ 2
Sears Maintenance Agreement ........ 2
IMPORTANT SAFETY INSTRUCTIONS ........ 3-4
Drying Procedures ........ 5-6
Common Drying Problems ........ 6
Care and Cleaning ........ 7
Avoid Service Checklist ........ 8
Español ........ 9
Service ........ Back Cover

## Product Record

In the space below, record the date of purchase, model and serial number of your product. You will find the model and serial number printed on an identification plate located on the left side of the door opening.

Model No. 417

Date of Purchase ..........

Serial No. ..........

Save these instructions and your sales receipt for future reference.

## Dryer Warranty

**Full One Year Warranty on Mechanical and Electrical Parts**

For one year from the date of purchase, if this Dryer is installed and operated according to the instructions in the Use and Care Guide, Operating Instructions, and Installation Instructions, Sears will repair or replace any of its mechanical or electrical parts if they are defective in material or workmanship.

**Warranty Restriction**

If this Dryer is used for any purpose other than Private Family Use, all warranty coverage is effective for only 90 days.

**Warranty Service**

Warranty service is available by contacting your nearest Sears Service Center in the United States.

This warranty applies only while this Dryer is in use in the United States.

This warranty gives you specific legal rights, and you may also have other rights which vary from state to state.

**Sears, Roebuck and Co., Dept. 817WA, Hoffman Estates, IL 60179**

## Master Protection Agreement

In the U.S.A

Congratulations on making a smart purchase. Your new Kenmore® appliance is designed and manufactured for years of dependable operation. But like all products, it may require preventive maintenance or repair from time to time. That's when having a Master Protection Agreement can save you money and aggravation.

*Purchase a Master Protection Agreement now and protect yourself from unexpected hassle and expense.*

The Master Protection Agreement also helps extend the life of your new appliance. Here's what's included in the Agreement:

- √ Expert service by our 12,000 professional repair specialists
- √ Unlimited service and no charge for parts and labor on all covered repairs
- √ "No-lemon" guarantee – replacement of your covered product if more than three product failures occur within 12 months
- √ Product replacement if your covered product can't be fixed
- √ Annual Preventive Maintenance Check at your request – no extra charge
- √ Fast help by phone – non-technical and instructional assistance on products repaired in your home, plus convenient repair scheduling
- √ Power surge protection against electrical damage due to power fluctuations
- √ Rental reimbursement if repair of your covered product takes longer than promised

Once you purchase the Agreement, a simple phone call is all that it takes for you to schedule service. You can call anytime day or night, or schedule a service appointment online.

Sears has over 12,000 professional repair specialists, who have access to over 4.5 million quality parts and accessories. That's the kind of professionalism you can count on to help prolong the life of your new purchase for years to come. Purchase your Master Protection Agreement today!

**Some limitations and exclusions apply. For prices and additional information, call 1-800-827-6655.**

**Sears Installation Service**

For Sears guaranteed professional installation of home appliances and items like garage door openers and water heaters, in the U.S.A. call 1-800-4-MY-HOME®

**WARNING** For your safety, the information in this manual must be followed to minimize the risk of fire or explosion or to prevent property damage, personal injury or loss of life.

- Do not store or use gasoline or other flammable vapors and liquids in the vicinity of this or any other appliance.
- **WHAT TO DO IF YOU SMELL GAS:**
  - Do not try to light any appliance.
  - Do not touch any electrical switch; do not use any phone in your building.
  - Clear the room, building or area of all occupants.
  - Immediately call your gas supplier from a neighbor's phone. Follow the gas supplier's instructions.
  - If you cannot reach your gas supplier, call the fire department.

Installation and service must be performed by a qualified installer, service agency or the gas supplier.

**Your safety and the safety of others is very important.**

We have provided many important safety messages in the Use and Care Guide, Operating Instructions, Installation Instructions and on your appliance. Always read and obey all safety messages.

⚠ This is the safety alert symbol. This symbol alerts you to hazards that can kill or hurt you or others. All safety messages will be preceded by the safety alert symbol and the word "DANGER" or "WARNING". These words mean:

**DANGER** You will be killed or seriously injured if you don't follow instructions.

**WARNING** You can be killed or seriously injured if you don't follow instructions.

**All safety messages will identify the hazard, tell you how to reduce the chance of injury, and tell you what can happen if the instructions are not followed.**

Pedestal

A pedestal accessory specifically designed for this dryer may be used when elevating the dryer for ease of use.

Failure to use accessories certified by the manufacturer could result in personal injury, property damage or damage to the dryer.

## Important Safety Instructions

**Read all instructions before using this dryer.**

**WARNING** To reduce the risk of fire, electrical shock, or injury to persons when using this dryer, comply with the basic warnings listed below.

⚠ Failure to comply with these warnings could result in serious personal injuries.

ENGLISH

### Prevent Fire

**WARNING** Do not dry items that have been previously cleaned in, soaked in, or spotted with gasoline, cleaning solvents, kerosene, cooking oils, waxes, etc. Do not store these items on or near the dryer. These substances give off vapors that could ignite or explode.

**WARNING** To prevent fire, do not use heat to dry items containing plastic, foam rubber or similarly textured rubber-like materials, or items containing feathers or down. Use Air Fluff (No Heat) only.

**WARNING** Clean the lint screen before or after each load. The interior of the dryer, lint screen housing and exhaust duct should be cleaned approximately every 18 months by qualified service personnel. An excessive amount of lint build-up in these areas could result in inefficient drying and possible fire. See **Care and Cleaning**, page 7.

**WARNING** Do not operate the dryer if the lint screen is blocked, damaged or missing. Fire hazard, overheating and damage to fabrics can occur. If your dryer has a drying rack, always replace the lint screen when finished using the drying rack.

**WARNING** Keep area around the exhaust opening and surrounding areas free from the accumulation of lint, dust and dirt.

**WARNING** Do not obstruct the flow of ventilating air. Do not stack or place laundry or throw rugs against the front or back of the dryer.

**WARNING** Do not spray any type of aerosol into, on or near dryer at any time.

**WARNING** Do not use fabric softeners or products to eliminate static unless recommended by the manufacturer of the fabric softener or product.

⚠ Failure to comply with these warnings could result in fire, explosion, serious bodily injury and/or damage to the rubber or plastic parts of the dryer.

Printed in U.S.A.

This Use and Care Guide provides general operating instructions for your dryer. It also contains information about features for several other models. Your dryer may not have every feature included.

Use the dryer only as instructed in this Use & Care Guide and the **Operating Instructions** included with your dryer.

**WARNING** Avoid fire hazard or electrical shock. Do not use an adapter plug or extension cord or remove grounding prong from electrical power cord. Failure to follow this warning can cause serious injury, fire or death.

***ELECTRIC*** **DRYERS:**

**CORRECT**
**Use this way ONLY**

***GAS*** **DRYERS:**

**CORRECT**
**Use this way ONLY**

**Note:** The instructions appearing in this Use and Care Guide are not meant to cover every possible condition and situation that may occur. Common sense and caution must be practiced when installing, operating and maintaining any appliance.

### Protect Children

**WARNING** Do not allow children to play on or in the dryer. Close supervision of children is necessary when the dryer is used near children. As children grow, teach them the proper, safe use of all appliances.

**WARNING** Destroy the carton, plastic bag and other packing materials after the dryer is unpacked. Children might use them for play. Cartons covered with rugs, bedspreads or plastic sheets can become airtight chambers.

**WARNING** Keep laundry products out of children's reach. To prevent personal injury, observe all warnings on product labels.

**WARNING** Before the dryer is removed from service or discarded, remove the dryer door to prevent accidental entrapment.

⚠ Failure to comply with these warnings could result in serious personal injuries.

### Prevent Injury

**WARNING** To prevent shock hazard and assure stability during operation, the dryer must be installed and electrically grounded by a qualified service person in accordance with local codes. Installation instructions are packed in the dryer for the installer's reference. Refer to INSTALLATION INSTRUCTIONS for detailed grounding procedures. If the dryer is moved to a new location, have it checked and reinstalled by a qualified service person.

**WARNING** To prevent personal injury or damage to the dryer, the electrical power cord of a gas dryer must be plugged into a properly grounded and polarized 3-prong outlet. **The third grounding prong must never be removed. Never ground the dryer to a gas pipe. Do not use an extension cord or an adaptor plug.**

**WARNING** **ALWAYS disconnect** the dryer from the electrical supply before attempting any service or cleaning. Failure to do so can result in electrical shock or injury.

**WARNING** Do not use any type spray cleanser when cleaning dryer interior. Hazardous fumes or electrical shock could occur.

**WARNING** To prevent injury, do not reach into the dryer if the drum is moving. Wait until the dryer has stopped completely before reaching into the drum.

**WARNING** To prevent injury and damage to the dryer:

- **All repairs and servicing must be performed by an authorized servicer** unless specifically recommended in this Owner's Guide. Use only authorized factory parts.
- **Do not** tamper with controls.
- **Do not** install or store the dryer where it will be exposed to the weather.

⚠ A thermal limiter switch automatically turns off the motor in the unlikely event of an overheated situation (electric dryers only). A service technician must replace the thermal limiter switch after correcting the fault.

⚠ Failure to comply with these warnings could result in serious personal injuries.

**SAVE THESE INSTRUCTIONS**

## Drying Procedures

- Follow the guidelines below for preparing the load for drying.
- Read the **Operating Instructions** card for operating your specific model.
- **Always read and follow fabric care labels and laundry product labels.**

**WARNING** To reduce the risk of fire, electrical shock, or injury to persons, read **Important Safety Instructions**, pages 3-4, before operating this dryer.

Follow fabric care label instructions.

Place small items in a mesh bag.

Fill dryer drum 1/3 to 1/2 full.

1. **Prepare items for drying.**
   - Dry items of similar fabric, weight and construction in the same load.
   - Separate dark items from light-colored items. Separate items that shed lint from those that attract lint. If an item sheds lint, turn it inside out.
   - Be sure buckles, buttons and trim are heatproof and won't damage the drum finish. Close zippers, fasten hooks and Velcro®-like fasteners. Tie strings and sashes to prevent snagging and tangling.
   - If possible, turn pockets inside out for even drying.
   - Check for stains which may not have been removed in washing. Dryer heat may permanently set some stains. Repeat stain removal process before drying.
   - Place small items in a mesh bag to prevent tangling and for easy removal.
2. **Check that lint screen is clean and in place.**
3. **Load the dryer.**
   - The average load will fill the drum 1/3 to 1/2 full. Items need room to tumble freely for even drying and less wrinkling. **Do not overload dryer.**
   - When drying large items, dry only 2 or 3 at a time. Fill out the load with small and medium sized items.
   - For delicate or very small loads, add 2 lint-free towels for better drying, less wrinkling, and to prevent grease stains caused by fabric softener sheets.
   - Do not overdry items. Overdrying can cause wrinkling, shrinkage, harshness, and a build-up of static electricity, which can produce more lint.
   - If desired, add a dryer fabric softener sheet.
4. **Close the dryer door and set dryer controls (some models).** See **Operating Instructions** card for your specific model controls.
5. **Turn cycle selector clockwise to the desired setting.**
6. **Start the dryer.**
   - Turn the START knob clockwise to ON. Hold for 1-2 seconds and release.
   - To add or remove items when the dryer is running, open the door. The dryer will always stop when the door is opened. Allow the drum to come to a complete stop before reaching inside.
   - To restart dryer, close the door then turn the START knob clockwise to ON. Hold for 1-2 seconds and release.
7. **When the cycle ends, remove items immediately and hang or fold.** If load is removed before the cycle ends, turn cycle selector to OFF.

ENGLISH

## Features

**Cycle Signal Control (some models)**
When the Cycle Signal Control is ON, a signal will sound at the end of each cycle and during the WRINKLE-PAD setting (some models). The volume is adjustable on some models.

**Drum Light (some models)**
A drum light will come on whenever the door is opened to illuminate the dryer drum during loading and unloading. Closing the door turns off the light.

**Reversible Dryer Door**
Your dryer is equipped with a reversible door. The door can be hinged on the right or left side. Refer to the INSTALLATION INSTRUCTIONS for directions on changing the door.

**Drying Rack (some models)**
Use the drying rack to dry items which should not be tumble dried.
1. Open the dryer door and remove the lint screen.
2. Insert drying rack into the dryer drum. Place the front bar under the lip of the lint screen opening.
3. Place items to be dried on top of the rack. Weight should not exceed 10 lbs. Leave space between items, but do not let items hang over the sides or through the grate. Do not tumble other items when using the drying rack.
4. Select a Heat/Dry setting best suited for items being dried. Use only the Air Fluff (no heat) temperature setting for items containing plastic, foam rubber, rubber-like materials, feathers or down.
5. When items are dry, remove the rack and replace the lint screen. If lint screen is not in place, tumbling items could enter the exhaust system and cause damage to the dryer.

### Common Drying Problems

Many drying problems involve poor cleaning results, poor soil and stain removal, residues of lint and stains, and fabric damage. For satisfactory drying results, follow these suggestions provided by The Soap and Detergent Association.

| PROBLEM | POSSIBLE CAUSES | SOLUTIONS | PREVENTIVE MEASURES |
|---|---|---|---|
| Greasy, oily stains | Fabric softener stains | Rub fabric softener stains with bar soap. Rinse and rewash. | Add a few bath towels to small loads for proper tumbling. Extra "lube-like" fabrics should be air dried. Use proper drying temperature. Place fabric softener sheet on top of load before starting the dryer. |
| Lint | Overloading. Overdrying causes static electricity. Lint screen not clean when cycle began. Lint is attached to "pills." | Reduce load size and rewash using liquid fabric softener in the final rinse. Or, add a fabric softener sheet and tumble without heat. Use lint brush or roller to remove lint. | Do not overload dryer. Use fabric softener in washer or dryer to reduce static electricity. Remove items when they are slightly damp to avoid overdrying. Check that lint screen is clean and in place. |
| Pilling (Fibers break off, ball up and cling to fabric) | Pilling is normal with synthetic and permanent press fabric. This is due to abrasion from normal wear. | Use a lint brush or shaver to remove pills. | Use fabric softener to lubricate fibers. When loading, use spray starch or fabric finish on collars and cuffs. Turn items inside out to reduce abrasion. |
| Staining | Overdrying. | Irreversible condition. | Follow fabric care label directions. If combining a concern, check load closely. Remove items while slightly damp and hang or lay flat to complete drying. Shake knits into shape. |
| Wrinkling | Overloading. Leaving items in dryer after cycle ends. | Reduce load size and tumble at medium or low heat for 5-10 minutes. Remove items immediately. Hang or fold. | Do not overload dryer. Remove items as soon as cycle ends. |

## Care and Cleaning

**⚠ WARNING**
To reduce the risk of fire or serious injury to persons or property, comply with the basic warnings listed in Important Safety Instructions, page 3-4, and those listed below.

- Before cleaning the dryer interior, unplug the electrical power cord to avoid electrical shock hazards.
- Do not use any type spray cleaner when cleaning dryer interior. Hazardous fumes or electrical shock could occur.

**Inside**
Clean the lint screen after every load. Lint build-up is a screen collects airflow, which causes longer drying times. The screen is located at the bottom of the door opening. Remove by pulling straight up. Remove the lint and replace the screen.

Occasionally a waxy build-up may form on the lint screen from using dryer-added fabric softener sheets. To remove this build-up, wash the lint screen in warm, soapy water. Dry thoroughly and replace. Do not operate the dryer without the lint screen in place.

If the dryer drum becomes stained from noncolorfast fabrics, clean the drum with a damp cloth and a mild liquid household cleanser. Remove cleanser residue before drying the next load.

Every 18 months an authorized service should clean the dryer cabinet interior and exhaust duct. These areas can collect lint and dust over time. An excessive amount of lint build-up could result in inefficient drying and possible fire hazard.

**Outside**
- Clean the cabinet with mild soap and water. Never use harsh, gritty or abrasive cleansers.
- If the cabinet becomes stained, clean with diluted chlorine bleach (1/2 cup (120 ml) in 1 quart (.95 liter) water). Rinse several times without water.
- Remove glue residue from tape or labels with a mixture of warm water and mild detergent. Or, touch residue with the sticky side of the tape or label.
- Before moving the dryer, place a strip of cardboard or thin fiberboard under the front leveling legs to prevent damage to floor.

**ENGLISH**



## Avoid Service Checklist

Before calling for service, review this list. It may save both time and expense. The list includes common occurrences that are not the result of defective workmanship or materials in the dryer.

| OCCURRENCE | POSSIBLE CAUSE | SOLUTION |
|---|---|---|
| Dryer does not start. | Electrical power cord is not securely plugged in or plug may be loose. | Make sure the plug fits tightly in wall outlet. |
| | House fuse blown or circuit breaker tripped. | Reset circuit breaker or replace fuse. |
| | | Make sure electrical box is not overloaded and the dryer is on a separate circuit. |
| | Thermal limiter tripped. | Call authorized service person for replacement. |
| Dryer runs but won't heat. | There are 2 house fuses in the dryer circuit. If 1 of the 2 fuses is blown, the drum may turn but the dryer will not become hot. | Replace fuse. |
| | Gas supply valve is not open (gas models). | Check to make sure supply valve is open. See INSTALLATION INSTRUCTIONS for procedure. |
| | Dryer does not have enough gas supply to operate the burner flame (gas models). | See INSTALLATION INSTRUCTIONS. |
| | LP gas supply tank is empty or there has been a utility interruption of natural gas (gas models). | Refill or replace tank. Dryer should heat when utility service is restored. |
| Drying cycle takes too long, outside of the dryer feels too hot or smells hot. | Lint screen is clogged with lint. | Make sure lint has been removed from the lint screen before starting each cycle. |
| | Exhaust duct requirements have not been met. | Exhaust duct must be at least 4 inches in diameter and made of rigid or flexible metal. When in place, the duct must have no more than two 90° bends and must not extend longer than listed in INSTALLATION INSTRUCTIONS. |
| | Electric dryer is connected to a 208 volt circuit. | Drying time will be 20% longer than drying on a 240 volt circuit. |
| | Drying procedures have not been followed. | See Drying Procedures, page 6. |
| | Outside exhaust hood or exhaust duct may be clogged or restricted. | Clean out any obstruction. |
| | High humidity. | Use a dehumidifier near the dryer. |
| Excessive wrinkling. | Dryer is overloaded. | Do not overload. See Drying Procedures, page 3. |
| | Items left in dryer too long. | Remove items as soon as cycle ends. |
| | Incomplete sorting of items. | See Drying Procedures, page 6. |
| | Drying temperature too high. | Follow fabric care label directions. |
| Scratching or chipping of the drum finish. | Foreign objects such as coins, pins, clips or buttons are inside the drum. | Always remove foreign objects from pockets before laundering. Remove objects from drum and restart dryer. |
| | Permanently attached items such as belt buckles, zippers and fasteners may be hitting the inside of the drum. | It may be necessary to locate a scrap of material securely around ornaments before drying to prevent scratching and damage to the dryer. Drum damage caused by foreign objects is not covered by the warranty. |

## Índice

| | |
|---|---|
| English | 2-6 |
| Registro del producto | 8 |
| Garantía para la secadora | 8 |
| Contrato de protección principales | 9 |
| **INSTRUCCIONES IMPORTANTES** | |
| PARA LA SEGURIDAD | 10-11 |
| Procedimientos para el secado | 12 |
| Características | 13 |
| Problemas comunes del secado | 14 |
| Cuidado y limpieza | 15 |
| Evitar llamadas de servicio | 16 |
| Servicio | Cubierta |

## Registro de producto

Registre en la parte reservada a continuación la fecha de compra, el número de modelo y el número de serie de su electrodoméstico. El número de modelo y el número de serie están localizados como una placa de identificación ubicada en la parte trasera de la puerta de la tapa.

Número de modelo: _____

Fecha de compra: _____

No. de serie: _____

Guarde estas instrucciones y su boleto de compra para futuras referencias.

## Garantía para la secadora

**Garantía completa de un año para piezas mecánicas y eléctricas**
Por un año desde la fecha de compra original, el esta secadora se instala y opera de acuerdo con las instrucciones del Manual de Uso y Mantenimiento, las instrucciones para la Operación y las instrucciones para la Instalación, Sears repararà o reemplazará cualesquiera de sus piezas mecánicas o eléctricas en caso de que estas estén defectuosas debido a material o a mano de obra.

**Restricción de la garantía**
Si se opera esta secadora para un uso distinto al uso doméstico de una sola familia, toda la cobertura de la garantía es efectiva para solamente 90 días.

**Servicio bajo la garantía**
Para obtener servicio bajo la garantía póngase en contacto con el más cercano Centro de Servicio Sears en los Estados Unidos.

Esta garantía se aplica únicamente mientras esta secadora esté siendo usada en los Estados Unidos.

Esta garantía le otorga derechos legales específicos, y usted también puede tener otros derechos que varían de un estado a otro.

Sears, Roebuck and Co. Dept. 817WA, Hoffman Estates, IL 60179

## CONTRATOS DE PROTECCIÓN PRINCIPALES

Le felicitamos por su sabia decisión de compra. Su nuevo electrodoméstico Kenmore ha sido diseñado y fabricado para ofrecerle muchos años de rendimiento confiable. Pero, como todos los productos, de vez en cuando puede necesitar mantenimiento preventivo o reparación. En tal momento, es cuando un Contrato de Protección le puede ahorrar preocupaciones y gastos.

Adquiera un Contrato de Protección Principal ahora y protéjase contra inconvenientes y gastos inoportunos.

El Contrato de Protección Principal adquirido le ayuda a prolongar la vida útil de su nuevo electrodoméstico. El Contrato incluye lo siguiente:
- Servicio cubierto por expertos: 12,000 profesionales especializados en reparaciones.
- Servicio periódico ilimitado y gratis de piezas y mano de obra para todas las reparaciones cubiertas dentro de nuestras horas normales de trabajo.
- Garantía de rendimiento: reemplazo del producto cubierto si ocurren 4 reparaciones de un mismo producto dentro de doce meses.
- Reemplazo del producto si el producto bajo contrato no puede ser reparado.
- Revisión anual de Mantenimiento Preventivo cuando lo solicite - sin costo adicional.
- Ayuda rápida por teléfono - ayuda e información en lo línea para sus reparaciones en su hogar, además de Estado de tantos instrumentos para las reparaciones.
- Protección contra aumentos de alquileres debido a fluctuaciones de su tarifa de alquiler.
- Reembolso de monto de contrato si uso realizamos de los productos cubiertos continuarán tiempo que lo permita.

Una vez que usted ha comprado el Contrato, solamente necesita una llamada por teléfono para fijar la hora de servicio. Puede llamar a cualquier hora, durante el día o en la noche o puede fijar la hora para el servicio a través de la computadora.

Sears tiene más de 12,000 profesionales especializados en reparaciones, con llaves acceso a más de 4.7 millones de piezas y accesorios de calidad. Esa es la clase de profesionalismo el que usted puede contar para ayudar a prolongar la vida útil de su nuevo electrodoméstico de su hogar. ¿Por qué no llamarnos? Contrato de Protección Principal Sears.

Para instalaciones, profesionales guardamanos de electrodomésticos:
Exhiben ellas de trabajadores y productividades. Sierra y ambulante antes como sistemas de aparatos de calidad de Partes instantánas profesionales guardamanos de aparatos. Para probar el etiqueta profesionales protección y probadoras: Sierra y ambulante antes como sistemas de aparatos de electrodomésticos normas y calefacciones de aguas, en los EE.UU. llamar al 1-800-4-MY-HOME®

## ESPAÑOL

## Su seguridad y la seguridad de terceros son muy importantes.

## Instrucciones importantes para la seguridad

Lea todas las instrucciones antes de utilizar esta secadora.

### Pedestal

### Evite el incendio

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073910

---

## Proteja a los niños

## Evite lesiones

### SECADORAS ELÉCTRICAS:



### SECADORAS A GAS:



**GUARDE ESTAS INSTRUCCIONES**

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073911

---

## Procedimientos para el secado

1. **Prepare la ropa para el secado.**
2. **Compruebe que la rejilla para pelusas esté limpia y colocada en su lugar.**
3. **Llene la secadora.**
4. **Cierre la puerta de la secadora y coloque los controles de la secadora (algunos modelos).**
5. **Gire la perilla del programador hasta la posición deseada.**
6. **Ponga la secadora en marcha.**
7. **Cuando se termine el ciclo, saque las prendas inmediatamente y cuélguelas o dóblelas.**

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073912

---

## Características

### Control de la Señal de Ciclo (algunos modelos)

### Luz del Tambor (algunos modelos)

### Puerta Reversible

### Parrilla de Secado (algunos modelos)



## Problemas comunes del secado

| PROBLEMA | CAUSAS POSIBLES | SOLUCIONES | MEDIDAS PREVENTIVAS |
|---|---|---|---|

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073913

## Cuidado y limpieza



**ADVERTENCIA** Para reducir el riesgo de incendio o lesiones graves a personas o materiales, cumpla con las advertencias básicas enumeradas en las instrucciones importantes para la seguridad en las páginas 10 y 11, y las que se enumeran a continuación.

- Antes de limpiar el interior de la secadora, desconecte el cable eléctrico para evitar riesgos de descargas eléctricas.

- No use ningún limpiador en vaporizador cuando limpie el interior de la secadora. Pueden desprenderse vapores peligrosos o producirse descargas eléctricas.

### Interior

- Limpie la rejilla para pelusas después de cada carga. La acumulación de pelusas en la rejilla limita el pase de aire, lo que hace que los tiempos de secado sean más largos. La rejilla se encuentra en la parte interior de la abertura de la puerta. Sáquela jalando hacia arriba. Saque las pelusas y vuelva a colocar la rejilla.

- De vez en cuando puede formarse una acumulación de cera sobre la rejilla causada por el uso de hojas de suavizante en la secadora. Para eliminar esta acumulación, lave la rejilla para pelusas en agua jabonosa y caliente. Séquela bien y vuelva a colocarla en su lugar. No ponga la secadora en marcha sin la rejilla para pelusas en su lugar.

- El el tambor de la secadora tiene manchas de rizos de colorete, límpielo con un paño húmedo y un limpiador líquido suave. Limpie el residuo del limpiador antes de secar la siguiente carga.



- Cada 18 meses un técnico de servicio autorizado debe limpiar el interior de la estructura de la secadora y el conducto de salida. Estas áreas pueden acumular pelusas y polvo con el tiempo. Una cantidad excesiva de pelusas puede crear un secado deficiente o un posible riesgo de incendio.

### Exterior

- Limpie la envoltura con un jabón suave y agua. No use nunca limpiadores ásperos, granulados o abrasivos.

- Si la envoltura se mancha, limpie con lejía diluida (½ taza (125 mL) en 1 cuarto de galón (0,95 L) de agua). Enjuague varias veces con agua limpia.

- Elimine el residuo de pegamento de la cinta o las etiquetas con una mezcla de agua caliente y detergente suave. O bien, toque el residuo con el lado pegajoso de la cinta o etiqueta.

- Antes de mover la secadora, coloque una tira de cartón o lámina delgada de fibra debajo de las patas delanteras deslizantes para evitar dañar el piso.

---

## Evitar llamadas de servicio

Antes de llamar para obtener servicio, examine esta lista. Puede ahorrarle tiempo y dinero. Esta lista incluye los problemas comunes que no son el resultado de una fabricación o materiales defectuosos de esta secadora.

| PROBLEMA | CAUSA POSIBLE | SOLUCION |
|---|---|---|

---

**For in-home major brand repair service:**
Call 24 hours a day, 7 days a week

## 1-800-4-MY-HOME℠ (1-800-469-4663)

**Para pedir servicio de reparación a domicilio – 1-800-676-5811**

In Canada for all your service and parts needs call
Au Canada pour tout le service ou les pièces

1-800-665-4455

**For the repair or replacement parts you need:**
Call 6 am - 11 pm CST, 7 days a week

## PartsDirect℠

**1-800-366-PART** (1-800-366-7278)

**Para ordenar piezas con entrega a domicilio – 1-800-659-7084**

**For the location of a Sears Parts and Repair Center in your area:**
Call 24 hours a day, 7 days a week

## 1-800-488-1222

**For information on purchasing a Sears Maintenance Agreement or to inquire about an existing Agreement:**
Call 9 am - 5 pm, Monday - Saturday

## 1-800-827-6655



**SEARS
HomeCentral℠**

The Service Side of Sears℠

---

Page: 1 Document Name: Untitled

HPJ28405 - 16        HPS - Item Agreement                06/02/12
ALEMOOSH ADAMIAN                (818)291-9663  Loc : 1 ET:  CC:N

Mdse code: DRYERG                Mdse desc: DRYER, KENMORE GAS WHITE
Model # : 41793142200           Serial # : X031407374

To view another agreement, press F10 or F11.

Agmt # : 191835023100002   SP . . . : FA FT       Purchase amt :   89.99
Purch date : 04/13/2003    Type . . : SGL         Actual Tax  . :    0.00
Start date : 04/13/2003    Plan . . : STANDARD    Ref Mat     . :    0.00
Expir date : 04 13 2006    Ded amount:             Ref Tax     . :    0.00
#Cvg Month : 24            Serv loc : O           Ref Cvg Ca  . :    0.00
Adj Reason :              Rsng time :             Ref Cvg Cr Tax:    0.00
Cancel date:              Acc S/Mth :      3.74
Obligor  : SRS.

Enter  F1=Help  F2=Exit  F10=Prev  F11=Next  F12=Prev screen

Date: 6/2/2012 Time: 4:36:09 PM

ANSI Z21.5.1-2002
CSA 7.1-2002

AMERICAN NATIONAL STANDARD/CSA STANDARD

FOR

# GAS CLOTHES DRYERS

Volume I - Type 1 Clothes Dryers



---

AMERICAN NATIONAL STANDARD
ANSI Z21.5.1-2002

CSA STANDARD
CSA 7.1-2002

Third Edition - 2002

This Standard is a revised edition
of the former Standard for

GAS CLOTHES DRYERS
Volume I - Type 1 Clothes Dryers

ANSI Z21.5.1-1999 · CSA 7.1-M99
and Addenda
ANSI Z21.5.1a-1999 · CSA 7.1a-M99
ANSI Z21.5.1b-2001 · CSA 7.1b-2001

APPROVED

IGAC

February 14, 2002
American National Standards Institute, Inc.

February 7, 2002
Intergovincial Gas Advisory Council
Effective in Canada October 1, 2002

Secretariats

CSA America, Inc.
8501 East Pleasant Valley Road
Cleveland, Ohio 44131

Canadian Standards Association
178 Rexdale Boulevard
Toronto, Ontario
Canada M9W 1R3

Published - May 2002

Copyright © 2002

Canadian Standards Association

Permission is granted to republish material herein in laws or ordinances,
and in regulations, administrative orders, or similar documents issued by
public authorities. Those desiring permission for other republication should
consult Canadian Standards Association at 178 Rexdale Boulevard,
Toronto, Ontario, Canada M9W 1R3.

Copyright © 2002

CSA America, Inc.

Permission is granted to republish material herein in laws or ordinances,
and in regulations, administrative orders, or similar documents issued by
public authorities. Those desiring permission for other republication should
consult CSA America, Inc. at 8501 East Pleasant Valley Road, Cleveland,
Ohio 44131.

---

b.   The control incorporates only two terminals or leads, the interchange of which does not
     change the operation of the control.

### 1.18 MOTORS AND BLOWERS

1.18.1   See Exhibit A, Items Unique to the United States and Exhibit B, Items Unique to Canada for
         provisions covering motors.

1.18.2   Motor, blower or fan bearings shall be either (a) permanently lubricated or (b) provided with
         accessible means for lubrication. The removal of screws or access panels shall be considered
         acceptable. Also see 1.23.7 and 1.23.8.

### 1.19 LOADING DOORS

1.19.1   Loading doors shall be substantially reinforced so as to prevent warping.

1.19.2   Loading doors shall not show breakage, permanent deflection or damage in any part thereof
         when subjected to a load of 50 pounds (22.7 kg), uniformly applied for a period of 5 minutes
         without impact, along the top edge of swing type doors when perpendicular to the plane of the
         face of the dryer, or along a strip 4 inches (102 mm) wide and the full width of drop down
         which stop in the horizontal position, equidistant from the hinges and the same edge of the
         door when open.

1.19.3   Swing type doors on the drying chamber shall be equipped with a means to hold the door
         closed. Swing-type doors shall also comply with 2.17, Door and Catch Test.

### 1.20 MOISTURE AND LINT DISPOSAL

1.20.1   The dryer shall be provided with means for exhaust duct connection. Dryers shall be provided
         with a suitable collar that will accommodate standard duct material of integral inch size.

1.20.2   Where a lint screen is provided upstream from the exhaust duct collar, the lint screen shall be
         readily removable or easily accessible for cleaning without disconnecting the exhaust duct.

### 1.21 INSULATION

1.21.1   When insulation is employed, it shall be uniformly packed and provided with protection to
         prevent shifting, deterioration from excessive heat, and contact with rotating parts.

1.21.2   Thermal insulation shall be considered as an electrically dead metal part and shall be reliably
         spaced from electrically live parts in accordance with the applicable spacings specified in
         Exhibits A, Items Unique to the United States and B, Items Unique in Canada.

### 1.22 INSTRUCTIONS

For dryers sold in Canada, also see Exhibit B, Items Unique to Canada.

11

---

Instructions shall be reviewed by the testing agency for comprehensibility, accuracy, and
compatibility with results of test and with the National Fuel Gas Code, ANSI Z223.1/NFPA 54
or the Canadian Natural Gas and Propane Installation Code, CSA B149.1.

1.22.1   Instructions for the proper installation, operation, and maintenance of the dryer may be
         provided as separate manuals or combined as one manual. Each manual provided shall contain
         instructions to retain the manual for future reference.

1.22.2   Type I household dryers shall include:

         a.   Installation instructions;

         b.   Operating instructions; and

         c.   Maintenance instructions.

1.22.3   Type I commercial dryers shall include:

         a.   Installation instructions; and

         b.   Maintenance instructions.

1.22.4   The front cover or the first page of the manual containing the operating instructions shall bear
         the following hazard warning. It shall be boxed as shown:

12

## Panel 1 (p. 13)

> **WARNING: For your safety the information in this manual must be followed to minimize the risk of fire or explosion or to prevent property damage, personal injury or death.**
>
> — Do not store or use gasoline or other flammable vapors and liquids in the vicinity of this or any other appliance.
>
> — WHAT TO DO IF YOU SMELL GAS
>
> • Do not try to light any appliance.
> • Do not touch any electrical switch; do not use any phone in your building.
> • Clear the room, building or area of all occupants.
> • Immediately call your gas supplier from a neighbor's phone. Follow the gas supplier's instructions.
> • If you cannot reach your gas supplier, call the fire department.
>
> — Installation and service must be performed by a qualified installer, service agency or the gas supplier.

The letters used for the brand statement above shall be bold-faced type having a minimum uppercase letter height of 0.110-inch (2.81 mm). The minimum vertical spacing between lines of type shall be 0.042 inch (1.18 mm).* Lowercase letters shall be compatible with the uppercase letter size specification.

1.22.5 The front cover or the first page of the installation instructions for a Type I commercial dryer shall bear:

a. A note instructing the purchaser to post in a prominent location instructions to be followed in the event the user smells gas. The information to be posted shall be obtained by consulting with the local gas supplier.

b. The following "For Your Safety" caution, with a note instructing the purchaser to post this caution in a prominent location:

> **FOR YOUR SAFETY**
> Do not store or use gasoline or other flammable vapors and liquids in the vicinity of this or any other appliance.

* This is the height and line spacing corresponding to 12 point type.

13   Revised: September 2002

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER

## Panel 2 (p. 14)

1.22.6 The installation instructions shall include:

a. Assembly instructions for field-installed parts and components, including all controls and accessories (where applicable).

b. Statements indicating:

1. The installation must conform with local codes, or in absence of local codes, with the *National Fuel Gas Code, ANSI Z223.1/NFPA 54* or the *Canadian Natural Gas and Propane Installation Code, CSA B149.1*.

2. The dryer, when installed, must be electrically grounded in accordance with local codes, or in the absence of local codes, with the *National Electrical Code, ANSI/NFPA 70*, or the *Canadian Electrical Code, CSA C22.1*.

3. The dryer must not be installed or stored in an area where it will be exposed to water and/or weather.

4. Dryers installed in residential garages must be elevated 18 inches (46 cm) above the floor.

   Note: If the manufacturer specifies that this dryer must not be installed in a residential garage, this clause is not required.

5. The dryer must be secured to the structure, and methods for installing securing means provided with the appliance.

   Note: This applies only to dryers requiring securing means to comply with 1.22.4.

6. Clearances from combustible construction.

7. Adequate clearances for servicing and proper operation.

8. Provisions for adequate air supply and adequate clearances for air openings into the combustion chamber.

9. Dimensions of required combustion and ventilation air openings in closet doors.

   Note: This applies only to dryers suitable for installation in a closet.

10. No other fuel-burning appliance shall be installed in the same closet as the dryer.

    Note: This applies only to dryers suitable for installation in a closet.

11. Combustible materials, gasoline, and other flammable vapors and liquids must not be stored near the dryer.

12. The dryer must be disconnected from the gas supply piping system during pressure testing.

13. Proper exhaust installation, indicating the type of exhaust duct, where applicable, and including the following statements:

14   Revised: September 2002

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER

## Panel 3 (p. 15)

(a) The dryer shall not be exhausted into any gas vent, chimney, wall, ceiling, or concealed space of a building; and

(b) The dryer must be exhausted to the outdoors.

(c) Exhaust duct must not be connected or secured with screws or other fastening device which extend into the interior of the duct.

14. A ¼ inch NPT minimum plugged tapping, accessible for test gage connection, must be installed immediately upstream of the gas supply connection to the dryer.

15. A vent line must extend from the regulator vent to the outdoors (if applicable, see 1.14.2).

16. The following wording or the equivalent: "WHEN DISCARDING OR STORING YOUR OLD CLOTHES DRYER, REMOVE THE DOOR."

c. Dryers suitable for installation in a mobile home shall contain the following additional installation instructions:

1. That the installation of the dryer conform to the *Manufactured Home Construction and Safety Standard, Title 24 CFR, Part 3280* [formerly the Federal Standard for Mobile Home Construction and Safety, Title 24, HUD (Part 280)], or Standard CAN/CSA Z240 MH.

2. Means available from the manufacturer for secure attachment of the dryer to the structure (see 1.2.41).

3. Exhaust ducts must be securely fastened to a noncombustible portion of the mobile home structure and must not terminate beneath the mobile home.

4. Mobile home exhaust kit part number if available from the manufacturer, or instructions for the appropriate type, size, and installation of the duct.

5. Provisions for introduction of outside air into the dryer room. The free area of any opening for the introduction of outside air into the dryer room is less than twice the area of the dryer exhaust outlet.

1.22.7 Operating instructions shall include information, clearly understandable, for the safe use and operation of the dryer. The operating instructions shall contain statements indicating the following wording or the equivalent:

"Do not allow children to play on or in the appliance. Close supervision of children is necessary when the appliance is used near children."

1.22.8 Maintenance instructions shall include instruction for all maintenance intended to be performed by the user, including recommended frequency guidelines. Maintenance instructions shall include, but are not limited to:

a. Cleaning of lint screen (when supplied).

15   Revised: September 2002

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER

## Panel 4 (p. 18)

b. Lubrication of moving parts (when applicable), including type and amount of lubricant. (Also see 1.22.9.)

c. Periodic examination of exhaust systems.

d. Source for replacement parts.

e. Keeping dryer area clear and free from combustible materials, gasoline and other flammable vapors and liquids.

f. Keeping the dryer area clean and free from items that would obstruct the flow of combustion and ventilation air.

1.22.9 Also see 1.2.3.6, 1.14.2, 1.22.5 through 1.22.6 and 1.22.8.

### 1.23 MARKING

1.23.1 Marking material shall be identified by class number and shall meet the following specifications. A brief marking materials table is contained. All markings shall be suitable for application to surfaces upon which applied. The designation of any class of marking shall not preclude the use of marking of a lower number class.

**Class I. Integral Marking**

Marking that is embossed, cast, stamped or otherwise formed in the part. This includes markings behind into an unmarked surface.

**Class II-A. Permanent Plate**

Shall be made of metal having a minimum thickness of 0.042 inch (0.30 mm) and shall be securely attached by mechanical means.

**Class II-B. Permanent Plate**

Shall be made of metal having a thickness of 0.008 to 0.012 inch (0.15 to 0.30 mm) and shall have mechanical attachment means at all corners with a maximum spacing of 3 inches (152 mm) between mechanical fasteners.

**Class II-C. Permanent Plate**

Shall be made of metal having a thickness less than 0.008 inch (0.15 mm). Such plates shall be attached by means of solvent-soluble adhesive which will comply with 2.19, Marking Material Adhesion and Legibility. These materials shall not be located on surfaces having temperatures exceeding 200°F (93°C) as determined during conduct of 2.12, Wall, Floor and Ceiling Temperatures.

**Class II-A. Permanent Plate**

Shall be made of pressure-sensitive metal foil requiring no solvent or activator, provided such plates comply with 2.19, Marking Material Adhesion and Legibility. These materials shall not

18   Revised: September 2002

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER

be located on surfaces having temperatures exceeding 300°F (149°C) as determined during conduct of 2.14, Wall, Floor and Ceiling Temperatures.

**Class IIIA-1. Permanent Label**

Shall be made of material not adversely affected by water, shall be attached by means of moisture-insoluble adhesive, and shall comply with 2.19, Marking Material Adhesion and Legibility. These materials shall not be located on surfaces having temperatures exceeding 300°F (149°C) as determined during conduct of 2.14, Wall, Floor and Ceiling Temperatures.

**Class IIIA-2. Permanent Label**

Shall be made of material not adversely affected by water, shall be attached by means of moisture-soluble adhesive and shall comply with 2.19, Marking Material Adhesion and Legibility. These materials shall not be located on surfaces having temperatures exceeding 175°F (79.5°C) as determined during conduct of 2.14, Wall, Floor and Ceiling Temperatures.

**Class IIIB. Waterproof Marking**

Shall be printed directly on the part with waterproof marking ink inherently affected by a temperature of 175°F (79.5°C) and shall comply with 2.19, Marking Material Adhesion and Legibility. This marking shall not be used on surfaces having temperatures exceeding 175°F (79.5°C) as determined during conduct of 2.14, Wall, Floor and Ceiling Temperatures.

**Class IIIC. Waterproof Label**

Shall be made of material not soluble in water, and may use water-soluble adhesive for attachment means.

**Class IV. Nonwaterproof Label**

Shall be made of material which may be soluble in water, and may use water-soluble adhesive for attachment means.

**Class V. Printed Marking**

Marking shall be clear and prominent and may be applied directly by any printing means.

**Class VI. Attached Tags**

1.23.2    RATING PLATE(S). Each dryer shall bear a plate or a combination of adjacent plates of Class IIIA marking material located so as to be easily read when the dryer is in a normally installed position. A plate(s) visible after removal of an access panel, without the use of tools, is satisfactory. This plate(s) shall include the following information:

a.    The manufacturer's, dealer's or distributor's name and address.

b.    The manufacturer's model number.

c.    A distinctive number or numbers which will identify an individual dryer.

17

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073926

---

d.    Type of gas for which tested: Nat., Mfd., Mix., Propane, LP or ___ Btu LP gas air mixture; and the type of gas for which equipped: Nat., Mfd., Mix., Propane, LP or ___ Btu LP gas air mixture (the heating value for the LP gas air mixture shall be indicated).

e.    The manifold pressure recommended by the manufacturer.

f.    Maximum permissible gas supply pressure ("___" wc). The value inserted in the blank shall be the same as the increased inlet test pressure specified in Table V for the type of gas for which the appliance is certified.

g.    Minimum permissible gas supply pressure for purpose of input adjustment when the dryer is equipped with a gas appliance pressure regulator.

h.    The manufacturer's input rating as follows: "Input ___ Btuh (___ kW)".

i.    Electrical rating – voltage, frequency, and total input in amperes as follows: "___ V," "___ Hz," "___ A".

j.    Identification of this standard by indicating either this edition of the standard, or the most recent effective addenda thereto, with one of the following markings:

"ANS Z21.5.1 - CSA 7.1-(year) Clothes Dryers, Vol. 1,"
"ANS Z21.5.2a - CSA 7.1a-(year) Clothes Dryers, Vol. 1," or
"ANS Z21.5.2b - CSA 7.1b-(year) Clothes Dryers, Vol. 1."

The last two digits of the year may be used to indicate the year of the standard or addenda.

k.    The symbol of the organization making the tests for compliance with this standard.

1.23.3    INSTRUCTION PLATE. A dryer which requires more than the manual operation of a single control external to the dryer to place it in service shall have clearly defined, legible and complete instructions for lighting and shutting down the dryer on Class IIIC marking material. These instructions shall be located on or adjacent to the controlling device or in an equally conspicuous position where the instructions can be easily read and readily observed by the operator. Lighting instructions shall specify a 5-minute complete shutoff period before the dryer is relighted.

1.23.4    CLEARANCE MARKINGS.

a.    Each dryer shall bear a marking on Class IIIC marking material, located as specified in 1.23.1 or where visible during installation, stating the minimum clearances from combustible construction for the top, all sides and the exhaust duct surfaces. A dryer complying with the optional provisions of 2.14.2 shall also be marked to indicate closer installation requirements. The clearance between the exhaust duct when it pierces the enclosure and combustible construction, if other than zero, shall also be included.

b.    A dryer which requires clearance from any type of construction for serviceability or proper operation shall bear a marking on Class IIIC marking material, located on the

18

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073927

---

surface(s) requiring such clearance or where visible during installation, indicating the minimum distance required.

1.23.5    A dryer for closet installation shall bear a statement on Class IIIA marking material, referring to the installation instructions for closet installation. This statement shall (1) be located as specified in 1.23.2, or (2) be visible during installation.

1.23.6    A clothes dryer equipped with securing means utilized to comply with 1.18 shall bear a Class IV marking prominently located on the front or top of the dryer reading to the effect that the installation is not complete until the dryer is secured to the structure with the securing means provided and that the installation instructions should be referred to for proper installation.

1.23.7    A dryer for domestic use which is also suitable for manufactured home installations (see 1.2.12) shall incorporate on the rating plate, or on a separate marking plate of Class IIIA marking material adjacent to the rating plate, a permanent and prominent statement reading to the effect that the dryer is also suitable for manufactured home installation. If the part numbers of the installation and exhaust kits are not included on this plate, a marking shall be incorporated to indicate the location of this information.

Any of the following may be substituted for manufactured home in the above marking:

a.    Mfd. home (mobile home);

b.    Manufactured (mobile) home;

c.    Mfd. (mobile) home;

d.    Manufactured home; or

e.    Mfd. home.

1.23.8    Suitable instructions for lubrication of motor and blower or fan bearings, if applicable, shall be provided on a Class V marking either on the fan or blower housing or on surfaces adjacent to the means of access.

1.23.9    ELECTRICAL DIAGRAMS. Each dryer shall bear a marking on Class IV marking material stating, "Caution: Label all wires prior to disconnection when servicing controls. Wiring errors can cause improper and dangerous operation. Verify proper operation after servicing."

1.23.10    The dryer shall bear a marking, on Class IIIA marking material, located so as to be readily visible to the user when handling the dryer, on which appears wording to warn the user that:-

a.    The dryer must be used only for water washed fabrics; and

b.    Heat should not be used for drying foam rubber items or similarly textured rubber-like material.

1.23.11    All dryers shall bear a Class IIIA-2 label stating "This Dryer must be Exhausted to the Outdoors" or equivalent wording. The marking shall be 16 letters not less than ¹⁄₈ inch

18

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073928

---

(3.2 mm) high which will be readily visible on the enclosure front, or from the front when the dryer door is opened.

1.23.12    Also see 1.23.4, and 1.9.2.

1.23.13    A clothes dryer certified for domestic use in Canada with natural gas and propane and convertible to the alternate gas, shall bear a Class III marking on or adjacent to the rating plate to the effect as follows: "For use with natural gas and propane, a conversion kit, as supplied by the manufacturer, shall be used to convert this dryer to the alternate fuel. Pour utilisation avec le gaz naturel et le propane. Une trousse de conversion fournie par le fabricant doit être utilisée pour passer d'un combustible à l'autre."

20

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073929

# HOME FIRES INVOLVING
# CLOTHES DRYERS AND WASHING MACHINES

John R. Hall, Jr.
March 2009

**National Fire Protection Association**
Fire Analysis and Research Division

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073930

---

# HOME FIRES INVOLVING
# CLOTHES DRYERS AND WASHING MACHINES

John R. Hall, Jr.
March 2009

**National Fire Protection Association**
Fire Analysis and Research Division

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073931





---

### Abstract

In 2003–2006, there were 15,350 non-confined home structure fires per year reported to U.S. fire departments when clothes dryers or washing machines were the equipment involved in ignition, with associated annual losses of 16 civilian deaths, 435 civilian injuries, and $204 million in direct property damage. Dryers alone accounted for 92% of those fires and all of the reported deaths.

These estimates are based on data from the U.S. Fire Administration's (USFA's) National Fire Incident Reporting System (NFIRS) and the National Fire Protection Association's (NFPA's) annual fire department experience survey.

Keywords: Fire statistics, home fires, clothes washer, clothes dryer.

### Acknowledgements

The National Fire Protection Association thanks all the fire departments and state fire authorities who participate in the National Fire Incident Reporting System (NFIRS) and the annual NFPA fire experience survey. These firefighters are the original sources of the detailed data that make this analysis possible. Their contributions allow us to estimate the size of the fire problem.

We are also grateful to the U.S. Fire Administration for its work in developing, coordinating, and maintaining NFIRS.

For more information about the National Fire Protection Association, visit www.nfpa.org or call 617-770-3000. To learn more about the One-Stop Data Shop go to www.nfpa.org/osds or call 617-984-7443.

Copies of this analysis are available from:

National Fire Protection Association
One-Stop Data Shop
1 Batterymarch Park
Quincy, MA 02169-7471
www.nfpa.org
e-mail: osds@nfpa.org
phone: 617-984-7443

NFPA No. USS57
Copyright © 2009, National Fire Protection Association, Quincy, MA

### Table of Contents

| | Page |
|---|---|
| Table of Contents | i |
| List of Tables and Figures | ii |
| Clothes Dryers and Washing Machines Fact Sheet | iii |
| | |
| Clothes Dryers and Washing Machines Fact Sheet | 1 |
| Appendix A - How National Estimates Statistics Are Calculated | 14 |

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER       EHP LARSON 073932

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER       EHP LARSON 073933

List of Tables and Figures

Page

Figure 1. Home Fires Involving Washers or Dryers, by Year 1
Table A. Home Fires Involving Washers or Dryers, by Type of Equipment 2
Table B. Injuries Involving Washers or Dryers Reported to Hospital Emergency Rooms 3
Table 1. Home Fires Involving Washers or Dryers, by Year 7

Table 2. Home Fires Involving Washers or Dryers, by Factor Contributing to Ignition 8
A. Clothes Dryers and Washing Machines 8
B. Clothes Dryers 9
C. Washing Machines 10
D. Combination Washer/Dryers 10

Table 3. Home Fires Involving Washers or Dryers, by Item First Ignited 11
A. Clothes Dryers and Washing Machines 11
B. Clothes Dryers 11
C. Washing Machines 12
D. Combination Washer/Dryers 12

Table 4. Home Fires Involving Washers or Dryers, by Area of Origin 13
A. Clothes Dryers and Washing Machines 13
B. Clothes Dryers 13
C. Washing Machines 14
D. Combination Washer/Dryers 14

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER EHP LARSON 073934

NFPA
One-Stop Data Shop
Fire Analysis and Research Division
One Batterymarch Park, Quincy, MA 02169
Email: osds@nfpa.org
www.nfpa.org

## Clothes Dryers and Washing Machines Fact Sheet

In 2006, an estimated 17,700 reported U.S. non-confined or confined home* structure fires involving clothes dryers or washing machines (including combination washer/dryers) resulted in an estimated:

- 15 civilian deaths
- 360 civilian injuries
- $194 million in direct property damage

**Leading Items First Ignited in Non-Confined Fires Involving Clothes Washer or Clothes Dryer, 2003-2006**

| Dryer | Fires | Washer | Fires |
|---|---|---|---|
| Clothing | 30% | Wire or cable insulation | 29% |
| Dust, fiber, or lint | 27% | Appliance housing or casing | 21% |
| Unclassified soft goods or clothing | 10% | Drive or other belt | 18% |

- Most (81%) non-confined home structure fires involving washers or dryers began in a laundry room or area.
- Most of these home fires involve clothes dryers (92% in 2003-2006).
- The risk of fire is slightly higher for gas-fueled clothes dryers than for electric-powered clothes dryers.
- The leading cause (29% of fires) of home clothes dryer and washer fires was failure to clean.

*Homes are dwellings, duplexes, manufactured homes, apartments, townhouses, rowhouses, and condominiums.

Estimates are derived from the U.S. Fire Administration National Fire Incident Reporting System (NFIRS) Version 5.0 and NFPA's annual fire department experience survey.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER EHP LARSON 073935

## Clothes Dryers and Washing Machines

**In 2006, an estimated 17,700 reported U.S. non-confined or confined[1] home structure fires involving clothes dryers or washing machines (including combination washer/dryers) resulted in 15 civilian deaths, 360 civilian injuries, and $194 million in direct property damage.**
Washer and dryer fires were mostly level from 1980 to 1998, with only a slight decline in the first years of the period to break the pattern. After some volatility during the transition years as NFIRS Version 5.0 was introduced, the estimates have settled into a new level trend lower than the lowest levels of 1980-1998. Civilian injuries have stabilized in a range comparable to that seen in the 1990s. Direct property damage after adjustment for inflation is varying year to year but around a generally higher average than those seen prior to 1999.

In 2006, clothes dryers and washing machines accounted for 4.5% of all reported home structure fires, 0.6% of associated civilian deaths, 2.9% of associated civilian injuries, and 2.8% of associated direct property damage.

**Figure 1. Home Fires Involving Washers or Dryers, by Year Structure Fires Reported to U.S. Fire Departments (Excluding Fires Reported as Confined Fires)**

30,000
25,000
20,000
15,000
10,000
5,000
0
Fires
Year

Note: See Note on year table.

Source: Data from NFIRS and NFPA survey.

Most (92%) home fires involving washers or dryers involve clothes dryers.

[1] Confined fires are fires reported as confined to fuel burner or boiler, chimney or flue, cooking vessel, trash, incinerator, or commercial compactor. For fires reported as confined fires, most data fields are not required in the National Fire Incident Reporting System (NFIRS). See Appendix for more details.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER EHP LARSON 073936

In 2003-2006, washers and dryers were involved in an estimated 1,450 home structure fires per year that were reported as confined fires. They add about 10% to the average of non-confined fires. The largest share of these confined fires was for contained trash fires:

- Contained trash fire (42% of total reported confined home structure fires involving washer or dryer),
- Confined to fuel burner or boiler (23%),
- Confined to cooking vessel (13%),
- Confined to chimney or flue (13%),
- Confined to incinerator (9%), and
- Confined to commercial compactor (8%).

The confined flue fires are the ones that make the most sense for this kind of equipment. The contained trash or rubbish fires make sense if "trash" is understood to include lint. Most of these fires involved either lint or items (e.g., clothing, other soft goods) that can generate lint in a dryer. The others could include examples of using equipment not designed for clothes drying (cooking vessel, incinerator) as a makeshift clothes dryer. More likely, those categories may have been used because there is no code for dryer, but there are two codes for equipment used to heat the contents of a compartment or enclosure in the equipment. That description fits a clothes dryer, even though the purpose is not cooking or incineration of the contents.

**Table A. Home Fires Involving Washers or Dryers, by Type of Equipment Annual Average of 2003-2006 Structure Fires Reported to U.S. Fire Departments (Including Fires Reported as Confined Fires)**

| Equipment | Fires | | Civilian Deaths | | Civilian Injuries | | Direct Property Damage (in Millions) | |
|---|---|---|---|---|---|---|---|---|
| Clothes dryer | 15,490 | (92%) | 16 | (100%) | 403 | (92%) | $190 | (94%) |
| Washing machine | 780 | (4%) | 0 | (0%) | 17 | (4%) | $6 | (3%) |
| Washer/dryer combination | 570 | (3%) | 0 | (0%) | 16 | (4%) | $6 | (3%) |
| Total washer or dryer | 16,840 | (100%) | 16 | (100%) | 436 | (100%) | $202 | (100%) |

Note: These are national estimates of fires reported to U.S. municipal fire departments and so exclude fires reported only to Federal or state agencies or industrial fire brigades. National estimates are projections. Casualty and loss projections can be heavily influenced by the inclusion or exclusion of one unusually serious fire. Fires are rounded to the nearest ten, civilian deaths and injuries to the nearest one, and direct property damage to the nearest million dollars. Damage has not been adjusted for inflation. Figures reflect a proportional share of home fires reported as "no equipment" but lacking a confidently specific heat source (codes 40-99) [illegible]. Totals may not equal sums because of rounding.

Source: Data from NFIRS Version 5.0 and NFPA survey.

**The risk of fire is slightly higher for gas-fueled clothes dryers than for electric-powered clothes dryers.**
In 2003-2006, home fires involving electric-powered dryers outnumbered home fires involving gas-fueled dryers by 3.2-to-1. Usage statistics are available for 2001 and 2007, when the ratios of households using electric-powered dryers to households using gas-

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER EHP LARSON 073937

footed dryers were 3.6-to-1 and 3.4-to-1, respectively.[?] The ratio of usage being higher than the ratio of fires implies a slightly higher risk for gas-footed dryers.

The estimated difference in risk might be larger if the analysis could adjust for differences in other risk-related characteristics of users of the two types of dryers. For example, the relative usage of electric-powered dryers is considerably greater for some high-risk groups – rural communities (10.6-to-1) and the South region (13.3-to-1) – and lower for some low-risk groups, such as the West region (2.0-to-1). In other words, the owners of electric-powered dryers are disproportionately located in regions and in sizes of communities where the overall risk of fire is above average. If the estimated fire risks associated with electric-powered and gas fueled dryers were adjusted to reflect these non-dryer-related differences in fire risks of the dryer owners, then the slight estimated risk advantage for electric-powered dryers would be re-estimated as a somewhat larger risk advantage.

**In 1999-2003, there were an average of 1.4 electrocution deaths per year involving clothes dryers.[?]**
This captures all reports issued by the U.S. Consumer Product Safety Commission, which did not report on product-related electrocution deaths for 1999. In addition, clothes workers accounted for two electrocution deaths in 2000. In 2002, clothes washers were part of a larger group, with no separate results by type of equipment, that together accounted for ten electrocution deaths.

**In 2006, an estimated 21,330 injuries involving clothes dryers and clothes washers were reported to hospital emergency rooms.[?]**
Unlike civilian fire injuries, these injuries were more likely to involve clothes washers than clothes dryers. The leading types of injuries were strains and sprains, lacerations, and contusions and abrasions. These types of injuries might be expected to occur when trying to move the appliance, when the victim falls on the appliance, or when the appliance falls on the victim.

Table II. Injuries Involving Washers or Dryers Reported to Hospital Emergency Rooms, 2006

| Type of Equipment | Total | Strains or Sprains | Lacerations | Contusions or Abrasions |
|---|---|---|---|---|
| Clothes washers | 19,578 | 4,806 | 2,620 | 2,760 |
| Clothes dryer | 7,769 | 2,370 | 1,490 | 1,319 |
| Total | 27,330 | 7,150 | 4,110 | 3,950 |

[?] Based on analysis of the Home Structure Fires 2007, U.S. Census Bureau, 2005, Table 961, from non-Housing Survey 1991-2ld., Department of Commerce and J.B. Underwood of Heating and Other Developments, Table 2-4.

[?] Karen F. Chowdhury, 2006 Data Review Associated with Consumer Products Estimated 2006, Table 2, www.cpsc.gov, and www.cpsc.gov/pdf-the-event

[?] Estimate from the National Electronic Injury Surveillance System (NEISS), operated at the U.S. Consumer Product Safety Commission website, www.cpsc.gov.

**Failure to clean is the leading factor contributing to ignition cited for 2003-2006 non-confined home structure fires involving washers or dryers (29%) and clothes dryers specifically (31%).**
Many other leading factors involve mechanical or electrical failures or malfunctions with little detail provided. Fire deaths often cite human-error factors, including failure to clean (9 civilian fire deaths per year) and unclassified operational deficiency (4 deaths per year).

**The item first ignited for 2003-2006 home non-confined clothes dryer structure fires is likely to be something being dried or a byproduct of such an item (such as lint), while for home non-confined clothes washer structure fires, the first item ignited is likely to be a part of the appliance itself.**
The leading items for clothes dryers include clothing (30% of fires and 26% of civilian deaths); dust, fiber, or lint (27% of fires and 31% of deaths), and unstratified soft goods or clothing (10% of fires). The leading items for clothes washers include wire or cable insulation (20% of fires), appliance housing or casing (21% of fires), and drive belt (18% of fires).

**Most (81%) 2003-2006 non-confined home structure fires involving washers or dryers began in a laundry room or area.**
Other leading areas of origin included garage (3% of fires), crawl space or substructure space (2%), and kitchen (2%).

**There is no direct statistical evidence of a home fire problem involving dryers and spontaneous heating of soft goods impregnated by flammable or combustible liquids.**
The fires of concern occur when flammable or combustible liquids are absorbed by soft goods like towels, are not completely removed during washing, and then become part of a delayed ignition of goods heated by a clothes dryer. If the pile is large enough, and if the goods have certain physical properties, then it is possible that heat will build up inside the pile faster than heat is lost to the surrounding air. The task is associated with large piles of goods, more characteristic of a large commercial or institutional laundry than of a home, and the risk is also increased if the dryer cycle is interrupted before completion of the cool-down portion of the cycle. Only 1% of home dryer fires began with the ignition of flammable or combustible liquids and a side analysis showed only 0.2% of home dryer fires involved a chemical reaction or spontaneous heating as the heat source.

Safety Tips:

• Clean the lint filter in a dryer before or after each use because accumulated dust and lint can be a fire hazard.

  If clothing is still damp at the end of a typical drying cycle or drying requires longer times than normal, this may be a sign that the lint screen or the exhaust duct is blocked.[?]

[?] Overheated clothes dryers can cause fires, CPSC Document #5022, U.S. Consumer Product Safety Commission, Washington, DC, updated June 2003.

• Also, remove accumulated lint around the drum. Do not operate the dryer without a lint filter.

• Periodically check while the dryer is operating to make sure that the air exhaust vent pipe is not restricted and the outdoor vent flap will open. Clean lint out of the vent pipe once a year.

  To remove a blockage in the exhaust path, it may be necessary to disconnect the exhaust duct from the dryer. Remember to reconnect the ducting to the dryer and outside vent before using the dryer again.[?]

• There are long, thin brushes one can buy to make it easier to reach and remove lint in the vent pipe and around the drum. These are also dryer lint removal services.

  Have a qualified service person clean the interior of the dryer chassis periodically to minimize the amount of lint accumulation.[?]

• Replace plastic or foil, accordion-type ducting material with rigid or corrugated semi-rigid metal duct. Most manufacturers specify the use of a rigid or corrugated semi-rigid metal duct, which provides maximum airflow. The flexible plastic or foil type duct can more easily trap lint and is more susceptible to kinks or crushing, which can greatly reduce the airflow.[?]

• Ensure that a dryer is plugged into an outlet suitable for its electrical needs.

• Do not leave a dryer running if you leave the home, because if it malfunctions, no one will be there to avert possible disaster.

• Keep the dryer area clear of combustibles like boxes and clothing.

• Have your dryer installed and serviced by a professional.

• Take special care when drying clothes that have been soiled with volatile chemicals such as gasoline, cooking oils, cleaning agents, or finishing oils and stains. If possible, wash the clothing more than once to minimize the amount of volatile chemicals on the clothes and, preferably, hang the clothes to dry. If using a dryer, use the lowest heat setting and a drying cycle that has a cool-down period at the end of the cycle. To prevent clothes from igniting after

[?] Overheated clothes dryers can cause fires, CPSC Document #5022, U.S. Consumer Product Safety Commission, Washington, DC, updated June 2003.

[?] For more information on factors in lint accumulation, reporting, and cautions of fire, see Karen Chester, Clothes Dryer and Lint Ignition Characteristics, U.S. Consumer Product Safety Commission, Washington, DC, May 2003.

drying, do not leave the dried clothes in the dryer or piled in a laundry basket.[?]

• It is important to keep dryers in good working order to avoid problems associated with lack of maintenance and part failures. Gas dryers should be inspected by a professional occasionally to ensure that the gas line and connection are intact and free of leaks.

• To help reduce electrical problems associated with washing machines and dryers, make sure the right plugs and outlet are used and the machine is connected properly.

• Avoid overloading a washing machine or dryer and follow manufacturer's equipment care and operating instructions. This should help cut down on the number of fires caused by parts breaking and leaks.

• Have a professional check the equipment if there are any doubts that it is running properly or safely.

• Washing machines and dryers should be properly grounded.

[?] Overheated clothes dryers can cause fires, CPSC Document #5022, U.S. Consumer Product Safety Commission, Washington, DC, updated June 2003.

[?] For more information on drying clothes, CPSC Document #5022, U.S. Consumer Product Safety Commission, Washington, DC, updated June 2003.

Table 1. Home Fires Involving Washers or Dryers, by Year
Structure Fires Reported to U.S. Fire Departments

| Year | Fires | Civilian Deaths | Civilian Injuries | Direct Property Damage (in Millions) As Reported | In 2004 Dollars |
|------|-------|-----------------|-------------------|--------------------------------------------------|------------------|
| 1980 | 24,100 | 7 | 380 | $38 | $94 |
| 1981 | 22,000 | 19 | 250 | $32 | $70 |
| 1982 | 20,800 | 45 | 330 | $41 | $85 |
| 1983 | 15,200 | 5 | 253 | $49 | $100 |
| 1984 | 12,400 | 7 | 270 | $60 | $118 |
| 1985 | 18,600 | 5 | 240 | $67 | $307 |
| 1986 | 10,700 | 17 | 260 | $60 | $130 |
| 1987 | 12,000 | 25 | 245 | $50 | $99 |
| 1988 | 18,900 | 22 | 260 | $71 | $130 |
| 1989 | 18,000 | 8 | 262 | $64 | $104 |
| 1990 | 18,300 | 24 | 200 | $83 | $128 |
| 1991 | 18,600 | 10 | 338 | $96 | $142 |
| 1992 | 19,500 | 8 | 409 | $78 | $112 |
| 1993 | 19,000 | 8 | 406 | $87 | $127 |
| 1994 | 20,300 | 6 | 400 | $91 | $124 |
| 1995 | 20,300 | 27 | 366 | $104 | $137 |
| 1996 | 20,400 | 31 | 370 | $126 | $150 |
| 1997 | 20,500 | 36 | 420 | $128 | $161 |
| 1998 | 19,500 | 23 | 440 | $100 | $121 |
| 1999 | 19,300 (16,300) | 6 (0) | 160 (100) | $113 ($112) | $136 ($135) |
| 2000 | 15,900 (15,200) | 0 (0) | 440 (446) | $175 ($174) | $203 ($204) |
| 2001 | 18,200 (16,900) | 31 (31) | 320 (320) | $158 ($158) | $171 ($171) |
| 2002 | 18,600 (17,100) | 50 (50) | 450 (450) | $180 ($179) | $202 ($204) |
| 2003 | 17,100 (15,400) | 18 (18) | 460 (470) | $254 ($254) | $259 ($259) |
| 2004 | 16,500 (15,400) | 52 (52) | 460 (460) | $171 ($171) | $183 ($187) |
| 2005 | 15,800 (14,600) | 14 (14) | 440 (440) | $205 ($206) | $213 ($213) |
| 2006 | 17,700 (16,400) | 15 (15) | 360 (360) | $184 ($184) | $194 ($194) |

Note: Figures in parentheses exclude confined fires, which are fires reported as confined to fuel burner or boiler, chimney or flue, cooking vessel, trash, incinerator, or commercial compactor. There are fires reported to U.S. municipal fire departments and so exclude fires reported only to Federal or state agencies or industrial fire brigades. Fire and casualty are projections. Fires are rounded to the nearest hundred, civilian deaths are expressed in the nearest one, civilian injuries are rounded down to the nearest ten, and dollar loss to the nearest million. Fires, deaths, and injuries are rounded more so little than they are where the report, civilian otherwise, most of the and the shown would have finer significant places, and that would suggest an unreasonable high degree of precision. Figures reflect a proportional share of fires with equipment involved in ignition unknown. Fires reported as "no equipment" but lacking a confirming specific item source (codes 60-99) are also treated as unknown equipment and allocated. Because of fire participation in NFIRS Version 5.0 during 1999-2002, estimates for those years are highly uncertain and need to be used with caution. Inflation adjustments to 2004 dollars is done using the consumer price index.

Source: Data from NFIRS Version 4.1 (1980-1998) and Version 5.0 (1999-2006) and from NFPA survey.

Home Fires Involving Clothes Dryers
And Washing Machines, 3/09

7

NFPA Fire Analysis & Research, Quincy, MA

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073942

---

Table 2. Home Fires Involving Washers or Dryers, by Factor Contributing to Ignition
Annual Average of 2003-2006 Structure Fires Reported to U.S. Fire Departments
(Excluding Fires Reported as Confined Fires)

A. Clothes Dryers and Washing Machines

| Factor | Fires | | Civilian Deaths | | Civilian Injuries | | Direct Property Damage (in Millions) |
|--------|-------|---|-----------------|---|-------------------|---|---------------------------------------|
| Failure to clean | 4,450 (25%) | | 9 (15%) | | 91 (21%) | | $97 (21%) |
| Unclassified mechanical failure or malfunction | 3,640 (24%) | | 4 (22%) | | 116 (22%) | | $49 (24%) |
| Unclassified electrical failure or malfunction | 1,350 (8%) | | 0 (0%) | | 15 (4%) | | $30 (15%) |
| Unspecified short-circuit arc | 780 (5%) | | 0 (0%) | | 35 (8%) | | $30 (5%) |
| Heat source too close to combustibles | 770 (5%) | | 0 (0%) | | 24 (6%) | | $15 (7%) |
| Worn out | 710 (5%) | | 0 (0%) | | 14 (2%) | | $5 (1%) |
| Unclassified operational deficiency | 560 (4%) | | 4 (24%) | | 29 (7%) | | $12 (6%) |
| Automatic control failure | 530 (2%) | | 0 (0%) | | 8 (2%) | | $9 (4%) |
| Equipment overloaded | 520 (3%) | | 0 (0%) | | 16 (4%) | | $13 (6%) |
| Unclassified factor contributed to ignition | 510 (3%) | | 3 (18%) | | 17 (4%) | | $6 (5%) |
| Installation deficiency | 480 (3%) | | 0 (0%) | | 13 (3%) | | $10 (5%) |
| Equipment overloaded | 430 (3%) | | 0 (0%) | | 3 (1%) | | $3 (2%) |
| Unclassified misuse of material | 340 (2%) | | 0 (0%) | | 14 (3%) | | $2 (1%) |
| Equipment not being operated properly | 320 (2%) | | 0 (0%) | | 15 (4%) | | $5 (3%) |
| Short circuit arc from defective or worn insulation | 230 (2%) | | 0 (0%) | | 15 (3%) | | $3 (1%) |
| Arc or spark from operating equipment | 220 (1%) | | 0 (0%) | | 10 (2%) | | $4 (2%) |
| Leak or break | 180 (1%) | | 0 (0%) | | 3 (1%) | | $1 (1%) |
| Short circuit arc from mechanical damage | 140 (1%) | | 0 (0%) | | 3 (1%) | | $3 (2%) |
| Abandoned or discarded material | 150 (1%) | | 0 (0%) | | 3 (1%) | | $6 (4%) |
| Arc from faulty contact or broken conductor | 90 (1%) | | 0 (0%) | | 0 (0%) | | $2 (1%) |
| Design deficiency | 90 (1%) | | 0 (0%) | | 0 (0%) | | $1 (0%) |
| Other known factor contributing to ignition | 360 (2%) | | 0 (0%) | | 35 (8%) | | $8 (4%) |
| Total fires | 15,100 (100%) | | 16 (100%) | | 413 (100%) | | $201 (100%) |
| Total factor entries | 16,580 (108%) | | 17 (124%) | | 484 (117%) | | $233 (115%) |

Home Fires Involving Clothes Dryers
And Washing Machines, 3/09

8

NFPA Fire Analysis & Research, Quincy, MA

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073943

---

Table 1. Home Fires Involving Washers or Dryers, by Factor Contributing to Ignition (Continued)
Annual Average of 2002-2006 Structure Fires Reported to U.S. Fire Departments
(Excluding Fires Reported as Confined Fires)

B. Clothes Dryers

| Vector | Fires | | Civilian Deaths | | Civilian Injuries | | Direct Property Damage (in Millions) |
|--------|-------|---|-----------------|---|-------------------|---|---------------------------------------|
| Failure to clean | 4,320 (31%) | | 9 (25%) | | 91 (27%) | | $45 (24%) |
| Unclassified mechanical failure or malfunction | 3,340 (23%) | | 3 (26%) | | 112 (22%) | | $46 (24%) |
| Unclassified electrical failure or malfunction | 990 (7%) | | 0 (0%) | | 9 (3%) | | $19 (10%) |
| Heat source too close to combustibles | 720 (5%) | | 0 (0%) | | 23 (6%) | | $13 (7%) |
| Unspecified short circuit arc | 630 (4%) | | 0 (0%) | | 30 (8%) | | $10 (5%) |
| Worn out | 590 (4%) | | 0 (0%) | | 7 (2%) | | $3 (2%) |
| Unclassified operational deficiency | 570 (4%) | | 4 (24%) | | 26 (7%) | | $12 (6%) |
| Automatic control failure | 490 (3%) | | 0 (0%) | | 8 (2%) | | $7 (4%) |
| Equipment overloaded | 480 (3%) | | 0 (0%) | | 16 (4%) | | $9 (5%) |
| Installation deficiency | 470 (3%) | | 0 (0%) | | 10 (3%) | | $10 (5%) |
| Unclassified factor contributed to ignition | 400 (3%) | | 3 (19%) | | 17 (4%) | | $6 (3%) |
| Equipment overloaded | 370 (3%) | | 0 (0%) | | 4 (1%) | | $3 (2%) |
| Unclassified misuse of material | 320 (2%) | | 0 (0%) | | 12 (3%) | | $2 (1%) |
| Equipment not being operated properly | 300 (2%) | | 0 (0%) | | 16 (4%) | | $5 (3%) |
| Short circuit arc from defective or worn insulation | 210 (2%) | | 0 (0%) | | 12 (3%) | | $3 (1%) |
| Arc or spark from operating equipment | 190 (1%) | | 0 (0%) | | 6 (2%) | | $4 (2%) |
| Leak or break | 160 (1%) | | 0 (0%) | | 6 (1%) | | $1 (1%) |
| Short circuit arc from mechanical damage | 120 (1%) | | 0 (0%) | | 4 (1%) | | $3 (2%) |
| Abandoned or discarded material | 110 (1%) | | 0 (0%) | | 3 (1%) | | $7 (4%) |
| Design deficiency | 80 (1%) | | 0 (0%) | | 0 (0%) | | $1 (0%) |
| Arc from faulty contact or broken conductor | 70 (1%) | | 0 (0%) | | 0 (0%) | | $1 (1%) |
| Other known factor contributing to ignition | 320 (2%) | | 0 (0%) | | 36 (9%) | | $8 (4%) |
| Total fires | 14,220 (100%) | | 16 (100%) | | 406 (100%) | | $190 (100%) |
| Total factor entries | 15,580 (108%) | | 20 (124%) | | 452 (113%) | | $219 (115%) |

Home Fires Involving Clothes Dryers
And Washing Machines, 3/09

9

NFPA Fire Analysis & Research, Quincy, MA

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073944

---

Table 2. Home Fires Involving Washers or Dryers, by Factor Contributing to Ignition (Continued)
Annual Average of 2003-2006 Structure Fires Reported to U.S. Fire Departments
(Excluding Fires Reported as Confined Fires)

C. Washing Machines

| Factor | Fires | | Civilian Deaths | | Civilian Injuries | | Direct Property Damage (in Millions) |
|--------|-------|---|-----------------|---|-------------------|---|---------------------------------------|
| Unclassified mechanical failure or malfunction | 300 (29%) | | 0 (NA) | | 2 (44%) | | $2 (33%) |
| Unspecified short-circuit arc | 140 (21%) | | 0 (NA) | | 4 (21%) | | $1 (19%) |
| Unclassified electrical failure or malfunction | 100 (15%) | | 0 (NA) | | 2 (11%) | | $1 (13%) |
| Worn out | 100 (14%) | | 0 (NA) | | 3 (13%) | | $0 (6%) |
| Other known factor contributing to ignition | 580 (25%) | | 0 (NA) | | 7 (39%) | | $3 (28%) |
| Total fires | 680 (100%) | | 0 (NA) | | 17 (100%) | | $6 (100%) |
| Total factor entries | 710 (117%) | | 0 (NA) | | 17 (100%) | | $7 (120%) |

NA - Not applicable because total is zero.

D. Combination Washer-Dryers

| Factor | Fires | | Civilian Deaths | | Civilian Injuries | | Direct Property Damage (in Millions) |
|--------|-------|---|-----------------|---|-------------------|---|---------------------------------------|
| Unclassified mechanical failure or malfunction | 140 (26%) | | 0 (NA) | | 4 (23%) | | $1 (25%) |
| Failure to clean | 120 (22%) | | 0 (NA) | | 4 (24%) | | $1 (11%) |
| Unclassified electrical failure or malfunction | 60 (11%) | | 0 (NA) | | 6 (1%) | | $0 (2%) |
| Other known factor contributing to ignition | 200 (47%) | | 0 (NA) | | 4 (24%) | | $5 (88%) |
| Total fires | 560 (100%) | | 0 (NA) | | 16 (100%) | | $6 (100%) |
| Total factor entries | 580 (106%) | | 0 (NA) | | 16 (100%) | | $7 (125%) |

NA - Not applicable because total is zero.

Note: Multiple entries are allowed, resulting in more factor entries than fires. Figures exclude confined fires, which are fires reported as confined to fuel burner or boiler, chimney or flue, cooking vessel, trash, incinerator, or commercial compactor. These are municipal estimates of fires reported to U.S. municipal fire departments and so exclude fires reported only to Federal or state agencies or industrial fire brigades. National estimates are projections. Casualty and loss projections can be heavily influenced by the inclusion or exclusion of one unusually serious fire. Fires are rounded to the nearest ten, civilian deaths and injuries to the nearest one, and direct property damage to the nearest million. Fires are shown with unknown data allocated when factor contributing to ignition is unknown. Fires reported as "no equipment" but lacking a confirming specific item source (codes 60-99) are also treated as unknown equipment and allocated. Fires with this equipment and factor contributing to ignition unknown, unreported, none, or blank have also been allocated proportionally. Totals may not equal sums because of rounding error.

Source: Data from NFIRS Version 5.0 and NFPA survey.

Home Fires Involving Clothes Dryers
And Washing Machines, 3/09

10

NFPA Fire Analysis & Research, Quincy, MA

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073945

Table 3. Home Fires Involving Washers or Dryers, by Item First Ignited
Annual Average of 2003-2006 Structure Fires Reported to U.S. Fire Departments
(Excluding Fires Reported as Confined Fires)

A. Clothes Dryers and Washing Machines

| Item First Ignited | Fires | | Civilian Deaths | | Civilian Injuries | | Direct Property Damage (in Millions) | |
|---|---|---|---|---|---|---|---|---|
| Clothing | 4,370 | (28%) | 4 | (22%) | 165 | (38%) | $60 | (30%) |
| Dust, fiber, or lint | 4,020 | (26%) | 3 | (21%) | 70 | (17%) | $18 | (10%) |
| Unclassified soft goods or clothing | 1,490 | (10%) | 2 | (10%) | 50 | (12%) | $23 | (16%) |
| Appliance housing or casing | 1,160 | (8%) | 4 | (24%) | 12 | (3%) | $24 | (12%) |
| Wire or cable insulation | 1,100 | (7%) | 0 | (0%) | 18 | (5%) | $12 | (6%) |
| Linen other than bedding | 680 | (4%) | 0 | (0%) | 15 | (3%) | $4 | (2%) |
| Unclassified item first ignited | 500 | (3%) | 0 | (0%) | 5 | (1%) | $3 | (1%) |
| Mattress or bedding | 390 | (3%) | 0 | (0%) | 5 | (1%) | $7 | (3%) |
| Interior wall covering | 260 | (2%) | 3 | (19%) | 3 | (1%) | $17 | (9%) |
| Drive belt | 220 | (1%) | 0 | (0%) | 6 | (1%) | $0 | (0%) |
| Flammable or combustible gas or liquid | 150 | (1%) | 0 | (0%) | 32 | (7%) | $2 | (1%) |
| Pipe, duct, conduit or hose | 120 | (1%) | 6 | (0%) | 0 | (0%) | $1 | (0%) |
| Multiple item first ignited | 130 | (1%) | 0 | (0%) | 7 | (2%) | $2 | (1%) |
| Structural member or framing | 90 | (1%) | 0 | (0%) | 0 | (0%) | $6 | (3%) |
| Goods not made up, including fabrics and yard goods | 90 | (1%) | 0 | (0%) | 2 | (1%) | $0 | (0%) |
| Other known item first ignited | 580 | (4%) | 0 | (0%) | 22 | (5%) | $12 | (6%) |
| **Total** | **15,350** | **(100%)** | **16** | **(100%)** | **413** | **(100%)** | **$201** | **(100%)** |

B. Clothes Dryers

| Item First Ignited | Fires | | Civilian Deaths | | Civilian Injuries | | Direct Property Damage (in Millions) | |
|---|---|---|---|---|---|---|---|---|
| Clothing | 4,240 | (30%) | 4 | (26%) | 165 | (41%) | $58 | (31%) |
| Dust, fiber, or lint | 3,890 | (27%) | 3 | (21%) | 66 | (16%) | $17 | (10%) |
| Unclassified soft goods or clothing | 1,420 | (10%) | 0 | (0%) | 50 | (11%) | $19 | (10%) |
| Appliance housing or casing | 960 | (7%) | 4 | (24%) | 12 | (3%) | $22 | (12%) |
| Wire or cable insulation | 840 | (6%) | 0 | (0%) | 30 | (8%) | $11 | (6%) |
| Linen other than bedding | 660 | (5%) | 0 | (0%) | 15 | (4%) | $4 | (2%) |
| Unclassified item first ignited | 430 | (3%) | 0 | (0%) | 5 | (1%) | $2 | (1%) |
| Mattress or bedding | 360 | (3%) | 0 | (0%) | 5 | (1%) | $7 | (2%) |
| Interior wall covering | 210 | (2%) | 3 | (19%) | 3 | (1%) | $11 | (6%) |
| Flammable or combustible gas or liquid | 140 | (1%) | 0 | (0%) | 29 | (7%) | $2 | (1%) |
| Pipe, duct, conduit or hose | 120 | (1%) | 6 | (0%) | 0 | (0%) | $1 | (0%) |
| Multiple item first ignited | 110 | (1%) | 0 | (0%) | 3 | (1%) | $1 | (1%) |
| Drive belt | 90 | (1%) | 0 | (0%) | 3 | (1%) | $0 | (0%) |
| Structural member or framing | 80 | (1%) | 0 | (0%) | 0 | (0%) | $4 | (2%) |
| Goods not made up, including fabrics and yard goods | 70 | (1%) | 0 | (0%) | 2 | (1%) | $0 | (0%) |
| Other known item first ignited | 500 | (4%) | 0 | (0%) | 18 | (5%) | $10 | (5%) |
| **Total** | **14,720** | **(100%)** | **12** | **(100%)** | **400** | **(100%)** | **$190** | **(100%)** |

Home Fires Involving Clothes Dryers
And Washing Machines, 2009                    11       NFPA Fire Analysis & Research, Quincy, MA

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                                           EHP LARSON 073946

---

Table 3. Home Fires Involving Washers or Dryers, by Item First Ignited (Continued)
Annual Average of 2003-2006 Structure Fires Reported to U.S. Fire Departments
(Excluding Fires Reported as Confined Fires)

C. Washing Machines

| Item First Ignited | Fires | | Civilian Deaths | | Civilian Injuries | | Direct Property Damage (in Millions) | |
|---|---|---|---|---|---|---|---|---|
| Wire or cable insulation | 250 | (39%) | 0 | (NA) | 4 | (26%) | $1 | (13%) |
| Appliance housing or casing | 140 | (21%) | 0 | (NA) | 0 | (0%) | $2 | (30%) |
| Drive belt | 130 | (13%) | 0 | (NA) | 3 | (15%) | $0 | (2%) |
| Unclassified item first ignited | 60 | (9%) | 0 | (NA) | 2 | (14%) | $0 | (1%) |
| Other known item first ignited | 160 | (23%) | 0 | (NA) | 8 | (40%) | $2 | (34%) |
| **Total** | **640** | **(100%)** | **0** | **(NA)** | **17** | **(100%)** | **$6** | **(100%)** |

NA - Not applicable because total is zero.

D. Combination Washer/Dryers

| Item First Ignited | Fires | | Civilian Deaths | | Civilian Injuries | | Direct Property Damage (in Millions) | |
|---|---|---|---|---|---|---|---|---|
| Dust, fiber, or lint | 130 | (26%) | 0 | (NA) | 8 | (49%) | $1 | (11%) |
| Clothing | 90 | (16%) | 0 | (NA) | 0 | (0%) | $1 | (22%) |
| Wire or cable insulation | 70 | (13%) | 0 | (NA) | 4 | (24%) | $0 | (2%) |
| Appliance housing or casing | 70 | (12%) | 0 | (NA) | 0 | (0%) | $1 | (13%) |
| Other known item first ignited | 190 | (33%) | 0 | (NA) | 4 | (27%) | $3 | (49%) |
| **Total** | **540** | **(100%)** | **0** | **(NA)** | **16** | **(100%)** | **$6** | **(100%)** |

NA - Not applicable because total is zero.

Note: Figures include confined fires, which are data reported as confined to fuel burner or boiler, chimney or flue, cooking vessel, trash, incinerator, or commercial compactor. These are national estimates of fires reported to U.S. municipal fire departments and so exclude fires reported only to Federal or state agencies or industrial fire brigades. Federal estimates are projections. Casualty and loss projections can be heavily influenced by the inclusion or exclusion of one unusually serious fire. Fires are rounded to the nearest ten, civilian deaths and injuries to the nearest one, and direct property damage to the nearest million dollars. Damage has not been adjusted for inflation. Figures reflect a proportional share of fires with inadequate incident or ignition unknown. Fires reported as "no equipment" but having a confirming specific heat source and/or fires that are treated as unknown equipment and allocated. Fires with this uncertainty and item first ignited unknown have also been allocated proportionately. Totals may not equal sums because of rounding error.

Source: Data from NFIRS Version 5.0 and NFPA survey.

Home Fires Involving Clothes Dryers
And Washing Machines, 2009                    12       NFPA Fire Analysis & Research, Quincy, MA

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                                           EHP LARSON 073947

---

Table 4. Home Fires Involving Washers or Dryers, by Area of Origin
Annual Average of 2003-2006 Structure Fires Reported to U.S. Fire Departments
(Excluding Fires Reported as Confined Fires)

A. Clothes Dryers and Washing Machines

| Area of Origin | Fires | | Civilian Deaths | | Civilian Injuries | | Direct Property Damage (in Millions) | |
|---|---|---|---|---|---|---|---|---|
| Laundry room or area | 12,530 | (81%) | 3 | (21%) | 379 | (88%) | $160 | (79%) |
| Garage* | 420 | (3%) | 0 | (0%) | 4 | (1%) | $11 | (6%) |
| Crawl space or substructure space | 360 | (2%) | 4 | (26%) | 14 | (4%) | $4 | (2%) |
| Kitchen | 350 | (2%) | 4 | (24%) | 10 | (2%) | $5 | (2%) |
| Unclassified equipment or service area | 200 | (2%) | 0 | (0%) | 7 | (2%) | $3 | (1%) |
| Laundry or small chute | 140 | (1%) | 0 | (0%) | 3 | (1%) | $1 | (1%) |
| Bathroom | 140 | (1%) | 0 | (0%) | 7 | (2%) | $1 | (1%) |
| Unclassified area of origin | 110 | (1%) | 0 | (0%) | 3 | (1%) | $2 | (1%) |
| Unclassified storage area | 110 | (1%) | 0 | (0%) | 2 | (1%) | $2 | (1%) |
| Bedroom for sleeping area | 110 | (1%) | 0 | (0%) | 2 | (1%) | $3 | (1%) |
| Unclassified structural area | 100 | (1%) | 0 | (0%) | 3 | (1%) | $2 | (1%) |
| Closet | 100 | (1%) | 0 | (0%) | 3 | (1%) | $0 | (2%) |
| Duct | 90 | (1%) | 0 | (0%) | 0 | (0%) | $1 | (0%) |
| Other known area of origin | 550 | (4%) | 3 | (21%)** | 3 | (1%) | $11 | (6%) |
| **Total** | **15,350** | **(100%)** | **16** | **(100%)** | **413** | **(100%)** | **$201** | **(100%)** |

* Includes residential garages and attached carports.
** The leading area of origin for the deaths and a does above is not from that functions area (8% of fire deaths).

B. Clothes Dryers

| Area of Origin | Fires | | Civilian Deaths | | Civilian Injuries | | Direct Property Damage (in Millions) | |
|---|---|---|---|---|---|---|---|---|
| Laundry room or area | 11,500 | (81%) | 3 | (21%) | 351 | (88%) | $150 | (79%) |
| Garage* | 400 | (3%) | 0 | (0%) | 4 | (1%) | $11 | (6%) |
| Crawl space or substructure space | 350 | (2%) | 4 | (26%) | 14 | (3%) | $4 | (2%) |
| Kitchen | 310 | (2%) | 4 | (24%) | 10 | (3%) | $5 | (2%) |
| Unclassified equipment or service area | 200 | (2%) | 0 | (0%) | 7 | (2%) | $3 | (1%) |
| Laundry or trash chute | 170 | (1%) | 0 | (0%) | 3 | (1%) | $1 | (1%) |
| Bedroom | 130 | (1%) | 0 | (0%) | 2 | (1%) | $3 | (1%) |
| Heating equipment room | 100 | (1%) | 0 | (0%) | 3 | (1%) | $1 | (1%) |
| Unclassified storage area | 100 | (1%) | 0 | (0%) | 2 | (1%) | $2 | (1%) |
| Unclassified area of origin | 90 | (1%) | 0 | (0%) | 3 | (1%) | $1 | (0%) |
| Unclassified structural area | 90 | (1%) | 0 | (0%) | 3 | (1%) | $1 | (1%) |
| Closet | 90 | (1%) | 0 | (0%) | 2 | (1%) | $0 | (0%) |
| Duct | 90 | (1%) | 0 | (0%) | 0 | (0%) | $1 | (0%) |
| Other known area of origin | 510 | (4%) | 3 | (19%)** | 0 | (0%) | $11 | (0%) |
| **Total** | **14,120** | **(100%)** | **16** | **(100%)** | **400** | **(100%)** | **$190** | **(100%)** |

† Excluding residential garages coded as separate property.
** The leading area of origin for the deaths and a noted above is not from that functions area (18% of fire deaths).

Home Fires Involving Clothes Dryers
And Washing Machines, 2009                    13       NFPA Fire Analysis & Research, Quincy, MA

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                                           EHP LARSON 073948

---

Table 4. Home Fires Involving Washers or Dryers, by Area of Origin (Continued)
Annual Average of 2003-2006 Structure Fires Reported to U.S. Fire Departments
(Excluding Fires Reported as Confined Fires)

C. Washing Machines

| Area of Origin | Fires | | Civilian Deaths | | Civilian Injuries | | Direct Property Damage (in Millions) | |
|---|---|---|---|---|---|---|---|---|
| Laundry room or area | 500 | (84%) | 0 | (NA) | 17 | (95%) | $5 | (91%) |
| Other known area of origin | 110 | (16%) | 0 | (NA) | 0 | (5%) | $1 | (9%) |
| **Total** | **630** | **(100%)** | **0** | **(NA)** | **17** | **(100%)** | **$6** | **(100%)** |

NA - Not applicable because total is zero.

D. Combination Washer/Dryers

| Area of Origin | Fires | | Civilian Deaths | | Civilian Injuries | | Direct Property Damage (in Millions) | |
|---|---|---|---|---|---|---|---|---|
| Laundry room or area | 430 | (78%) | 0 | (NA) | 11 | (71%) | $5 | (85%) |
| Other known area of origin | 120 | (22%) | 0 | (NA) | 5 | (29%) | $1 | (15%) |
| **Total** | **240** | **(100%)** | **0** | **(NA)** | **16** | **(100%)** | **$6** | **(100%)** |

NA - Not applicable because total is zero.

Note: Figures include confined fires, which are data reported as confined to fuel burner or boiler, chimney or flue, cooking vessel, trash, incinerator, or commercial compactor. These are national estimates of fires reported to U.S. municipal fire departments and so exclude fires reported only to Federal or state agencies or industrial fire brigades. Federal estimates are projections. Casualty and loss projections can be heavily influenced by the inclusion or exclusion of one unusually serious fire. Fires are rounded to the nearest ten, civilian deaths and injuries to the nearest one, and direct property damage to the nearest million dollars. Damage has not been adjusted for inflation. Figures reflect a proportional share of fires with equipment involved in ignition unknown. Fires reported as "no equipment" but having a confirming specific heat source (code 40-69) are also treated as unknown equipment and allocated. Fires with this uncertainty and area of origin unknown have also been allocated proportionately. Totals may not equal sums because of rounding error.

Source: Data from NFIRS Version 5.0 and NFPA survey.

Home Fires Involving Clothes Dryers
And Washing Machines, 2009                    14       NFPA Fire Analysis & Research, Quincy, MA

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                                           EHP LARSON 073949

## Appendix A.
### How National Estimates Statistics Are Calculated

The statistics in this analysis are estimates derived from the U.S. Fire Administration's (USFA's) National Fire Incident Reporting System (NFIRS) and the National Fire Protection Association's (NFPA's) annual survey of U.S. fire departments. NFIRS is a voluntary system by which participating fire departments report detailed factors about the fires to which they respond. Roughly two-thirds of U.S. fire departments participate, although not all of these departments provide data every year. Fires reported to federal or state fire departments or industrial fire brigades are not included in these estimates.

NFIRS provides the most detailed incident information of any national database not limited to large fires. NFIRS is the only database capable of addressing national patterns for fires of all sizes by specific property use and specific fire cause. NFIRS also captures information on the extent of flame spread, and automatic detection and suppression equipment. For more information about NFIRS visit http://www.nfirs.fema.gov/. Copies of the paper forms may be downloaded from http://www.nfirs.fema.gov/documentation/design/NFIRS_Paper_Forms_2008.pdf.

NFIRS has a wide variety of data elements and code choices. The NFIRS database contains coded information. Many code choices describe several conditions. These cannot be broken down further. For example, area of origin code 83 captures fires starting in vehicle engine areas, running gear areas or wheel areas. It is impossible to tell the portion of each from the coded data.

**Methodology may change slightly from year to year.**
NFPA is continually examining its methodology to provide the best possible answers to specific questions, methodological and definitional changes can occur. *Earlier editions of the same report may have used different methodologies to produce the same analysis, meaning that the estimates are not directly comparable from year to year.*

**NFPA's fire department experience survey provides estimates of the big picture.**
Each year, NFPA conducts an annual survey of fire departments which enables us to capture a summary of fire department experience on a larger scale. Surveys are sent to all municipal departments protecting populations of 50,000 or more and a random sample, stratified by community size, of the smaller departments. Typically, a total of roughly 3,000 surveys are returned, representing about one of every ten U.S. municipal fire departments and about one-third of the U.S. population.

The survey is stratified by size of population protected to reduce the uncertainty of the final estimate. Small rural communities have fewer people protected per department and are less likely to respond to the survey. A larger number must be

surveyed to obtain an adequate sample of those departments. (NFPA also makes follow-up calls to a sample of the smaller fire departments that do not respond, to confirm that those that did respond are truly representative of fire departments their size.) On the other hand, large city departments are so few in number and protect such a large proportion of the total U.S. population that it makes sense to survey all of them. Most respond, resulting in excellent precision for their part of the final estimate.

The survey includes the following information: (1) the total number of fire incidents, civilian deaths, and civilian injuries, and the total estimated property damage (in dollars), for each of the major property use classes defined in NFIRS; (2) the number of on-duty firefighter injuries, by type of duty and nature of illness; (3) the number and nature of non-fire incidents; and (4) information on the type of community protected (e.g., county versus township versus city) and the size of the population protected, which is used in the statistical formula for projecting national totals from sample results. The results of the survey are published in the annual report *Fire Loss in the United States*. To download a free copy of the report, visit http://www.nfpa.org/assets/files/PDF/OS.fireloss.pdf.

**Projecting NFIRS to National Estimates**
As noted, NFIRS is a voluntary system. Different states and jurisdictions have different reporting requirements and practices. Participation rates in NFIRS are not necessarily uniform across regions and community sizes, both factors correlated with frequency and severity of fires. This means NFIRS may be susceptible to systematic biases. No one at present can quantify the size of these deviations from the ideal, representative sample, so no one can say with confidence that they are or are not serious problems. But there is enough reason, for concern so that a second database – the NFPA survey – is needed to project NFIRS to national estimates and to project different parts of NFIRS separately. This multiple calibration approach makes use of the annual NFPA survey where its statistical design advantages are strongest.

Scaling ratios are obtained by comparing NFPA's projected totals of residential structure fires, non-residential structure fires, vehicle fires, and outside and other fires, and associated civilian deaths, civilian injuries, and direct property damage with comparable totals in NFIRS. Estimates of specific fire problems and circumstances are obtained by multiplying the NFIRS data by the scaling ratios. Reports for incidents in which mutual aid was given are excluded NFPA's analyses.

Analyses at the NFPA, the USFA and the Consumer Product Safety Commission developed the specific basic analytical rules used for this procedure. "The National Estimates Approach to U.S. Fire Statistics," by John R. Hall, Jr. and Beatrice Harwood, provides a more detailed explanation of national estimates. A copy of the article is available online at http://www.nfpa.org/osds or through NFPA's One-Stop Data Shop.

*Home Fires Involving Clothes Dryers And Washing Machines, 3/09*    15    NFPA Fire Analysis & Research, Quincy, MA

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                                    EHP LARSON 073950

*Home Fires Involving Clothes Dryers And Washing Machines, 3/09*    16    NFPA Fire Analysis & Research, Quincy, MA

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                                    EHP LARSON 073951

Version 5.0 of NFIRS, first introduced in 1999, used a different coding structure for many data elements, added some property use codes, and dropped others. The essentials of the approach described by Hall and Harwood are still used, but some modifications have been necessary to accommodate the changes in NFIRS 5.0.

Figure 1 shows the percentage of fires originally collected in the NFIRS 5.0 system. Each year's release version of NFIRS data also includes data collected in older versions of NFIRS that were converted to NFIRS 5.0 codes.

**Figure 1. Fires Originally Collected in NFIRS 5.0 by Year**



For 2002 data on, analyses are based on scaling ratios using only data originally collected in NFIRS 5.0.

### NFPA survey projections
### NFIRS totals (Version 5.0)

For 1999 to 2001, the same rules may be applied, but estimates for those years in this form will be less reliable due to the smaller amount of data originally collected in NFIRS 5.0; they should be viewed with extreme caution.

NFIRS 5.0 introduced six categories of confined structure fires, including:
- cooking fires confined to the cooking vessel,
- confined chimney or flue fires,
- confined incinerator fire,
- confined fuel burner or boiler fire or delayed ignition,
- confined commercial compactor fire, and
- trash or rubbish fires in a structure with no flame damage to the structure or its contents.

Although causal and other detailed information is typically not required for these incidents, it is provided in some cases (typically 10-20%). Some analyses, particularly

those that examine cooking equipment, heating equipment, fires caused by smoking materials, and fires started by playing with fire, may examine the confined fires in greater detail. Because the confined fire incident types describe certain scenarios, the distribution of unknown data differs from that of all fires. Consequently, allocation of unknowns must be done separately.

Some analyses of structure fires show only non-confined fires. In these tables, no category shown are of non-confined structure fires rather than all structure fires. This approach has the advantage of showing the frequency of specific factors in fire causes, but the disadvantage of possibly overstating the percentage of factors that are seldom seen in the confined fire incident types.

Other analyses include entries for confined fire incident types in the causal tables and show percentages based on total structure fires. In these cases, the confined fire incident type is treated as a general casual factor.

For most fields other than Property Use, NFPA allocates unknown data proportionally among known data. This approach assumes that if the missing data were known, it would be distributed in the same manner as the known data. NFPA makes additional adjustments to several fields. *Casualty and loss projections can be heavily influenced by the inclusion or exclusion of unusually serious fires.*

*In the formulas that follow, the term "all fires" refers to all fires in NFIRS on the dimension studied.*

**Factor Contributing to Ignition:** In this field, the code "none" is treated as an unknown and allocated proportionally. For Human Factor Contributing to Ignition, NFPA enters a code for "not reported" when no factors are recorded. "Not reported" is treated as an unknown, but the code "none" is treated as a known code and not allocated. Multiple entries are allowed in both of these fields. Percentages are calculated so the total number of fires, not entries, resulting in sums greater than 100%. Although Factor Contributing to Ignition is only required when the cause of ignition was coded as: 2) unintentional, 3) failure of equipment or heat source; or 4) act of nature, data is often present when not required. Consequently, any fire in which no factor contributing to ignition was entered was treated as unknown.

In some analyses, all entries in the category of electrical failure or malfunction (factor contributing to ignition 30-39) are combined and shown as "electrical failure or malfunction." This category includes:

31. Water-caused short circuit arc;
32. Short-circuit arc from mechanical damage;
33. Short-circuit arc from defective or worn insulation;
34. Unspecified short circuit arc;
35. Arc from faulty contact or broken connector, including broken power lines and

*Home Fires Involving Clothes Dryers And Washing Machines, 3/09*    17    NFPA Fire Analysis & Research, Quincy, MA

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                                    EHP LARSON 073952

*Home Fires Involving Clothes Dryers And Washing Machines, 3/09*    18    NFPA Fire Analysis & Research, Quincy, MA

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER                                    EHP LARSON 073953

loose connections;
36. Arc or spark from operating equipment, switch, or electric fence;
37. Fluorescent light ballast; and
38. Electrical failure or malfunction, other.

**Type of Material First Ignited (TMI).** This field is required only if the Item First Ignited falls within the code range of 60-69. NFPA has created a new code "not required" for this field that is applied when Item First Ignited is in code 70-99 (organic materials, including cooking materials and vegetation, and general materials, such as electrical wire, cable insulation, transformers, tires, books, newspaper, dust, rubbish, etc.) and TMI is blank. The rule for allocation of unknown data is:

(All fires – TMI Not required)
(All fires – TMI Not Required – Undetermined – Black)

**Heat Source.** In NFIRS 5.0, one grouping of codes encompasses various types of open flames and smoking materials. In the past, these had been two separate groupings. A new code was added to NFIRS 5.0, which is code 69: "Heat from open flame or smoking material, other." NFPA treats this code as a partial unknown and allocates it proportionally across the codes in the 61-69 range, shown below.

61. Cigarette;
62. Pipe or cigar;
63. Heat from undetermined smoking material;
64. Match;
65. Lighter: cigarette lighter, cigar lighter;
66. Candle;
67 Warning or road flare, fuse;
68. Backfire from internal combustion engine. Excludes flames and sparks from an exhaust system, (11); and
69. Flame/torch used for lighting. Includes gas light and gas-liquid-fueled lantern.

In addition to the conventional allocation of missing and undetermined data, NFPA multiplies fires with codes in the 61-69 range by

All fires in range 60-69
All fires in range 61-69

The downside of this approach is that heat sources that are truly a different type of open flame or smoking material are erroneously assigned to other categories. The grouping "smoking materials" includes codes 61-63 (cigarettes, pipes or cigars, and heat from undetermined smoking material, with a proportional share of the code 60s and less unknown data.

**Equipment Involved in Ignition (EII).** NFIRS 5.0 originally defined EII as the piece of

| *Home Fires Involving Clothes Dryers And Washing Machines, 3/09* | 19 | *NFPA Fire Analysis & Research, Quincy, MA* |

equipment that provided the principal heat source to cause ignition if the equipment malfunctioned or was used improperly. In 2006, the definition was modified to be "the piece of equipment that provided the principal heat source to cause ignition." However, much of the data predates the change. Individuals who have already been trained with the older definition may not change their practices. To compensate, NFPA treats fires in which EII = NNN and heat source is not in the range of 40-99 as an additional unknown.

To allocate unknown data for EII, the known data is multiplied by

All fires
(All fires – blank – undetermined – [fires in which EII =NNN and heat source <>40-99])

In addition, the partially unclassified codes for broad equipment groupings (i.e., code 100 – heating, ventilation, and air conditioning, other; code 200 – electrical distribution, lighting and power transfer, other; etc.) were allocated proportionally across the individual code choices in their respective broad groupings (heating, ventilation, and air conditioning; electrical distribution, lighting and power transfer, other; etc.). Equipment that is truly unclassified is not allocated further. This approach as the same downside as the allocation of heat source 69 described above. Equipment that is truly different is erroneously assigned to other categories.

In some analyses, various types of equipment are grouped together. (Confined fire incident types are not discussed here.)

| Code Grouping | EII Code | NFIRS definitions |
|---|---|---|
| Central heat | 132 | Furnace or central heating unit |
| | 133 | Boiler (power, process or heating) |
| Fixed or portable space heater | 131 | Furnace, local heating unit, built-in |
| | 123 | Fireplace with insert or stove |
| | 134 | Heating stove |
| | 141 | Heater, excluding catalytic and oil-filled |
| | 142 | Catalytic heater |
| | 143 | Oil-filled heater |
| Fireplace or chimney | 121 | Fireplace, masonry |
| | 122 | Fireplace, factory-built |
| | 125 | Chimney connector or vent connector |
| | 126 | Chimney – brick, stone or masonry |
| | 127 | Chimney–metal, including stovepipe or flue |
| Wiring, switch or outlet | 210 | Unclassified electrical wiring |
| | 211 | Electrical power or utility line |

| *Home Fires Involving Clothes Dryers And Washing Machines, 3/09* | 20 | *NFPA Fire Analysis & Research, Quincy, MA.* |

| | 212 | Electrical service supply wires from utility |
| | 214 | Wiring from meter box to circuit breaker |
| | 216 | Electrical branch circuit |
| | 217 | Outlet, receptacle |
| | 218 | Wall switch |
| Power switch gear or overcurrent protection device | 215 | Panel board, switch board, circuit breaker board |
| | 219 | Ground fault interrupter |
| | 222 | Overcurrent, disconnect equipment |
| | 227 | Surge protector |
| Lamp, bulb or lighting | 230 | Unclassified lamp or lighting |
| | 231 | Lamp-tabletop, floor or desk |
| | 232 | Lantern or flashlight |
| | 233 | Incandescent lighting fixture |
| | 234 | Fluorescent light fixture or ballast |
| | 235 | Halogen light fixture or lamp |
| | 236 | Sodium or mercury vapor light fixture or lamp |
| | 237 | Work or trouble light |
| | 238 | Light bulb |
| | 241 | Nightlight |
| | 242 | Decorative lights – line voltage |
| | 243 | Decorative or landscape lighting – low voltage |
| | 244 | Sign |
| Cord or plug | 260 | Unclassified cord or plug |
| | 261 | Power cord or plug, detachable from appliance |
| | 262 | Power cord or plug- permanently attached |
| | 263 | Extension cord |
| Torch, burner or soldering iron | 331 | Welding torch |
| | 332 | Cutting torch |
| | 333 | Burner, including Bunsen burners |
| | 334 | Soldering equipment |
| Portable cooking or warming equipment | 631 | Coffee maker or teapot |
| | 632 | Food warmer or hot plate |
| | 633 | Kettle |

| *Home Fires Involving Clothes Dryers And Washing Machines, 3/09* | 21 | *NFPA Fire Analysis & Research, Quincy, MA* |

| | 634 | Popcorn popper |
| | 635 | Pressure cooker or canner |
| | 636 | Slow cooker |
| | 637 | Toaster, toaster oven, counter-top broiler |
| | 638 | Waffle iron, griddle |
| | 639 | Wok, frying pan, skillet |
| | 641 | Breadmaking machine |

**Item First Ignited.** In most analyses, mattress and pillows (item first ignited 31) and bedding, blankets, sheets, and comforters (item first ignited 32) are combined and shown as "mattresses and bedding." In many analyses, wearing apparel not on a person (code 34) and wearing apparel on a person (code 35) are combined and shown as "clothing." In some analyses, flammable and combustible liquids and gases, piping and filters (item first ignited 60-69) are combined and shown together.

**Area of Origin.** Two areas of origin: bedroom for more than five people (code 21) and bedroom for less than five people (code 22) are combined and shown as simply "bedroom."

**Rounding and percentages.** The data shown are estimates and generally rounded. An entry of zero may be a true zero or it may mean that the value rounds to zero. Percentages are calculated from unrounded values. It is quite possible to have a percentage entry of up to 100%, even if the rounded number entry is zero. The same rounded value may account for a slightly different percentage share. Because percentages are expressed in integers and not carried out to several decimal places, percentages that appear identical may be associated with slightly different values.

Inflation. Property damage estimates are not adjusted for inflation unless so indicated.

| *Home Fires Involving Clothes Dryers And Washing Machines, 3/09* | 22 | *NFPA Fire Analysis & Research, Quincy, MA* |



Overheated Clothes Dryers Can Cause Fires, Safety Alert

### US Consumer Product Safety Commission

**Consumer Product Safety Commission**

**Overheated Clothes Dryers Can Cause Fires**

CPSC Document # 5022
Updated June 2003

The U.S. Consumer Product Safety Commission estimates that in 1998, clothes dryers were associated with 15,500 fires, 20 deaths and 370 injuries. Fires can occur when lint builds up in the dryer or in the exhaust duct. Lint can block the flow of air, cause excessive heat build-up, and result in a fire in some dryers.

To help prevent fires:

- Clean the lint screen/filter before or after drying each load of clothes. If clothing is still damp at the end of a typical drying cycle or drying requires longer times than normal, this may be a sign that the lint screen or the exhaust duct is blocked.

- Clean the dryer vent and exhaust duct periodically. Check the outside dryer vent while the dryer is operating to make sure exhaust air is escaping. If it is not, the vent or the exhaust duct may be blocked. To remove a blockage in the exhaust path, it may be necessary to disconnect the exhaust duct from the dryer. Remember to reconnect the ducting to the dryer and outside vent before using the dryer again.

- Clean behind the dryer, where lint can build up. Have a qualified service person clean the interior of the dryer chassis periodically to minimize the amount of lint accumulation. Keep the area around the dryer clean and free of clutter.

- Replace plastic or foil, accordion-type ducting material with rigid or corrugated semi-rigid metal duct. Most manufacturers specify the use of a rigid or corrugated semi-rigid metal duct, which provides maximum airflow. The flexible plastic or foil type duct can more easily trap lint and is more susceptible to kinks or crushing, which can greatly reduce the airflow.

- Take special care when drying clothes that have been soiled with volatile chemicals such as gasoline, cooking oils, cleaning agents, or finishing oils and stains. If possible, wash the clothing more than once to minimize the amount of volatile chemicals on the clothes and, preferably, hang the clothes to dry. If using a dryer, use the lowest heat setting and a drying cycle that has a cool-down period at the end of the cycle. To prevent clothes from igniting after drying, do not leave the dried clothes in the dryer or piled in a laundry basket.





Consumers can obtain this publication and additional publication information from the Publications section of CPSC's web site or by sending your publication request to info@cpsc.gov.

This document is in the public domain. It may be reproduced without change in part or whole by an individual or organization without permission. If it is reproduced, however, the Commission would appreciate knowing how it is used. Write the U.S. Consumer Product Safety Commission, Office of Information and Public Affairs, 4330 East West Highway, Bethesda, MD 20814 or send an e-mail to CPSC's On-line Form.

The U.S. Consumer Product Safety Commission is charged with protecting the public from unreasonable risks of serious injury or death from thousands of types of consumer products under the agency's jurisdiction. The CPSC is committed to protecting consumers and families from products that pose a fire, electrical, chemical, or mechanical hazard. The CPSC's work to ensure the safety of consumer products - such as toys, cribs, power tools, cigarette lighters, and household chemicals - contributed significantly to the decline in the rate of deaths and injuries associated with consumer products over the past 30 years.

To report a dangerous product or a product related injury, call CPSC's hotline at (800) 638-2772 or CPSC's teletypewriter at (301) 595-7263, or visit CPSC's web site at www.cpsc.gov/talk.html. To join a CPSC email subscription list, please go to https://www.cpsc.gov/cpsclist.aspx. Consumers can obtain this release and recall information at CPSC's Web site at www.cpsc.gov.

**Connect with us!** Explore | YouTube | Twitter | Flickr

Consumer Safety | Home | About CPSC | Library | Business

http://www.cpsc.gov/cpscpub/pubs/5022.html [1/7/2010 3:00:07 PM]

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073958

http://www.cpsc.gov/cpscpub/pubs/5022.html [1/7/2010 3:00:07 PM]

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073959

---

32-5034-04

## User's Information Guide

**Gas Furnaces — Non-Condensing**
**Fan Assisted Combustion System**
**Upflow / Horizontal and Downflow / Horizontal**

### ⚠ WARNING

If the information in this manual is not followed exactly, a fire or explosion may result causing property damage, personal injury or loss of life.

— Do not store or use gasoline or other flammable vapors and liquids in the vicinity of this or any other appliance.

— WHAT TO DO IF YOU SMELL GAS
- Do not try to light any appliance.
- Do not touch any electrical switch; do not use any phone in your building.
- Immediately call your gas supplier from a neighbor's phone. Follow the gas supplier's instructions.
- If you cannot reach your gas supplier, call the fire department.

— DO NOT USE THIS UNIT IF ANY PART HAS BEEN UNDER WATER. IMMEDIATELY CALL A QUALIFIED SERVICE TECHNICIAN TO INSPECT THE FURNACE AND TO REPLACE ANY PART OF THE CONTROL SYSTEM AND ANY GAS CONTROL WHICH HAS BEEN UNDERWATER.

### Contents

Dangers, Warnings & Cautions
General Information
To Start the Furnace
Proper Maintenance
The Problem Solver
Regular Dealer Maintenance
Warranty

### ⚠ WARNING

CO NOT USE THE UNIT IF ANY PART HAS BEEN UNDER WATER. IMMEDIATELY CALL A QUALIFIED SERVICE TECHNICIAN TO INSPECT THE FURNACE AND TO RE-PLACE ANY PART OF THE CONTROL SYSTEM AND ANY GAS CONTROL WHICH HAS BEEN UNDERWATER.

**GENERAL INFORMATION**

**User's Information**

### To Start the Furnace



CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073960

CONFIDENTIAL - SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073961

## User's Information



NOTE THE LOCATION OF THE MANUAL GAS SHUT-OFF VALVE FOR YOUR FURNACE. Have your installer or servicer show you the location if you have any questions.



UPFLOW FURNACE Manual Main Gas Valve May be Located on the Left or Right Side

HORIZONTAL FURNACE Manual Gas Shut-off Valve May be Located on the Top or Bottom Side

TOP VIEW OF RIGHT SIDE PIPING

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073962

## User's Information

### Proper Maintenance Reduces Energy Use

A clean filter saves money. When the furnace circulates and filters the air to your home, dust and dirt particles build up on the filter. Excessive accumulation can block the airflow, forcing the unit to work harder to maintain desired temperatures.

And the harder your unit has to work, the more energy it uses. So you pay more any time your system is running with a dirty filter.

**⚠ CAUTION**

Never operate your unit for either heating or cooling with filters removed.

Help ensure top efficiency by cleaning the filter once a month. If you have an upflow furnace, you can wash or change the filter once a month. Clean it thoroughly every month whenever you use it and clean or replace when dust and soot coats often.

Your furnace comes from the factory with a cleanable filter. You can clean the filter with a vacuum, OR you can wash it with a household detergent. Good quality, high velocity filters may be used for replacements in upflow furnaces.



With the new patented filter rack on the upflow models, all cleaning or replacing of filters is quick and easy. Some filters protective packages, perform one of your options.

**FACTORY SUPPLIED UPFLOW FURNACE RETURN AIR FILTERS**

| UPFLOW FURNACE RETURN AIR FILTERS | | | |
|---|---|---|---|
| CABINET WIDTH | QTY | CABINET BOTTOM FILTER | CABINET SIDE FILTER |
| 14-1/2" | 1 | 14" X 20" X 1" | 17-1/2" X 20" X 1" |
| 17-1/2" | 1 | 17" X 20" X 1" | 17-1/2" X 20" X 1" |
| 21" | 1 | 20" X 20" X 1" | 17-1/2" X 20" X 1" |
| 24-1/2" | 1 | 24" X 20" X 1" | 17-1/2" X 20" X 1" |

NOTE – On 5 ton air flow models, if the airflow requirement exceeds 1600 CFM, these models will require filters on both sides; (2) 1 side and the bottom; (2) just the bottom.

Replacing your filter. When replacing your furnace filter, use a high velocity type filter. On upflow furnaces, standard size 1" (thick high) velocity filters will fit into the patented filter rack which will automatically adjust to width to fit. Filters are available from your dealer.

**How to remove your filter.** The upflow furnace blower door has a hinge at the bottom which allows the door to tilt forward for filter servicing or replacement without the door being removed. The furnace filter in the bottom or side configuration can be removed by simply turning the two latches on the blower door 1/4 turn and tilting the door forward.



Blower Door Hinge and Bottom Filter Installation

The blower door may be removed if necessary by lifting the door outward 1 to 2 inches, then pulling up. The door will slide off the hinge pins and be removed. For replacement, simply insert the blower door bottom into the space between the furnace base front and the hinge, then tilt inward and latch.



Typical Upflow Right Side Return Filter Installation

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073963

## User's Information

The filter rack are spring loaded for automatic adjustment to allow standard size, loosely and/or replacement filters. The filter rack itself slides in adjust to the required width needed for bottom or side return. Always insert the cleanable (single edged) silicon seal firm.



FILTER RACK ASSEMBLY



UPFLOW/HORIZONTAL WITH FILTER KIT

The furnace filter may be secured with filter retaining brackets for right side return on smaller furnaces. To replace filters on these furnaces, remove the blower access door, push back to free the filter and clear the filter retaining bracket at the front of the unit. Gently pull the filter out.

After cleaning, replace the filter in the same manner making sure that filter is secured in place in both top and back filter retaining brackets at the unit, then pull the blower access door.

An filters may also be located outside of the furnace using a SIDE FILTER FRAME.

**Upflow/Horizontal Furnace Filters**

The Upflow/Horizontal furnace, when installed horizontally, requires a horizontal filter kit. The filters may be located below the furnace or in the return air duct near the furnace. Check with your dealer for the location of your filters.

An upflow/horizontal furnace in horizontal return air filter application, as shown, features two 14" x 20" x 1" filters on the 14-1/2" wide furnace cabinet or two 20" x 20" x 2 filters on the 17-1/2", 21", and 24-1/2" wide furnace cabinets.



Upflow/Horizontal Furnace Filters

**Downflow Furnace Filters**

Downflow/Horizontal furnaces are factory supplied with 2 standard size permanent type air filters which may be located outside in the furnace or at the return air duct. Check with your dealer for the location of your filters.

A downflow/horizontal furnace vertical return air filter application, as shown, features one 24" x 20" x 1" filters in the 14-1/2" wide furnace cabinet or two 16" x 20" x 1" filters in the 17-1/2", 21", and 24-1/2" wide furnace cabinets.



DOWNFLOW FILTER

| REQUIRED FILTERS – DOWNFLOW | |
|---|---|
| CABINET WIDTH | FILTER QUANTITY & SIZE |
| 14-1/2" | 2 - 14" X 20" X 1" |
| 17-1/2" | 2 - 16" X 20" X 1" |
| 21" | 2 - 16" X 20" X 1" |
| 24-1/2" | 2 - 16" X 20" X 1" |



### The Problem Solver

A furnace is not a household appliance. It is complex and requires professional maintenance and repair.

That's why attempts at "do-it-yourself" repairs on an in-warranty unit may void the remainder of your warranty.

Other than performing the simple maintenance recommended in this manual, you should not attempt to make any adjustments to your furnace. Your dealer will be able to take care of any questions or problems you may have. A periodic inspection of your furnace should be made by a qualified service agency at the start of each heating season.

Keep your furnace looking like new for years. Clean the exterior finish of your furnace with ordinary soap and water. For stubborn grease spots, use a household detergent. Lacquer thinner or other synthetic solvents may damage the finish.

**Save time and money. Before calling for service, check the following:**

| Problem | Possible Trouble | Possible Remedy |
|---|---|---|
| No Heating – Blower does not operate. | 1. Thermostat set incorrectly. | 1. Adjust thermostat. See operating instructions. |
| | 2. Blown fuse or tripped circuit breaker. | 2. Replace or reset protective device or call for service. |
| | 3. Defective component. | 3. Most service is automatic and will continue. If your unit still does not operate call for service. |
| | 4. Burner does not ignite. | 4. Call service. |
| | 5. Main gas line turned off. | 5. Have gas company check. |
| | 6. Blower motor removed or off. | 6. Close vent securely to restore power to blower and gas valve. |
| | 7. Lockout | 7. Turn power on-off-wait twice in 30 seconds. |
| Insufficient Heating – Blower operates continuously | 1. Dirty air filters. | 1. Clean or replace filters. |
| | 2. Blocked supply or return registers. | 2. Make sure registers are open and the obstacles blocking off the air. |
| No Heat – Vent motor is running. | Restricted or plugged furnace Condensate drain. | 1. Remove drain cleanto to condensate trap and clear per code. |
| | | 2. Flush or clean drain blockage. |
| | | 3. Reinstall cleanup. |
| Unusual Noise | | Call your servicer. |

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073964

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER

EHP LARSON 073965

## User's Information

The following warning complies with State of California law, Proposition 65.

⚠ **WARNING**

**THIS PRODUCT CONTAINS FIBERGLASS WOOL INSULATION**

Fiberglass dust and ceramic fibers are believed by the State of California to cause cancer through inhalation. Glasswool fibers may also cause respiratory, skin or eye irritation.

| PRECAUTIONARY MEASURES | FIRST AID MEASURES |
|---|---|
| • Avoid breathing fiberglass dust. | Eye Contact — Flush eyes with water to remove dust. If symptoms persist, seek medical attention. |
| • Use a NIOSH approved dust/mist respirator. | |
| • Avoid contact with the skin or eyes. Wear long-sleeved, loose-fitting clothing, gloves, and eye protection. | Skin Contact — Wash affected areas gently with soap and warm water after handling. |
| • Wash clothes separately from other clothing; rinse washer thoroughly. | |
| • Operations such as sawing, blowing, tear-out, and spraying may generate higher concentrations requiring additional respiratory protection. Use the appropriate NIOSH approved respirator in these situations. | |

⚠ **WARNING**

**CARBON MONOXIDE POISONING HAZARD**

Failure to follow the installation and operation instructions for the venting system's operation could result in carbon monoxide poisoning or death.

### Regular Dealer Maintenance



⚠ **WARNING**

**Hazardous Gases!**

Exposure to fuel substances or by-products of incomplete fuel combustion is believed by the State of California to cause cancer, birth defects, or other reproductive harm.

⚠ **WARNING**

⚠ **WARNING**

---

## User's Information

⚠ **CAUTION**



BURNER
BRACKET

MANIFOLD

MAIN BURNER
ORIFICE (Typical)

⚠ **WARNING**

---

## User's Information

**Limited Warranty
High Efficiency Induced Draft Gas Furnace
UD-C, DD-C, UD-R, DD-R, UD-RV and DD-RV**
(First letter may be preceded by an "A" or "T") (Parts Only)
Models Less Than 20 Tons for Residential Use*

 

11/2002

---

## User's Information

**Limited Warranty
High Efficiency Induced Draft Gas Furnace
UD-C, DD-C, UD-R, DD-R, UD-RV and DD-RV**
(First letter may be preceded by an "A" or "T") (Parts Only)
Models Less Than 20 Tons for Commercial Use*

 

## User's Information

### Notes

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

SF-5331-04                                          11

 

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER                          EHP LARSON 073970

CONFIDENTIAL – SUBJECT
TO PROTECTIVE ORDER                          EHP LARSON 073971